D

MB

2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

**JEFFREY SACKMAN**

Appellant

and

**HER MAJESTY THE QUEEN**

Respondent

---

## RESPONDENT'S MOTION RECORD

---

Teplitsky Colson
Barristers and Solicitors
70 Bond Street, Suite 200
Toronto, Ontario
M5B 1X3

Myles J. Kirvan
Deputy Attorney General of Canada
Department of Justice
Ontario Regional Office
Tax Law Services Section
The Exchange Tower
130 King St. West
Suite 3400, Box 36
Toronto, Ontario
M5X 1K6

Martin Teplitsky, Q.C.
Matthew Sokolsky
Counsel for the Appellant

Jenna Clark/Martin Beaudry
Erin Strashin
Counsel for the Respondent

# INDEX

# INDEX

| TAB | |
|-----|---|
| 1. | Notice of Motion |
| 2. | Affidavit of Laura Alescio |
| | Exhibit A – Artistic's Document for 1999 |
| | Exhibit B – *Artistic Ideas Inc. v Canada (Minister of National Revenue)*, 2008 TCC 452 |
| | Exhibit C – Page 39 of the Transcript of the Examination for Discovery of Jeffery Sackman, December 11, 2006 |
| | Exhibit D – Page 42 of the Transcript of the Examination for Discovery of Jeffery Sackman, December 11, 2006 |
| | Exhibit E – Pages 197 through to 214 of the Transcript of the Examination for Discovery of Jeffery Sackman, January 15, 2007 |
| | Exhibit F – Documents from Ro Gallery |
| | Exhibit G – Pages 161 through to 166 of the Transcript of the Examination for Discovery of Jeffery Sackman, January 15, 2007 |
| | Exhibit H – *Sackman v Canada*, 2008 FCA 177 |
| | Exhibit I – Letter to Joyce Harris of Teplitsky Colson from Laura Alescio of Department of Justice, dated September 7, 2004 |
| | Exhibit J – Letter to Laura Alescio of Department of Justice from Joyce Harris of Teplitsky Colson, dated September 8, 2004 |
| | Exhibit K – Motion Record filed by counsel for Artistic Ideas Inc. which includes a Notice of Motion dated September 1, 2006 and an affidavit sworn by Paul Sloan dated August 31, 2006 |
| | Exhibit L – Transcript of Evidence given by Paul Sloan on November 29, 2006 |
| | Exhibit M – Exhibits to the ommission of Paul Sloan held November 29, 2006 |
| | Exhibit N – Tab 59, 62, 63, 64, 77, 78, 79 and 98 of the Respondent's 2nd Supplementary List of Documents |
| | Exhibit O – Request to Admit together with covering letter, without attachments, both dated August 19, 2010 |
| | Exhibit P – Letter to the Department of Justice from Matthew Sokolsky of Teplitsky Colson dated August 23, 2010 |

Exhibit Q - Letter to Paul Sloan from the Department of Justice dated August 25, 2010

Exhibit R - Letter to Paul Sloan from the Department of Justice dated September 13, 2010, without enclosed transcript

Exhibit S – Letter to Martin Teplitsky of Teplitsky Colson from the Department of Justice dated February 25, 2011

Exhibit T – Letter to the Department of Justice from Martin Teplitsky of Teplitsky Colson dated March 1, 2011

1

2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

### JEFFREY SACKMAN

Appellant

- and -

### HER MAJESTY THE QUEEN

Respondent

## <u>NOTICE OF MOTION</u>

**TAKE NOTICE THAT** the Respondent will make a motion to the Court on October 14, 2011 at 9:30 a.m. or as soon thereafter as counsel may be heard at the Tax Court of Canada, Federal Judicial Centre, 180 Queen Street West, 6th Floor, Toronto, Ontario.

**THE MOTION IS FOR** a Direction

    a)  pursuant to section 119 of the *Tax Court of Canada Rules (General Procedure)* (the "Rules") granting leave to examine Mr. Paul Sloan, in California, USA, before the hearing of this appeal, on oath or affirmation, for the purpose of having his testimony available to be tendered as evidence at the hearing of the appeal; and

    b)  pursuant to sections 112, 119, 120 and 121 of the Rules, providing for

-2-

    i)    the issuance of a commission authorizing the taking of

           evidence before a named commissioner;

    ii)    the appointment of the trial judge as the named

           commissioner; and

    iii)    the issuance of a letter of request directed to the judicial

           authorities of the State of California, USA, for the issuance

           of such process as is necessary to compel Paul Sloan to

           attend and be examined before the commissioner.

**THE GROUNDS FOR THE MOTION ARE:**

1. The Respondent has determined it necessary to call Paul Sloan, a resident of California, as a witness at trial as Mr. Sloan can give evidence about material facts in dispute.

2. The Respondent will be prejudiced if Mr. Sloan's evidence is not made available to the trial judge.

3. Mr. Sloan does not want to travel to Canada for the purpose of testifying at trial.

4. There is no apparent prejudice to the Appellant.

5. This application is made *bona fide* and not for any improper purpose.

6. The Respondent relies on sections 112, 119, 120, 121 and 122 of the Rules.

-3-

**THE FOLLOWING DOCUMENTARY OR OTHER EVIDENCE** may be used at the

hearing of the motion:

1.  the affidavit of Laura Alescio, to be sworn and served in advance of the hearing of

    the motion;

2.  the pleadings and lists of documents filed in this appeal; and

3.  such further and other material as counsel may advise and this Honourable Court

    permit.

**THE ESTIMATED DURATION** of this hearing will be approximately two hours.

DATED at the City of Ottawa, Ontario, this 30th day of May, 2011.

Myles J. Kirvan
Deputy Attorney General of Canada

Per:    Jenna Clark
        Martin Beaudry
        Erin Strashin
        Counsel for the Respondent

        Department of Justice
        Tax Law Services Section
        Bank of Canada Building
        East Tower, 9th Floor
        234 Wellington Street
        Ottawa, Ontario
        K1A 0H8

        Telephone:   (613) 957-4814
        Facsimile:   (613) 941-2293

-4-

**TO:**       Tax Court of Canada
              200 Kent Street
              4th Floor
              Ottawa, Ontario
              K1A 0M1


**AND TO:**   Martin Teplitsky, Q.C.
              Matthew Sokolsky
              Teplitsky Colson
              Barristers and Solicitors
              70 Bond Street, Suite 200
              Toronto, Ontario
              M5B 1X3

2

**2002-4824(IT)G**

**TAX COURT OF CANADA**

BETWEEN:

**JEFFREY SACKMAN**

Appellant

- and -

**HER MAJESTY THE QUEEN**

Respondent

## <u>AFFIDAVIT</u>

I, Laura Alescio, of the City of Toronto, in the Province of Ontario, MAKE OATH AND SAY AS FOLLOWS:

1.     I am employed as a paralegal in the Tax Law Services Section of the Department of Justice in Toronto, Ontario.  I provide paralegal support with respect to this appeal and as such have personal knowledge of the matters hereinafter deposed to, save and except what is stated to be on information and belief, and where so stated, I verily believe them to be true.

2.     This appeal concerns the reassessment of the appellant's 2000 taxation year, wherein the Minister of National Revenue disallowed a tax credit claimed by the appellant in respect of donated art prints.

-2-

3.    I make this affidavit in support of a motion brought by the Attorney General of Canada in the Tax Court of Canada seeking a direction to obtain evidence from Paul Sloan in California, USA through a Commission, and for no other or improper purpose.

4.    The Respondent listed a document from Artistic Expressions, renamed in 1999 as Artistic Ideas ("Artistic").  Attached to this my Affidavit and marked as Exhibit "A" is a true copy of Artistic's document, listed as document 40 on the Respondent's Supplementary List of Documents (Partial Disclosure).

5.    The Tax Court of Canada issued a decision in a G.S.T. appeal, *Artistic Ideas Inc. v Canada (Minister of National Revenue)*, 2008 TCC 452 (the "Artistic appeal"). Attached to this my Affidavit and marked as Exhibit "B" is a true copy of the Reasons for Judgment in the Artistic appeal.

6.    At examination for discovery the appellant agreed that he understood he was appointing Artistic Ideas as his agent for the purposes of carrying out donations of prints to charities in return for charitable donation receipts.  Attached to this my Affidavit and marked as Exhibit "C" is a true copy of an excerpt from the transcript of the Examination for Discovery of Jeffrey Sackman conducted on December 11, 2006, title page 1 and page 39 where this statement was made.

7.    The Appellant stated during examination for discovery that he understood he purchased art from Coleman Fine Arts ("Coleman") and Silver Fine Arts ("Silver").  Attached to this my Affidavit and marked as Exhibit "D" is a true copy of an excerpt from the transcript of the Examination for Discovery of Jeffrey

-3-

Sackman conducted on December 11, 2006, title page 1 and page 42 where this statement was made.

8.   The appellant produced two binders of documents before the examination for discovery of the appellant.  Among these documents were invoices from the Ro Gallery in New York.  Attached to this my Affidavit and marked as Exhibit "E" is a true copy of an excerpt of the transcript of the examination for discovery of Jeffrey Sackman held on January 15, 2007, title page 85 and pages 197 through to 214, where the appellant through his counsel discussed these invoices.   Attached to this my Affidavit and marked as Exhibit "F" is a true copy of several of the documents produced by the appellant in 2006, with page numbers added by the respondent.

9.   The appellant stated at the examination for discovery that he has no information as to how Coleman and Silver obtained the prints that he purchased and acquired through Artistic.  The appellant stated at examination for discovery that he did not have any knowledge about what Artistic or Coleman or Silver paid for the prints that he bought and donated. Attached to this my Affidavit and marked as Exhibit "G" is a true copy of an excerpt of the transcript of the examination for discovery of Jeffrey Sackman, held on January 15, 2007, title page 85 and pages 157 through to 163, wherein the appellant makes this statement.

-4-

10.     The Federal Court of Appeal rendered a decision permitting the respondent to pose six questions to Artistic in a non-party examination. Attached to this my Affidavit and marked as Exhibit "H" is a true copy of the decision of the Federal Court of Appeal dated May 8, 2008, in the matter of *Sackman v Canada*, 2008 FCA 177.

11.     On September 7, 2004, I sent a letter to the office of Teplitsky Colson, counsel for the appellant, seeking information relating to this appeal. Attached to this my Affidavit and marked as Exhibit "I" is a true copy of the letter that I sent to Joyce Harris of Teplitsky Colson, with attachments.

12.     Ms. Harris sent me a letter by fax declining to answer these questions. Attached to this my Affidavit and marked as Exhibit "J" is a true copy of this letter sent to me by fax dated September 8, 2004.

13.     I have reviewed a Motion Record dated September 1, 2006 served on the Crown by Artistic, for the Artistic appeal. Attached to this my Affidavit and marked as Exhibit "K" is a true copy of the Motion Record which includes a Notice of Motion dated September 1, 2006 and an affidavit sworn by Paul Sloan dated August 31, 2006.

14.     I have reviewed the transcript of the commission of Paul Sloan, held on November 29, 2006. Attached to this my Affidavit and marked as Exhibit "L" is a true copy of the entire transcript of evidence given by Paul Sloan. I have also attached to this my Affidavit and marked as Exhibit "M" is a true copy of the exhibits to the commission of Paul Sloan held November 29, 2006.

-5-

15.     Copies of invoices and other documents issued by Ro Gallery to Silver or Coleman are listed on the Respondent's 2nd Supplementary List of Documents. Attached to this my Affidavit and marked as Exhibit "N" is a true copy of these copies of documents listed at numbers 59, 62, 63, 64, 77, 78, 79 and 98 of the Respondent's 2nd Supplementary List of Documents.

16.     The respondent served the appellant with a Request to Admit dated August 19, 2010. Attached to this my Affidavit and marked as Exhibit "O" is a true copy of the Request to Admit, with covering letter, without attachments, dated August 19, 2010.

17.     I have reviewed a letter dated August 23, 2010 wherein the appellant advised counsel for the respondent that he had no knowledge of and refused to admit any of the facts and documents stated in the Request to Admit. Attached to this my Affidavit and marked as Exhibit "P" is a true copy of the letter dated August 23, 2010 sent by counsel for the appellant.

18.     I am advised by Martin Beaudry, counsel for the respondent, that he sent a letter dated August 25, 2010 to Mr. Sloan to discuss Mr. Sloan's voluntary attendance as a witness for the respondent at the hearing of this appeal. Attached to this my Affidavit and marked as Exhibit "Q" is a true copy of said letter.

19.     I am advised by Mr. Beaudry that on September 8, 2010, he spoke with Mr. Sloan by telephone. During the conversation, Mr. Sloan told Mr. Beaudry that he will not voluntarily attend at trial in Canada. Mr. Sloan said that he does not want to travel to Canada.  Mr. Sloan said that he does not understand why his evidence is needed again.

-6-

20.     Mr. Beaudry advised me that he sent a letter dated September 13, 2010 to Mr.
Sloan confirming his refusal to attend at trial in Canada.  The letter notified Mr.
Sloan that the only other way that the respondent could obtain his testimony was
by commission.  A copy of Mr. Sloan's commission evidence was enclosed with
the letter. Attached to this my Affidavit and marked as Exhibit "R" is a true copy
of that letter, but without the enclosed transcript.

21.     I am advised by Mr. Beaudry that on February 25, 2011 he wrote to the appellant
to ask if he would consent to a motion seeking an Order for a Commission to be
held in California, United States.  Attached to this my Affidavit and marked as
Exhibit "S" is a true copy of the letter dated February 25, 2011.

22.     I reviewed a letter dated March 1, 2011, wherein counsel for the appellant wrote
back advising that he cannot consent.  Attached to this my Affidavit and marked
as Exhibit "T" is a true copy of the letter dated March 1, 2011.

SWORN BEFORE me at the City of          )
Toronto, in the Province of Ontario, this   )
30th day of September, 2011.                )
                                            )
                                            )       *Laura Alescio*
                                            )       _____
                                            )       Laura Alescio
                                            )
_____                 )
A Commissioner for Oaths in and             )
for the Province of Ontario                 )

CHRISTOPHER M. BARTLETT



B

**THIS IS EXHIBIT "A"**
referred to in the affidavit of
Laura Alescio
This _30th_ day of September, 2011

_____
**Commissioner for Taking Affidavits**

# Artistic Expressions '99

**THE OPPORTUNITY:**

DONATE ART TO VARIOUS CHARITIES AND RECEIVE A
SUBSTANTIAL TAX INCENTIVE

| | |
|---|---|
| Minimum Investment Amount | $ 3,500 |
| Donation Receipt | $10,000 |
| Tax Savings | $ 4,875* (39.29% return) |

\* Based on Ontario tax rates after having given the first $200 in charitable gifts.

TAX OPINION AVAILABLE ON REQUEST

TWO QUALIFIED APPRAISERS TO SUBSTANTIATE
THE FAIR MARKET VALUE OF THE ART

AFTER PURCHASING ELEVEN PIECES OF ART EACH INVESTOR
WILL BE ABLE TO DONATE UP TO TEN OF THE PIECES. EACH
WORK OF ART HAS AN APPRAISED MARKET VALUE OF AT
LEAST $1000. INVESTORS WHO CHOOSE TO DONATE TEN
PIECES OF ART WILL ACHIEVE TAX SAVINGS OF $4875 AND
A PIECE OF ART VALUED AT APPROXIMATELY $1000.

D 28

B

THIS IS EXHIBIT "B"
referred to in the affidavit of
Laura Alescio
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

*Case Name:*
## Artistic Ideas Inc. v. Canada (Minister of National Revenue - M.N.R.)

**Between**
**Artistic Ideas Inc., Appellant, and**
**The Minister of National Revenue, Respondent**

[2008] T.C.J. No. 413

[2008] A.C.I. no 413

2008 TCC 452

2008 G.T.C. 727

[2008] G.S.T.C. 160

Court File No. 2003-1855(GST)G

Tax Court of Canada
Toronto, Ontario

**Paris T.C.J.**

Heard: September 5-8, 2006, and June 11-14, 2007.
Judgment: August 7, 2008.

(106 paras.)

*Taxation -- Goods and Services Tax (GST) -- Collection and enforcement -- Persons obligated to collect -- Appeal from an assessment made under the Excise Tax Act which found that the appellant should have collected GST allowed in part -- Appellant argued it did not need to collect GST as it did not charge any commissions and that any services performed were done for no charge -- Respondent argued that this arrangement was a sham -- The respondent did not succeed in showing that the agreements entered into by the purchasers were shams.*

Appeal from an assessment made under the Excise Tax Act. The appellant operated a program that amounted to a tax shelter. The appellant arranged for Canadian residents to purchase lithographic prints at less than their supposed fair market value from two US vendors and donate the prints to charities and receive a donation receipt for their supposed fair market value. The assessor found that the appellant should have been collecting GST on its commissions and that it owed GST as well as other input tax credits. The respondent argued that the appellant received commissions or fees of $10,588,970 from the purchasers of the prints as consideration for services the appellant supplied to the purchasers in Canada. The appellant argued that it did not charge any commissions to the purchasers, that it received its commissions from the US vendors and that any services performed for the purchasers were done for no

charge. The respondent argued that this arrangement was a sham.

HELD: Appeal allowed in part. The assessment was referred back to the Minister of National Revenue for reconsideration. It was clear from the evidence that the purchasers did not agree to pay anything to the appellant for the services. The Agency Agreement expressly required the appellant to look to the dealers from which the prints were acquired for any commission. The respondent did not succeed in showing that the agreements entered into by the purchasers were shams. Therefore there was no basis on which to find that the commissions received by the appellant were paid by the purchasers. No evidence was led to show that the appellant exercised due diligence in reporting its input tax credits and no argument on the point was presented. Therefore there was no basis for deleting the penalty.

**Statutes, Regulations and Rules Cited:**

Excise Tax Act, R.S.C. 1985, c. E-15, s. 165(1)

**Counsel:**

Counsel for the Appellant: Irving Marks and Shawn Pulver.

Counsel for the Respondent: Perry Derksen and P. Michael Appavoo.

---

**JUDGMENT:**-- The appeal from the assessment made under Part IX of the *Excise Tax Act*, notice of which bears number 05B 8247 and is dated March 4, 2002, is allowed, in part, with costs, and the assessment is referred back to the Minister of National Revenue for reconsideration and reassessment in accordance with the attached Reasons for Judgment.

## REASONS FOR JUDGMENT

1    PARIS T.C.J.:-- Between November 4, 1998 and January 31, 2001, the Appellant, Artistic Ideas Ltd., ("Artistic") operated what it referred to as an "art donation program". For all intents and purposes the program was a tax shelter[1]. Artistic arranged for Canadian residents to purchase lithographic prints at less than their supposed fair market value from two US vendors and donate the prints to charities and receive a donation receipt for their supposed fair market value. This enabled purchasers paying income tax at the highest marginal rate to claim tax credits for charitable donations in excess of the amount they paid for the prints.

2    Artistic earned commissions totaling $10,588,970 from it operations during the relevant period. It did not collect GST on the services for which it received the commissions.

3    The Minister of National Revenue (the "Minister") assessed Artistic for $741,228 of GST under Part IX of the *Excise Tax Act*, (the "*Act*") on the basis that the commissions were received from the purchasers of the prints for taxable supplies made by Artistic to them in Canada. The Minister also assessed an additional $21,213.72 of GST for a re-supply of art work by Artistic, and disallowed $144,599.89 of input tax credits and imposed a penalty of $99,129.37 under subsection 280(1) of the *Act* on the unremitted GST and the over-claimed input tax credits.

Concessions

4    The Respondent now concedes that the GST on the re-supply of artwork should be reversed, and

that the Appellant is entitled to $52,118,96[2] of the disallowed input tax credits.

5    The Respondent also concedes that the Appellant was entitled to an allowance under subsection 296 (2.1) of the *Act* for GST paid in error of $1,050.00 for the period ending January 31, 2000, and $1,693.30 for the period ending January 31, 2001.

6    Finally, the Respondent also concedes that if Artistic is found to have received the commissions as consideration for taxable supplies, it would be entitled to offset GST of $110,762.86 that it previously reported against the GST collectible on the taxable supplies in issue[3].

Issues in appeal

7    The first issue in appeal is whether Artistic was required to collect GST in respect of the services for which it received the commissions.

8    If it is found that Artistic was required to collect GST, the second issue is whether the Minister properly calculated the amount of GST due, and the third issue is whether Artistic is liable for the subsection 280(1) penalty on the amount due.

9    The final issue is whether Artistic is liable for the subsection 280(1) penalty in respect of the disallowed input tax credits.

Position of the parties

Appellant

10    The Appellant says that the commissions did not attract GST because they were paid by the US vendors to the Appellant for acting as the vendors' agent arranging for orders for the prints which the vendors supplied to the purchasers outside Canada. The Appellant says that the services to the vendors were therefore zero rated pursuant to section 5 of schedule IV of Part V of the *Act*.

11    If it is found that any consideration was received from the purchasers, the Appellant says that the services that the Appellant supplied to the purchasers were incidental to the supply of the agent services to the US vendors and should be treated as incidental supplies having the same character as the main supply pursuant to section 138 of the *Act* and therefore would be zero rated supplies.

12    In the alternative, if any amounts were paid to it by the purchasers, only 5% of the commissions it received would be attributable to services supplied to the purchasers. Also, the Appellant says that the GST was included in the amounts paid.

13    The Appellant says that it exercised due diligence to ensure it collected and remitted the GST required under the *Act* and is not liable for the penalty.

Respondent

14    The Respondent says that the commissions were paid to the Appellant by the purchasers of the prints for services supplied to them by the Appellant in Canada. The services were therefore taxable supplies on which the Appellant was required to collect and remit GST in respect of the services supplied to them pursuant to subsection 165(1) of the Act. The supplies to the purchasers were separate and substantial supplies and not incidental to any supplies made to the US vendors. The GST was not included in the consideration paid to the Appellant by the purchasers, and the penalty was properly imposed.

<u>Witnesses</u>

**15**     Seven witnesses gave evidence on behalf of the Appellant: the two directors of the Appellant, Mark Pearlman ("Pearlman") and Allan Grossman ("Grossman"); the Appellant's tax lawyer, Graham Turner; the principal of the U.S. vendor companies; Paul Sloan, ("Sloan") the Appellant's office administrator, Susan Read; an art appraiser retained by the Appellant, Edith Yeomans; and an accountant who prepared the Appellant's financial statements and tax returns, Dan Kowalchuk.

<u>Facts</u>

**16**     The Appellant was incorporated in the fall of 1998 by Pearlman and Grossman to operate the art donation tax shelter. The shares of the Appellant were owned beneficially by companies owned by Pearlman's and Grossman's spouses and by a company owned by an unrelated person. Pearlman and Grossman were at all times the only directors. They are both chartered accountants.

**17**     Both Pearlman and Grossman gave evidence that the idea of setting up and operating an art donation tax shelter was suggested to them sometime in or around 1997 by Sloan, a resident of Los Angeles, California. Pearlman and Grossman had become acquainted with Sloan in the mid-1990s, and had worked together promoting a software tax shelter named Protosource that was marketed to Canadian taxpayers in 1995 and 1996. That tax shelter was apparently also conceived by Sloan.

**18**     According to Grossman and Pearlman, Sloan was aware of certain art donation tax shelters that were being marketed in Canada and he proposed to Pearlman and Grossman that they (i.e. Pearlman and Grossman) set up such a tax shelter using lithographic prints that Sloan had left in inventory over from some art galleries that he used to own in the United States. Sloan supposedly had a very large volume of prints available.

**19**     Pearlman explained the program in the following terms:

> "The art tax shelter was sort of based on the concept of what we thought the definition of fair market value was or our understanding of the definition of fair market value, being one that would reflect a retail price of something.

> If one could buy something at a wholesale price, if one could buy something at a wholesale price and donate that property, then if the differential between the retail price and the wholesale price was substantial enough, the tax benefit would turn a profit for the person making the purchase and donation."[4]

**20**     Initially, Pearlman and Grossman declined Sloan's proposal because they were involved in other projects, and because Pearlman had concerns about the application of the personal-use property provisions of the *Income Tax Act* to art donation tax shelters. Pearlman said that some time later he discussed the technical aspects of the proposed tax shelter with Graham Turner, ("Turner") a tax lawyer with whom he was acquainted, and satisfied himself that the tax shelter was, in fact, technically workable.

**21**     Pearlman and Grossman contacted Sloan and said that they were interested in working with him on the deal if he was still interested in supplying the art. Pearlman said that they discussed the need to be able to have art that they could buy for a third of its "retail value" and Sloan assured them that he could provide appraisals to support the required retail values.

**22**     Sloan said that in the conversation in which Pearlman and Grossman expressed their interest in

doing the tax shelter, they said they could be his agents in Canada, and he said he would give them a 50% commission. He said that the agent/principal relationship was their idea, and he accepted it because that is what they wanted.

**23**    According to Pearlman's and Grossman's testimony, their decision to act as Sloan's agent was not made until a later point, after Pearlman and Grossman had consulted again with Turner. First, they said that they began working out the details of their arrangement and "crunching the numbers to see what would work."

**24**    Pearlman said that they told Sloan that they wanted to sell the prints in groups of ten and proposed a price to the purchaser of $3,500 which they would share "50-50" with Sloan. Sloan would provide an appraisal for at least $1,000 per print and pay for shipping the art to Toronto, and Pearlman and Grossman would market the art and find charities to accept the donations. Sloan said that he could work with the proposed arrangement.

**25**    Pearlman and Grossman then met with Turner to discuss the deal and to confirm that he would provide a favorable tax opinion for it. Pearlman said that among other things they discussed he and Pearlman acting as Sloan's agent for selling the art, and also discussed whether GST would be payable on the purchases.

**26**    Pearlman said and it was decided that the sale of the prints would take place in the U.S. between Sloan or his companies, and that the purchaser would donate the prints while they were still located in the U.S. This way no GST would be payable by the purchaser, and the prints could be brought into Canada by the charity on a tax-exempt basis. Donations could be made as soon as the purchaser acquired the prints, making it possible to sell the prints right up to the end of the calendar year.

**27**    Grossman, Pearlman and Turner also decided that the prints should be sold in groups of eleven so that the buyer could retain one of the prints, in order to "give it more of a flavour of personal-use property."

**28**    Turner recalled having met with Pearlman and Grossman about setting up the tax shelter and discussing the GST implications of the deal, and the fees to be paid by Sloan's companies. He said that everything that was done [by Pearlman and Grossman] for Sloan's companies was done in the U.S. "so it was not a GST issue as far as we were concerned."

**29**    Grossman said that after discussions with Turner, they told Sloan that the best way to carry out the sales of the prints was for Grossman and Pearlman to act as his agent, that they would market the art program for him and that they would get paid a commission of 50%.

**30**    Pearlman and Grossman told Sloan that they wanted him to supply eleven prints for the same price as previously agreed, and that they "still needed 50% of the selling price." They also proposed that, rather than having the buyer pay the sales taxes on the eleventh print when it was imported, Sloan should pay half and they should pay half. Pearlman also said that Sloan agreed to the procedure that he and Grossman were suggesting for the sale of the prints and that Sloan knew that he [Sloan] was selling art to the purchasers and paying a fee to Pearlman and Grossman from the purchaser price.

**31**    The agreement between Sloan, Pearlman and Grossman was never put in writing. Pearlman and Grossman said they all trusted one another as a result of their earlier dealings, and did not feel the need for a written contract. Pearlman said that they often did deals on a handshake. On the other hand, Sloan said Grossman was supposed to come up with a written agreement but never did and that after the first year of operation a comfort level had been established. Turner said that he asked Grossman and Pearlman about drafting a written agreement but they had assured him that they had a deal with Sloan

that was not in writing.

**32**   In the early fall of 1998 Sloan sent up some prints along with appraisals, but Pearlman and Grossman felt that the appraisals were too high and were not credible. They told Sloan that they wanted to arrange for their own appraisals and they wanted Sloan to pay for them. Once again, Sloan agreed, and Pearlman and Grossman hired Edith Yeomans, ("Yeomans") and a second appraiser, Leslie Finks, to supply the appraisals.

**33**   Turner prepared the tax opinion and drafted the agreements to be signed by the purchasers of the prints. In the tax opinion Turner stated that the prints were to be acquired by the purchasers from the US vendors for $3,500 per set. Turner said that there was no provision in any of the documents he drafted for payment of any commission or fee by the purchasers to Artistic because Artistic was selling art as agent for the US vendors and was not involved in a fee-generating process vis-à-vis the purchasers. Both Pearlman and Grossman denied charging any fees or commission to the purchasers.

**34**   Grossman found charities willing to accept donations of the prints and give a charitable receipt for $1,000 per print and Pearlman and Grossman incorporated the Appellant. They made up some marketing materials, a catalogue of prints to be offered and organized a sales force of commission sub-agents to sell the prints and an office staff to process the orders.

**35**   Sloan sent samples of prints to the Appellant for Yeomans to appraise. Prints that she felt had a value of at least $1,000 CND were included in groupings of prints that were offered for sale. Yeomans said that she initially gave verbal assurances regarding the value of the prints and then provided written appraisals after the calendar year end. She said that the work of researching the prints was done prior to giving the verbal assurances of value, and that all that remained to be done was to put the appraisal in writing. Grossman was unable to say whether similar verbal assurances were given by the second appraiser prior to the sale of the prints.

**36**   The Appellant began selling the prints in November 1998. Purchasers were required to sign a Purchase Agreement, an order form and an Agency Agreement as well as a Deed of Gift.

**37**   The vendor of the prints under the Purchase Agreements entered into in 1998, 1999 and the first half of 2000 was Coleman Fine Arts Ltd. ("Coleman"), a company owned by Sloan. In the latter part of 2000, Silver Fine Arts Ltd. ("Silver"), another company owned by Sloan, became the vendor. No reason was given for this change.

**38**   The purchase price was $3,500 per set of eleven prints. This was set out in the order form, which was incorporated by reference into the Purchase Agreement. The price was stated to include GST and PST "where applicable". Pearlman said that was for the GST and PST due on the single print that was to be retained by the purchaser.

**39**   The Purchase Agreement also appointed the Appellant as escrow agent for both the vendor and purchaser. As escrow agent the Appellant was required to pay the expenses of the proposed transaction and to hold the payment for the prints until the transfer of the ownership of the prints to the purchaser was confirmed and two bona fide appraisals of the prints valuing each group of prints at not less than $10,000 had been received.

**40**   The Purchase Agreement was executed by Grossman on behalf of Coleman, and for the latter half of 2000 on behalf of Silver. Grossman and Sloan both testified that Sloan had given Grossman the authority to sign the agreements on behalf of the vendor companies.

**41**   Under the Agency Agreement the purchaser appointed the Appellant as its agent for the purpose of

acquiring prints from one or more dealers. The purchaser acknowledged and agreed that the Appellant and all its sub-agents would seek a commission and a fee from the dealers of the prints. The Appellant also agreed "to seek one or more charities, or other institution qualified under the *Income Tax Act* to give donation receipts, and obtain agreement from such charities and or institutions to accept donations and issue charitable receipts satisfactory to the Purchaser."

42    Under the Deed of Gift the purchaser transferred the prints to a charity chosen from a list supplied by the Appellant. Grossman had previously confirmed with those charities that they would accept gifts of prints arranged by the Appellant. The Deed of Gift also authorized the Appellant to take all steps necessary to complete the transfer.

43    The charity was required by the terms of the donation to hold the works for at least ten years. This was done in order to circumvent the requirement that a charity disburse 80% of any donation within one year of receiving the donation. An exception to that rule allows charities to build endowment funds, so that where a gift is directed to be held for a minimum ten year period the charity is exempted from the normal rule and is required to disburse only 4% of the gift in the following year.

44    The Appellant sent the Deeds of Gift to the respective charities along with a letter setting out the value of the prints and requesting that the charities acknowledge the gift and forward a charitable receipt to the Appellant. The Appellant had arranged with the charities that it would hold on to the receipts until it received the written appraisals confirming the value of the prints and then send them to the purchasers.

45    The funds received from the purchasers were generally put into a trust account set up by the Appellant, although a few cheques were deposited to other accounts in the Appellant's name. Once payment was received from a purchaser, Grossman said that the Appellant's office staff confirmed the order with Sloan by telephone to ensure he had sufficient stock of the prints that were selected.

46    Upon confirmation of the order, the Appellant considered that the terms of the escrow clause in the Purchase Agreement had been met, that the purchase was complete and that the Appellant was free to send 50% of the proceeds to the vendor and keep the balance for itself. The Appellant kept the interest on term deposits made with money in this account.

47    Both Grossman and Pearlman said that they felt that the escrow condition that required two bona fide appraisals was met when they had received two verbal valuations of the prints from the appraisers. They said that they expected that the verbal valuations would be confirmed in writing.

48    The Appellant offered discounts on purchases made early in the year, and to some purchasers on large sales. Pearlman and Grossman said that in some cases they got Sloan's agreement to split the discount with him and in other cases they absorbed the entire discount out of their commission. Artistic accepted promissory notes in payment for the prints from some purchasers. Grossman said that Sloan was aware that Artistic accepted the promissory notes and shared the risk of non-payment of the notes. Sloan said that he never agreed to accept the risk on the promissory notes.

49    After year end, the vendor shipped the prints to Artistic's office, where they were inspected, sorted, repackaged and then shipped to the charities, or in the case of the eleventh print, to the purchasers. The Appellant paid the cost of these activities.

50    Once the written appraisals were received, the Appellant forwarded a copy to the charities. A copy was also sent to the purchasers along with their charitable receipts.

51    Transfers of funds to Sloan's companies were made at various intervals starting November 20, 1998. After the calendar year end Grossman sent Sloan an accounting showing the number of units sold

and any adjustments that reduced the amount due to the vendors. The statement that Grossman sent contained little detail other than an aggregate of sales and adjustments to be made to the vendors' share of the proceeds. The adjustments included items Sloan had agreed to pay or share with the Appellant (such as appraisals, sales discounts, sales taxes, brokerage fees and legal fees and contributions to a legal defence fund for the purchasers.)

**52**   Artistic's operations were largely the same in each year. The appraisers worked on continuous stream of prints that were received throughout the year and gave verbal assurances of value, followed by written appraisals after the calendar year end. Finks was replaced by another appraiser in 1999.

**53**   Grossman testified that each year Artistic added new charities that would accept donations. At some point, Artistic began paying the charities a fee that was said to be intended to help them defray storage and insurance costs brought about by the ten year holding period for the donations. The fee ranged between $1,000 and $4,000 per million dollars of donations accepted. Grossman said that he probably asked Sloan to pay but he refused. Sloan said he was unaware of payments.

**54**   Artistic in certain cases arranged for purchasers to donate the eleventh print they received, thereby increasing their charitable donation tax credit. Artistic did not charge the purchasers for this extra service.

**55**   Over the period that the tax shelter was operated, the Appellant earned commissions of $10,588,970. According to Sloan approximately fifty thousand prints were sold.

**56**   In the Appellant's financial statements filed with its income tax returns for its taxation years ending January 31, 1999 and January 31, 2000 it originally reported its income on the basis that it was the vendor of the prints, by showing its revenue was from gross sales and deducting an amount for the cost of goods sold. After the GST audit began in 2000, and the CRA auditor showed Pearlman the returns, Pearlman told the auditor that the financial statements and returns were wrong and that the Appellant's income consisted of commissions received from Sloan's companies and not proceeds from the sale of the prints. Amended financial statements were prepared and amended tax returns were filed even though the error did not ultimately affect taxable income. According to the pleadings of the Respondent, the Minister accepted that the Appellant was not the vendor of the prints.

**57**   Grossman, who signed the original returns, said that he did not read the financial statements attached to the returns, and relied on the accountant who prepared them. He said that the financial statements were prepared from information given to the accountant by the Appellant's bookkeeper, who mistakenly set up the Appellant's accounting records on the basis that the Appellant was the vendor of the prints. The accountant, Dan Kowalchuk, confirmed that he prepared the financial statements and returns on the basis of the working papers provided to him by the bookkeeper. Grossman said that they had never looked at the records for the Appellant kept by the bookkeeper because he kept his own tracking sheets for the Appellant.

Appellant's arguments

**58**   Counsel stated that all of the evidence showed that Sloan wanted to market his art in Canada under an art donation program and that Artistic agreed to act as his agent to set up the program and to sell the art. Sloan's companies were the vendors of the art, as admitted by the Respondent, and they paid a commission on the sale to Artistic. Those commissions were received for services that were zero rated supplies pursuant to section 5 of Schedule VI of Part V of the *Act*, which reads:

> [Agent's or representative's service] -- A supply made to a non-resident person of a
> service of acting as an agent of the person or of arranging for, procuring or soliciting

orders for supplies by or to the person, where the service is in respect of

(a)    a supply to the person that is included in any other section of this Part; or

(b)    a supply made outside Canada by or to the person.

**59**    Counsel said that it was open to the Appellant and US vendors to structure their affairs in such a way as to minimize the amount of tax payable and that tax consequences must be based on the legal character of the relationships as structured, regardless of their economic or commercial substance and the absence of any non-tax purpose for their existence.

**60**    The Appellant's counsel submitted that the commissions earned by the Appellant in this case were consideration for acting as the vendors' agent pursuant to an oral agreement between Sloan on behalf of the US vendors and Grossman and Pearlman on behalf of the Appellant. Counsel said that there was no requirement that the Agency Agreement be put in writing and that the documentary evidence as well as the testimony of Grossman, Pearlman, Sloan and Turner proved the oral agreement was a valid, bona fide agreement and its terms were followed by the parties.

**61**    The purchase price for the prints was paid by the purchaser to the Appellant as escrow agent, but belonged to the vendor once the escrow conditions were fulfilled. At that point the vendor could use the money to pay the Appellant its commission. Pursuant to the oral Agency Agreement with Sloan, the Appellant took its commission from the funds and the payment of the commissions was corroborated by year end statements provided to Sloan showing the amount of sales made and the amount of fees paid to the Appellant. Counsel said that it was irrelevant that the Appellant mistakenly filed its returns on the basis that it was the vendor of the prints, since the Minister in these proceedings had accepted that Sloan's companies were the vendors.

**62**    Counsel referred to the provision in the Agency Agreement which stated that the Appellant would seek its commission or fee from the dealers from whom the prints were acquired, and said that the Respondent had not met the onus on it to show that that provision was a sham. In addition, he said that the Respondent had neither pleaded nor proved that the agreement between the purchasers and the vendors which set the purchase price of the prints at $3,500 was a sham.

**63**    In the absence of any proof that the agreement to pay $3,500 for the prints to the US vendors was a sham, there is no basis for finding that any of the consideration paid by the purchaser's was paid for services provided by the Appellant. There was nothing in any of the documentation or any of the testimony of the witnesses that indicates that the purchaser paid or agreed to pay any fee or commission. On the contrary, the purchaser acknowledged that any commission that was paid would be paid by the dealer.

**64**    Counsel also said that the vast majority of the work performed by the Appellant to market the art for sale was carried out prior to any purchaser being identified, such as getting verbal valuations from the appraisers and lining up the charities to accept the donations. This work was necessary to create a market for the artwork so that it could be sold in large quantities. After the sale of the prints, some services were performed by the Appellant for the benefit of the purchasers or charities, but these were minimal and no fees were charged for those services. Furthermore, the benefit of those services to the purchasers was incidental to the main benefit accruing to the vendors, ensuring ongoing sales of prints.

**65**    Counsel referred to the evidence of Grossman that, in his view, less than 5% of the services which the Appellant rendered were for the benefit of the purchasers. Overall, counsel said that any services that benefited the purchasers or charities were subservient or incidental to the services supplied by the Appellant to the US vendors for the sale of the art and paid for by the vendors and that section 138 of the *Act* would therefore apply to deem the supply of any services to the purchasers to be part of the service

supplied to the US vendors. Section 138 reads:

**Incidental supplies** --For the purposes of this Part, where

(a) a particular property or service is supplied together with any other property or service for a single consideration, and

(b) it may reasonably be regarded that the provision of the other property or service is incidental to the provision of the particular property or service,

the other property or service shall be deemed to form part of the particular property or service so supplied.

66    The Appellant's counsel said that if it is determined the purchasers paid commissions to the Appellant, the consideration should be allocated pursuant to subsection 153(2) of the *Act* which deals with consideration paid for multiple supplies. On the basis of Grossman's testimony, only 5% of the services provided by the Appellant were for the benefit of the purchasers and therefore only 5% of the commissions should be attributed to those services. Subsection 153(2) reads:

**Combined consideration** -- For the purposes of this Part, where

(a) consideration is paid for a supply and other consideration is paid for one or more other supplies or matters, and

(b) the consideration for one of the supplies or matters exceeds the consideration that would be reasonable if the other supply were not made or the other matter were not provided,

the consideration for each of the supplies and matters shall be deemed to be that part of the total of all amounts, each of which is consideration for one of those supplies or matters, that may reasonably be attributed to each of those supplies and matters.

67    The Appellant's counsel said that if it is determined the purchasers paid commissions to the Appellant, the GST was included in the commissions that were paid according to the Purchase Agreement. Therefore, if it is found that any portion of the fee was subject to GST because the purchaser was really paying a fee to the Appellant, that fee would have to be deemed to be inclusive of GST. The Minister's calculation failed to take this into account.

68    Counsel said that if it is found that the Appellant failed to collect GST, the penalties should be reversed on the grounds that the Appellant acted reasonably and with due diligence to structure its affairs in accordance with legal advice.

Position of the Respondent

69    The Respondent says that all of the commissions earned by the Appellant from its operations in the period in issue were paid to it by the purchasers for services performed for them. Those services included assisting with purchase of the prints, making the prints available in Canada, arranging for appraisals of the prints and finding charities that would accept them. The services were provided in Canada to persons resident in Canada and therefore they were taxable supplies on which the Appellant was required to collect GST under subsection 165(1) of the *Act*. That provision read at the time:

**Imposition of goods and services tax** -- Subject to this Part, every recipient of a taxable supply made in Canada shall pay to Her Majesty in right of Canada tax in

respect of the supply calculated at the rate of 7% on the value of the consideration for the supply.

**70**    The Respondent said that that the provision of the Agency Agreement that provided that the Appellant would seek its commission from the vendors of the prints, and the provision of the Purchase Agreement that the purchase price of the prints was $3,500 were both shams.

**71**    Counsel for the Respondent said that:

> Despite the documentation, the $3500 is paid by the donor, the purchaser, and it is split, and half of that represented Artistic's consideration from the donor for the services that it provided and the other half represented the portion that went to Sloan for the artwork.
>
> What was really going on was that A was taking its consideration from the funds paid by the donors, because the donors were paying $3500 for art plus services, and that what they were really buying, is a tax receipt through an art donation program.[5]

**72**    In essence, the Appellant earned 50% of amount paid by the purchasers which "represented its fee that it received from the donors for operation an art donation program."

**73**    Counsel said that the Appellant did not follow the agreements in a number of respects: for example, he said that the Appellant treated the purchase price as its own rather than as funds held in trust. It released funds to the vendors and took money for itself from the purchase funds before two written appraisals were provided for the prints.

**74**    Counsel submitted that the evidence showed that Artistic set up the tax shelter infrastructure to serve the purchasers of the prints, and that Artistic did a substantial amount of work for the purchasers to facilitate the acquisition and donation of the prints. It received, inspected, repackaged and shipped the prints, and obtained acknowledgment of donations and receipts from charities and forwarded the receipts to the purchasers. In some cases it arranged the donation of the eleventh print. It was not credible, he said, that Artistic provided these services to the purchasers for free.

**75**    Nor was it credible that most of the work in arranging for the donations was done before the purchasers bought the prints or that this work was done for the vendors. He referred to the evidence that showed that Grossman continued to sign up new charities to accept donations throughout the years the shelter operated, and pointed out that Artistic was obligated to do this work for the purchasers pursuant to the Agency Agreement. Despite what Grossman said in cross-examination, this work was not done for Sloan. Counsel said that:

> This was Artistic's art donation program and the only role that Coleman and Silver played was to source the artwork, that the whole purpose of this was to create charitable tax receipt, which is what Artistic was facilitating. There is no reason to for Sloan to be paying a commission when Artistic needed Sloan's artwork for the art donation program Artistic was operating and that it had created.[6]

**76**    Counsel for the Respondent also submitted that the Appellant did not act as Coleman's and Silver's agent and there was no agreement by which Coleman and Silver agreed to do so or to pay a commission to Artistic. Counsel said that the Court should reject Sloan's, Grossman's and Pearlman's evidence that an oral Agency Agreement existed between the parties, because they were not credible. Counsel pointed out a number of inconsistencies in their evidence and, in the case of Pearlman, inconsistencies between his evidence given at his examination for discovery and at the hearing.

**77**    Counsel says that the Appellant has failed to show a bona fide legal relationship of agency existed between Coleman and Silver and Artistic. Even if the Court accepts that there was an agreement between Artistic and Coleman and Silver, the Court should find that it did not create an agent-principal relationship between them because their conduct was not consistent with such a relationship. The labels that the parties use to describe their relationship are not determinative.

**78**    Counsel said that the essential ingredients of an agency relationship are:

> (i)    the consent of both the principal and the agent,
> (ii)    authority given to the agent by the principal, allowing the former to affect the latter's legal position, and
> (iii)    the principal's control of the agent's actions.[7]

**79**    According to counsel, significant factors in determining whether an agency relationship exists are the risk assumed by the parties and whether there was any obligation on the alleged agent to account for moneys received. He pointed out that in this case that Artistic assumed risk for a part of the purchase price of the prints that was paid by promissory notes by some of the purchasers. He said that if Artistic was acting on behalf of Sloan's companies, one would expect the principal to carry the risk.

**80**    Counsel also said that it did not appear that Sloan or his companies exercised control over Artistic in a manner that would indicate that the latter was acting as agent. Counsel said that there was minimal financial accounting made to Sloan, that Sloan was not familiar with the purchase agreement documents that were supposedly signed on his companies' behalf and he said that he did not receive copies of Purchase Agreements. Sloan was also unaware that Artistic was making payments to charities to help defray the cost of storage and insurance. Counsel said that one would expect Sloan to be more rigorous about what his supposed agents were doing on his behalf and about the accounting for profits.

**81**    Counsel asked the Court to find that Sloan never intended to create any legal relationship with the Appellant other than to supply prints for the latter's art tax shelter. He said that Sloan and his companies functioned as an accommodator for the Appellant, and let the Appellant determine all aspects of the relationship, including the price of the prints.

**82**    With respect to the calculation of the amount of GST due, counsel said that the reference to GST being included in the sale price would not be determinative, because the payment by the purchasers to the Appellant was a commission and not part of the sale price of the prints.

**83**    Counsel for the Respondent submitted that if the Appellant was found to have received consideration from the purchasers for supplies and services made to them, though supplies could not be considered incidental supplies for the purpose of the rule in section 138 of the *Act*. Counsel said that the incidental supply rule only applies to two separate supplies made by the same party, and not to separate supplies made by different parties. In support of this proposition counsel referred to the decision of Lamarre Proulx, J. in *Association Recreative Les Jardins du Château Inc.,* [1994] G.S.T.C. 32.

**84**    Even if it were possible to apply the rule to supplies made by two different parties, counsel said that the services Artistic was providing were not simply incidental to the supply of the prints as contended by the Appellant. He said that the whole reason for the donation programs existence was the tax receipt and that the services arranging to obtain a tax receipt were not secondary to the purchase of the art.

**85**    With respect to any apportionment of the consideration, counsel said that the evidence showed that the services provided to the purchasers far exceeded 5% of the overall services provided by Artistic.

86     Finally counsel for the Respondent said that if the written agreements between the purchasers and Artistic are found to be shams, and if Artistic is found not to be the agent for Sloan's companies, the subsection 280(1) penalties should be maintained since the Appellant did not show that it took all reasonable steps to ensure that it complied with the *Act*.

Analysis

87     Subsection 165(1) of the Act, as it read at the time, requires that GST be charged on the provision of a taxable supply at a rate of 7% of the value of the consideration given for the supply. That provision read:

> **Imposition of goods and services tax** -- Subject to this Part, every recipient of a taxable supply made in Canada shall pay to Her Majesty in right of Canada tax in respect of the supply calculated at the rate of 7% on the value of the consideration for the supply. .

88     The Respondent in this case maintains that the Appellant received commissions or fees of $10,588,970 from the purchasers of the prints as consideration for services the Appellant supplied to the purchasers in Canada.

89     The Appellant maintains that it did not charge any commissions to the purchasers, that it received its commissions from the US vendors and that any services performed for the purchasers were done for no charge.

90     It is clear from the evidence that the Appellant did provide services to the purchasers, including locating and arranging for the purchase of the prints, identifying charities to accept donation of the prints, and inspecting and delivering the prints to the charities and to the purchasers.

91     These were services that the Appellant had agreed to provide to the purchasers under the Agency Agreement and, in my view, the fact that some or most of the arrangements required of the Appellant had already been put in place prior to the signing of the Agency Agreement does not mean that the services were not provided to the purchasers. The services were performed in anticipation of the signing of the Agency Agreement and the purchasers received the benefit of those services.

92     However, it is also clear from the evidence that the purchasers did not agree to pay anything to the Appellant for those services. The Agency Agreement expressly required the Appellant to look to the dealers from which the prints were acquired for any commission. There is no ambiguity in the wording of the Agency Agreement in this respect.

93     The Respondent contends that this provision in the Agency Agreement is a sham. This position was advanced for the first time in the Reply to Notice of Appeal, as an additional fact the Respondent was relying on in the appeal. Therefore, the Respondent has the onus of proving sham here.

94     In order to constitute a sham, there must be a common intention that the rights and obligations created by the documentary evidence are different from the actual rights and obligations contemplated by the parties to the transaction. As Lord Diplock said in *Snook v. London & West Riding Investments Ltd.*, [1967] 1 All E.R. 518 at 528.

> I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and

obligations different from the actual legal rights and obligations (if any) which the parties intend to create. One thing I think, however, is clear in legal principle, morality and the authorities...that for acts or documents to be a "sham", with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a "shammer" affect the rights of a party whom he deceived.

**95** In this case, there is no evidence of a common intention that the rights and obligations in the Agency Agreement were different than those contemplated by the parties. None of the purchasers were called as witnesses and Grossman and Pearlman both said that the Appellant did not charge the purchasers any fee or commission.

**96** Rather, the Respondent asks the Court to infer that the purchasers must have agreed to pay a fee or commission to the Appellant because of the extent of the services that the Appellant provided to them. The Respondent says that it is not credible that those services were provided for free.

**97** The Respondent also says that the evidence shows that the Appellant did not treat the funds it received from the purchasers as funds held in trust for the vendors and took the commissions from the purchasers funds before the escrow conditions relating to the appraisals were met, and that this is a further indication that the Appellant did not intend to be bound by the agreements.

**98** I do not believe it is necessary to determine whether the Appellant breached any escrow terms of the Agency Agreement because there was no evidence which led to show that the purchasers were ever aware of the alleged breaches or that they consented to the Appellant's conduct. More importantly to the Respondent's sham argument, the evidence did not show that the purchasers did not intend to bind the Appellant to the escrow conditions when they entered into the agreements. At most, the evidence shows that the Appellant did not carry out certain of its escrow obligations in accordance with the agreement, but that this did not affect its overall performance under that agreement and the Purchase Agreement, and no purchaser took issue with the performance in itself. The fact that the purchasers did not take issue with the allege failure of the Appellant regarding the escrow condition cannot be construed as an indication of a sham.

**99** With respect to the Respondent's point that the Appellant provided extensive services to the purchasers, I am not aware of any requirement that the Appellant charge for those services. Furthermore the services were provided in the context of the overall tax shelter operations in order to ensure the ongoing sale of prints from which the Appellant benefited. It was apparent that these arrangements were extremely lucrative for the Appellant, and that it could well absorb the relatively minor cost of the services provided to the purchasers.

**100** In order to show that the purchasers paid fees on commission to the Appellant, the Respondent would have also been required to prove that the purchase price set out in the Purchase Agreement and order forms signed by the purchasers was also a sham. Under that agreement the purchasers agreed to pay $3,500 per set of prints to the US vendors. As I noted above, none of the purchasers were called to testify, and I cannot infer from the remaining evidence that they did not intend to be bound by that agreement, or that the deal to purchase the prints was other than what was contained in the agreement. No provision in those agreements was made for the payment of a commission to Artistic by the purchasers. I conclude that it was not the intention of the purchasers to pay any commission to the Appellant for its services.

**101** For all of these reasons, I find that the Respondent has not succeeded in showing that the agreements entered into by the purchasers or any part of them were shams. Therefore there is no basis

on which to find that the commissions received by the Appellant were paid by the purchasers. The transactions entered into by the purchasers with the US vendors and with the Appellant must be accepted as they are found in the Purchase and Agency Agreements. As stated by the Supreme Court of Canada in *Shell Canada Ltd. v. The Queen*[8]:

> ... absent a specific provision of the Act to the contrary or a finding that they are a sham, the taxpayer's legal relationships must be respected in tax cases. Recharacterization is only permissible if the label attached by the taxpayer to the particular transaction does not properly reflect its actual legal effect.

**102**    I also accept the evidence of Pearlman, Grossman and Sloan that the US vendors agreed to pay a commission to the Appellant for acting as their agent in the sale of the prints. This evidence was corroborated by the testimony of Turner, a disinterested witness, whose testimony was not challenged in cross-examination. Turner provided advice on the structuring of the relationship between Artistic and the US vendors to minimize tax, and that advice appears to have been acted on by the parties. .

**103**    I disagree with the Respondent that the Appellant's conduct was inconsistent with an agency relationship between it and the vendors of the prints. There was evidence of consent by the vendors to the Appellant acting as its agent and evidence that the vendors granted the necessary authority to the Appellant to bind it under the Purchase Agreements. The risk under those agreements was on the vendors rather than on the Appellant which is also consistent with an agency relationship. Only in a few cases did the Appellant take on some risk regarding payment, but this was insignificant in the context of the overall number of prints sold. The Appellant did account to the vendors for the proceeds from the sales and for the vendors' portion of certain shared expenses. It is true that the accounting was rather rudimentary, but it met the requirements of the parties in the circumstances. Sloan said that he was aware of roughly how much was due to the vendors at any point because he kept close track of the number of prints shipped, and had regular discussions with Grossman about the expenses incurred. Overall, the relationship between the Appellant and the US vendors meets the generally accepted definition of "agency" set out by Fridman in *The Law of Agency* ( 7th ed.) at page 11 :

> Agency is the relationship that exists between two persons when one, called the *agent*, is considered in law to represent the other, called the *principal*, in such a way as to be able to affect the principal's legal position in respect of strangers to the relationship by the making of contracts or the disposition of property.

**105**    In light of my conclusions above, the only issue that remains to be addressed is the Appellant's liability for the subsection 280(1) penalty in respect of the disallowed input tax credits. After the concession made by the Respondent noted at the beginning of these reasons, there remains the disallowed input tax credits of $92,480.93 for the periods in issue. Although Artistic stated that it was challenging the penalty on the remaining amount, no evidence was led to show that it exercised due diligence in reporting its input tax credits and no argument on the point was presented. Therefore I find that there is no basis for deleting the penalty in this case.

**106**    For all of these reasons the appeal is allowed in part, with costs and the assessment is referred back to the Minister for reconsideration and reassessment on the basis that the Appellant was not required to collect GST on the commissions it received during the period under appeal and on the basis of the concessions set out in paragraphs 4 and 5 of these reasons.

PARIS T.C.J.

cp/e/qlaim/qlmrz/qlhcs/qlaxw/qlhcs/qlaxw

Page 16 of 16

1 The arrangements did not technically meet the definition of "tax shelter" in subsection 237.1(1) of the *Income Tax Act* as it then read because the claims made by purchasers were for tax credits rather than for deductions or losses. The definition was amended effective February 18, 2003 to cover arrangements involving claims for tax credits.

2 The ITCs are to be allowed as follows:

> For the period ending January 31, 1999-$16,016.70. For the period ending January 31, 2000-$22,917.69. For the period ending January 31, 2001-$13,184.57.

3 The GST relates to the following periods :

> Period ending January 31, 1999 $23,941.32. Period ending January 31, 2000 $56,574.86. Period ending January 31, 2001 $30,246.68.

4 Transcript of proceedings, p. 11.

5 Transcript of proceedings, p. 920.

6 Transcript of Proceedings, p. 995.

7 (*Royal Securities Corp. v. Montreal Trust Co.* (1966), 59 D.L.R. (2nd) 666 (Ont. H.C.) at p. 684).

8 [1999] 3 S.C.R. 622 at paragraph 39.

C

**THIS IS EXHIBIT "C"**
referred to in the affidavit of
**Laura Alescio**
This _30ᵗʰ_ day of September, 2011

_____
**Commissioner for Taking Affidavits**

MHiQ

MHFeltman Verbatim Reporting

TAX COURT OF CANADA

IN RE:  The Income Tax Act

BETWEEN:                                    2002-4824(IT)G

JEFFREY SACKMAN

                                                Appellant

– and –


HER MAJESTY THE QUEEN

                                              Respondent




This is the Examination for Discovery of **JEFFREY SACKMAN**,

the Appellant herein, held at the Offices of the Department

of Justice, 2 First Canadian Place, Exchange Tower, Suite

3400, Toronto, Ontario, on Monday, December 11, 2006.


APPEARANCES:

Martin Teplitsky, Q.C.                for the Appellant

Perry Derksen, Esq.)                  for the Respondent

Jenna Clark            )




                    MHFeltman Verbatim Reporting

        375 Merton Street, #302   Toronto, Ontario  M4S 1B4

                    Per:  Holly Feltman, C.V.R.

1        A.  Do I have a practice?  I sign an awful

2  lot of things in my professional life.  I don't know that

3  it matters if it's dated a day before and I sign it on the

4  next day.

5  134.       Q. What was your understanding as to the

6  purpose of entering into this agency agreement at Tab 70?

7        A. It's self-explanatory.

8        MR. TEPLITSKY:  The agreement speaks for

9  itself.

10  135.       BY MR. DERKSEN:  Q.  I'm not asking what

11  the agreement says, I'm asking what Mr. Sackman's

12  understanding is as to why he was entering into the

13  agreement.

14        A. To agree with what's written.  I mean,

15  I don't understand that question.

16  136.       Q. So you understood that you were

17  appointing Artistic Ideas as your agent for the purposes of

18  acquiring prints.

19        A. That's what it says.

20  137.       Q. And you understood you were appointing

21  Artistic Ideas as your agent for the purposes of carrying

22  out donations of those prints to charities in return for

23  charitable donation receipts.

24        A. Correct.

25  138.       Q. Is there any issue about the

D

**THIS IS EXHIBIT "D"**
referred to in the affidavit of
**Laura Alescio**
This 20th day of September, 2011

**Commissioner for Taking Affidavits**

MHMF

MHFeltman Verbatim Reporting

1    TAX COURT OF CANADA

2    IN RE:   The Income Tax Act

3    BETWEEN:                        2002-4824(IT)G

4                JEFFREY SACKMAN

5                                    Appellant

6                – and –

7

8            HER MAJESTY THE QUEEN

9                                    Respondent

10

11

12   This is the Examination for Discovery of JEFFREY SACKMAN,

13   the Appellant herein, held at the Offices of the Department

14   of Justice, 2 First Canadian Place, Exchange Tower, Suite

15   3400, Toronto, Ontario, on Monday, December 11, 2006.

16

17   APPEARANCES:

18   Martin Teplitsky, Q.C.              for the Appellant

19   Perry Derksen, Esq.)                for the Respondent

20   Jenna Clark          )

21

22

23           MHFeltman Verbatim Reporting

24   375 Merton Street, #302   Toronto, Ontario  M4S 1B4

25               Per:  Holly Feltman, C.V.R.

MHG
MHFeltman Verbatim Reporting

42

Jeffrey Sackman

1          MR. DERKSEN:  If I said Artistic Ideas, I

2   apologize.

3          MR. TEPLITSKY:  And that's 1998, but, yes,

4   it is his signature, even though I don't consider it

5   relevant, and his signature appears at Tabs 67, 68, and 69.

6   148.       BY MR. DERKSEN:  Q.  So you agree that

7   each of these documents at Tabs 66, 67, 68, and 69 are

8   copies of the purchase agreements that you entered into

9   with respect to your purchases of the art.

10          MR. TEPLITSKY:  Yes.

11   149.       BY MR. DERKSEN:  Q.  In the first three

12   instances, I take it, you understood you were purchasing

13   art from Coleman Fine Arts, and then in the latter

14   agreement in November of 2000, you understood you were

15   purchasing art from Silver Fine Arts.

16          A.  It appears, yes.

17   150.       Q.  Do you know why there was a change

18   between Coleman and Silver?

19          A.  No.

20   151.       Q.  Did you have any understanding of who

21   Coleman Fine Arts Ltd. was?

22          A.  No.

23   152.       Q.  Were you ever told who the principals

24   of Coleman Fine Arts were?

25          A.  No.

E

**THIS IS EXHIBIT "E"**
**referred to in the affidavit of**
**Laura Alescio**
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

85

MHFeltman Verbatim Reporting

1 <u>TAX COURT OF CANADA</u>

2 <u>IN RE:  The Income Tax Act</u>

3 BETWEEN:                              2002-4824(IT)G

4 **JEFFREY SACKMAN**

5                                          Appellant

6                   — and —

7

8 **HER MAJESTY THE QUEEN**

9                                        Respondent

10

11 This is the Examination for Discovery of **JEFFREY SACKMAN**,

12 the Appellant herein, held at the Offices of the Department

13 of Justice, 2 First Canadian Place, Exchange Tower, Suite

14 3400, Toronto, Ontario, on Monday, January 15, 2007.

15                   **VOLUME II**

16

17 <u>APPEARANCES</u>:

18 Martin Teplitsky, Q.C.              for the Appellant

19 Perry Derksen, Esq.)                for the Respondent

20 Jenna Clark          )

21

22

23              MHFeltman Verbatim Reporting

24      375 Merton Street, #302   Toronto, Ontario  M4S 1B4

25              Per:  Holly Feltman, C.V.R.

MHFeltman Verbatim Reporting

197

Jeffrey Sackman

1    the Crown copies of the working papers of the experts?

2                    MR. TEPLITSKY:  I'll give you the report.

3                    MR. DERKSEN:  I'm asking for their working

4    papers, their working file.

5    REF 125        MR. TEPLITSKY:  No, but if you have a case

6    which says that that's producible, send it over to me, if

7    you don't mind, and I'll be prepared to change my view.

8    It's still covered, I would have thought, by litigation

9    privilege.  The Rules provide for production of the report.

10   But I may be wrong, you might have a case.

11                   MR. DERKSEN:  Let's take a few minutes.

12   --- RECESS

13                   MR. DERKSEN:  I'm going to pass over to

14   you, Mr. Sackman, what I now understand is a copy of the

15   binder that Mr. Teplitsky produced to us on, I believe it

16   was, December 7, and just so that we know what we're

17   talking about, let's identify it as Exhibit 7.

18                   MR. TEPLITSKY:  That's fine.

19                   MR. DERKSEN:  So binder received from Mr.

20   Teplitsky on December 7, 2006.

21   EXHIBIT 7:  Appellant's sales receipts binder.

22                   MR. TEPLITSKY:  This stuff at the front I

23   don't think is something I gave you, is it?

24                   MS. CLARK:  It's an exact photocopy of the

25   binder you provided to us.

MHFeltman Verbatim Reporting

Jeffrey Sackman

1          MR. TEPLITSKY:  It starts really here,

2   appraisals in support, all right, yes.

3   596.          BY MR. DERKSEN:  Q.  Just so I understand,

4   Mr. Sackman, what this is, can you explain to me how this

5   binder has been set up and the relevance of these documents

6   to your appeal and the issues raised in the appeal?

7          MR. TEPLITSKY:  Do you want me to answer

8   that?  He won't be able to, it's my work.

9          MR. DERKSEN:  All right, if your client

10   can't answer it, I'm used to you answering these types of

11   questions.

12          MR. TEPLITSKY:  I don't want to do it,

13   since you seem to object to it, but this is part of my work

14   product in the litigation which I have disclosed to you.

15          MR. DERKSEN:  Go ahead, feel free.

16          MR. TEPLITSKY:  Central to the Appellant's

17   case is that there is a retail market for the art which he

18   donated and that the assessment should be based on the

19   retail fair market value, that is the highest price that a

20   purchaser would pay for these goods, not on some other

21   different market.  So, accordingly, I asked Ms. Yeomans to

22   collect for me on an ongoing basis, on an ongoing project,

23   invoices that would reflect the fair market value of and

24   that there is a retail market and/or a wholesale market

25   where the price is higher than the assessed value or

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1     appraised values for the claim.

2             This book was organized by artist with

3     examples of invoices that she's been able to find.  Now,

4     obviously, it isn't easy to get some of these invoices, but

5     that is what has been collected thus far and that is an

6     ongoing project by Ms. Yeomans and by Mr. Rosoff, to find

7     examples, supporting examples of sales of art from these

8     artists, some of which are exactly the ones that were

9     donated, at values that are supportive of the appraisers'

10    assessment.  So that's how it was organized at my request.

11    597.        BY MR. DERKSEN:  Q.  So you have said that

12    Edith Yeomans was involved in assembling this binder.

13            MR. TEPLITSKY:  She was, at my request,

14    involved in obtaining the documents.  Putting together the

15    binder, I'm responsible for that.  This is not a work of

16    art, it's just a way of organizing many of the pieces.

17    When she does her final report, these will be put forward

18    by her, I hope, in a way that is prettier.  So this is my

19    work, this is not her work.  Obtaining the invoices was her

20    work, putting together the book in this form, and this is

21    not a final form, it was just a lot, I thought, easier for

22    you than dumping on you another slew of sales invoices.

23    598.        BY MR. DERKSEN:  Q.  You mention also that

24    Charles Rosoff was involved in obtaining some of these

25    documents.

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1          MR. TEPLITSKY:  I'm not sure which ones he

2     obtained.  She has been the principal person doing it.

3     599.          BY MR. DERKSEN:  Q.  Is it possible for

4     you to identify which came from Yeomans and which came from

5     Rosoff?

6          MR. TEPLITSKY:  No, I can't.  I know that

7     I have asked him to do it as well and he may have made some

8     of the introductions for her in order to get it, but it's

9     hard to get.  And, of course, there are sales occurring on

10    the Web which we can't get the invoices for and what have

11    you.

12    600.          BY MR. DERKSEN:  Q.  Is this material

13    material that was accumulated — I appreciate that — maybe

14    you can confirm this for me.  There appear to be extracts

15    from Yeomans's appraisal reports.

16         MR. TEPLITSKY:  Yes.

17    601.          BY MR. DERKSEN:  Q.  So that aside, is the

18    material contained within the binder material that was

19    obtained after the appraisals were prepared and issued to

20    Artistic Ideas as part of the art donation program back in

21    2000 and 2001?

22         MR. TEPLITSKY:  Some of this, perhaps most

23    of it, contains information which she had orally.  In other

24    words, she would call around to galleries, she did whatever

25    appraisers do to attempt to verify their conclusion as to

1   value.  When I was retained, I said to her and to Rosoff

2   that I felt we needed to make an effort to get documents to

3   corroborate what people were saying to her and she said

4   this was difficult to do and I said it's essential to our

5   case that we show that there is a retail market for these

6   goods that is corroborative of the value opinion that you

7   have reached.  So with those marching instructions, she

8   produced an earlier bundle which I sent to you and then the

9   diagram was produced, which is not in here, about how

10  values are augmented in the art market, and then there was

11  another big bundle.  I said now I'd better put them in some

12  form of organization for you, but this is not going to be

13  its final form.  So this was really done just to

14  convenience you in terms of seeing what we have obtained

15  thus far.  It is not more than that.

16  602.          BY MR. DERKSEN:  Q.  Is there any way to

17  determine what Yeomans had before the litigation and after

18  the litigation?

19               MR. TEPLITSKY:  I know from talking with

20  her and from reading her report, but also from speaking

21  with her, that basically she did research into each of

22  these artists and did research into the market, but I think

23  it was mainly based on oral.  So I don't want to swear that

24  she didn't have any of these pieces of paper, I doubt that

25  she had at the time, but she had the information in them.

1   She would have called a gallery and said, "Are you selling

2   this and what do you get for it?" and they would have told

3   her.  I said, "I want to see the piece of paper."

4   603.            BY MR. DERKSEN:  Q.  If Mr. Sackman would

5   produce Yeomans's working paper files we could figure that

6   out.

7             MR. TEPLITSKY:  I don't see the relevance

8   of figuring it out exactly for the reasons I previously

9   gave.  You have not accepted her appraisal reports, period,

10  so we're going to do an expert's report from her that we're

11  going to use at trial with her as a witness which will have

12  these documents as part of it.

13  604.            BY MR. DERKSEN:  Q.  What relevance do the

14  documents that relate to prints that Mr. Sackman did not

15  purchase have to this appeal?

16            MR. TEPLITSKY:  Their relevance is simply

17  to illustrate what the artist for a comparable piece was

18  being sold for at that time.  You'll see that these are

19  all, I think, in and around the 2000 year, so they're not

20  2006, or 1996, or 2004, et cetera, documents.  I asked to

21  get documents on or about 2000, to show what the fair

22  market value was at that time.  In any event, while we're

23  at it, there are other potential cases that these documents

24  will be useful for as well.  Anyway, I just gave it to you,

25  you don't need to read more into it than my view that I

MHF

MHFeltman Verbatim Reporting

Jeffrey Sackman

1    have a duty to provide you with copies of the material that

2    we have and get.

3    605.          BY MR. DERKSEN:  Q.  Does this binder

4    contain all of the documents that Yeomans or Rosoff have

5    obtained with respect to sales of same subject properties

6    or what they viewed as comparable subject properties?

7                  MR. TEPLITSKY:  You have everything I

8    have.  I have not edited this or removed a single sheet of

9    paper.

10                 MR. DERKSEN:  I have everything that you

11   have.

12                 MR. TEPLITSKY:  That's right.

13   606.          BY MR. DERKSEN:  Q.  Has Yeomans provided

14   you with everything....

15                 MR. TEPLITSKY:  I don't know.

16   607.          BY MR. DERKSEN:  Q.  What I'm asking, Mr.

17   Teplitsky, is has Yeomans obtained invoices at lower

18   amounts?

19                 MR. TEPLITSKY:  Not that I'm aware of.

20   608.          BY MR. DERKSEN:  Q.  Is Yeomans aware of

21   any transactions at lower amounts?

22                 MR. TEPLITSKY:  I'm not aware of any.  She

23   certainly hasn't provided me with any, nor did I tell her

24   not to provide me with any.  I said, "Get me the documents,

25   if you can," but they're hard to get.  It's not like these

**MHＨＩＲ**

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1   people are all that anxious to say, "Here's my client list

2   and here's what I'm doing."  She also relied on list prices

3   at Ro and list prices on the Internet, but that's not

4   included.  These are actual sales.  Because someone would

5   say, "There's your list price, but what are you actually

6   selling them for?"

7   609.          BY MR. DERKSEN:  Q.  Do you know whether

8   Yeomans wrote to any of these sources?

9          MR. TEPLITSKY:  I don't know whether she

10   wrote or how she went about it.  I think it was through

11   oral pestering and persistence.

12   610.          BY MR. DERKSEN:  Q.  Are you prepared to

13   ask her?  In essence, Mr. Teplitsky, if you're going to be

14   relying on this stuff, I'd like to see the correspondence

15   that's being provided....

16          MR. TEPLITSKY:  I know you would, but

17   maybe at trial you can cross-examine her on this stuff.

18   I'm not going to make a huge work project for myself

19   because I'm fulfilling what I think is my ethical

20   obligation to get you the papers I have.  I didn't ask her,

21   "Did you write them any letters?"

22   611.          BY MR. DERKSEN:  Q.  Are you prepared to

23   ask her now?

24   **REF 126**          MR. TEPLITSKY:  No, I'm not interested,

25   frankly.  I trust that she's an honourable person, recently

MHF

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    elevated to a higher position in the American Academy of

2    Appraisers, and that she's doing her job honestly.  You're

3    obviously skeptical and questioning or suspicious.  I'm

4    not.

5                     MR. DERKSEN:  I'm only as suspicious as

6    the Appellant appears to be vis-à-vis our Navigant stuff.

7                     MR. TEPLITSKY:  I told you I don't have

8    any facts to say that it's inauthentic, but how I could

9    admit the authenticity escapes me.

10                    MR. DERKSEN:  I'm not going to answer that

11   question.

12                    MR. TEPLITSKY:  I won't ask your client

13   tomorrow to admit that these are authenticity documents,

14   though I might ask him if he has any information that

15   they're not.

16   612.          BY MR. DERKSEN:  Q.  Many of these

17   documents are redacted.

18                    MR. TEPLITSKY:  Yes, and they were not

19   redacted by me or by her.  These are redacted by the

20   vendors who didn't want the name of the client to be

21   disclosed.

22   613.            BY MR. DERKSEN:  Q.  Is the Appellant

23   prepared to make efforts to provide un-redacted copies?

24                    MR. TEPLITSKY:  I don't have them.  This

25   is what they gave us after a hell of a lot of effort,

MHF

MHFeltman Verbatim Reporting

Jeffrey Sackman

1   according to her.  I didn't make the effort, all I've been

2   is persistent in bugging them to get it and they've been

3   the ones getting it and they're getting what they can get.

4   614.            BY MR. DERKSEN:  Q.  The binder contains

5   documents that appear to come from Charles Bragg, perhaps

6   Charles Lynn Bragg or Ro Gallery.  Did Yeomans obtain any

7   documentation from those three sources (Charles Bragg,

8   Charles Lynn Bragg, or Ro Gallery or Robert Rogale[?])

9   about sales to Coleman Fine Arts, Silver Fine Arts, or Paul

10  Sloan?

11           MR. TEPLITSKY:  No.  I didn't ask her

12  that, I knew you already had them.  In any event, it's not

13  relevant as far as I'm concerned.  I'm prepared — if one

14  wanted to talk to shorten this case, I am prepared to say

15  that there are different markets and here's the value for

16  the different markets, and if retail market isn't the right

17  market, then we're wrong.  I cannot justify the appraised

18  amounts other than as retail market appraisals.  So if you

19  want to say that you could buy these things at wholesale or

20  get them directly from the painter or the artist for less

21  money than what was shown, I don't have any doubt.  Whether

22  those are exactly the right numbers, but I know that there

23  is a huge difference, as there are in diamonds and other

24  commodities, between buying at source and selling retail.

25  615.            BY MR. DERKSEN:  Q.  It seems clear to me

MHFeltman Verbatim Reporting

207

Jeffrey Sackman

1    that Yeomans has access to Charles Bragg, Charles Lynn

2    Bragg, Ro Gallery.

3                MR. TEPLITSKY:  She seems to have access

4    to the Braggs and to Ro Gallery, but that doesn't mean that

5    they're sitting there and saying to her, "Edy, what else

6    can I give you?"  I think you will find out if you examine

7    her at trial, and I will ask her about the lengths that she

8    had to go to to get what I've produced thus far.

9    616.          BY MR. DERKSEN:  Q.  Are you prepared to

10   have Yeomans make inquiries of Charles Bragg, Charles Lynn

11   Bragg, and Robert Rogale about what....

12               MR. TEPLITSKY:  Why don't you hire your

13   own expert and then your own expert can go and make these

14   inquiries for you?

15   617.          BY MR. DERKSEN:  Q.  I take it that you're

16   not prepared to have her make these inquiries.

17   REF 127       MR. TEPLITSKY:  If they are to advance

18   your case, no.  If you think there are some inquiries I

19   could make to advance my case, I'd be happy to hear what

20   you had to say on that.

21               MR. DERKSEN:  You'd be happy to have me

22   help you with that, would you?

23               MR. TEPLITSKY:  Yes, of course, but you

24   seem to be as reluctant to help me with my case as I am

25   possibly to want to help you, of course.

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    618.          BY MR. DERKSEN:  Q.  These pages are

2    numbered and there's a page I would like to ask you to turn

3    up at A27.  This appears to be a letter from Charles Bragg

4    to Edy Yeomans.  Reference is made about four paragraphs

5    in: "If the Dyansen or Martin Lawrence dealers were the

6    original sources to other galleries it could be an

7    aberration, not a yardstick."  Are you prepared to make

8    inquiries of Yeomans to find out what information she

9    received about Dyansen?

10   **REF 128**     MR. TEPLITSKY:  No.

11   619.          BY MR. DERKSEN:  Q.  Did she know whether

12   Dyansen was a gallery that was owned by Paul Sloan?

13              MR. TEPLITSKY:  I have no idea who Dyansen

14   is.

15   620.          BY MR. DERKSEN:  Q.  Are you prepared to

16   ask her that?

17   **REF 129**     MR. TEPLITSKY:  No, I'm not.  Pretty soon

18   I'll stop sending you the material I get, if this is my

19   reward, to find tasks for me to do supplementary to my

20   disclosure.

21              MR. DERKSEN:  It's Mr. Sackman's

22   disclosure and wouldn't it be nice if he was able to

23   address these things so you didn't have to, but we have an

24   understanding about that.

25              MR. TEPLITSKY:  No, we don't, because why

209

MHFeltman Verbatim Reporting

Jeffrey Sackman

1   can't you — you're very sensitive to anything and how could

2   he possibly know anything about these things when this is

3   the preparation for his case for trial with his expert?

4   Why would the litigant himself be familiar with these

5   things? He wouldn't be. So why are you acting like this

6   is some sort of a big shock to you?

7   621.            BY MR. DERKSEN:   Q.   As part of Yeomans's

8   contact with Bragg, are you prepared to ask Yeomans whether

9   Bragg told her that he was selling prints to Paul Sloan?

10  **REF 130**      MR. TEPLITSKY:   No, I'm not.   I think if

11  you read this letter, what he's trying to say is that there

12  are occasions where people pick up these prints at very low

13  prices because of this, that, and the other thing, like

14  dealers going bad and what have you.   He is, generally

15  speaking, not in this market any more and that's how I

16  construed the letter.   But anyway, I'm not going to ask her

17  any more questions, but I will continue to supply you with

18  documents that she provides.

19  622.            BY MR. DERKSEN:   Q.   With respect to

20  Yeomans's contact with Ro Gallery, did she ask for all of

21  the sales of the subject titles or similar pieces?

22              MR. TEPLITSKY:   I can only tell you what I

23  instructed her to do, which was to find out for me and

24  obtain for me invoices about retail sales or sales to

25  dealers which are wholesale, sort of high-end wholesale.

MHFeltman Verbatim Reporting

1    That's what I asked her to do.

2    623.          BY MR. DERKSEN:  Q.  Do any of the

3    invoices in the binder pertain to sales of groups of

4    prints?

5              MR. TEPLITSKY:  No.  While there are some

6    that have more than one print to them, but if you mean

7    group volumes, no.  No, these are retail.

8              MR. DERKSEN:  Individual sales of one

9    print here, one print there.

10             MR. TEPLITSKY:  That's right, or two

11   prints or what have you.  This is the retail market.

12   624.          BY MR. DERKSEN:  Q.  Do any of these

13   invoices relate to prints that were sold as part of an art

14   donation program?

15             MR. TEPLITSKY:  I hope not.

16   625.          BY MR. DERKSEN:  Q.  There is a series of

17   documents that appear to be in Japanese.

18             MR. TEPLITSKY:  They're Japanese to me,

19   too.  I could help you with your French.

20   626.          BY MR. DERKSEN:  Q.  Is the Appellant

21   going to translate those documents?

22             MR. TEPLITSKY:  No.

23             MR. DERKSEN:  You won't provide us with a

24   translation.

25   U/T 131      MR. TEPLITSKY:  I'm not providing myself

**MHF**

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    with one.  If I get myself a translation, Mr. Derksen, I

2    will certainly give you a copy.  Meanwhile, I don't have

3    one and at the moment I don't intend to get one.

4    627.          BY MR. DERKSEN:  Q.  Do you know how

5    Yeomans obtained these invoices in Japanese?

6                  MR. TEPLITSKY:  I have no idea, but I

7    imagine that they're from a dealer, but I'm only guessing.

8    628.          BY MR. DERKSEN:  Q.  Are you prepared to

9    ask her that?

10                 MR. TEPLITSKY:  I will ask her, obviously,

11   for my own purposes.

12   629.          BY MR. DERKSEN:  Q.  Are you prepared to

13   make inquiries of Yeomans and ask and advise where she got

14   these?

15   U/T 132        MR. TEPLITSKY:  I have not met with Edy

16   Yeomans since I got the last bundle.  I met with her after

17   the first bundle, I haven't met with her since I got the

18   last bundle.  I forwarded them to you immediately, but I

19   had only received them very shortly before December 7.  So

20   I'll ask her about the Japanese ones because, obviously,

21   they're not very plain.

22                 MR. DERKSEN:  We'd like to know where they

23   came from.

24                 MR. TEPLITSKY:  That's fine, I'd like to

25   know, too.

212

MHFeltman Verbatim Reporting

Jeffrey Sackman

1   630.          BY MR. DERKSEN:  Q.  In addition, Mr.

2   Teplitsky, if we could have an explanation as to what the

3   Appellant says the reference to the 40 percent amount

4   means.  We have no idea.

5                   MR. TEPLITSKY:  Where is that?

6                   MR. DERKSEN:  For example, pages B11, B12,

7   B13, B14.

8                   MR. TEPLITSKY:  The Japanese ones.

9                   MR. DERKSEN:  Yes, B14, B15, and so on.

10  Those are just representative.

11  U/T 133      MR. TEPLITSKY:  I will find out for you.

12  631.          BY MR. DERKSEN:  Q.  And also, just as

13  you've got some of those Japanese invoices, there is also

14  some handwriting.  If that's handwriting of Yeomans, if you

15  could just identify that.

16  U/T 134      MR. TEPLITSKY:  I'll ask her whose

17  handwriting it is.

18  632.          BY MR. DERKSEN:  Q.  Mr. Teplitsky, as

19  part of the difficulty that we're having understanding

20  these documents insofar as they're in Japanese, if you

21  could provide us with some explanation as to how we can

22  determine the dates.  It's not always clear to us.

23                   MR. TEPLITSKY:  I think it's right up

24  here.

25                   MR. DERKSEN:  At B11, for example.

**MHF**

MHFeltman Verbatim Reporting                                Jeffrey Sackman

1    **U/T 135**          MR. TEPLITSKY:  It's September 004, but

2    anyway, I'll check with her on the dates.

3    633.          BY MR. DERKSEN:  Q.  And then within the

4    binder there is a series of price lists.  What, if any,

5    relevance does the Appellant say....

6                    MR. TEPLITSKY:  I think the price lists

7    are some evidence of what the retail market is.  They're

8    not as good evidence as actual sales, but they are the

9    advertised selling prices of the goods.  The same thing, do

10   you value a house on what the listed price was?  It's some

11   indication of value, but the better indication is what did

12   it actually sell for.

13   634.          BY MR. DERKSEN:  Q.  Is Yeomans aware of

14   any actual sales at the amounts stated in the price lists,

15   these Internet price lists?

16                    MR. TEPLITSKY:  She can't get that

17   information.  We haven't yet figured out how to access that

18   information, but one, I suppose, can assume that people

19   don't advertise endlessly on the Internet if they're not

20   doing any business, but this is an inference.  If I could

21   get that, believe me, I would have it, but we're going to

22   keep on trying.  This is a work in process.

23                    MR. DERKSEN:  Off the record, please.

24   --- RECESS

25   635.          BY MR. DERKSEN:  Q.  Mr. Teplitsky, I'm

MH♦IT

MHFeltman Verbatim Reporting                                      Jeffrey Sackman

1  given to understand that I may not have actually used the

2  words "working papers" when I asked for materials and the

3  files of Rosoff and Yeomans as far as it relates to before

4  the litigation concerning the appraisals.

5           MR. TEPLITSKY:  Yes, you only used it

6  maybe ten times.

7           MR. DERKSEN:  If I didn't, can we make it

8  clear that my request included the working papers.

9           MR. TEPLITSKY:  That's fine.

10           MR. DERKSEN:  The Crown is prepared to

11  adjourn the discovery subject to questions arising from the

12  undertakings and subject to the disposition of any refusal

13  motions that the Crown may proceed with.

14           MR. TEPLITSKY:  That's fine.

15           MR. DERKSEN:  Thank you.

16           MR. TEPLITSKY:  Thank you.

17

18                              CERTIFIED CORRECT

19

20                              Holly Feltman, C.V.R.

21

22

23

24

25

F

**THIS IS EXHIBIT "F"**
referred to in the affidavit of
**Laura Alescio**
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

84

**Ro Gallery Image Makers, inc.**

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date:  11/10/1999

**Sold To:**
Nesconset, NY 11767

**Ship To:**

Delray Beach FL 33484

| Order #:99-508 | Terms: | Paid Ck | Shipped Via: | UPS – 2 day insured | |
|---|---|---|---|---|---|
| **Artist** | **Quantity** | **Description** | | **Cost\*** | **Amount** |
| Picasso (estate) | 1 | Le Peintre et son modele Ap 34 | | $2700.00 | $2,700.00 |

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice.* | **Sub Total:** | $2,700.00 |
| | **Packing, Handling, Shipping & Insurance:** | $35.00 |
| **Comments:** | **Sales Tax :** | Ship to FL |
| | **Total Invoice:** | $2,735.00 |

**Ro**
**Gallery**
**Image Makers, inc.**

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
**Date:  1/26/00**

Sold To:

St. Pete Beach, FL 33706

Ship To:

St. Pete Beach, FL 33706

85

| Order #:00-501 | Terms:  Paid by check | | Shipped Via:  | UPS 2 day insured | |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Picasso (estate) | 1 | Femme au Fauteuil Rouge 489/500 | | $2780.00 | $2,780.00 |

| | | | |
|---|---|---|---|
| *Prices Subject to Change Without Notice. | | Sub Total: | $2,780.00 |
| | Packing, Handling, Shipping & Insurance: | | $35.00 |
| | Sales Tax : | | Ship to FL |
| Comments: | Total Invoice: | | $2,815.00 |

86

**RGallery**
*Image Makers, Inc.*

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date: 2/15/00

**Sold To:**

3550 Galt Ocean Drive
Ft. Lauderdale, FL 33308

**Ship To:**

3550 Galt Ocean Drive
Ft. Lauderdale, FL 33308

| Order #:00-309 | Terms: Paid MC | | Shipped Via: | | UPS - insured |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Picasso (estate) | 1 | "Deux Enfants Claude et Paloma" 19A    101/500 Certificate enclosed | | $4500.00 | $4,500.00 |

| *Prices Subject to Change Without Notice. | Sub Total: | $4,500.00 |
|---|---|---|
| | Packing, Handling, Shipping & Insurance: | $55.00 |
| **Comments:** | Sales Tax: | Ship to FL |
| | Total Invoice: | **$4,555.00** |



The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

## INVOICE
### Date:   11-30-2000

Sold To:

Tokyo, JAPAN 113-0031

Ship To:

Bunkyo
Tokyo, JAPAN 113-0031

87

| Artist | Terms: **Paid American Express** | Quantity | Description | Shipped Via: | Cost* | Customer fed ex Amount |
|--------|------|----------|-------------|--------------|-------|--------|
| MIRO, Joan | | 1 | "Le Mirror de l'homme par les betes" HC | | $8500.00 | $8,500.00 |
| Picasso(estate) | | 1 | Femme Assise  AP 22 | | $2800.00 | $2800.00 |
| Hall, Susan | | 1 | Pencils   AP (etching/aquatint) | | $2500.00 | $2500.00 |
| | | | title not listed | | | |
| | | | all others @ $1400 | | | |

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice. | Sub Total: | $13,800.00 |
| Packing, Handling, Shipping & Insurance: | | CUST FX |
| Sales Tax : | | Ship to Japan |
| Total Invoice: | | $13,800.00 |

Comments:

# Ro Gallery Image Makers, inc.

**The Source For Select Artworks**

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

## INVOICE
Date: 12/18/1999

**Sold To:**
Chattanooga, TN 37421

**Ship To:**
Chattanooga, TN 37421

88

| Artist | Quantity | Description | Cost* | Amount |
|--------|----------|-------------|-------|--------|
| | | Terms: Paid MC | Shipped Via: | UPS- 2 day insured |
| PICASSO (Estate) | 1 | J-28 "Tete de Femme en gris et rouge sur fond Ocre   217/500 | $2500.00 | $2,500.00 |
| MIRO | 1 | 6/50 lithograph | $6000.00 | $6,000.00 |
| Lombardi, G. | 1 | Gathering Cane   800·700 | $1250.00 | $1250.00 |
| Max, P. | 1 | Liberty (mixed media on paper) | $3700.00 | $3700.00 |
| Fiorvanti | 1 | Cottage in winter   900 | $1400.00 | $1400.00 |
| *Prices Subject to Change Without Notice. | | | Sub Total: | $14,850.00 |

Packing, Handling, Shipping & Insurance: No Charge
Sales Tax : Ship to TN
Total Invoice: $14,850.00

**Comments:**



**RO*allery***
*Image Makers, Inc.*
The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date: 11/28/00]

Sold To:
DR. RANDALL SWANLUND

Ship To:
DR. RANDALL SWANLUND

89

| Order 00r30981 | Terms: | Paid Visa* | Shipped Via: | Airborne – 2 day ins | |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Pablo PICASSO | 1 | Femme a la Robe Multicolore  AP 12 | | $2950.00 | $2,950.00 |
| (estate) | 1 | Femme Assise d'une Fenetre     118/500 | | $2500.00 | $2,500.00 |
| | | | | | |
| | | *Certificates of Authenticity enclosed* | | | |

| | |
|---|---|
| *Prices Subject to Change Without Notice.* | |
| Sub Total: | $5,450.00 |
| Packing, Handling, Shipping & Insurance: | $15.00 |
| Sales Tax : | Ship to WA |
| Total Invoice: | $5,465.00 |

Comments: Thank you for your order.

**90**

**Ro
Gallery
Image Makers, inc.**

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com

**INVOICE**
Date: 3/10/2000

Sold To:

North Kingston, RI 02852

Ship To:

North Kingston, RI 02852

| Orde4:Exp2050 | Terms: | Paid check # 1897 | | Shipped Via: | | UPS OVERNIGHT |
|---|---|---|---|---|---|---|
| **Artist** | **Quantity** | | **Description** | | **Cost\*** | **Amount** |
| Picasso Pablo | 1 | | "L'entriente", bloch number 1111 Original Etching    21/50 framed | | $16,500.00 | $16,500.00 |
| Picasso (Estate) | 1 | | #24-1 "Femme au Fauteuil Rouge" 492/500 | | $3000.00 | $3,000.00 |
| | | | Certificates enclosed | | | |
| *Prices Subject to Change Without Notice.* | | | | | **Sub Total:** | $19,500.00 |

| | | |
|---|---|---|
| | **Packing, Handling, Shipping & Insurance:** | $140.00 |
| **Comments:** | **Sales Tax :** | Ship to RI |
| | **Total Invoice:** | **$19,640.00** |

**91**

## Ro Gallery Image Makers, inc.

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 ● 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date: **10/11/1999**

**Sold To:**

Winnepeg, Manatoba,
CANADA R3L 1R1

**Ship To:**

Winnepeg, Manatoba,
CANADA R3L 1R1

| Order:99e5777 | Terms: | Paid AmEx* | Shipped Via: | | Fed Ex Intl |
|---|---|---|---|---|---|
| **Artist** | **Quantity** | **Description** | | **Cost*** | **Amount** |
| Picasso, P. (estate) | 2 | Nature Morte au Gueridon et a l'Assette Reference #11-B 47/500 Fillette au Bateau Reference: # 4-B Ap 16 | | $2500.00 | $5,000.00 |

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice. | Sub Total: | $5,000.00 |
| **Packing, Handling, Shipping & Insurance:** | | $75.00 |
| Comments:  Thank you for your order. | Sales Tax : | Ship to CAN |
| | Total Invoice: | $5,075.00 |

92

**Ro Gallery Image Makers, inc.**

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date: 3/16/2000

Sold To:

Houston, TX 77219

Ship To:

Houston TX 77004

| Order:00-7650 | Terms: consignment | | Shipped Via: | UPS – 2 day insured | |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Picasso (estate) | 1 | "Femme au Beret" #23-10 185/500 Limited edition re-creation of an oil on Canvas by Picasso created in 1939. Year of publication: 1981 Lithograph in colors on Arches Paper. Approved by the Heirs of PICASSO. | | $3000.00 | $3,000.00 |
| *Prices Subject to Change Without Notice. | | | | Sub Total: | $3000.00 |
| | | | Packing, Handling, Shipping & Insurance: | | $50.00 |
| Comments: | | | Sales Tax : | | Ship to TX |
| | | | Total Invoice: | | **$3,050.00** |

# Ro Gallery Image Makers, inc.

**The Source For Select Artworks**

47-15 36ᵗʰ Street
Long Island City, New York 1110
Tel: 718 937-0901 • 212 732-688
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date:  1/5/00

Sold To:

Cleveland, OH 44113

Ship To:

Cleveland, OH 44113

93

| Order #:001001 | Terms: | COD | Shipped Via: | | UPS – 2 DAY INS |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Picasso (estate) | 3 | 11B:  1/500<br>26D:  484/500<br>23-8:  321/500 | | $3000.00 | $9,000.00 |
| | 1 | Discount | | -$150.00 | ($ 150.00) |

*Prices Subject to Change Without Notice.*

Comments:

| | |
|---|---|
| Sub Total: | $8,850.00 |
| Packing, Handling, Shipping & Insurance: | $55.00 |
| Sales Tax : | Ship to OH |
| Total Invoice: | $8,905.00 |

94

**Ro
Gallery
Image Makers, inc.**

The Source For Select Artworks

47-15 36th Stree'
Long Island City, New York 1110'
Tel: 718 937-0901 ● 212 732-688'
Fax: 718 937-120'
e-mail: art@rogallery.con
web address: www.rogallery.con

**INVOICE**
Date:  3/6/1999

**Sold To:**

799 Park Avenue
New York, NY 10021

**Ship To:**

799 Park Avenue
New York, NY 10021

| Order:EXPO99 | Terms: | Paid AM EX | Shipped Via: | | Direc |
|---|---|---|---|---|---|
| Artist | Quantity | Description | Cost* | Amount | |
| Picasso (estate) | 1 | Visage de Femme sur Fond Raye AP 18 | $3000.00 | $3,000.0( | |
| *Prices Subject to Change Without Notice. | | | Sub Total: | $3,000.0( | |
| | | | Packing, Handling, Shipping & Insurance: | No Charge | |
| Comments: | | | Sales Tax : | | |
| | | | Total Invoice: | $3,000.0( | |

**95**

# ROGallery
*Image Makers, Inc.*

**The Source For Select Artworks**

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 ● 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
**Date:  8/15/98**

Sold To:

Brookline, MA 02146

Ship To:

Brookline, MA 02146

| Order:00-8761 | Terms: | Paid check | Shipped Via: | | UPS |
|---|---|---|---|---|---|
| **Artist** | **Quantity** | **Description** | | **Cost\*** | **Amount** |
| Picasso (estate) | 1 | Le Peintreet son modele" 26-9 Framed. 4/500 | | $5000.00 | $5,000.00 |

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice.* | **Sub Total:** | $5,000.00 |
| **Packing, Handling, Shipping & Insurance:** | | $55.00 |
| **Sales Tax :** | | Ship to MA |
| **Comments:**            **Total Invoice:** | | $5,055.00 |

12/09/2001  07:30   7189371206                    ROGALLERY                    PAGE  02

**RGallery.com**

The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date: 11/19/2001

Sold To:

Oakland, CA 94609

Ship To:

same

96

| Order:0113444 | Terms: Upon presentation | | Shipped Via: | | UPS - insured |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Picasso (estate) | 1 | "Cavalier en Armure" AP 4 | | $2850.00 | $2,850.00 |
| | | Certificate of Authenticity enclosed. | | | |

*Prices Subject to Change Without Notice.*

| | | |
|---|---|---|
| | Sub Total: | $2,850.00 |
| Packing, Handling, Shipping & Insurance: | | $35.00 |
| Sales Tax: | | Ships to CA |
| Total Invoice: | | $2,885.00 |

Comments:  Thank you for your order.

# Ro Gallery Image Makers, inc.

**The Source For Select Artworks**

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

## INVOICE
### Date:  3/30/2000

**Sold To:**

Ithaca, NY 14850

**Ship To:**

Ithaca, NY 14850

**97**

| Order:00-5011 | Terms: | Upon Presentation | | Shipped Via: | | UPS – 2 day |
|---|---|---|---|---|---|---|
| Artist | Quantity | Description | | | Cost* | Amount |
| Picasso (estate) | 2 | 12-E – "Les Repas Des Enfants" 214/500 1-B – "Fillette Couronee au Bateau" 436/500 | | | 2500.00 | $5,000.00 |

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice. | Sub Total: | $5,000.00 |
| | Packing, Handling, Shipping & Insurance: | $50.00 |
| **Comments:** | Sales Tax : | |
| | Total Invoice: | $5,050.00 |

G

**THIS IS EXHIBIT "G"**
**referred to in the affidavit of**
**Laura Alescio**
This _30th_ day of September, 2011

**Commissioner for Taking Affidavits**

85

**MHia**

MHFeltman Verbatim Reporting

1        TAX COURT OF CANADA

2        IN RE:  The Income Tax Act

3     BETWEEN:                    2002-4824(IT)G

4              JEFFREY SACKMAN

5                                      Appellant

6                  – and –

7

8            HER MAJESTY THE QUEEN

9                                  Respondent

10

11     This is the Examination for Discovery of **JEFFREY SACKMAN**,

12     the Appellant herein, held at the Offices of the Department

13     of Justice, 2 First Canadian Place, Exchange Tower, Suite

14     3400, Toronto, Ontario, on Monday, January 15, 2007.

15                  **VOLUME II**

16

17     APPEARANCES:

18     Martin Teplitsky, Q.C.          for the Appellant

19     Perry Derksen, Esq.)            for the Respondent

20     Jenna Clark          )

21

22

23            MHFeltman Verbatim Reporting

24      375 Merton Street, #302   Toronto, Ontario  M4S 1B4

25              Per:  Holly Feltman, C.V.R.

1    charities, including the Ontario Foundation.  What

2    information did Artistic provide the charities with respect

3    to the possible sale of the prints?

4    **REF 75**        MR. TEPLITSKY:  That's a refusal.

5    485.        BY MR. DERKSEN:  Q.  Were you aware, Mr.

6    Sackman, that Artistic may have advised charities, in

7    particular the Ontario Foundation, that the charities could

8    sell some of the prints?  Did you have any personal

9    knowledge of that?

10                A.  No.

11   486.        Q.  You've never heard of that.

12                A.  No.

13   487.        Q.  Do you know if Coleman Fine Arts or

14   Silver Fine Arts or an individual by the name of Paul Sloan

15   engaged anyone to go out and source or find prints for the

16   prints that were transacted as part of Artistic's art

17   donation program?

18                MR. TEPLITSKY:  We don't.

19   488.        BY MR. DERKSEN:  Q.  Are you prepared to

20   make inquiries of Artistic Ideas and to advise with respect

21   to that?

22   **REF 76**        MR. TEPLITSKY:  No.

23   489.        BY MR. DERKSEN:  Q.  Do you know where

24   Coleman Fine Arts — Mr. Teplitsky, in fairness, I wanted to

25   ask some questions with respect to the source of the prints

MHFeltman Verbatim Reporting                                        Jeffrey Sackman

1     for 1998 and 1999.  To move matters along, I take it your

2     client would refuse to answer questions of that nature.

3  **REF 77**       MR. TEPLITSKY:  Yes.

4    490.       BY MR. DERKSEN:  Q.  With respect to 2000,

5     are you aware of any information as to how Coleman and

6     Silver Fine Arts obtained prints that were part of

7     Artistic's art donation program or the prints that you

8     purchased and acquired through Artistic Ideas?

9         MR. TEPLITSKY:  We have no information.

10    491.       BY MR. DERKSEN:  Q.  Are you prepared to

11     make inquiries of Artistic Ideas with respect to that

12     matter?

13  **REF 78**       MR. TEPLITSKY:  No.

14    492.       BY MR. DERKSEN:  Q.  So you have no

15     information about the history of the prints that were

16     transacted in 2000.

17         MR. TEPLITSKY:  Other than is contained in

18     our appraisal reports and will be in our expert reports.

19    493.       BY MR. DERKSEN:  Q.  Are you aware of

20     whether Coleman Fine Arts or Silver Fine Arts or Paul Sloan

21     sold any of the subject prints to other people that weren't

22     involved in the art donation program, Artistic's art

23     donation program?

24         MR. TEPLITSKY:  The only specific evidence

25     of sales, retail sales or wholesale sales, specific

MHF

MHFeltman Verbatim Reporting

159

Jeffrey Sackman

1   evidence, I have provided to you.

2                   MR. DERKSEN:   In the binder.

3                   MR. TEPLITSKY:   In the binder, yes.   I

4   don't have anything else other than what's disclosed in the

5   experts' reports or in what I've already given to you.

6   494.             BY MR. DERKSEN:   Q.   Do you know whether

7   Coleman Fine Arts, Silver Fine Arts, or Paul Sloan had any

8   affiliation or particular interest in the charities that

9   you donated to?

10                   MR. TEPLITSKY:   I have no knowledge of

11   that.

12   495.             BY MR. DERKSEN:   Q.   Are you prepared to

13   make those inquiries?

14   REF 79           MR. TEPLITSKY:   No.

15                   MR. DERKSEN:   Off the record, please.

16   --- OFF THE RECORD

17   496.             BY MR. DERKSEN:   Q.   If you would turn up

18   Exhibit 3, Binder 2 of the Respondent's second

19   supplementary documents, and I would ask you to turn up Tab

20   39, Mr. Sackman.   I would ask you to look at this document,

21   which appears to be an invoice.   It has at the top Charles

22   Lynn Bragg and it's dated, it appears, May 24, 2001, and

23   says ship to Artistic Ideas and bill to Coleman Fine Arts,

24   and it references some prints and shows a unit price of $40

25   and a quantity of 3,738.   Is Mr. Sackman prepared to admit

MHFeltman Verbatim Reporting

Jeffrey Sackman

1    that Coleman Fine Arts was paying $40 per print with

2    respect to the Charles Lynn Bragg prints that he bought and

3    donated as part of the donations in 2000?

4                    MR. TEPLITSKY:  No.  This references a

5    transaction subsequent to 2000.

6    497.            BY MR. DERKSEN:  Q.  I'm going to suggest

7    to you that this concerns the subject properties for 2000.

8    Are you prepared to make inquiries of Artistic Ideas to

9    confirm whether this invoice concerns the Charles Lynn

10   Bragg prints that Mr. Sackman bought and donated through

11   Artistic's program in 2000?

12   **REF 80**        MR. TEPLITSKY:  No.

13   498.            BY MR. DERKSEN:  Q.  And are you prepared

14   to make inquiries and ask for copies of agreements, the

15   agreements that are referenced in the document?  This is

16   the agreement with Charles Lynn Bragg and Silver Fine Arts

17   dated September 21, 2000, and last updated May 24, 2000?

18   **REF 81**        MR. TEPLITSKY:  No.

19   499.            BY MR. DERKSEN:  Q.  Are you prepared to

20   admit the authenticity of this document, that it's a copy

21   of an invoice?

22                    MR. TEPLITSKY:  No, not unless you tell me

23   how you got it, then I might consider it.

24                    MR. DERKSEN:  It's my understanding that

25   this document was obtained through a request through the

MHFeltman Verbatim Reporting

161

Jeffrey Sackman

1  IRS through a mutual assistance request.

2  MR. TEPLITSKY:  I obviously can't agree to

3  that.

4  500.  BY MR. DERKSEN:  Q.  Are you prepared to

5  undertake to make inquiries to confirm whether Artistic

6  Ideas, Mr. Sackman's agent, received a copy of this invoice

7  and advise as to its understanding of what this document

8  relates to?

9  MR. TEPLITSKY:  Artistic Ideas is not even

10  a party to the listed agreement.

11  MR. DERKSEN:  It certainly indicates that

12  it is receiving something pursuant to this invoice.

13  **REF 82**  MR. TEPLITSKY:  The goods referenced, I

14  take it, are being shipped, according to this agreement, to

15  Artistic.  It's not a contracting party.  The contracting

16  parties are identified as Silver Fine Arts and Charles Lynn

17  Bragg.  So, no.

18  501.  BY MR. DERKSEN:  Q.  I apologize if I'm

19  repeating myself.  Are you prepared to make inquiries of

20  Artistic to determine whether they received a copy of this

21  document?

22  **REF 83**  MR. TEPLITSKY:  No.

23  502.  BY MR. DERKSEN:  Q.  Are you prepared to

24  make inquiries to confirm the cost to Coleman or Silver

25  Fine Arts or Paul Sloan with respect to the Charles Lynn

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    Bragg prints that you bought and donated in 2000?

2    **REF 84**        MR. TEPLITSKY:  No.  Did you get the

3    balance of this invoice?

4                    MR. DERKSEN:  I'm sorry.

5                    MR. TEPLITSKY:  You didn't get the

6    agreement, the Schedule A.

7                    MR. DERKSEN:  I'm not aware of the Crown

8    having a copy of it.  Off the record, please.

9    --- OFF THE RECORD

10   503.          BY MR. DERKSEN:  Q.  Turn over to Tab 40

11   of Exhibit 3.  This is a document that appears to be an

12   invoice from Charles Bragg, Asylum Studio, to Silver Fine

13   Arts, dated July 26, 2001, and it refers to 5,000 graphics,

14   assorted titles, $40 apiece, and total amount $200,000.

15   Are you prepared to make inquiries of Artistic Ideas or

16   Silver Fine Arts or Paul Sloan to confirm whether this is a

17   copy of an invoice concerning Charles Bragg prints that

18   were purchased and donated by Mr. Sackman in the 2000

19   taxation year?

20                   MR. TEPLITSKY:  Which of Mr. Sackman's

21   prints do you saying are included in this?

22                   MR. DERKSEN:  I'm asking you if you're

23   prepared to make those inquiries.

24   **REF 85**        MR. TEPLITSKY:  No.

25   504.          BY MR. DERKSEN:  Q.  And are you prepared

MHFeltman Verbatim Reporting

163

Jeffrey Sackman

1  to admit or make inquiries about how much Silver Fine Arts

2  or Paul Sloan was paying for the Charles Bragg prints that

3  were part of Artistic's art donation program?

4  REF 86          MR. TEPLITSKY:  No.

5  505.            BY MR. DERKSEN:  Q.  Are you prepared to

6  make inquiries and to provide, if available, copies of any

7  agreements between Charles Bragg and Silver Fine Arts?

8  REF 87          MR. TEPLITSKY:  No.

9  506.            BY MR. DERKSEN:  Q.  Do you have any

10  knowledge, Mr. Sackman, about what Artistic or Coleman Fine

11  Arts or Silver Fine Arts paid for the prints that you

12  bought and donated?

13                  A.  No.

14  507.            Q.  I take it, Mr. Teplitsky, the

15  Appellant is not prepared to admit the authenticity of this

16  document.

17                  MR. TEPLITSKY:  Is this another one you

18  got through the IRS?

19                  MR. DERKSEN:  That's my understanding.

20                  MR. TEPLITSKY:  And did you get anything

21  to indicate that any of this has anything to do with this

22  case?

23                  MR. DERKSEN:  Only the information that

24  I've received as part of the commission.

25                  MR. TEPLITSKY:  Did you produce that

H

**THIS IS EXHIBIT "H"**
referred to in the affidavit of
**Laura Alescio**
This _30th_ day of September, 2011

**Commissioner for Taking Affidavits**

*Case Name:*
## Sackman v. Canada

Between
**Her Majesty the Queen, Appellant, and
Jeffrey Sackman and Artistic Ideas Inc., Respondents**

[2008] F.C.J. No. 726

2008 FCA 177

2008 D.T.C. 6407

[2008] 4 C.T.C. 99

167 A.C.W.S. (3d) 64

378 N.R. 192

Docket A-378-07

Federal Court of Appeal
Toronto, Ontario

**Linden, Noël and Ryer JJ.A.**

Heard: May 6, 2008.
Judgment: May 8, 2008.

(23 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Examination for discovery -- Persons who may be examined -- Non-parties -- Range of examination -- Relevancy -- Appeal by Crown from dismissal of its motion for permission to examine for discovery a representative of a third party pursuant to s. 99 of Tax Court of Canada Rules -- Originally Crown had sought to ask 86 questions, but on appeal limited their request to six -- Appeal allowed -- Questions now proposed by Crown were relevant to the determination of the market in which the artwork was sold for the purpose of determining its fair market value -- This constituted information not possessed by Crown, and was not unfair to either respondent or third party.*

Appeal by the Crown from dismissal of its motion for permission to examine for discovery a representative of a third party, Artistic, pursuant to s. 99 of the Tax Court of Canada Rules (General Procedure). The motion sought leave to examine a knowledgeable nominee of Artistic on a wide variety of questions, 86 in total, which related to the art donation program through which Sackman purchased art and made the charitable donations that were in issue in the main appeal. On appeal, the Crown proposed to limit the scope of the examination which it wished to conduct to a single issue, which

reduced the number of questions which it sought to explore from 86 to six.

HELD: Appeal allowed with reference to the 6 questions proposed by the Crown. The six questions now proposed by the Crown were relevant to the determination of the market in which the artwork was sold for the purpose of determining its fair market value. This constituted information not possessed by the Crown, and was not unfair to either Sackman or Artistic.

**Statutes, Regulations and Rules Cited:**

Tax Court of Canada Rules (General Procedure), SOR/90-688, s. 99(1)

Appeal From: Appeal from an order of Bowman C.J. of Tax Court of Canada dated August 17, 2007, and substituted by amended order dated August 27, 2007, in Tax Court File No. 2002-4824(IT)G).

**Counsel:**

Perry Derksen and Martin Beaudry, for the Appellant.

Martin Teplitsky and Matthew Sokolsky, for the Respondent (Jeffrey Sackman).

Irving Marks and Shawn L. Pulver, for the Respondent (Artistic Ideas Inc.).

---

The judgment of the Court was delivered by

1    NOËL J.A.:-- This is an appeal from a decision of Bowman C.J., which, *inter alia*, dismissed the Crown's motion for permission to examine for discovery a representative of a third party, Artistic Ideas Inc. ("Artistic"), pursuant to section 99 of the *Tax Court of Canada Rules (General Procedure)* SOR/90-688, as amended (the "Tax Court Rules"). The motion sought leave to examine a knowledgeable nominee of Artistic on a wide variety of questions -- 86 in total -- having to do with the art donation program through which the respondent, Jeffrey Sackman, purchased art and made the charitable donations that are in issue in the main appeal.

2    In challenging Bowman C.J.'s refusal to grant leave, the Crown has departed significantly from the motion as it was originally presented. It now proposes to limit the scope of the examination which it wishes to conduct to a single issue, thereby reducing the number of questions which it seeks to explore from 86 to 6.

**RELEVANT FACTS**

3    Artistic ran an art donation program whereby individual taxpayers, described as "investors" would purchase prints in bulk for a low price. Commencing in 1998, Artistic offered these investors groups of 11 prints, appraised at a value of at least $1000, for $3,500. The investors would then donate 10 of the 11 prints and receive a tax receipt of $10,000. Using the Ontario and federal tax rates, each investor was said to achieve tax savings of $5,029 on a $3,500 investment. Through its program, Artistic acted as agent for the investors in acquiring the prints from one of two vendors -- Coleman Fine Arts Inc. and later in 2000, Silver Fine Arts Ltd - and finding one or more charities to accept donations and issue charitable receipts.

4    Jeffrey Sackman bought several groups of prints and donated a total of 447 prints in 2000 through

Artistic's art donation program. For the 2000 taxation year, he reported total charitable gifts of $802,031 and claimed the corresponding tax credit (Appellant's Memorandum, para. 7).

**5**    The Minister of National Revenue (the "Minister") reassessed Mr. Sackman for the 2000 taxation year on the basis that the fair market value of the prints donated could not exceed the amount he paid for them. As Mr. Sackman produced no evidence of payment, the Minister assumed that the cost of the prints, and consequently their fair market value, was nil. The Minister nevertheless conceded that the prints must have had some value. Mr. Sackman appealed this reassessment and the main issue before the Tax Court in the appeal (the "Sackman Appeal") concerns the fair market value of the donated prints. Artistic, although it appears as a respondent in the present appeal, is not a party to the Sackman Appeal. [Artistic is currently awaiting a decision of the Tax Court on an appeal from a notice of assessment for Goods and Services Tax (the "G.S.T. appeal"). As part of the G.S.T. appeal, a representative of Artistic, Mark Pearlman, was examined and cross-examined for discovery.]

**6**    This Court has twice considered similar appeals involving the fair market value of prints purchased and donated by taxpayers through promoters such as Artistic (see *Klotz v. Canada*, [2004] T.C.J. No. 52, 2004 TCC 147, aff'd in *Klotz v. Canada*, [2005] F.C.J. No. 754, 2005 FCA 158 ("*Klotz*") and *Nash v. Canada*, [2005] F.C.J. No. 1921, 2005 FCA 386 ("*Nash*")). In both cases, the determination of the fair market value for the prints was based on evidence establishing the volume and details of the transactions by the promoters.

**7**    In August of 2004, several years prior to the commencement of the examinations for discovery in the Sackman Appeal, the Crown formally requested information and documents from Artistic. Artistic advised that the request was inappropriate and refused to respond (Tringali Affidavit, No.2, paras. 18-20 and Exhibits "B", "C" and "D" thereto, Appeal Book, Vol. I. Tab 6, p.77).

**8**    During the examination for discovery of Mr. Sackman, the Crown asked for information concerning Artistic's art donation program, including whether Mr. Sackman would undertake to make inquiries of Artistic about the prints sold and donated through the program. Some of the questions were directed at establishing the volume and details of the transactions in the Artistic's art donation program in order to determine the market created by the donation program and the fair market value of the prints. Mr. Sackman refused to make the requested undertakings. He also refused to admit the accuracy of certain facts contained in a report (the "Navigant Report") prepared for the Crown regarding certain of the transactions in Artistic's art donation program.

**9**    Subsequently, on February 13, 2007, the Crown wrote to Artistic's counsel and again requested the information and documents. A list of 86 questions subdivided under a number of topics was attached as Schedule A to the letter (Exhibit "G" of Tringali Affidavit No.2, Appeal Book, Vol.1, Tab 6(g), p. 160). The Crown also asked whether Artistic would consent to an order for third-party discovery. Artistic refused to answer the Crown's questions or consent to an order for third-party discovery.

**10**    In light of Mr. Sackman's refusal to make inquiries and Artistic's refusal to informally provide information and documents, the Crown brought a motion under rule 99 of the *Tax Court Rules*, for leave to examine Artistic for discovery as a non-party through a knowledgeable nominee with respect to the 86 questions which Artistic had refused to respond to (the questions are set out at Appendix A of the decision under review). Rule 99 provides:

> **99.** (1) The Court may grant leave, on such terms respecting costs and other matters as are just, to examine for discovery any person who there is reason to believe has information relevant to a material issue in the appeal, other than an expert engaged by or on behalf of a party in preparation for contemplated or pending litigation.

(2)   Leave under subsection (1) shall not be granted unless the Court is satisfied that,

    (*a*) the moving party has been unable to obtain the information from other persons whom the moving party is entitled to examine for discovery, or from the person sought to be examined,

    (*b*) it would be unfair to require the moving party to proceed to hearing without having the opportunity of examining the person, and

    (*c*) the examination will not,

    (i)   unduly delay the commencement of the hearing of the proceeding,
    (ii)  entail unreasonable expense for other parties, or
    (iii) result in unfairness to the person the moving party seeks to examine.

(3)   A party who examines a person orally under this section shall, if requested, serve any party who attended or was represented on the examination with the transcript free of charge, unless the Court directs otherwise.

(4)   The examining party is not entitled to recover the costs of the examination from another party unless the Court expressly directs otherwise.

(5)   The evidence of a person examined under this section may not be read into evidence at the hearing under subsection 100(1).

* * *

**99.** (1) La Cour peut accorder, à des conditions appropriées, notamment quant aux dépens, l'autorisation d'interroger au préalable une personne, à l'exception d'un expert engagé en prévision d'un litige ou en instance par une partie, ou en son nom, si elle a des raisons de croire que cette personne possède des renseignements pertinents sur une question importante en litige.

(2)   La Cour n'accorde l'autorisation selon le paragraphe (1) que si elle est convaincue :

    a) que le requérant n'a pas été en mesure d'obtenir ce renseignement de l'une des personnes qu'il a le droit d'interroger au préalable ou de la personne qu'il désire interroger;

    b) qu'il est injuste d'exiger que l'instance soit instruite sans que le requérant de la requête ait la possibilité d'interroger cette personne;

    c) que l'interrogatoire n'aura pas pour effet, selon le cas :

    (i)   de retarder indûment le début de l'instruction de l'instance,
    (ii)  d'entraîner des dépenses injustifiées pour les autres parties,
    (iii) de causer une injustice à la personne que le requérant désire interroger.

(3)   Sauf directive contraire de la Cour, la partie qui interroge oralement une personne en application du présent article signifie, sur demande, une transcription gratuite de l'interrogatoire à toute partie qui y a assisté ou qui s'y est fait représenter.

(4)   Sauf directive expresse contraire de la Cour, la partie interrogatrice n'a pas le droit de recouvrer d'une autre partie les dépens de l'interrogatoire.

(5)   La déposition d'une personne interrogée en application du présent article ne peut être consignée en preuve à l'audience aux fins du paragraphe 100(1).

**11**   The motions judge denied the Crown's motion on the basis that the 86 questions with respect to which discovery was being sought were oppressive, excessive and aimed at the improper purpose of impeaching Mr. Pearlman.

## POSITION OF THE PARTIES

**12**   On appeal, the Crown has narrowed down the questions with respect to which it seeks to examine Artistic from 86 to 6. Those which remain in issue are questions 41-44; 46 and 49, as summarized at paragraph 22 of the Crown's memorandum:

- **Composition of Groups**: A listing of the composition of the groups of prints and the number of each particular group sold in 1998, 1999 and 2000.
- **Dates of Sale and Donation and Prices Paid**: A listing by name of donor showing the date of purchase, the number of groups purchased, the price paid per groups and the date of the gift for 1998, 1999 and 2000.
- **Details by Donor**: A report for each donor showing the print titles acquired and charity selected for 1998, 1999 and 2000.
- **Details by Title**: A report by print title showing the names of the donors and the number of each title purchased for 1998, 1999 and 2000.
- **Details by Charity**: A report by charity showing the print titles and number of each title donated for 1998, 1999 and 2000.
- If Artistic cannot provide the above reports, what reports can be generated?

**13**   These questions are aimed at identifying the precise market into which the prints were sold with a view of establishing their fair market value. The position of the Crown, as I understand it, is that having regard to the 6 questions which they wish to pursue and their limited scope, all the conditions precedent for ordering a third party discovery under subsection 99(1) of the Tax Court Rules are met and the concerns raised by Bowman C.J. in dismissing the original application are no longer present.

**14**   In response, both Mr. Sackman and Artistic take the position that there was nothing in the original 86 questions that can assist the Crown in advancing its case and that the information sought was already in the possession of the Minister. Otherwise, they contend that Bowman C.J. properly dismissed the Crown's application for the reasons that he gave.

## ANALYSIS AND DECISION

**15**   The gist of the reasoning of Bowman C.J. for rejecting the appellant's motion as it was originally framed is as follows:

[24] On February 3, 2007, counsel for the respondent wrote to the solicitors for the appellant asking that Artistic provide answers to 86 questions which are attached as Schedule A to the letter. That schedule is attached as Appendix A. These are the questions that the Crown wants to put to the representative of Artistic. That representative (Mark Pearlman) has already been examined and cross-examined in Artistic's own appeal to the Tax Court of Canada [the G.S.T. appeal]. The transcript of a third party's examination cannot be used at trial in the same way as the discovery of a party is used. The questions have to do with the promotional activity of Artistic in selling the program. It may be that the Crown wants to have the transcript of the

representative of Artistic on the off chance that he is called as a witness. The transcript might be useful as a means of impeaching him. This is not a proper use of section 99. There is absolutely nothing in the questions in Appendix A that can assist in determining fmv. I regard the 86 questions in Schedule A as a case of overkill.

**16**   I believe it can safely be said that in rejecting the appellant's motion, Bowman C.J. was not putting his mind to the issue as it is now presented before us. His assessment of the 86 questions placed before him is that they had to do with Artistic's promotional activities. I do not dispute this general assessment. However, the six questions now being pursued, when looked upon on their own, do not come within that description. When regard is had to the remaining questions and the information that they seek, the Crown's motion can no longer be labelled as a case of "overkill".

**17**   The first question to address on a motion under subsection 99(1) of the *Tax Court Rules* is relevance. In this respect, there is no doubt that the information sought by the six questions is relevant to the determination of the market in which the artwork (i.e., the group of prints) is sold for the purpose of determining its fair market value (*Klotz, supra*; *Nash, supra*). To the extent that Bowman C.J. held otherwise, he was in error.

**18**   The second issue is whether the moving party has established that the information sought cannot otherwise be obtained either from persons whom it is entitled to examine for discovery, or from the person sought to be examined. In this respect, neither Mr. Sackman nor Artistic question the Crown's allegation that they have both refused, and continue to refuse, to provide the information sought. Furthermore, given that Artistic is not willing to confirm the accuracy of the facts underlying the Navigant Report, there is no basis for the respondents' assertion that the Crown already has the information being sought.

**19**   As to the third issue, an argument can be made that the Crown can defend its case on the basis of the fair market value of the artwork that it has so far assumed and that accordingly, no unfairness would result from the fact that the Crown is not in a position to establish a more precise valuation. However, the Crown, like the respondent, is entitled to put its best foot forward in this litigation and to the extent that it needs information from Artistic in order to place a more accurate figure on the value of the artwork, it should have access to it before trial.

**20**   Counsel for Artistic further argued that granting the motion would create unfairness for its client. In support of this contention, counsel expressed the concern that the information sought could be used against Artistic in the G.S.T. appeal before the Tax Court. In so stating, counsel recognized that the G.S.T. appeal has now been heard and that the matter is under advisement, so that there is no longer any practical likelihood of prejudice. However, counsel argues that in the event of an appeal, additional evidence can exceptionally be admitted. He adds that in some instances, matters are remitted back by the Court of Appeal, with directions that new evidence be allowed. That is the context in which counsel claims that the examination sought could be prejudicial and hence unfair, to his client.

**21**   The concern so expressed is based on an unlikely scenario that is far too speculative to support a conclusion of unfairness. Furthermore, the argument ignores the implied undertaking imposed on parties to a civil litigation not to use answers obtained for any other purpose than securing justice in the proceeding in which the answers were compelled (*Juman v. Doucette*, [2008] S.C.J. No. 8, para. 27). I should add that it is difficult to see how the information being sought, which pertains to the identification of the market into which the artwork was sold, could be relevant to the G.S.T. appeal as it was described to this Court.

**22**   Finally, counsel for Artistic argued that responding to the questions would entail unreasonable expenses. These expenses were estimated at $15,000 before Bowman C.J. at a time when 86 questions

were in play. Counsel for the Crown has reiterated his undertaking to reimburse Artistic for reasonable counsel fees up to $10,000. Given the limited number of questions which are outstanding, this is sufficient to address Artistic's costs concerns.

23   For these reasons, I would allow the appeal, set aside the decision of Bowman C.J., insofar as the six questions set out in paragraph 12 above are concerned, and giving the decision which ought to have been given, I would issue an order granting the Crown leave to examine a knowledgeable nominee of Artistic as a third party so that the Crown can obtain an answer to the said questions. The Crown should have its costs against both respondents.

NOËL J.A.
LINDEN J.A.:-- I agree
RYER J.A.:-- I agree

cp/e/qlaim/qlpxm/qltxp/qlrxg/qlcas/qlcxm/qlhcs

I

**THIS IS EXHIBIT "I"**
referred to in the affidavit of
Laura Alescio
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

 **Department of Justice**
Canada

**Ministère de la Justice**
Canada

| | |
|---|---|
| Ontario Regional Office | Bureau régional de l'Ontario |
| The Exchange Tower | la tour Exchange |
| 130 King Street West | 130 rue King ouest |
| Suite 3400, Box 36 | Pièce 3400, CP 36 |
| Toronto, Ontario | Toronto (Ontario) |
| M5X 1K6 | M5X 1K6 |

*Tel:* (416) 952-7269
*Fax:* (416) 973-0810
*Email:* Laura.Alescio@justice.gc.ca

*Our File:*
*Notre dossier:* 3-504992

*Your File:*
*Votre dossier:*

September 7, 2004

## VIA COURIER

Teplitsky Colson
Barristers & Solicitors
70 Bond Street
Suite 200
Toronto, Ontario
M5B 1X3

**Attention: Joyce Harris**

Dear Ms Harris:

Re:   **SACKMAN, Jeffrey v. H.M.Q.**
      **Court File No.:  2002-4824(IT)G**

Thank you for your message dated August 27, 2004.  In your message, you have advised us to send our questions for Artistic Ideas Inc. ("Artistic") to you.

Arnold Bornstein and Michael Appavoo are lawyers with the Department of Justice. They represent the Crown in the appeal of Jeffrey Sackman to the Tax Court of Canada. I am a paralegal assigned to assist them in that matter.

Mr. Sackman purchased and donated works through Artistic.  Artistic has information that is relevant to his appeal.  We would appreciate its cooperation in answering the questions set out below.

In order to assist it in answering those questions, we provide, as an attachment to this letter, a list of the works purchased by Mr. Sackman (the "List").

Would you be kind enough to let us know, on or before September 14, 2004, whether Artistic will attempt to answer the following questions?  If so, would Artistic please answer our questions by September 27, 2004?  Would you also please forward us a hard copy of those answers?

Canadä

- 2 -

## Questions

**Acquisition of artwork**

Our understanding is that there are purchase agreements for the artwork between Coleman Fine Arts ("Coleman") or Silver Fine Arts ("Silver") and the purchasers/donors who acquire and donate that artwork through Artistic.

1) How much did Coleman, Silver or Artistic pay for each of the works found in the List?

2) For each print found on the List,

   a. how many other prints from the same edition did Coleman or Silver obtain?

   b. from whom did Coleman or Silver obtain the print and any other prints from the same edition? Please name the source.

3) For each work, which is not a print, found on the List, from whom did Coleman or Silver obtain the work? Please name the source.

4) Who specifically did Coleman or Silver engage to find the works? Please name the finder(s).

5) What instructions were given to the finder(s)?

6) How was (were) the finder(s) remunerated?

7) Were any of the works sold through Artistic created specifically for sale through Artistic?

8) If so, who are the artists, and what are the titles, of such works?

9) On what basis did Artistic, Coleman or Silver select the works that were sold to purchasers/donors?

10) Are any of prints from the same editions as those sold to purchasers/donors through Artistic still in the inventory of Coleman or Silver?

**Sales arrangements**

We understand that Artistic arranged for the sale of the works to Canadians.

*Duration*

11) When did Artistic begin to make works available to purchasers/donors?

12) When did Artistic stop making such works available to purchasers/donors?

- 3 -

### Sellers

13) How did Artistic solicit customers to buy and to donate the works? In other words, did it have its own internal sales staff or did it use independent salespersons? Or did it both have that staff and use those independent salespersons?

14) If Artistic engaged or dealt with salespersons to solicit customers, did Artistic pay the salespersons commissions?

15) If so, how were the commissions calculated?

16) What were the names of the independent salespersons, if any?

17) For which firms did the independent salespersons, if any, work?

### Gallery

18) Did Artistic operate a gallery in Canada in which it displayed the works or samples of the works sold and donated?

19) If so,

    a.    where was the gallery located?

    b.    was the gallery open to the public?

    c.    when did Artistic first open the gallery?

    d.    when, if ever, did Artistic close the gallery?

### Scope of operations

20) Did Artistic arrange for sales of works to Canadians in every province?

21) If not,

    a.    why not?

    b.    where did it not arrange for such sales?

22) Did Artistic have offices outside Toronto?

### Number of works sold

23) How many works were sold through Artistic in:

    a.    1998?

    b.    1999?

- 4 -

    c.     2000?

    d.     2001?

    e.     2002?

24) Did Artistic ever sell a single work to a purchaser as opposed to selling a work as part of a group?

25) If so,

    a.     who is the artist, and what is the title, of each such work that each such purchaser bought?

    b.     when did each such sale occur? Please answer on a work-by-work basis.

    c.     what price did the purchaser pay for the work? Please answer on a work-by-work and purchaser-by-purchaser basis.

    d.     did the price paid include GST?

    e.     did the price paid include PST?

## Charities

We understand that Artistic arranged for the donation of the artwork purchased through it to charities.

26) How did Artistic select those charities?

27) Did the purchaser/donor have any input into the selection of the charities to which he or she donated his or her works?

## Appraisals

We understand that appraisers valued either the works donated by Mr. Sackman or works from the same editions as the works donated by Mr. Sackman. The appraisers were Leslie Fink, Edith Yeomans and Charles Rosoff. The appraisals by Yeomans and Rosoff are addressed to representatives of Artistic.

### Fink

28) Who recommended the appraiser, Leslie Fink, to Artistic?

29) Who paid for the appraisals Fink made?

30) How many appraisals did Fink prepare for Artistic in:

- 5 -

    a.    1999?

    b.    2000?

    c.    2001?

    d.    2002?

31)    How much was Fink paid for each such appraisal?

32)    Please provide a copy of any contract or agreement with or retainer for Fink.

33)    Does Artistic have Finks' working papers, supporting documents, and/or correspondence related to the appraisals that Fink prepared for Artistic? If so, would it provide us with copies of those documents?

### Yeomans

34)    Who recommended the appraiser, Edith Yeomans, to Artistic?

35)    Who paid for the appraisals Yeomans made?

36)    How many appraisal reports did Yeomans prepare for Artistic in:

    a.    1999?

    b.    2000?

    c.    2001?

    d.    2002?

37)    How much was she paid for each such appraisal?

38)    Please provide a copy of any contract or agreement with or retainer for Yeomans.

39)    Does Artistic have Yeoman's working papers, supporting documents, and/or correspondence related to the appraisals Yeomans prepared for Artistic? If so, would it provide us with copies of those documents?

### Rosoff

40)    Who recommended the appraiser, Charles Rosoff, to Artistic?

41)    Who paid for the appraisals Rosoff made?

42)    How many appraisal reports did Rosoff prepare for Artistic in:

- 6 -

    a.    1999?

    b.    2000?

    c.    2001?

    d.    2002?

43)    How much was he paid for each such appraisal?

44)    Please provide a copy of any contract or agreement with or retainer for Rosoff.

45)    Does Artistic have Rosoff's working papers, supporting documents, and/or correspondence related to the appraisals Rosoff prepared for Artistic? If so, would it provide us with copies of those papers?

### Generally

46)    What information did Artistic give to each of the appraisers for the works those appraisers valued?

47)    What documents did Artistic give to each of the appraisers for the works those appraisers valued?

48)    Please provide copies of all such documents to us.

49)    Why did Artistic make the works sold through it available at less than the fair market values established by Fink, Yeomans or Rosoff?

### Sales of prints

50)    For each of the prints purchased by Mr. Sackman,

    a.    how many other purchasers, who dealt with Artistic, bought prints from the same edition? Please provide your answers on a print-by-print basis.

    b.    on what date did each such purchaser buy his or her print? Please answer this question on a purchaser-by-purchaser and print-by-print basis.

    c.    how much did each such purchaser pay for his or her print? Please answer this question on a purchaser-by-purchaser and print-by-print basis.

51)    Please state whether each such purchaser entered into a purchase agreement with Coleman or with Silver. Please answer this question on a purchaser-by-purchaser and print-by-print basis.

52)    Concerning the price, which each such purchaser paid for his or her print, we have the following questions:

- 7 -

    a.    did the price include GST? Please answer this question on a purchaser-by-purchaser and print-by-print basis.

    b.    did the price include PST? Please answer this question on a purchaser-by-purchaser and print-by-print basis.

    c.    how was the price calculated? In particular, did each print have an individual price?

53)    Were there any prints from the same editions as the prints purchased by Mr. Sackman, which were obtained by Coleman, Silver or Artistic, and which were not sold through Artistic?

    a.    if so, what happened to those prints?

**Sales of works other than prints**

Mr. Sackman might have purchased artwork that was not a print.

54)    For each such work,

    a.    how many other purchasers, who dealt with Artistic, bought a work, other than a print, by the same artist? Please answer this question on a work-by-work basis.

    b.    on what date did each such purchaser buy such a work? Please answer this question on a purchaser-by-purchaser and work-by-work basis.

    c.    how much did each such purchaser pay for such a work? Please answer this question on a purchaser-by-purchaser and work-by-work basis.

55)    Please state whether each such purchaser entered into a purchase agreement with Coleman or with Silver. Please answer this question on a purchaser-by-purchaser and work-by-work basis.

56)    Concerning the price, which each such purchaser paid for his or her work, we have the following questions:

    a.    did the price include GST? Please answer this question on a purchaser-by-purchaser and work-by-work basis.

    b.    did the price include PST? Please answer this question on a purchaser-by-purchaser and work-by-work basis.

    c.    how was the price calculated? In particular, did each work have an individual price?

- 8 -

57)   Were there works by the same artists as the non-print works purchased by Mr. Sackman, which were obtained by Coleman, Silver or Artistic, and which were not sold through Artistic?

   a.   if so, what happened to those works?

Thank you for your assistance in this matter.

Yours truly,

*Laura Alescio*

Laura Alescio
Paralegal
Tax Law Services Section

Encl.

| Title of Painting or... Art... | Name of Artist |
| --- | --- |
| Anemonies | Faulconer |
| Anemonies | Faulconer |
| Anemonies | Faulconer |
| Apple Blossom | D'Orazio |
| Apple Blossom | D'Orazio |
| Apple Blossom | D'Orazio |
| Apple Blossom Glory | Ameche |
| Apple Blossom Glory | Ameche |
| Apple Blossom Glory | Ameche |
| Apple Blossom Glory | Ameche |
| Apple Blossom Glory | Ameche |
| Apples | Karwoski |
| Artist and Model | Jonson |
| Artist and Model | Jonson |
| Artist and Model | Jonson |
| Ballet 1 (Pink) | Jonson |
| Ballet 1 (Pink) | Jonson |
| Ballet 1 (Pink) | Jonson |
| Ballet 2 (red) | Jonson |
| Ballet 2 (red) | Jonson |
| Ballet 2 (red) | Jonson |
| Beach at Brighton | Faulconer |
| Beach at Brighton | Faulconer |
| Beach at Brighton | Faulconer |
| Beauty and the Beast | Bragg |
| Beauty and the Beast | Bragg |
| Beauty and the Beast | Bragg |
| Belly Dancer | Pardo |
| Belly Dancer | Pardo |
| Belly Dancer | Pardo |

| PlantName | Artist |
| --- | --- |
| Blue Bouquet | Ensrud |
| Blue Bouquet | Ensrud |
| Boldest Native | Knigin |
| Boldest Native | Knigin |
| Boldest Native | Knigin |
| Boldest Native | Knigin |
| Boldest Native | Knigin |
| Buena Fortuna | Faulconer |
| Buena Fortuna | Faulconer |
| Buena Fortuna | Faulconer |
| Buena Fortuna | Faulconer |
| Buena Fortuna | Faulconer |
| Butterfly Cup | Faulconer |
| Butterfly Cup | Faulconer |
| Butterfly Cup | Faulconer |
| Calvary Charge | Schaare |
| Calvary Charge | Schaare |
| Calvary Charge | Schaare |
| Calvary Charge | Schaare |
| Calvary Charge | Schaare |
| Camelot (Knight Rider) | Bragg |
| Circle of Church | Rabinovich |
| Circle of Church | Rabinovich |
| Contraction | Peters |
| Contraction | Peters |
| Country Paradise (Eisenhower Farm) | Ameche |
| Country Paradise (Eisenhower Farm) | Ameche |
| Country Paradise (Eisenhower Farm) | Ameche |
| Country Paradise (Eisenhower Farm) | Ameche |

| Print Name | Artist |
|---|---|
| Crossing the Divide | Purcell |
| Crossing the Divide | Purcell |
| Crossing the Divide | Purcell |
| Crossing the Divide | Purcell |
| Crossing the Divide | Purcell |
| Crossing the Divide | Purcell |
| Crossing the Divide | Purcell |
| Crystal (blue) | Peters |
| Crystal (blue) | Peters |
| Crystal (blue) | Peters |
| Crystal (blue) | Peters |
| Cycle II | Rosenblum |
| Cycle II | Rosenblum |
| Cycle III | Rosenblum |
| Day on a Farm | Ameche |
| Day on a Farm | Ameche |
| Day on a Farm | Ameche |
| Desperado | Jonson |
| Desperado | Jonson |
| Desperado | Jonson |
| Early Morning Departure | Muller, Dodi |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Emergence | Laventhol |
| Fall Ferns | Faulconer |
| Fall Ferns | Faulconer |
| Fall Ferns | Faulconer |

iii

| Print Name | Artist |
|---|---|
| Falling in Love | Simon |
| Falling in Love | Simon |
| Falling in Love | Simon |
| Falling in Love | Simon |
| Fan Figuration | Peters |
| Fan Figuration | Peters |
| Fan Figuration | Peters |
| Fan Figuration | Peters |
| Geese In Flight | Forrest |
| Geese In Flight | Forrest |
| Geese In Flight | Forrest |
| Gold Field 1905 | Purcell |
| Gold Field 1905 | Purcell |
| Gold Field 1905 | Purcell |
| Grand Canyon Suite II | Purcell |
| Grand Canyon Suite II | Purcell |
| Grand Canyon Suite II | Purcell |
| Grand Canyon Suite II | Purcell |
| Grand Canyon Suite II | Purcell |
| Green Winged Teal | Forrest |
| Green Winged Teal | Forrest |
| Green Winged Teal | Forrest |
| Guilty -Objection Overruled | Bragg |
| Guilty -Objection Overruled | Bragg |
| Head & Upper Torso | Clift |
| Head & Upper Torso | Clift |
| Head & Upper Torso | Clift |
| Herbs on Pink Background | Faulconer |
| Herbs on Pink Background | Faulconer |
| Herbs on Pink Background | Faulconer |
| Herbs on Pink Background | Faulconer |
| Herbs on Pink Background | Faulconer |

| Product Name | Artist Last Name |
|---|---|
| Heroes | Brusca |
| Heroes | Brusca |
| Heroes | Brusca |
| Imaginary Triangle | Peters |
| Imaginary Triangle | Peters |
| Impressions | Christiansen |
| Impressions | Christiansen |
| Impressions | Christiansen |
| In the Clear | Knigin |
| In the Clear | Knigin |
| In the Clear | Knigin |
| In the Clear | Knigin |
| Infinitive | Peters |
| Infinitive | Peters |
| Infinitive | Peters |
| Interchange | Peters |
| Interchange | Peters |
| Interchange | Peters |
| Interchange | Peters |
| Island Woman | Azuz |
| Island Woman | Azuz |
| Johnny Jump Up | Faulconer |
| Johnny Jump Up | Faulconer |
| Johnny Jump Up | Faulconer |
| Kahlua Lark - Horse and Dog | McLean, Richard |
| Kahlua Lark - Horse and Dog | McLean, Richard |
| Kahlua Lark - Horse and Dog | McLean, Richard |
| Le Bistro | Azuz |
| Le Bistro | Azuz |

| Print Name | Artist |
|---|---|
| Le Bistro | Azuz |
| Looking for Strays | Purcell |
| Looking for Strays | Purcell |
| Looking for Strays | Purcell |
| Mount Shasta | Ameche |
| Mount Shasta | Ameche |
| Mount Shasta | Ameche |
| Nocturne | Bragg |
| Nocturne | Bragg |
| Nocturne | Bragg |
| Oh for a Horse | Purcell |
| Oh for a Horse | Purcell |
| Oh for a Horse | Purcell |
| Oh for a Horse | Purcell |
| Oh for a Horse | Purcell |
| On the Spanish Trail | Purcell |
| On the Spanish Trail | Purcell |
| On the Spanish Trail | Purcell |
| On the Spanish Trail | Purcell |
| Pansies | Faulconer |
| Pansies | Faulconer |
| Pansies | Faulconer |
| Pansies | Faulconer |
| Pansies | Faulconer |
| Pansies | Faulconer |
| Paris Barge | Faulconer |
| Paris Barge | Faulconer |
| Peregrine | Forrest |
| Peregrine | Forrest |
| Peregrine | Forrest |
| Pinwheel | Peters |
| Pinwheel | Peters |

| Print Name | Artist |
|---|---|
| Portrait of an Old Flyer | Clift |
| Portrait of an Old Flyer | Clift |
| Portrait of an Old Flyer | Clift |
| Portrait of an Old Flyer | Clift |
| Portrait of an Old Flyer | Clift |
| Portrait of an Old Flyer | Clift |
| Portrait of an Old Flyer | Clift |
| Ready CB | Bragg |
| Ready CB | Bragg |
| Ready CB | Bragg |
| Red Ferns | Faulconer |
| Red Ferns | Faulconer |
| Reflected Landscape | Simon |
| Reflected Landscape | Simon |
| Reflected Landscape | Simon |
| Reflected Landscape | Simon |
| Santa Margharita | Ensrud |
| Santa Margharita | Ensrud |
| Satin Doll | McLean, Richard |
| Seven Deadly Sins - Anger | Bragg |
| Seven Deadly Sins - Anger | Bragg |
| Seven Deadly Sins - Anger | Bragg |
| Seven Deadly Sins - Envy | Bragg |
| Seven Deadly Sins - Envy | Bragg |
| Seven Deadly Sins - Gluttony | Bragg |
| Seven Deadly Sins - Gluttony | Bragg |
| Seven Deadly Sins - Gluttony | Bragg |
| Seven Deadly Sins - Greed | Bragg |
| Seven Deadly Sins - Greed | Bragg |
| Seven Deadly Sins - Lust | Bragg |
| Seven Deadly Sins - Lust | Bragg |

vii

| Print Name | |
|---|---|
| Seven Deadly Sins - Lust | Bragg |
| Seven Deadly Sins - Vanity | Bragg |
| Seven Deadly Sins - Vanity | Bragg |
| Sienna | Carter Clarence |
| Sienna | Carter Clarence |
| Sienna | Carter Clarence |
| Skier | Jonson |
| Skier | Jonson |
| Skier | Jonson |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Skiing II | Schaare |
| Spring Bouquet | Faulconer |
| Spring Bouquet | Faulconer |
| Spring Bouquet | Faulconer |
| Spring Bouquet | Faulconer |
| Spring Bouquet | Faulconer |
| Spring Bouquet | Faulconer |
| Spring Hope - Robins Eggs | Faulconer |
| Spring Hope - Robins Eggs | Faulconer |
| Spring Hope - Robins Eggs | Faulconer |
| Springtime in Gettysburg | Ameche |
| Springtime in Gettysburg | Ameche |
| Springtime in Gettysburg | Ameche |
| Springtime in Gettysburg | Ameche |
| Springtime in Gettysburg | Ameche |

viii

| Print Name | |
|---|---|
| Springtime in Gettysburg | Ameche |
| State 2 Mohawk | Melnick |
| State 2 Mohawk | Melnick |
| Sweet Violet - Rose/Flower | Brusca |
| Sweet Violet - Rose/Flower | Brusca |
| Sweet Violet - Rose/Flower | Brusca |
| The Blacksmith Shop | Purcell |
| The Blacksmith Shop | Purcell |
| The Blacksmith Shop | Purcell |
| The Blacksmith Shop | Purcell |
| The Blacksmith Shop | Purcell |
| The Blacksmith Shop | Purcell |
| The Chess Player | Bragg |
| The Chess Player | Bragg |
| The Chess Player | Bragg |
| The Eighth Day | Bragg |
| The Eighth Day | Bragg |
| The Eighth Day | Bragg |
| The Music Lesson | Bragg |
| The Music Lesson | Bragg |
| The Music Lesson | Bragg |
| Veternarian | Bragg |
| Waiting for the new arrival | Purcell |
| Waiting for the new arrival | Purcell |
| Waiting for the new arrival | Purcell |
| Waiting for the new arrival | Purcell |
| Waiting for the new arrival | Purcell |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |

ix

| Plan Name | |
|---|---|
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Willowbrook Road | Christiansen |
| Winter | Ameche |
| Winter | Ameche |
| Winter | Ameche |
| Winter | Ameche |
| Winter | Ameche |
| Winter | Ameche |
| Woman Playing a Poppin | Knigin |
| Woman Playing a Poppin | Knigin |
| Woman Playing a Poppin | Knigin |
| Writing Box | Faulconer |
| Writing Box | Faulconer |
| Writing Box | Faulconer |
| Writing Box | Faulconer |
| Writing Box | Faulconer |
| Writing Box | Faulconer |
| Your Witness | Bragg |

| Print Name & Description | |
|---|---|
| Litho 'Rainbow Reef' | BraggCL |
| Litho 'Nature morte sur gueridon' | Picasso |
| Litho 'Portrait of Olga Picasso' | Picasso |
| Litho 'By Appointment' | BraggCharles |
| Litho 'Anesthesia 1848' | BraggCharles |
| Litho 'Justice Department, Retroactive Division' | BraggCharles |
| Litho 'Les fils de l'artiste (enfant dejeunant)' | Picasso |
| Litho 'Night Vision' | BraggCL |
| Litho 'Antique Ambulance' | BraggCharles |
| Litho 'Marc Chagall' | BraggCharles |
| Litho 'Chevalier en armure, page et femme nue' | Picasso |
| Litho 'Femme assise dans un fauteuil Iresse' | Picasso |
| Litho 'Rainbow Reef' | BraggCL |
| Litho 'Sleeper II' | BraggCL |
| Litho 'Tete de morte, lampe cruches et poireaux' | Picasso |
| Litho 'Tete de morte, lampe cruches et poireaux' | Picasso |
| Litho 'Tete de morte, lampe cruches et poireaux' | Picasso |
| Litho 'Nature morte au verre' | Picasso |
| Litho 'Nature morte au verre' | Picasso |
| Litho 'Nature morte au verre' | Picasso |
| Litho 'Portrait d'un homme debout avec barbiche' | Picasso |
| Litho 'Portrait d'un homme debout avec barbiche' | Picasso |
| Litho 'Portrait d'un homme debout avec barbiche' | Picasso |
| Litho 'And He Saw that it was good (manbaby)' | BraggCharles |
| Litho 'And He Saw that it was good (manbaby)' | BraggCharles |
| Litho 'Rainbow Reef' | BraggCL |
| Litho 'The Perfect Couple(golfers)' | BraggCharles |

| Print (Name) | Artist |
|---|---|
| Litho 'Tete de morte, lampe cruches et poireaux' | Picasso |
| Litho 'Cosmic Dance' | BraggCL |
| Litho 'Justice Department, Retroactive Division' | BraggCharles |
| Litho 'Les fils de l'artiste (enfant dejeunant)' | Picasso |
| Litho 'Psychiatrist' | BraggCharles |
| Litho 'The Emperor Takes a Leak 2' | BraggCL |
| Litho 'Jungle Story' | BraggCL |
| Litho 'The Fifth Day' | BraggCharles |
| Litho 'The Jury' | BraggCharles |
| Litho 'The Klondike Bar and Grill' | BraggCharles |
| Litho 'Cultured Cat' | BraggCL |
| Litho 'Chevalier en armure, page et femme nue' | Picasso |
| Litho 'African Watering Hole' | BraggCL |
| Litho 'Rainbow Reef' | BraggCL |
| Litho 'Don Quixote(on horse)' | BraggCharles |
| Litho 'Anesthestia 1848' | BraggCharles |
| Litho 'Viking' | BraggCharles |
| Litho 'Morning (1st edition)' | BraggCL |
| Litho 'The Emperor Takes a Leak' | BraggCL |
| Litho 'Song of the Sea' | BraggCL |
| Litho 'Antique Ambulance' | BraggCharles |
| Litho 'Cyrano de Bergerac' | BraggCharles |
| Litho 'Marc Chagall' | BraggCharles |
| Litho 'Open House' | BraggCharles |
| Litho 'Legend of Aurora' | BraggCL |
| Litho 'Morning (1st edition)' | BraggCL |
| Litho 'Quatre Nus au Harem' | Picasso |
| Litho 'And He Saw that it was good (maribaby)' | BraggCharles |
| Litho 'Tete de femme' | Picasso |

| Print Name | Artists |
|---|---|
| Litho 'Portrait of Marie-Therese Walter' | Picasso |
| Litho 'Portrait of Marie-Therese Walter' | Picasso |
| Litho 'Portrait of Marie-Therese Walter' | Picasso |
| Litho 'Femme assise dans un fauteuil' | Picasso |
| Litho 'Femme assise dans un fauteuil' | Picasso |
| Litho 'Femme assise dans un fauteuil' | Picasso |
| Litho 'Jeux de page' | picasso |
| Litho 'Jeux de page' | Picasso |
| Litho 'Jeux de page' | Picasso |
| Litho 'Tete de femme' | Picasso |
| Litho 'Quatre Nus au Harem' | Picasso |
| Litho 'Femme au chapeau gris' | Picasso |
| Litho 'Arlequin moustache a la guitare' | Picasso |
| Litho 'Arlequin moustache a la guitare' | Picasso |
| Litho 'Femme assise dans un fauteuil tresse' | Picasso |
| Litho 'Femme assise dans un fauteuil tresse' | Picasso |
| Litho 'Le Bouquet' | Picasso |
| Litho 'Le Bouquet' | Picasso |
| Litho 'Pigeons' | Picasso |
| Litho 'Femme debout' | Picasso |
| Litho 'Femme debout' | Picasso |
| Litho 'Swan Song' | BraggCL |
| Litho 'Quatre Nus au Harem' | Picasso |
| Litho 'Femme dans un fauteuil' | Picasso |
| Litho 'Swan Song' | BraggCL |
| Litho 'Legend of Aurora' | BraggCL |
| Litho 'Rescue the Reef' | BraggCL |
| Litho 'Rescue the Reef' | BraggCL |

xiii

| Print Name | Artist |
|---|---|
| Litho 'Rescue the Reef' | BraggCL |
| Litho 'Visage de femme de face' | Picasso |
| Litho 'Visage de femme de face' | Picasso |
| Litho 'Visage de femme de face' | Picasso |
| Litho 'The Sixth Day' | BraggCharles |
| Litho 'The Sixth Day' | BraggCharles |
| Litho 'The Sixth Day' | BraggCharles |
| Litho 'Tete de femme' | Picasso |
| Litho "Femme dans un fauteuil" | Picasso |
| Litho 'Legend of Aurora' | BraggCL |
| Litho 'Beauty and the Reef' | BraggCL |
| Litho 'Beauty and the Reef' | BraggCL |
| Litho 'Beauty and the Reef' | BraggCL |
| Litho 'Buste de petite fille' | Picasso |
| Litho 'Buste de petite fille' | Picasso |
| Litho 'Buste de petite fille' | Picasso |
| Litho 'Song of the Sea' | BraggCL |
| Litho 'Song of the Sea' | BraggCL |
| Litho 'Song of the Sea' | BraggCL |
| Litho 'Femme au chapeau gris' | Picasso |
| Litho 'Femme au chapeau gris' | Picasso |
| Litho "Femme dans un fauteuil" | Picasso |

J

**THIS IS EXHIBIT "J"**
**referred to in the affidavit of**
**Laura Alescio**
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

Sep-08-04    03:42pm    From-TEPLITSKY COLSON              +416 365 9936       T-895   P.001/002   F-535

## TEPLITSKY, COLSON
### BARRISTERS

SUITE 200
70 BOND STREET
TORONTO, ONTARIO
M5B 1X3

JOYCE HARRIS
Certified by the Law
Society as a Specialist
in Civil Litigation

TEL: (416) 365-9320
FAX: (416) 365-7702

DIRECT LINE: (416) 865-5344
E-MAIL: jharris@teplitskycolson.com

## _FACSIMILE_

**DATE:**                    Wednesday, September 8, 2004

**TO:**    (individual's name)    Laura Alescio
            (firm name)

**FAX NO. CALLED:**          416-973-0810

**FROM:**                    Joyce Harris

**FIRM:**                    Teplitsky, Colson

**FILE NAME AND NUMBER:**    Artistic Ideas 15777

**TOTAL PAGES (including this page):**   2

**IN CASE OF TRANSMISSION PROBLEMS, PLEASE CONTACT MAUREEN AT 365-9320**

**COMMENTS/INSTRUCTIONS:**

IMPORTANT NOTE:
The following material is intended for use only by the individual or entity to which it is specifically addressed above and should not be read by, or delivered to, any other person. Such material may contain privileged or confidential information, the disclosure or other use of which by other than the intended recipient may result in the breach of certain laws or the infringement of rights of third parties. If you have received this telecopy in error, please notify us immediately by calling our offices (collect if necessary) at (416) 365-9320 and return the original telecopy to us by mail (postage prepaid), and we will reimburse you for the cost of return postage. Please destroy any telecopy and any confidential copy which you may receive by mail at our expense. We thank you in advance for your cooperation and assistance.

Sep-08-04   03:43pm   From-TEPLITSKY COLSON          +416·365·9936       T-895  P.002/002  F-535

# TEPLITSKY, COLSON
## BARRISTERS

SUITE 200
70 BOND STREET
TORONTO, ONTARIO
M5B 1X3

JOYCE HARRIS
Certified by the Law
Society as a Specialist
in Civil Litigation

TEL: (416) 365-9320
FAX: (416) 365-7702

DIRECT LINE: (416) 865-5344
E-MAIL: jharris@teplitskycolson.com

September 8, 2004

**Delivered by Fax**
Ms. Laura Alescio
Department of Justice Canada
Ontario Regional Office
The Exchange Tower
130 King Street West
Suite 3400, Box 36
Toronto, Ontario
M5X 1K6

Dear Ms. Alescio:

**Re:  Jeffrey Sackman v H.M.Q.**

We acknowledge receipt of your letter of September 7, 2004.  However, we consider your requests for information to be inappropriate and accordingly we will not be responding.

Yours very truly,

Joyce Harris
JH/mm

c.c.    M. Pearlman

K

**THIS IS EXHIBIT "K"**
**referred to in the affidavit of**
**Laura Alescio**
This _30ᵗʰ_ day of September, 2011

_____

**Commissioner for Taking Affidavits**

2003-1855(GST)G

## TAX COURT OF CANADA

BETWEEN:

### ARTISTIC IDEAS INC.

Appellant

and

### HER MAJESTY THE QUEEN

Respondent

## MOTION RECORD

**ROBINS, APPLEBY & TAUB LLP**
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

2

TO:   **PERRY DERKSEN**
      Department of Justice
      Ontario Regional Office
      The Exchange Tower
      130 King Street West
      Suite 3400, Box 36
      Toronto, ON  M5X 1K6

      Tel: (416) 952-1504
      Fax: (416) 973-0810

      Counsel for the Respondent

3

**INDEX**

| TAB | DOCUMENT |
|---|---|
| 1 | Notice of Motion |
| 2 | Affidavit of Paul Sloan |

Court No. 2003-1855(GST)G

**TAX COURT OF CANADA**
*In the Excise Tax Act, R.S.C. 1985, c. E-15, as amended*

BETWEEN:

**ARTISTIC IDEAS INC.**

Appellant

- and -

**HER MAJESTY THE QUEEN**

Respondent

## NOTICE OF MOTION

**TAKE NOTICE THAT** the Appellant will make a motion to the Court on Tuesday, September 5, 2006, at 9:30 a.m., or as soon after that time as the motion may be heard at 180 Queen Street West, Suite 200, Toronto, Ontario.

**THE MOTION IS FOR:**

(a) An Order granting the Appellant leave to file the Affidavit of Mr. Paul Sloan, sworn August 28, 2006, with cross-examination and re-examination to be conducted by telephone or video conference; or

(b) An Order permitting the evidence of Mr. Paul Sloan to be taken by video or telephone conference; or

(c) An Order to allow for the evidence of Mr. Paul Sloan to be taken by commission in California; or

(d) Such further or other Order as this Court deems just.

2

**THE GROUNDS FOR THIS MOTION ARE:**

(a)    The Appellant wishes to call Mr. Paul Sloan, a resident of California, as a witness at trial;

(b)    On August 28, 2006, Mr. Sloan swore an Affidavit concerning his companies' dealings with the Appellant;

(c)    Mr. Sloan is 70 years-old, and has recently become concerned about flying in light of increased terrorism concerns;

(d)    As the date for attendance in Toronto approached, Mr. Sloan decided that he did not want to travel to Toronto;

(e)    Mr. Sloan's advisor informed the Appellant's counsel on August 29, 2006, of his decision not to fly to Toronto;

(f)    Although Mr. Sloan is not prepared to fly to Toronto, he is willing to testify via either phone or video conference, or in person in California;

(g)    The Appellant is willing to pay the costs of either the video conference or commissioning the evidence as may be ordered;

(h)    Mr. Sloan is a material witness. The Appellant will be unduly prejudiced if not granted leave to obtain his evidence;

(i)    Sections 143(1)(a), 4(1) and (2), 9, 119-122 of the *Tax Court of Canada Rules (General Procedure)*.

3

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

      (a)     Affidavit of Paul Sloan, sworn August 31, 2006;

      (b)     Such other evidence as this Honourable Court may permit.

Date: Friday, September 1, 2006

                            **ROBINS, APPLEBY & TAUB LLP**
                            Barristers & Solicitors
                            120 Adelaide Street West
                            Suite 2600
                            Toronto, ON  M5H 1T1

                            **Irving Marks**  LSUC#19979H
                            Tel: 416.360.3329
                            **Shawn Pulver**  LSUC#51129L
                            Tel: 416.360.3803
                            Fax: 416.868.0306

                            Solicitors for the Appellant

TO:   **PERRY DERKSEN**
        Department of Justice
        Ontario Regional Office
        The Exchange Tower
        130 King Street West
        Suite 3400, Box 36
        Toronto, ON  M5X 1K6

        Tel: (416) 952-1504
        Fax: (416) 973-0810

        Counsel for the Respondent

r:\files\0600073\im\pleadings\notice of motion.doc

2003-1855(GST)G

TAX COURT OF CANADA

B E T W E E N :

ARTISTIC IDEAS INC.

Appellant

- and -

HER MAJESTY THE QUEEN

Respondent

---

NOTICE OF MOTION

---

Robins, Appleby & Taub LLP
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

08/31/2006   10:47   13107889532                ALPERT AND ASSOC                    PAGE  02

2003-1855(GST)G

## TAX COURT OF CANADA

BETWEEN:

## ARTISTIC IDEAS INC.

Appellant

and

## HER MAJESTY THE QUEEN

Respondent

## AFFIDAVIT OF PAUL SLOAN

I, **PAUL SLOAN**, of the City of Woodland Hills, in the State of California, **MAKE OATH AND SAY AS FOLLOWS:**

1.      I am the President and sole shareholder of Coleman Fine Arts Ltd. and Silver Fine Arts Ltd., which are incorporated pursuant to and do business under the laws of California, and as such have knowledge of the facts to which I depose.

2.      Over the past several weeks, I, together with my advisors, Mr. Glen Alpert and Elliot Kajan have had discussions with the lawyers for Artistic Ideas Inc. ("Artistic"), in preparation for my attendance as a witness at Artistic's income tax appeal, commencing on September 5, 2006, in Toronto, Ontario, Canada.

3.      On August 28, 2006, I swore an Affidavit concerning my companies' dealings with Artistic.

4.      I am 70 years old, and recently have become scared about flying in light of increased terrorism concerns. I am of Jewish descent and the increase of anti Semitism throughout the Middle East and United States has me concerned for my safety as well as Jews worldwide.  As the date for attendance

2

in Toronto approached, I decided under concerns from my family and friends that I could not travel until the threats of terrorism dissipate.

5.      Mr. Alpert informed Mr. Marks, counsel for Artistic, on August 29, 2006, of my decision and my fears of travel at this time.  Although I will not travel, I am willing to testify via either phone or videoconference, or in person in California.

| | |
|---|---|
| SWORN before me at the City of _____ , In the State of California, This _____ day of, 2006. | ) ) ) ) ) |
| A Commissioner, Notary, etc. | ) Paul Sloan |

*PLEASE SEE ATTACHED CALIFORNIA CERTIFICATE*

r:\files\060073\im\pleadings\affidavit of p. sloan #2.doc

# JURAT

State of California

County of San Diego

Subscribed and sworn to (or affirmed) before me on

this _31st_ day of _August_ ,20_06_,

by _Paul Sloan_

personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

BERRIE A. SYREK
Commission # 1559804
Notary Public - California
San Diego County
My Comm. Expires Mar 15, 2009

(seal)                                Signature _Berrie A. Syrek_

2003-1855(GST)G

TAX COURT OF CANADA

B E T W E E N :

ARTISTIC IDEAS INC.

Appellant

- and -

HER MAJESTY THE QUEEN

Respondent

---

## MOTION RECORD

---

Robins, Appleby & Taub LLP
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

L

THIS IS EXHIBIT "L"
referred to in the affidavit of
Laura Alescio
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

COMMISSION EVIDENCE

TAX COURT OF CANADA

**CERTIFIED COPY**

ARTISTIC IDEAS, INC.,            )
                                 )
                  Appellant,     )
                                 )
          AND                    )        No. 2003-1855(GST)G
                                 )
HER MAJESTY THE QUEEN,           )
                                 )
                  Respondent.    )
_____)

TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, NOVEMBER 29, 2006

BEVERLY HILLS, CALIFORNIA

REPORTED BY:
JEANINE CURCIONE
CSR NO. 10223, RPR
JOB NO. 061129JCU

Tel. 310.859.6677  Fax 310.859.6694



**Gradillas**
C O U R T   R E P O R T E R S
345 N Maple Dr, Suite 185, Beverly Hills, CA 90210

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMISSION EVIDENCE

TAX COURT OF CANADA

ARTISTIC IDEAS, INC.,                    )
                                         )
                 Appellant,              )
                                         )
        AND                              )    No. 2003-1855(GST)G
                                         )
HER MAJESTY THE QUEEN,                   )
                                         )
                 Respondent.             )
                                         )

TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, NOVEMBER 29, 2006

BEVERLY HILLS, CALIFORNIA

REPORTED BY:
JEANINE CURCIONE
CSR NO. 10223, RPR
JOB NO. 061129JCU

1

```
 1              TRANSCRIPT OF PROCEEDINGS, taken at 9:35 A.M.,

 2   Wednesday, November 29, 2006, at 345 North Maple Drive,

 3   Suite 185, Beverly Hills, California, before Jeanine

 4   Curcione, C.S.R. No. 10223, RPR, pursuant to notice.

 5

 6   APPEARANCES OF COUNSEL:

 7   COMMISSIONER PARIS

 8   JENNA L. CLARK, REGISTRAR

 9

10   FOR THE APPELLANT:

11           ROBINS, APPLEBY & TAUB, LLP
             BY:  IRVING MARKS, ESQ.
12           120 Adelaide Street West
             Suite 2600
13           Toronto, Ontario M5H 1T1

14   FOR HER MAJESTY THE QUEEN:

15           DEPARTMENT OF JUSTICE CANADA
             BY:  PERRY DERKSEN, ESQ.
16           130 King Street West
             Suite 3400, Box 36
17           Toronto, Ontario M5X 1K6

18   FOR THE WITNESS:

19           KAHAN, MATHER AND BARISH
             BY:  ELLIOTT H. KAJAN, ESQ.
20           9777 Wilshire Boulevard
             Suite 805
21           Beverly Hills, California 90212

22

23

24

25
```

2

```
1                        INDEX

2

3   WITNESS          DIRECT EXAMINATION    CROSS-EXAMINATION

4   PAUL SLOAN               5                    33

5

6   REDIRECT EXAMINATION      FURTHER REDIRECT

7        80                        106

8   RECROSS EXAMINATION

9        110

10

11                  E X H I B I T S

12  NO.        FOR IDENTIFICATION

13  A2              31

14  R5              55

15  R6              56

16  R7              65

17  R8              67

18  R9              70

19  R10             74

20  A3              81

21

22

23

24

25

                                                    3
```

```
 1              BEVERLY HILLS, CALIFORNIA;

 2        WEDNESDAY, NOVEMBER 29, 2006, 9:35 A.M.

 3

 4        MR. MARKS:  Good morning, Your Honor.  I wonder

 5   if, given the conference setting here, if we could

 6   conduct this seated.

 7        THE COMMISSIONER:  That's fine.  I think that's

 8   more logical.

 9        MR. MARKS:  We're here to hear the evidence of

10   Mr. Paul Sloan.  He's here and ready to testify.

11        THE COMMISSIONER:  And Madam Registrar, would

12   you have the witness sworn and affirmed.

13

14                   PAUL SLOAN,

15            having been first duly sworn, was

16            examined and testified as follows:

17

18        THE REGISTRAR:  Please state your full name and

19   occupation.

20        THE WITNESS:  Paul Malcolm Sloan.  My address is

21   6041 Fenwood Avenue, Woodland Hills, California.  And

22   my occupation is retired.

23        THE COMMISSIONER:  Thank you.

24        Mr. Marks.

25        MR. MARKS:  Thank you, Your Honor.  Mr. Sloan
```

4

1   has a back problem that he needs to stand up every so

2   often to stretch his back, so if we could accommodate

3   him at appropriate times?

4           THE COMMISSIONER:  I understand.  If you're

5   aware that Mr. Sloan would like to stand, if

6   Mr. Sloan -- is that chair --

7           MR. KAJAN:  Hopefully it was the chair and not

8   your back.

9           THE COMMISSIONER:  In any event, if you would

10  let us know if you need to stand while you're giving

11  testimony, that's fine.

12          MR. MARKS:  Thank you very much.

13          Mr. Sloan, could you --

14          THE COMMISSIONER:  Let's stop for a second and

15  change the chair.

16              (Recess taken.)

17

18              DIRECT EXAMINATION

19  BY MR. MARKS:

20      Q.  Mr. Sloan, I understand that you know Allan

21  Grossman and Mark Pearlman?

22      A.  That's correct.

23      Q.  And how did you come to know those two

24  individuals?

25      A.  I met them in Toronto, Canada, in the mid

5

1    '90s.

2        Q.  And what were the circumstances under which

3    you met?

4        A.  Originally, I went to Allan Grossman's

5    office to solicit him regarding an investment I had.

6        Q.  And what business were you in at that time?

7        A.  I was in investment banking, California.

8        Q.  And what was the purpose of your meeting

9    with Mr. Grossman?

10       A.  I had a company that I was raising money

11   for, and I was introduced to Allan by a friend of mine

12   who said he might be able to help me.

13       Q.  And what was your understanding of what

14   business Mr. Grossman was in at that time?

15       A.  Well, he was in the investment banking

16   business, and he raised money for companies.

17       Q.  And what was the particular venture that you

18   were seeking to raise money for at that time?

19       A.  It was a company called Protosource.  It was

20   a software company.

21       Q.  And did Mr. Grossman express interest in

22   that?

23       A.  Originally, no.  We did have a nice

24   discussion, and he invited me back if I had anything

25   else to show him.

6

1        Q.   And did his interest change after a period

2   of time?

3        A.   His interest changed the following year.  I

4   went back to see him, and I had raised some money on

5   that particular company the previous year, and we were

6   still looking to raise additional funds for it, and at

7   that time he was interested.

8        Q.   And did you -- did Mr. Grossman proceed to

9   raise funds for that transaction?

10       A.   Yes.

11       Q.   Over what period of time did you work with

12  Mr. Grossman on that?

13       A.   I worked with him for a two-year period.

14       Q.   Was Mr. Pearlman involved in that venture?

15       A.   Yes.

16       Q.   Did they have a company they were using to

17  do that?

18       A.   Yes.

19       Q.   Do you remember the name of the company?

20       A.   I think it was ASG, but I'm not positive.

21       Q.   And through the course of that, did you get

22  to know Mr. Pearlman?

23       A.   Yes.  We became very friendly.  We became

24  very social.

25       Q.   And were you social with Mr. Grossman as

7

1    well?

2          A.   Yes, very social.

3          Q.   And what do you mean by that?

4          A.   Well, they came down to L.A.  I went up to

5    Toronto.  We became friends.

6          Q.   At some point in your relationship with

7    them, did you have any discussions with them about

8    selling art in Canada?

9          A.   Yes.

10          Q.   And when did that come up?

11          A.   That came up in the -- I think somewhere

12    around '98, somewhere in there, '97, '98, and I noticed

13    that there were a number of art programs being done in

14    Canada, and I was getting some calls from people in

15    Canada for art, and I told them -- they were very aware

16    of the programs.  It's nothing that I told them that

17    they weren't aware of.  They knew my background in the

18    art business, and I said if you're interested in

19    getting involved in anything like this, I could

20    definitely produce all the art you needed.

21          Q.   And when you say that they knew your

22    background in the art business, what was your

23    background in the art business?

24          A.   Well, I was a partner in a company called

25    Dyanson, D-y-a-n-s-o-n, which was -- we started out

8

1   with one gallery in New York, and eventually we had 11

2   galleries across the country, including Hawaii.  And

3   the company, at one point, was doing over $50 million a

4   year.

5           Q.  Over how much?

6           A.  50 million.

7           Q.  50.  Thank you.

8               And these were retail art galleries or --

9           A.  These were retail art galleries.

10          Q.  Had you told Allan and Mark about this

11  business in the course of your discussion?

12          A.  Yes.

13          Q.  And you say that you became aware of art

14  programs being carried out in Canada.

15              What do you mean by an "art program"?

16          A.  Well, some of these were being sold with

17  various tax benefits, either a donation.  Some were a

18  little different.  They were all structured

19  differently.  But the core of the deal was the art.

20          Q.  And you saw this -- you told them -- I think

21  you said that you saw this as an opportunity for you to

22  sell art in Canada and --

23          A.  Yes.  I had a great deal of art in inventory

24  as well as all the connections in the business you

25  need, and if they had the ability, you know, to sell

9

1    the art, I could produce it.

2       Q.  And how much art inventory did you have at

3    that time?

4       A.  I would say $5 million worth.

5       Q.  And are you able to say how many separate

6    pieces of art that represented?

7       A.  Just in round numbers, a couple of hundred

8    thousand.

9       Q.  And at that time in or around 1998, were you

10   still in the Dyanson business of art galleries?

11       A.  No.

12       Q.  So this was inventory that you had been left

13   with when that business --

14       A.  Yeah.  We sold the business to London Fine

15   Arts in '95, and we kept a lot of inventory, my partner

16   and I.

17       Q.  And when you first raised this topic with

18   Allan and Mark, what was their response?

19       A.  Originally their response was -- Mark's

20   response was he had no interest.  Allan had a little

21   more interest.  It wasn't their cup of tea.

22       Q.  And did that change after a period of time?

23       A.  It did change.  I can't tell you exactly

24   when it happened, but it did change.  And they called

25   me and said they were interested doing an art deal and

10

1   would I be interested, and I said yes.

2        Q.  Did they have any specific proposal at that

3   time that they expressed to you or --

4        A.  Yeah.  They said they could be my agents in

5   Canada.  They had the ability to find purchasers for

6   the art.  They had an overhead.  They had offices.

7   They had people to sell the product.  They had

8   secretarial.  They had a warehouse.  They had backup.

9   And if I could provide the art, they would definitely

10  sell it.

11       Q.  Was there anything else discussed about the

12  price or fees at that time, or did that come later?

13       A.  It came later.

14       Q.  So what was your response to -- you told

15  them that you could --

16       A.  We started talking about the price of how we

17  would structure and the best way to operate, and I said

18  I'd be willing to give them a 50 percent commission on

19  anything they sold and, if that would work out for

20  them, it would work out for me.

21       Q.  And how did you decide that, in your mind,

22  that 50 percent would be reasonable?

23       A.  Well, at the time we had no idea, you know,

24  what volume would be and how much business there would

25  be, but they were willing to spend a considerable

                                                        11

1    amount of money to find the business, and they had had

2    an overhead and you couldn't -- you know, it wouldn't

3    have been fair to pay any less than 50 percent.

4         Q.  Did you discuss with them what the price for

5    the art would be and how you would arrive at it?

6         A.  They created the price for the art, which

7    was $3,500 for ten pieces, and then that changed to 11

8    pieces later.

9         Q.  And were there any conditions attached to

10   the type or value of art that had to be sold?

11        A.  Yes.  I had to get an appraisal for them

12   locally.  So I found an appraiser in L.A. by the name

13   of Dick Ruskin, who is a noted appraiser, and the

14   appraisals had to come in somewhere around a thousand

15   dollars Canadian, which would be what?  At the time was

16   about 650 U.S.

17        Q.  What was the reason that you had to provide

18   an appraisal at that value?

19        A.  Well, they needed that value in order to

20   create the type of structure they wanted.

21        Q.  And what was your reaction to the price of

22   $3,500 for ten pieces of art that had an appraised

23   value of at least a thousand dollars?

24        A.  Well, that was no problem because the

25   average print in those days sold for roughly a

                                                    12

1   thousand-plus.   This piece on the wall sold for

2   probably 3,000.

3          Q.   You're referring to a piece of art on the

4   wall of the conference room where this examination is

5   being held.

6          A.   Yes.

7          Q.   And what do you recall about how -- you say

8   that the art was going to be sold -- initial proposal

9   was that it would be sold in bundles of 10 pieces for

10   3,500 and then later it changed to 11.

11          A.   Yes.

12          Q.   What do you recall about when that change

13   occurred and what the reason for the change was?

14          A.   After they got involved, I think in

15   attempting to market the deal, and they felt because

16   they were going to allow the people to choose the art,

17   which as unique and unusual, that they would like to

18   have the investor have a piece of the art for his wall

19   to do whatever he wanted with.

20          Q.   And what was going to happen to the other

21   ten pieces?

22          A.   They were going to donate them.

23          Q.   Donate them to what?

24          A.   To a charity of their choice.

25          Q.   You said that it was your obligation to

13

1    provide the appraisal.

2            Did that mean that you had to pay for it?

3        A.   Yes.   That was my obligation.   The appraisal

4    was my obligation.   The shipping was my obligation, and

5    as it turned out, there were a few other odds and ends

6    expenses.

7        Q.   And what were the obligations of Allan and

8    Mark and eventually their company -- I haven't asked

9    you this, but did Allan and Mark create a company to

10   carry out this program?

11       A.   They created a company called Artistic

12   Ideas, and they had Allan's wife, Jeanine, was the

13   officer and -- I shouldn't say officer.   She was the

14   manager in charge of the office, and she basically

15   handled all the paperwork and the structure.   And she

16   had people under her, et cetera, and they handled the

17   expenses of creating a sales force, of managing that

18   sales force, the paperwork, the legal, the accounting,

19   expenses of running that type of a sales organization,

20   which are substantial.

21       Q.   Yes.

22            And were you involved in arranging for any

23   of the documentation for the sale of the art?

24       A.   No.

25       Q.   Who took care of that?

                                                        14

1     A.  Allan.  Allan Grossman.

2     Q.  And when the purchasers purchased these

3  bundles of 11 pieces of art from you, did you sign any

4  document between your company selling the art and the

5  purchaser?

6     A.  No.

7     Q.  How did those documents get signed?

8     A.  I authorized Allan to sign for Coleman.

9     Q.  Coleman was your company?

10    A.  Yes.

11    Q.  We've seen another company referred to in

12  the documents by the name of silver?

13    A.  Yes, Silver Fine Arts.

14    Q.  Is that also your company?

15    A.  Yes.

16    Q.  Did you authorize Allan to sign for that

17  company as well?

18    A.  Yes.

19    Q.  And as the deal was structured, did you have

20  any discussions with Allan or Mark regarding where

21  title to the art would be transferred?

22    A.  Well, title to the art was going to be

23  transferred in the United States because that's where

24  the art was.

25    Q.  And was there discussion about how and when

15

1    it would be donated to the charities?

2          A.   That was really their responsibility.

3          Q.   Were you involved in any of the

4    documentation relating to the purchaser's donation of

5    the art to the various charities?

6          A.   No.

7          Q.   So now once the program got underway and art

8    was being sold, how did you keep track of -- I missed

9    something.  Let me go back.

10              You said that you were going to provide the

11   appraisal and you named an appraiser.  Did it turn out

12   that Artistic used that appraiser?

13         A.   No.  They used that appraiser, but they also

14   provided one of their own.

15         Q.   Yes.  Do you know the name of that other

16   appraiser?

17         A.   Well, they had two appraisers, actually.

18   The first year they had Leslie Fink, and they then

19   subsequently had Edie Yeomans, who became the appraiser

20   for subsequent years after that.

21         MR. KAJAN:  Do you want to spell those names?

22   BY MR. MARKS:

23         Q.   Spell the names for the court reporter if

24   you can.

25         A.   Leslie Fink, L-e-s-l-i-e, F-i-n-k.  Edie

16

1    Yeomans, E-d-i-e, Y-e-o-m-a-n-s, I think.

2          Q.   And whose responsibility was it to pay for

3    those appraisals?

4          A.   It was my responsibility.

5          Q.   And once the sales program got underway,

6    were you involved at all in the marketing of the art in

7    Canada?

8          A.   No.

9          Q.   Whose responsibility was that?

10         A.   That was Allan and Mark's and their company.

11         Q.   And --

12         A.   Artistic Ideas.

13         Q.   And as I understand it, a significant volume

14   of art was actually sold under this program.

15         A.   Over the years, yes.

16         Q.   And in the first year as the sales got

17   underway, what system did you set up for keeping track

18   of which pieces were being sold and what inventories

19   would be required and so on?

20         A.   Well, they set up the system.  I didn't have

21   any system other than they would call me and let me

22   know how many units were sold, and by virtue of that, I

23   knew how much art I needed to gather and send to them

24   and have appraised.

25         Q.   You said that the purchasers were given the

                                                          17

```
 1   choice of various pieces of art --

 2        A.   That's correct.

 3        Q.   -- that they could purchase.

 4        A.   Right.

 5        Q.   And so how were you notified of which

 6   particular pieces had been sold and in which

 7   quantities?

 8        A.   Well, Jeanine would fax me a list every now

 9   and then of orders they received.

10        Q.   And when did you -- during the year, did you

11   take care of shipping the art to --

12        A.   I shipped the art year end.  Typically after

13   January.

14        Q.   And where did you ship the art to?

15        A.   I shipped the art to the charities in care

16   of Artistic Ideas.

17        Q.   And what was your understanding of what

18   Artistic Ideas was going to do with the art once it was

19   received?

20        A.   Well, they had people in the warehouse who

21   would receive the art, unpack the shipments, and check

22   to see if any of the art was damaged or wasn't in

23   pristine shape.  The particular appraiser they had in

24   Canada, Edie Yeomans, would come over and actually

25   check the art and wouldn't approve it unless it was
```

18

1  perfect.  And therefore, if there was any damage, they

2  would send it back, and I had to replace it.

3       Q.  And did you receive payments of your

4  50 percent of the purchase price from time to time from

5  Artistic?

6       A.  Yes.

7       Q.  How was that arranged?

8       A.  Well, there wasn't any specific arrangement.

9  As money came in, Allan would pick, I guess, a number

10 that he felt was taking his 50 percent and send me what

11 might be mine and -- until we settled up at the end of

12 the year.

13      Q.  And as I understand it, the agreement

14 between yourself and your companies on the one hand and

15 Allan and Mark and their company on the other hand is

16 not in writing; is that correct?

17      A.  No.  It wasn't in writing.

18      Q.  Was there a particular reason that it was

19 not in writing?

20      A.  Allan Grossman was supposed to actually come

21 up with a document but never did.

22      Q.  And was that a problem as far as you were

23 concerned?

24      A.  After the first year, it wasn't a problem.

25      Q.  Why not?

19

1   A. Well, we both felt comfortable with each

2 other.  We had a certain amount of trust involved, and

3 I had nothing to lose because I didn't have to deliver

4 the art until the end of the year.  I always got an

5 honest count.

6   Q. And by the time you delivered the art at the

7 end of the year, had you received payment for the art

8 that you were going to ship?

9   A. Yes.  I was paid, for the most part, in

10 full.

11   Q. Now, you said that the purchase price that

12 you agreed to sell the art for was $3,500 for a bundle

13 of 11.

14   A. Yes.

15   Q. Did it ever happen that Allan or Mark wanted

16 to reduce or discount that price?

17   A. Not so much in the first year.  There might

18 have been some instances, but there weren't that many

19 discounts.

20   Q. Did they require your authority in order to

21 discount the price?

22   A. No.

23   Q. What if they wanted to reduce the amount

24 that was being paid to you?

25   A. Then they would have to -- then they would

20

1 need my okay.

2  Q. And we've seen in the documents in the

3 record some promissory notes that Artistic got from

4 purchasers.

5   Did Allan or Mark ever discuss with you the

6 fact that some purchasers gave promissory notes for

7 payment?

8  A. No.

9  Q. Did you ever accept any promissory notes

10 from purchasers?

11  A. I didn't, no.

12  Q. Were you made aware of the specific names of

13 purchasers who were purchasing the art?

14  A. No.

15  Q. You mentioned in your testimony that at year

16 end, there would be a tally of how much art had been

17 sold and how much was owing to you.

18  A. Yes.

19  Q. Did you receive something in writing from

20 Artistic with respect to that?

21  A. Yes.

22  MR. MARKS:  Your Honor, at this point, I propose

23 to show Mr. Sloan some documents for identification,

24 and I know my friend has an objection.  These are the

25 year-end statements that came up during Mr. Pearlman's

21

1    testimony if you recall.

2         THE COMMISSIONER:  Yes.

3         MR. MARKS:  There are two possible ways to deal

4    with it -- maybe there are more than two, but one is we

5    could deal with and argue that objection here and now.

6         The other would be, with the Court's

7    permission -- and I don't believe Mr. Derksen is in

8    agreement with this, but I'm suggesting it as a

9    possible way to deal with it -- rather than take the

10   time now to argue the objection, that the Court hear

11   the evidence, allow Mr. Derksen to cross-examine on the

12   documents if he wishes and reserve the question of the

13   argument on the objection and the admissibility of that

14   evidence to when we resume the trial back in Toronto.

15        So I'm in your hands as to which way you -- and

16   I've seen that done many times, where the Court will

17   hear certain evidence and reserve the question of

18   admissibility to a later date as an expeditious means

19   of handling it.

20        So I'm in your hands.  I'm prepared to go

21   forward either way.  If we argue it now, I think it

22   would be appropriate to excuse Mr. Sloan while we do

23   that, but otherwise I would propose to proceed now and

24   ask him only a few questions about these documents, and

25   then Mr. Derksen could cross-examine.

22

1          THE COMMISSIONER:   Mr. Derksen?

2          MR. DERKSEN:   Thank you, Your Honor.

3      The Crown's position is that the issue of

4   admissibly should be resolved today, and there really

5   is no reason, in the Crown's view, it can't be resolved

6   today.  We have time.  We're here.  I'm prepared to

7   make more full submissions as to admissibility, but for

8   the practical matter how to proceed, it's the Crows's

9   position that the issue should be decided if possible

10  today and that way the parties know what evidence is

11  being admitted.

12          THE COMMISSIONER:   I understand your point.  But

13  it seems to me that, in the circumstances, it would be

14  more desirable to have the documents identified by the

15  witness, to deal with the objection on admissibility at

16  the resumption of the proceedings in Toronto, perhaps

17  not waiting until the end of the trial but to have the

18  matter dealt with in Toronto.

19          I think it's desirable in the sense that this is

20  a commission to take evidence outside of the country.

21  In the event that any ruling I made on the

22  admissibility were challenged to the federal court of

23  appeal and overturned, it would necessitate the parties

24  returning to California to obtain Mr. Sloan's evidence

25  on the point.

23

1         Given that possibility, I think it's more

2    desirable to have the witness identify the documents if

3    he's able to and to answer questions on them.

4         Given that this is a proceeding that is before a

5    judge alone, I don't think there's any difficulty that

6    I would have, in the event that you are successful in

7    your motion to exclude the evidence, for me to

8    disregard it.

9         MR. DERKSEN:  If that's your ruling, then

10   obviously the Crown respects that.  As the rules

11   provide, it's the Crown's position, however, that --

12   and we got into this a little bit, you may recall,

13   during the trial in September, but as the rules

14   provide, as the matter stands right now, there were

15   answers given by the Appellant corporation's nominee

16   during the discovery that had never been corrected and

17   that, in the Crown's view, are inconsistent with these

18   documents that my learned friend proposes to tender.

19   So there is a real problem here with the rules

20   providing that my learned friend can't lead this

21   evidence, and now we're about to embark on that

22   process.  So I make that observation, but if it's your

23   preference --

24        THE COMMISSIONER:  I'm not following you,

25   necessarily.  You're saying that the Appellant has not

24

1    corrected answers given on examination for discovery by

2    the nominee of the Appellant and therefore would be

3    precluded from leading the evidence in these documents?

4         MR. MARKS:  Without leave of the Court.

5         THE COMMISSIONER:  Without leave of the Court.

6         MR. DERKSEN:  That's correct.

7         We're into, Your Honor, a situation similar to

8    that which we ran into with Mr. Turner.  The

9    Appellant's nominee gave evidence during the discovery

10   in response to certain questions by my colleague,

11   Mr. Bornstein, B-o-r-n-s-t-e-i-n, about what type of

12   information, what type of reports were provided to

13   Mr. Sloan, and Mr. Pearlman gave, in the Crown's view,

14   some very specific answers, and it's the Crown's view

15   these documents are inconsistent with those answers.

16        So there are really two issues about the

17   admissibility of these documents and I suppose a third.

18   One is authenticity.  That hasn't been admitted by the

19   Crown through the usual pretrial steps.

20        But there are two issues.  One is these

21   documents weren't listed in the Appellant's list of

22   documents, and at about 2:15 on Friday, the eve of the

23   trial on September 1, I received an additional list of

24   documents which the Appellant, in somewhat hollow

25   compliance with the rules, put the Crown on notice that

                                              25

1  they were serving an additional list of documents.

2  That's first obvious issue.

3  And secondly, as I state, rule 98, sub1,

4  provides that if the answers haven't been corrected on

5  the discovery, then if the evidence to be led is

6  favorable to the party, and it may be favorable, it's

7  not admissible except with the Court's leave.

8  So there really are two issues with the rules

9  and of course an issue of authenticity of the

10  documents.  I make that observation.  I realize that

11  you've expressed a preference for how to proceed today.

12  THE COMMISSIONER:  I think, and subject to any

13  comments that Mr. Marks has, I think that the most

14  practical way of proceeding is to have the evidence

15  heard and to decide subsequently whether or not that

16  evidence will be admissible -- ultimately admissible in

17  the determination that I have to make.

18  MR. MARKS:  I agree with that, Your Honor.  I

19  could respond to my friend now, but that would launch

20  us into the argument as to the admissibility, which

21  I've got a case brief here and so on which, as I

22  propose, I think for the reasons that Your Honor gave,

23  it makes ultimate good sense to reserve that to a later

24  date and to take the evidence so that whatever happens

25  in the future, we don't need to come back here and get

26

1    further evidence from Mr. Sloan.

2         THE COMMISSIONER:  I think that's best.  And I

3    think that the Court ultimately has control over its

4    own procedures and can make a determination even where

5    the issue of admissibility is not resolved in advance.

6    So I think I'm going to let counsel proceed with the

7    production of the documents and the questions for the

8    witness on those documents.

9         MR. DERKSEN:  Fair enough.

10        MR. MARKS:  Thank you, Your Honor.

11        Q.  And Mr. Sloan, you mentioned that you did

12   receive documents from Artistic at the year end giving

13   a tally, an accounting to you.

14        MR. DERKSEN:  As we proceed here, perhaps my

15   learned friend could establish whether he's going to

16   put an original to the witness or whether these will be

17   copies.

18        MR. MARKS:  These will be copies.

19        THE COMMISSIONER:  You can make any comments

20   that you'd like.

21        MR. DERKSEN:  Very well.  Just so the record is

22   clear then, Your Honor, the Crown has not admitted to

23   the authenticity to these documents, so if my learned

24   friend could establish their authenticity -- they are

25   not originals, and clearly the best evidence rule

27

1    contemplates the production of an original as an

2    exhibit in evidence.  So if my learned friend could not

3    address the issue of authenticity, then the Crown would

4    object to the introduction of these documents into

5    evidence.

6         THE COMMISSIONER:  Mr. Marks.

7         MR. MARKS:  Again, I have other witnesses to

8    call with respect to authenticity, so I propose to show

9    this witness copies of these documents and see if he

10   can identify them as copies of documents that he

11   received.

12        THE COMMISSIONER:  So they would be marked as

13   exhibits for identification subject to identification

14   and confirmation on authenticity at a later point in

15   the hearing?

16        MR. MARKS:  Yes.

17        THE COMMISSIONER:  Very well.  Then they will be

18   marked.  Madam Registrar will note that these will be

19   exhibits marked for identification only.

20        MR. MARKS:  Thank you, Your Honor.

21        Q.  Mr. Sloan, I'm showing you what appear to be

22   copies of statements or three sheets of paper, one

23   entitled "Coleman Year End January 31, 1999"; the

24   second one entitled "Coleman Year End, January 31,

25   2000"; and a third entitled "Coleman/silver Year End,

                                                        28

1    January 31, 2001."

2              And have you seen these documents before?

3        A.  Yes.

4        Q.  In what context?

5        A.  Well, this was a year-end reconciliation

6    that Allan would send me.

7        Q.  And what did these statements tell you?

8        A.  These statements told me the various

9    expenses that I was being charged or shared.

10       Q.  And what -- did it indicate anything about

11   how many pieces of art had been sold and at what price?

12       A.  Oh, sure.  Gross sales.

13       Q.  So just dealing with --

14       A.  But that number, I already know.

15       Q.  Yes.  How did you know that?

16       A.  Well, I knew that by virtue of how much art

17   they needed.

18       Q.  Yes.  And this was confirmation to you.

19       A.  Right.  This was confirmation.

20       Q.  And that's the first line of the statement,

21   and then the various adjustments are in the first

22   column?

23       A.  Their fee, which -- for 50 percent, which

24   they took.  Sales discount adjustments.  In this case,

25   there was a variety of adjustments.  Taxes.  I assume

29

1    this is customs taxes.  Sales price reductions.  In

2    this case, there was some reductions which we had

3    agreed to.  Lawyer fee.  Loss or brokerage.  I'm not

4    sure what that was.

5         Q.  I think it says "less brokerage."

6         A.  Less brokerage.  This had to do with the

7    brokerage or customs and wire charges which were for

8    wires sent to me.

9         Q.  And then it shows that after all those

10   adjustments, there's an amount of $2,095,963 of net

11   income?

12        A.  Right.

13        Q.  And then it shows the payments -- shows an

14   amount that says "less payments."

15        A.  Right.

16        Q.  And did that equate to the payments that you

17   had received to date?

18        A.  That's correct.

19        Q.  And then the last line says "net payable,"

20   and that would be the adjusting amount?

21        A.  Well, that was a minus $128.

22        Q.  Yeah, so it was pretty close?

23        A.  Yes, it was very close.

24        Q.  And are the two statements for the

25   subsequent years, do they take the same form?

30

1    MR. KAJAN:  Have they been actually marked?

2    MR. MARKS:  We'll do that in a moment.

3    THE COMMISSIONER:  Excuse me, sir.  I'm going to

4    ask you not to interrupt, if that's possible.  We'll

5    have counsel for the Appellant conduct the examination.

6    THE REGISTRAR:  Can we, for identification only,

7    label this as A2?

8    THE COMMISSIONER:  Yes.  A2 for identification,

9    three pages.

10            (Exhibit A2 was marked for identification.)

11   BY MR. MARKS:

12   Q.  Mr. Sloan, in the three years in question,

13   '98, '99 and 2000, how many pieces of art did you sell

14   through this art donation program?

15   A.  A round number, maybe 50,000.

16   Q.  And did you consider it to be a good deal

17   for you?

18   A.  It was a very good deal for me.

19   Q.  Why?

20   A.  You can see by the grosses they were doing a

21   very good job of selling.  And I thought that their

22   expenses were very high and they were covering their

23   own expenses to a certain extent, so therefore I

24   thought I was getting a very good price.

25   Q.  When the funds were received from the

31

1  purchasers of the art, do you know what happened to

2  them?  Who were they paid to?

3      A.  The funds for the purchasers of the art went

4  to Artistic Ideas.  I assume they went into their bank

5  account.

6      Q.  And then it was from that account that funds

7  were wired to you?

8      A.  Yes.

9      Q.  How did Artistic get paid the 50 percent fee

10 or commission?

11     A.  At the end of the year on the adjustment,

12 they basically took their fee.  They may have taken

13 some during the course of the year as well.

14     MR. MARKS:  Can I have a moment to consult with

15 my client, Your Honor?

16     THE COMMISSIONER:  Yes.  Would you like a short

17 break?

18     MR. MARKS:  Yes, thank you.

19         (Recess taken.)

20 BY MR. MARKS:

21     Q.  Mr. Sloan, when you were considering selling

22 your inventory of art in Canada, did you ever consider

23 setting up your own sales force or make arrangements

24 that way?

25     A.  I considered it.

32

1       Q.  And why did you decide not to do that?

2       A.  Way too expensive, too much work, too much

3   effort.  Just wasn't worth it.

4       MR. MARKS:  Those are all my questions, Your

5   Honor.

6       THE COMMISSIONER:  Thank you very much, counsel.

7   Mr. Derksen?

8       MR. DERKSEN:  Mr. Marks and I are just going to

9   switch spots here.

10      Thank you, Your Honor.

11

12                  CROSS-EXAMINATION

13  BY MR. DERKSEN:

14      Q.  Mr. Sloan, you until this morning have

15  refused to speak to my office about your involvement in

16  this matter; isn't that correct?

17      A.  Well, I put it in the hands of my business

18  manager.

19      Q.  Mr. Alpert?

20      A.  Yes.

21      Q.  And you understand that Mr. Alpert, on your

22  behalf, advised my office that you are not prepared to

23  be interviewed about your involvement with Artistic

24  Ideas and the arrangements you had with Artistic Ideas?

25      A.  Whatever he said.

                                                    33

1      Q.   You don't dispute that Mr. Alpert declined

2  my office's request to speak with you.

3      A.   I don't.

4      Q.   You were the president and sole shareholder

5  of Coleman Fine Arts?

6      A.   Yes.

7      Q.   And also Silver Fine Arts?

8      A.   Yes.

9      Q.   And were you also the CEO, chief executive

10 officer, of both of those companies?

11     A.   Yes.

12     Q.   And how about director?  Were you a director

13 of both of those companies?

14     A.   Yes.

15     Q.   I take it, Mr. Sloan, that you are aware

16 that Artistic Ideas and Mr. Grossman and Mr. Pearlman

17 had become involved in this litigation concerning this

18 proceeding.

19          You were aware of that?

20     A.   Yes.

21     Q.   And when did you first become aware of it?

22     A.   I don't remember.

23     Q.   Have you more recently, say, in the past

24 year, had occasion to discuss your recollection of

25 events concerning what transpired with you and

34

1   Mr. Grossman and Mr. Pearlman back in 1998, 1999, 2000,

2   2001?  Have you had occasion to speak with Mr. Pearlman

3   or Mr. Grossman about your recollection of the events?

4        A.   I really didn't get into any discussion with

5   them.

6        Q.   How about this past summer, July, August,

7   September?

8        A.   I spoke to them then.

9        Q.   And you discussed your evidence with them --

10  your recollection?

11       A.   My recollection.

12       Q.   And I take it some of that would have taken

13  place during a conference call?

14       A.   Was there a conference call?  Maybe.

15       Q.   You told us this morning, Mr. Sloan, that --

16  well, you understood that Allan Grossman, by

17  profession, is a chartered accountant?

18       A.   Yes.

19       Q.   And you understood that Mr. Mark Pearlman

20  was a chartered accountant by profession?

21       A.   Yes.

22       Q.   And that they were partners with a firm

23  known as Horwath and Ornstein?

24       A.   Yes.

25       Q.   And you understood that Mr. Grossman and

35

1   Mr. Pearlman didn't have a background in art galleries;

2   is that fair?

3          A.   It's fair.

4          Q.   And you told us this morning that you had a

5   background and ownership of some art galleries for

6   quite a number of years.

7          A.   Yes.

8          Q.   Did it strike you as odd, sir, that you were

9   using accountants to sell art?

10         A.   No.

11         Q.   Why not?

12         A.   Well, they have the ability to sell a

13  product, and whatever the product is, they learn it,

14  and once they learn it, they sell it.  And I don't

15  think they knew any more about software than they knew

16  about art.

17         Q.   Your company's -- first Coleman Fine Arts

18  Limited, that was a company, I take it, that would have

19  been incorporated for the purposes of this arrangement

20  with Mr. Grossman and Mr. Pearlman?

21         A.   Yes.

22         Q.   Back in September of '98?

23         A.   Yes.

24         Q.   And then Silver Fine Arts Limited, I

25  understand that it was incorporated later, but August

                                                      36

1   of 2000?

2        A.   Whatever.

3        Q.   Is there a reason why the second company was

4   incorporated?

5        A.   It was my accountant's idea.

6        Q.   And you've always been a director of both of

7   those companies?

8        A.   Yes.

9        Q.   Do you know, sir, someone by the name of

10  Edwin Metelits, M-e-t-e-l-i-t-s?

11       A.   Yes.

12       Q.   What association do you have with

13  Mr. Metelits?

14       A.   He was my accountant.

15       Q.   I'm going to pass you a document that's a

16  copy with a certificate from the State of California

17  with a date on the first page, February 15, 2005.   Take

18  a look at that, please.

19       MR. MARKS:   I'll take a page from my friend's

20  book.   I wonder if he has the original available?

21       THE COMMISSIONER:   Mr. Derksen?

22       MR. DERKSEN:   No, I don't.

23       MR. MARKS:   I object.

24       THE COMMISSIONER:   What do you propose to do

25  with it?

37

1      MR. DERKSEN:  I'm going to ask Mr. Sloan if it's

2  possible that he's not a director of Silver Fine Arts.

3      THE WITNESS:  I always assumed I was a director.

4      MR. MARKS:  I think that my friend wants to use

5  a document to cross-examine.  This witness can't

6  identify this document.  It hasn't been introduced into

7  evidence in any other matter.  It's not the original

8  document.

9      THE COMMISSIONER:  I haven't heard Mr. Derksen

10  suggest that he intends to enter it as an exhibit at

11  this point.  It would be at that point that the

12  authenticity of the document would come into play.

13  He's showing the witness a document and suggesting to

14  him that, in fact, he wasn't a director.  I think it's

15  open to Mr. Derksen to do so.

16      MR. MARKS:  Very well.

17  BY MR. DERKSEN:

18      Q.  You've had an opportunity to look at this

19  document, sir?

20      A.  Yes.

21      Q.  Is it possible that you aren't a director or

22  officer of Silver Fine Arts Limited?

23      A.  It's possible.

24      Q.  Well, are you or aren't you?

25      A.  I was under the assumption that I was a

38

1    director and an officer, but you're showing me a

2    document that shows me otherwise.

3         MR. MARKS:  In fairness to the witness, he's

4    showing a document that has a date on it and asking

5    him --

6         THE COMMISSIONER:  I don't think the witness was

7    admitting the contents of the document.  He was simply

8    saying he saw something that suggested he was not a

9    director.

10        MR. MARKS:  I'm objecting to the lack of

11   fairness in my friend's question because he made a

12   sweeping statement that this document appears to be

13   filed as of a certain date and may only represent the

14   state of affairs as of that date, and Mr. Sloan's

15   evidence may relate to a different time period.  So I'm

16   just suggesting that my friend, in fairness, relate his

17   questions to a time period.

18        THE COMMISSIONER:  If you believe there's any

19   confusion caused by the question asked by counsel and

20   the answer given by the witness, I'm going to invite

21   you to deal with that in redirect.

22        MR. DERKSEN:  Perhaps, then, we should mark the

23   document for the purposes of identification.

24        THE COMMISSIONER:  Do you propose -- are you

25   then proposing to have it identified at a later date?

                                                       39

1    MR. DERKSEN:  No.  I don't intend to try to
2  introduce it into evidence.  I don't have the original.
3  So I think it just stops at being a document that was
4  put to the witness.
5    THE COMMISSIONER:  Well, a document itself, I
6  don't believe, can be put in as an exhibit at this
7  point.  When a document is put in and marked for
8  identification, that is indicating it's subject to be
9  identified at a later point.  If you wish to try to do
10  that, it can be marked for identification, but in the
11  event you don't have the document identified, it would
12  not be part of the record.
13    MR. DERKSEN:  Very well.
14    Q.  Mr. Sloan, having looked at that document,
15  do you recognize that document?
16    A.  Do I recognize it?  I do now.
17    Q.  And what do you understand the document to
18  be?
19    A.  Well, it's obviously a state of
20  incorporation of a company.
21    Q.  For Silver Fine Arts Limited?
22    A.  Yes.
23    Q.  Have you seen the original of that document
24  before?
25    A.  I don't remember.

40

1      Q.  Very well.  You can just pass it back to me

2  then, please.

3         Sir, what was your understanding of how the

4  art donation program that Mr. Pearlman and Mr. Grossman

5  were involved in, how that program worked?

6      A.  My understanding was that they were going to

7  offer a group of art images to their purchasers for the

8  purpose of a purchase of 11 pieces to be donated to a

9  charity, and it was up to the investor to choose what

10  group he wanted to buy.

11      Q.  Did you have any understanding as to the

12  potential tax savings return on investment that this

13  program would generate for a potential purchaser?

14      A.  I had an idea.

15      Q.  And what was your understanding?

16      A.  I didn't know the exact numbers.  I just

17  knew it generated a deduction.

18      Q.  And you understood that Artistic Ideas would

19  go out and find potential purchasers who would become

20  donors of the artwork.

21      A.  Yes.

22      Q.  And you understood that Artistic Ideas

23  arranged for appraisers to appraise the artwork?

24      A.  Yes.

25      Q.  And you understood that Artistic arranged to

41

1    find charities who would accept donations of the

2    artwork?

3            A.   Yes.

4            Q.   And you understood that Artistic would get

5    the artwork into the hands of the charities on behalf

6    of the donors?

7            A.   Yes.

8            Q.   I take it you weren't involved in paying any

9    of the charities an amount based on the dollar value of

10   donation receipts issued by the charities?

11           A.   I was unaware of it.

12           Q.   Is it fair to say, Mr. Sloan, that your

13   companies, Coleman Fine Arts and Silver Fine Arts, had

14   no obligations insofar as Artistic Ideas art donation

15   program was operating?

16           A.   Would you repeat that question.

17           Q.   Is it fair to say that your companies,

18   Coleman Fine Arts and Silver Fine Arts, had no

19   obligations insofar as the operation of the art

20   donation program?  All you did was source the prints.

21   Is that fair so say?

22           A.   Yeah, that's fair to say.

23           Q.   And you understood that in order for

24   Artistic Ideas art donation program to work within this

25   donor market, they needed prints.   They needed you to

42

1    source prints?

2        A.   Yes.

3        Q.   And that was what attracted you as part of

4    the business venture; is that fair?

5        A.   Yes.

6        Q.   Were you involved in the approval of sales

7    to individual purchase donors?

8        A.   No.

9        Q.   Never got involved?

10       A.   Only in the case where there might have been

11   some form of a discount.

12       Q.   I'd like to ask you to turn up tab 2 of

13   Exhibit A1.   If we have an exhibit copy here.

14       THE COMMISSIONER:   The court has only brought

15   the one.

16       MR. MARKS:   You can use my copy.

17       THE COMMISSIONER:   Thank you, Mr. Marks.

18       MR. DERKSEN:   Do you mind if I just confirm it's

19   not marked up?

20       THE COMMISSIONER:   The record is Volume 1 of A1?

21       MR. DERKSEN:   That's correct.   Tab 2 of

22   Exhibit A1.

23       Q.   Mr. Sloan, I'm just passing you Exhibit A1,

24   and if you would, please turn up tab 2 of Volume 1, and

25   you should have in front of you a document headed

                                                      43

1   "Purchase Agreement," dated December 29, 1998.

2       Do you see that, sir?

3   A.  Yes.

4   Q.  Do you recognize this document?

5   A.  Yes.

6   Q.  What's the first time that you would have

7 seen a document like what you're looking at at tab 2 in

8 blank, not filled in with purchaser information?

9   A.  I don't recall.

10   Q.  The preamble of the document on the first

11 page starts:

12       "Whereas the vendor is the owner of the art

13       collectively, the prints set out in schedule A

14       hereto."

15       Do you know what schedule A is?

16   A.  No.

17   Q.  Do you know, sir, what prints were being

18 sold to this particular purchaser?

19   A.  No.

20   Q.  Here it's Mr. Sachman, S-a-c-h-m-a-n.

21       Look at the last page of the document of

22 this tab, Mr. Sloan.  There's a signature under the

23 name Coleman Fine Arts Limited.

24       Do you recognize that signature?

25   A.  Yes.

44

1        Q.   Whose signature do you recognize that to be?

2        A.   Allan Grossman.

3        Q.   And had you approved Mr. Grossman to execute

4   this document on your behalf?

5        A.   Yes.

6        Q.   Talk a moment to look at the document, if

7   you need to.

8             Is it your understanding that this was the

9   document under which your company, Coleman Fine Arts,

10  would effectively sell prints to a donor purchaser?

11       A.   Since I wasn't involved in this document, I

12  don't know.

13       Q.   You have no real understanding of this

14  document.

15       A.   No.

16       Q.   And so when it says, "Whereas the vendor is

17  the owner of the art collectively, the prints set out

18  in schedule A hereto," and then in paragraph 1 it

19  starts, "the vendor hereby sells" -- I'm on page 1,

20  paragraph 1, Mr. Sloan -- "the vendor hereby sells,

21  assigns, transfers and conveys to the purchaser all

22  right, title and interest in and to the prints," and so

23  on, did you have any understanding as to what specific

24  prints were being sold through a document such as this?

25       A.   No.

                                                          45

1          Q.   But is it fair to say that on December 29,

2     1998, Mr. Grossman, on your behalf, was selling some

3     prints?

4          A.   Yes.

5          Q.   And lower, at the bottom of paragraph 1, the

6     second-to -- the second last line, reference is made --

7     if you need to take a look at that, reference is made

8     to "notwithstanding the fact that such prints are

9     stored at the premises of the vendor at Los Angeles,

10    California, or are in transit."

11              Were all of the prints stored with you?

12         A.   Yes.

13         Q.   And these prints that were being sold on

14    your behalf by Artistic Ideas, these were prints that

15    you owned?

16         A.   Well, not all.

17         Q.   When you say "not all," what do you mean?

18         A.   There were prints that I owned in my

19    inventory, and there were prints that I purchased.

20         Q.   Is it the case, sir, that some of the prints

21    that you purchased were actually being purchased after

22    the donation year?  So we take -- for example, this

23    agreement that we're looking at at tab 2 contemplates a

24    sale by Coleman Fine Arts, December 29, 1998.

25              Is it possible that you acquired prints in

46

1    1999 that pertained to this 1998 donation year?

2            A.   I have no knowledge of that.

3            Q.   You have no knowledge of that?

4            A.   No.

5            Q.   So you have no knowledge of acquiring prints

6    after the donation year.

7            A.   Right.

8            Q.   And when I say "donation year," you

9    understand that, for example, I'm referring to the 1998

10   donation year.

11           A.   Yes.

12           Q.   A calendar year.

13           A.   Yes.

14           Q.   If you would turn over to tab 5, please, of

15   Exhibit A1, Mr. Sloan.  I understand this to be a

16   listing of prints.  And you scan down the page, about

17   the tenth print down, Guitare Verte et Boutaille.  I'm

18   not a Francophone, so I'm terrible in the

19   pronunciation, but I will spell it.  G-u-i-t-a-r-e

20   V-e-r-t-e e-t B-o-u-t-a-i-l-l-e.

21           Do recognize that as a Picasso?

22           A.   Yes.

23           Q.   Is that something that you would have

24   transacted or sold as part of the prints sold in

25   your --

47

1        A.   Yes.

2        Q.   -- sold to the purchasers?

3        A.   Absolutely.

4        Q.   And further down, there's another Picasso,

5   maybe about 20 prints down, Minotaure et Femme --

6   M-i-n-o-t-a-u-r-e, et is e-t, and Femme is F-e-m-m-e --

7   another Picasso print?

8        A.   Yes.

9        Q.   Something that you would have sold as part

10  of this transaction with the purchasers?

11       A.   Yes.

12       Q.   And then over on the second page about 11

13  down, Femme a la Guitare, F-e-m-m-e.  A la is a, l-a.

14  Guitare, G-u-i-t-a-r-e.  Another Picasso print.

15            Something you would have sold in the

16  transaction with purchasers?

17       A.   Yes.

18       Q.   So just some examples of many of the prints

19  you would have sold; is that fair?

20       A.   Yes.

21       Q.   These three Picassos that I referred you to,

22  did those come from a business known as Museum Masters

23  International?

24       A.   Possibly.

25       Q.   Is it possible that you acquired those

48

1    prints from Museum Masters after the donation year?

2         A.   No.

3         Q.   Not possible?

4         A.   No.   Not if they were donated in that year.

5         Q.   Did you acquire some prints from Museum

6    Masters International?   Would you agree with that?

7         A.   Yes.

8         Q.   And is it fair that you would have been

9    paying somewhere between 10 to $20 for each print?

10        A.   Not correct.

11        Q.   Not correct?

12             What would you have paid?

13        A.   I don't remember exactly what I paid for

14   each piece, but it was substantially more than $20.

15        Q.   More than 40?

16        A.   Yes.

17        Q.   More than 60?

18        A.   I don't know.   There were different prices

19   for different things.

20        Q.   How did that work?   Can you give me some

21   general explanation of how the prices worked?

22        A.   Well, certain pieces I bought in bulk, and

23   other pieces I didn't.

24        Q.   And pieces that you bought in bulk, what

25   would you have paid?

49

1          A.   Could have paid as low as $40 and could have

2    paid as high as $80.

3          Q.   As a generality, was there sort of an

4    average price of what you were paying?  You told us

5    that you sold about 50,000 prints.

6          A.   Is there an average price that I was paying?

7          Q.   Yes.

8          A.   No.  There wasn't an average price.

9          Q.   Did it -- did the price go over $60?

10         A.   Sometimes.

11         Q.   80?

12         A.   Yeah.

13         Q.   What was the most frequent price?

14         A.   Most frequent price was probably somewhere

15   between 40 and 60.

16         Q.   Is there a term in the art industry or the

17   limited edition print industry called "pulling," you

18   pull prints?

19         A.   You mean pulling prints regarding the

20   printing of them?

21         Q.   Yes.

22         A.   Yes.

23         Q.   And what's your understanding of that term?

24         A.   My understanding of that term?  That has to

25   do with the printing.

50

1          Q.   Is that how they're made essentially?

2          A.   Right.  How they're made.

3          Q.   Were any of the prints that were transacted

4    in this arrangement with Artistic Ideas, were any of

5    those prints that were being pulled specifically for

6    the sale through Artistic Ideas to these purchasers?

7          A.   None of these prints were printed at that

8    time if that's what you're suggesting.

9          Q.   So it's all old art?

10         A.   Yes.

11         Q.   How old?

12         A.   Which pieces are we talking about?

13         Q.   Generally.

14         A.   Generally, there would be no way to tell

15   you.  You'd have to give me a specific.

16         Q.   Well, did any of the art come from editions

17   that were published in the 1980s?

18         A.   Yes.

19         Q.   1990s?

20         A.   Yes.

21         Q.   As late as 1997?

22         A.   Depends.  I'd have to look at the list.

23         Q.   I'm going to pass you a document, sir.  It's

24   two pages.  The first page is headed -- kind of a

25   customs invoice, and there's a date over on the right

51

1    side, March 4, 1999.  And over on the left side,

2    vendor, Coleman Fine Art Limited.

3            Do you recognize this document, sir?

4        A.  Yes, I do.

5        Q.  What is this?

6        A.  Well, this is a customs invoice.

7        Q.  And do you recognize this as a copy of one

8    of the invoices that your company, Coleman Fine Arts,

9    would have transacted with back in --

10       A.  Yes.

11       Q.  Were you involved in the preparation of

12   documents such as this?

13       A.  No.

14       Q.  Who prepared them?

15       A.  They were prepared by Artistic Ideas.

16       Q.  Were they sent to you?

17       A.  Yes.

18       Q.  And what did you do with them?

19       A.  I checked them to see exactly what had to be

20   sent, and I used them for shipping.

21       Q.  So, for example, in this Canada customs

22   invoice, there's a purchaser's name over on the right

23   side of the document, League for Human Rights, B'nai

24   Brith Foundation.

25            Did you understand that as a charity that

                                                          52

1    was to be receiving prints?

2          A.   Yes.

3          Q.   And the prints being shipped in the new

4    year -- and when I say in the new year, March 4, 1999,

5    is the way the arrangement worked that purchasers would

6    acquire or buy the prints from Coleman in 1998, and

7    then they would be shipped the following year, 1999?

8          A.   Yes.

9          Q.   So here, for example, March 4, 1999, this

10   would have been a shipment for the 1998 donation year?

11         A.   Yes.

12         Q.   If you look over on the second page, it's

13   headed MMI, Museum Masters International Limited.

14              Do you see that?

15         A.   Yes.

16         Q.   Do you recognize this?

17         A.   Yes.

18         Q.   What do you understand this to be?

19         A.   This was Museum Masters who shipped these

20   particular goods for me.

21         Q.   For you?

22         A.   Yes.

23         Q.   And I notice that in shipping the goods,

24   Museum Masters is reflecting a unit price of a thousand

25   dollars.

53