1           Do you see that?

2       A.   Yes.

3       Q.   So the document appears to reflect a

4   thousand dollars per unit, essentially a thousand

5   dollars per print.

6           What was your understanding of how that came

7   to be reflected on this commercial invoice?

8       A.   I think that that was the appraisal.

9       Q.   And so how did Museum Masters get that

10  information?

11      A.   From me.

12      Q.   And did you provide that information to all

13  of your sources of the prints?

14      A.   No.

15      Q.   Did you provide that type of information to

16  print companies or entities that were selling prints to

17  you for the purposes of shipment to Artistic Ideas?

18      A.   Yes.

19      Q.   Now, the commercial invoice is also dated

20  March 4, 1999.

21          So why is it that Museum Masters

22  International is transacting, if I can use that word,

23  with prints in March of '99 that concern the 1998

24  donation year?

25      A.   They were purchased in 1998.  I asked them

54

1    to hold them until I had invoices, and they shipped

2    them when I told them to ship them.

3         Q.   So your evidence is that you had acquired

4    these prints in 1998.

5         A.   That's correct.

6         MR. DERKSEN:   Now, the witness has identified

7    this document as a copy, and consequently the Crown

8    proposes that it be marked as an exhibit, as

9    Exhibit R5, Your Honor.

10        THE COMMISSIONER:   Mr. Marks?

11        MR. MARKS:   No objection.

12        THE COMMISSIONER:   The witness has identified it

13   sufficiently.   It will be marked as R5.

14             (Exhibit R5 was marked for identification.)

15        MR. DERKSEN:   Your Honor, I will pass you a

16   copy.

17        THE COMMISSIONER:   Thank you.

18        MR. DERKSEN:   And if the witness's copy could

19   eventually be marked as R5, please.

20        THE COMMISSIONER:   Could you please pass that

21   back to Madam Registrar to have it marked as an

22   exhibit.   Thank you.

23   BY MR. DERKSEN:

24        Q.   I'll pass you another document, sir.   It's

25   dated March 4, 1999, and it also bears the -- appears

55

1  to be the letterhead of Museum Masters International

2  Limited.

3          Do you recognize this document, sir?  I

4  notice there's a cc to Paul Sloan down at the bottom.

5      A.  Yes.

6      Q.  You recognize this document?

7      A.  Yes.

8      Q.  What do you understand this document to be?

9      A.  Well, this was a document that was just

10  confirming that she was sending a shipment.

11      Q.  It says Lynn Miller at Museum Masters?

12      A.  Yes.

13      Q.  So on March 4, 1999, she's writing to

14  Artistic Ideas with a cc to you, confirming that she's

15  sending a shipment?

16      A.  That's correct.

17      MR. DERKSEN:  I believe the witness has

18  identified this document sufficiently to have it

19  admitted.  If my learned friend has any objections the

20  Crown asks that it be tendered as Exhibit R6, Your

21  Honor.

22          MR. MARKS:  No objection.

23          THE COMMISSIONER:  R6.

24              (Exhibit R6 was marked for identification.)

25          MR. DERKSEN:  I'll pass a copy to Your Honor.

56

1       THE COMMISSIONER:  Thank you.

2  BY MR. DERKSEN:

3       Q.  I'll ask you to look at another document

4  dated March 4, 1999, on what appears to be a Museum

5  Masters International letterhead.

6       Do you recognize this document?

7       A.  Yes.

8       Q.  And what's your understanding of this

9  document?

10      MR. MARKS:  Excuse me.  Could I have a copy?

11      MR. DERKSEN:  I apologize, Mr. Marks.

12       Q.  You were about to tell me what your

13  understanding was of this document, sir?

14       A.  I don't know what this is.

15       Q.  I'm sorry.  Maybe I misunderstood.  I

16  thought you told me you recognized it.

17       A.  I thought this was a shipping document, but

18  when I looked at it, I'm not sure what it is.

19       Q.  Did you notice that there are several

20  prints?  The third one down, Femme a la Guitare, that's

21  a print that we spoke about earlier, a Picasso print?

22       A.  Uh-huh.

23       Q.  And it indicates a quantity of three at $20,

24  extension, $60.

25       Is that what you were paying for that

57

1   Picasso print per unit?

2        A.  I don't think so.  I think -- I don't know

3   what this is, but I don't think so.  I don't remember

4   paying $20 to Marilyn Goldberg for anything.

5        Q.  Marilyn Goldberg was with Museum Masters?

6        A.  Yes.

7        Q.  And similarly, the print about ten down,

8   Guitare Verte et Boutaille, another one we referred to

9   earlier, another Picasso.

10       A.  Yes.

11       Q.  So you have no recollection, sir, of paying

12  $20 for any of these prints that are described on this

13  document?

14       A.  No.

15       Q.  You recognize them as all being Picassos?

16       A.  Yes.

17       Q.  And you never received a copy of this

18  document?

19       A.  I may have.  I don't remember.

20       Q.  Is it possible that you hadn't acquired some

21  of these prints until after the donation year?

22       A.  No.

23       Q.  You were prepared to go on hook for prints

24  before donors or purchasers had entered into --

25       A.  Yes.  I advanced a lot of money to various

58

1    broker dealers and to art dealers to acquire art.  It

2    was a common practice.  It's the only way you could

3    really buy at the right price.

4         Q.  So you advanced money to dealers -- you said

5    brokers --

6         A.  Yeah.

7         Q.  With respect to specific titles or just

8    generally a quantity of prints?

9         A.  Some cases respective titles, some cases

10   just a major advance.

11        Q.  On the understanding that they would supply

12   titles --

13        A.  Yeah.

14        Q.  I'll ask you to pass that document back to

15   me then, if you would, please.

16            I'll pass you another document, sir.  This

17   appears to be on Artistic Ideas letterhead, addressed

18   to you, Paul Sloan, dated February 17, 1999.

19            Do you recognize this document, sir?

20        A.  No, I don't.

21        Q.  You don't?  Is this something that you would

22   have received?

23        A.  Possibly.

24        Q.  There's a handwritten note down at the

25   bottom -- first of all, it appears to be from a Susan

                                                    59

```
 1   Read.

 2              Do you recognize that name?

 3        A.   Yes.

 4        Q.   And who do you understand Susan Read to be?

 5        A.   She was a manager of the Artistic Ideas

 6   office at the time.

 7        Q.   Did you have contact with her from time to

 8   time?

 9        A.   Yes.

10        Q.   And there's a note down at the bottom:

11             "P.S., the 19 units may not be pulled.   Send

12        orders as they currently stand."

13             And it's signed Sue, S-u-e.

14        A.   Yes.

15        Q.   Do you have any understanding of what that

16   note might refer to, sir?

17        A.   No, I don't.

18        Q.   If you could pass that back to me, please.

19             Sir, you understood that the way Artistic

20   Ideas was selling the prints in groups, that a

21   potential purchaser would select the group of prints?

22        A.   Yes.

23        Q.   Of various titles?

24        A.   Yes.

25        Q.   Were there occasions where particular groups
```

60

1    that were being marketed by Artistic were no longer

2    available because of particular prints within that

3    group weren't available?

4          A.   Well, they might have been sold out.

5          Q.   So if you had a group of 11 prints, you

6    might have been able to come up with 10 of one print

7    but only 6 of another?

8          A.   They had x number of prints available to

9    them.  If the group got sold out, they would have to

10   offer something else.

11         Q.   Do you know if there were substitutions that

12   were just thrown in to make up groups?

13         A.   I don't know.

14         Q.   Charles Bragg, do you recognize that name as

15   an artist?

16         A.   Yes.

17         Q.   And Bragg is B-r-a-g-g.

18              Was Charles Bragg the source of some of the

19   prints that were transacted with Artistic?

20         A.   Yes.

21         Q.   Charles Bragg has a son, Charles Lynn Bragg.

22   Is that your understanding?

23         A.   Yes.

24         Q.   And did you also obtain prints through

25   Charles Lynn Bragg as part of these transactions

61

```
1   through Artistic?

2        A.  Yes.

3        MR. DERKSEN:  May I have a moment, please?

4        THE COMMISSIONER:  Let's take a break.  Ten

5   minutes.

6             (Recess taken.)

7   BY MR. DERKSEN:

8        Q.  Pass you another document, Mr. Sloan, that

9   appears to be some more custom shipping documents.  If

10  you would, please, take a look at that.

11       MR. MARKS:  Which document did you hand him?

12  Could you just describe it?

13       MR. DERKSEN:  Sure.

14       Q.  Mr. Sloan, I've passed you a document.  It's

15  four pages, and the first page over on the upper left

16  hand side of the page refers to Silver Fine Arts, care

17  of Glenn L. Curtis Associates.  And down at the bottom,

18  it references Russell, R-u-s-s-e-l-l, A. Farrow,

19  F-a-r-r-o-w, Limited.

20            Take a look at this document, sir.

21            Do you recognize this as another set of

22  shipping documents for prints that were shipped to

23  Aladdin's Children's Charity that concerned prints by

24  Charles Bragg and Charles Lynn Bragg?

25       A.  I assume.
```

                                                          62

1          Q.   And over on the second page down at the

2     bottom, I see your name, Paul Sloan.

3               So you would have been involved in providing

4     these documents for the purposes of shipment of Bragg

5     prints?

6          A.   Yes.

7          Q.   That were to go to Aladdin's Children's

8     Charity.

9          A.   Right.

10         Q.   And similar to the earlier document that we

11    looked at, if you would turn in, please, to page 3,

12    there's a document.  It's entitled at the top "Gallery

13    Detailed Bragg, CL."  Do you have that?  The third

14    page, sir.

15         A.   Yeah.

16         Q.   And is this a document that would have been

17    provided to you by Artistic, or was this something that

18    your companies produced for the purposes of shipping

19    the prints up through Canada customs and over to

20    Artistic Ideas?

21         A.   This would have been provided by Artistic.

22         Q.   To you for the purposes of shipment?

23         A.   That's correct.

24         Q.   And I see here the first print that's listed

25    on this third page, Bragg CL, do you understand that to

63

1    be Charles Lynn Bragg?

2        A.   Yes.

3        Q.   So African Watering Hole, you see that

4    there?  The first print?

5        A.   Yes.

6        Q.   Appraised value $6,300?

7        A.   Right.

8        Q.   You recognize that as one of the Charles

9    Lynn Bragg prints that were transacted with Artistic

10   Ideas and these purchasers?

11       A.   Yes.

12       Q.   And then over on the next page, the fourth

13   page, there's another document headed "Gallery Detailed

14   Bragg."

15            Do you understand this fourth page to

16   concern prints that were being shipped up to Artistic

17   for Aladdin's Children's Charity prints by Charles

18   Bragg?  Same idea as the earlier page?

19       A.   Yes.

20       Q.   And these Bragg prints would have been

21   transacted in the 2000 donation year?  That's the first

22   year that Silver Fine Arts came into existence?

23       A.   I assume.  I don't remember.

24       MR. DERKSEN:  Your Honor, it's the Crown's

25   position that Mr. Sloan has sufficiently identified

                                                          64

1   this document for the purposes of having it tendered as

2   an exhibit, and so the Crown moves to have this

3   tendered as Exhibit R7.

4          MR. MARKS:  I don't believe Mr. Sloan said that

5   he had ever seen this document before.  He did answer

6   some questions about it, which he said various things

7   like, "I assume," but I'm not sure that he did identify

8   the document.

9          THE COMMISSIONER:  What was your position,

10  Mr. Sloan?  Did you say that you recognize the

11  document?

12         THE WITNESS:  Yeah, I think I recognize it.

13         MR. MARKS:  Very well.  No objection.

14         THE COMMISSIONER:  Okay.  Exhibit R7.  Thank

15  you, sir.

16             (Exhibit R7 was marked for identification.)

17         MR. DERKSEN:  Your Honor, I'll just pass you a

18  clean copy.

19         THE COMMISSIONER:  Thank you.  And the witness

20  copy can be handed to down to the registrar, please.

21  BY MR. DERKSEN:

22         Q.  Next, Mr. Sloan, I pass you what appears to

23  be an invoice from Charles Lynn Bragg, dated May 24,

24  2001.  Would you take a look at that, please.

25             On the right side of the page, it appears to

65

1  be bill to Coleman Fine Arts Limited.

2        Do you see that, sir?

3      A.  Yes.

4      Q.  Do you recognize this as an invoice -- a

5  copy of an invoice that Charles Lynn Bragg issued to

6  you or your company, Coleman Fine Arts?

7      A.  Yes.

8      Q.  There's quantity reflected, 3,738 prints.

9      Do you see that?

10      A.  Yes.

11      Q.  Is that -- does that accord with your

12  recollection of about what number of prints that you

13  would have acquired --

14      A.  I can't say for sure, but I assume.

15      Q.  Appears to be approximately correct.

16      A.  Yeah.

17      Q.  Is it fair so say that you were paying $40 a

18  print for the Charles Lynn Bragg prints?

19      A.  Yes.

20      Q.  And that would have included, for example,

21  the print, the African Watering Hole, we looked at

22  earlier with the appraised value of $6,300?

23      A.  If this came from Charles Bragg, it had --

24  oh, this is Charles Lynn Bragg.  Yes.

25      Q.  Now, Charles Lynn Bragg is invoicing you in

66

1    May of 2001.  So when, sir, did you acquire the titles

2    that were shipped as part of the 2000 donation year?

3         A.   I acquired them in 2000.

4         Q.   Why was he invoicing you in May of '01?

5         A.   Because I gave him a purchase order and this

6    is -- when he shipped it is when he billed me.

7         Q.   So he shipped the prints up to Artistic

8    Ideas for you?

9         A.   That's correct.

10        Q.   So these weren't prints that you had in your

11   inventory.

12        A.   No.

13        Q.   Were any of these prints created fresh for

14   these transactions through Artistic?

15        A.   I don't recall.

16        Q.   You don't recall?

17             Crown asks that this invoice dated May 24,

18   2001, from Charles Lynn Bragg to Coleman Fine Arts be

19   tendered and marked as Exhibit R8, please, Your Honor.

20        THE COMMISSIONER:  R8.  Can you hand your copy

21   down to the registrar.

22             (Exhibit R8 was marked for identification.)

23        MR. DERKSEN:  I pass Your Honor a clean copy.

24        THE COMMISSIONER:  Thank you.

25

67

1    BY MR. DERKSEN:

2         Q.   Sir, I'm passing you another document that

3    appears to be an invoice, this time from Charles Bragg,

4    and there's a date over on the top right.  Appears to

5    be July 26, 2001.  And over on the left side, bill to

6    Silver Fine Arts, ordered by Paul Sloan.

7              Do you recognize this as a copy of an

8    invoice from Charles Bragg with respect to prints that

9    were transacted through Artistic Ideas?

10        A.   Yes.

11        Q.   And it refers to a quantity of 5,000

12   graphics.

13             Are those limited edition prints?

14        A.   Yes.

15        Q.   And does that number, 5,000, does that

16   accord with your recollection of the number of titles

17   approximately that would have come from Charles Bragg?

18        A.   I assume.

19        Q.   And the Bragg titles, is it fair to say that

20   you paid $40 per unit?

21        A.   Yes.

22        Q.   Now, Charles Bragg is invoicing you in July

23   of '01, and it's my understanding that there were

24   Charles Bragg prints in the 2000 donation year.

25             So sir, did you acquire these prints in

68

1   2001?

2        A.   I advanced Charles Bragg and Charles Lynn

3   Bragg consistent money on a regular basis, and then

4   they would send me a statement at the end, but this

5   wasn't necessarily what they would do.

6        Q.   I'm sorry.  This isn't necessarily what they

7   would do.  What do you mean?

8        A.   Well, if there was $200,000 involved, I may

9   have paid them 150,000, and the balance might have been

10   50,000.  This is just a bill.

11        Q.   Sir, when Allan Grossman signed the purchase

12   agreements on your company's behalf, say, for example,

13   in the 2000 donation year, did you own the prints at

14   the time they were purportedly being sold to the

15   donors --

16        A.   Yes.

17        Q.   -- the purchasers?

18             It's not a situation where you would, after

19   year end, communicate with Charles Bragg or Charles

20   Lynn Bragg and say, I need so many number of units?

21        A.   No.  I bought them during the course of the

22   year.  I may have bought more after the course of the

23   year as part of a package which I kept for the

24   following year.  But monies didn't always change hands

25   in full until they were shipped.

69

1        Q.   So you might not have paid for the prints at

2   the time you had sold them?

3        A.   I advanced -- I advanced all these artists

4   and my various dealers money.

5        MR. DERKSEN:   Crown asks that this invoice dated

6   July 26, 2001, from Charles Bragg to Silver Fine Arts

7   be tendered and marked as Exhibit R9, please, Your

8   Honor.

9        THE COMMISSIONER:   R9.   Once again, Mr. Sloan,

10  can I ask you to pass the copy you have down to the

11  registrar.

12            (Exhibit R9 was marked for identification.)

13       MR. DERKSEN:   I pass Your Honor a clean copy.

14       Q.   Sir, I'll pass you another letter from --

15  appears to be from Charles Bragg, dated August 14,

16  2001, addressed to Paul Sloan.   If you would take a

17  look at that, please, sir.

18            Do you recognize this as a letter that you

19  received from Charles Bragg?

20       A.   Yes.

21       Q.   It's a copy of a letter you received from

22  Charles Bragg?

23       A.   Yes.

24       Q.   And just so the record is clear, Mr. Sloan,

25  is this Charles Bragg or Charles Lynn Bragg that's

70

GRADILLAS COURT REPORTERS
(310) 859-6677

1    writing to you here?

2         A.   This is Charles Bragg.

3         Q.   And he write:

4              "Dear Paul, Irwin picked up the last of the

5         replacement pieces today.  There were only 11

6         pieces which we were unable to do."

7              What's your understanding of what that was

8    about?

9         A.   Obviously, these were damaged pieces.

10        Q.   Were they reprinted?

11        A.   He was to replace them.

12        Q.   So was he reprinting them or replacing them?

13        A.   I don't know.  It was up to him to replace

14   them.

15        Q.   Third paragraph, he writes:

16             "I still need to know about the four pieces

17        from this group, Camille, Camelot 1, and

18        Camelot 2 and John the 23rd that didn't quite

19        make the appraisal figure.  You said they were

20        close enough to use after we finished printing

21        the original order.  Let me know what you want

22        me to do on these pieces."

23             What's your understanding about what

24   Mr. Bragg is referring to?

25        A.   Well, from this letter, I would say that

71

1  these were not appraised at a high enough level and
2  that we didn't order them.
3      Q.  And when Mr. Bragg says "after we finish
4  printing the original order," what was the original
5  order that they were printing?
6      A.  I don't know.
7      Q.  Is it the case, sir, that they were printing
8  prints, graphic images for the purposes of this
9  program?
10      A.  That's possible.
11      Q.  The fourth paragraph, Mr. Bragg writes:
12          "I'm working on some large pieces that
13      should get appraisals of between 1,800 to
14      $2,200.  That should get our average up for the
15      new group.  I will send them to Edie this
16      August."
17          Do you understand that as a reference to
18  Edie Yeomans, the appraiser?
19      A.  Yes.
20      Q.  Sir, were you working with Charles Bragg
21  and Edie Yeomans to get appraisal values up?
22      A.  I never dealt with Edie Yeomans.
23      Q.  Did you understand Charles Bragg to be
24  working with Edie Yeomans?
25      A.  All artists would call the appraiser based

72

1    on something they thought should be included or not

2    included, and it was up to her as to whether she

3    listened to them or not.

4        Q.   You had no contact with Edie Yeomans?

5        A.   Very little contact.

6        Q.   Did you ever communicate with Charles Bragg

7    about the role that Edie Yeomans was playing?

8        A.   Well, he knew the process was that we sent a

9    sample to Edie Yeomans, along with Charles Rosoff, to

10   get appraised, and if they didn't appraise at a value

11   that we wanted to purchase them at, we weren't going to

12   purchase them.  It was up to him in some cases, not

13   all, to provide her with documentation.

14           If you look at her appraisal books, you'll

15   notice that she's extremely detailed, and she not only

16   checks one source but sometimes seven, eight, nine

17   sources.  Charles Bragg had a lot of sources of sales,

18   and if she didn't spot one, if he knew of one, I guess

19   he let her know.

20       Q.   Did you understand that Edie Yeomans was

21   relying on Charles Bragg as a source of information for

22   the purposes of the appraisal?

23       A.   No.  I don't think she was relying on him

24   for the purposes of appraisal.  Just for some

25   information occasionally.

73

1     MR. DERKSEN:  Crown asks or tenders this letter

2  dated August 14, 2001, from Charles Bragg to Paul Sloan

3  as R10, please, Your Honor.

4     THE COMMISSIONER:  R10.

5     THE WITNESS:  I think you notice on the back of

6  this, there was a bill for 207,000, of which 200,000

7  was paid and only $7,500 was still due, which was the

8  advance that he received.

9  BY MR. DERKSEN:

10     Q.  Do you know when this was advanced?

11     A.  I couldn't tell you.

12        (Exhibit R10 was marked for identification.)

13     MR. DERKSEN:  Pass Your Honor a clean copy.

14     THE COMMISSIONER:  Thank you.

15  BY MR. DERKSEN:

16     Q.  Sir, you told us earlier this morning that

17  you had sold Dyanson Galleries some number of years

18  before 1998; is that correct?

19     A.  Yes.

20     Q.  What year did you sell the galleries?

21     A.  I think it was in the '95, '96 range.

22     Q.  And you told us that you were left with a

23  number of prints.

24     A.  Yes.

25     Q.  How is it that you came to be left, after

74

1    the sale of the gallery, with a number of extra prints?

2        A.  Well, these were personal prints that I

3    wanted and that the owner didn't that bought it.

4        Q.  Multiple copies of same -- multiple prints

5    of the same edition?

6        A.  Yes.

7        Q.  Was it old inventory that Dyanson couldn't

8    sell off?

9        A.  It was old inventory.  Dyanson wasn't really

10   in the business of selling prints.  They were in the

11   business of selling sculpture.

12       Q.  How is it that the gallery had acquired

13   these titles?

14       A.  Well, these titles were published many years

15   before.

16       Q.  So was Dyanson Galleries in the business of

17   also publishing prints?  When I say "publishing," I

18   mean producing images of limited editions?

19       A.  Sure.

20       Q.  How many years earlier?

21       A.  Ten years earlier and before that.  Some of

22   these prints were done back in the 1980s, before

23   Dyanson Galleries.

24       Q.  Had you been involved in any similar

25   arrangements where art was being sold, transacted, and

75

1   then donated for the purposes of charitable donation

2   credits?

3        A.   No.

4        Q.   The arrangement your companies had with

5   Allan Grossman and Mark Pearlman, Artistic Ideas, was

6   $3,500 would be split 50/50.

7        A.   Yes.

8        Q.   And sir, you understand the Crown's view

9   or -- I realize that you're not from Canada -- the

10  government's view that the appraisals at a thousand

11  dollars Canadian per print do not reflect the true fair

12  market value of the prints.  You understand that the

13  government has challenged that?

14       A.   On this basis or some other basis?

15       Q.   Just generally with respect to the donations

16  that were made by persons who acquired prints.

17       A.   They were challenged you mean in a different

18  court case?

19       Q.   Yes.

20       A.   Yes.

21       Q.   You honestly believed, though, that these

22  prints each had a fair market value of a thousand

23  dollars a piece?

24       A.   Yes.

25       Q.   11 for $11,000?

76

1       A.   Yes.

2       Q.   And is it the case, sir, that even though

3  you believed that these prints were worth $11,000, your

4  evidence is that you were prepared to pay Artistic

5  Ideas 50 percent as a commission because they would get

6  you $3,500 for prints that you thought were worth

7  11,000?

8       A.   Yes.

9       Q.   Have you ever bought and sold a car?

10      A.   Yes.

11      Q.   Have you ever sold a car that you thought

12  was worth $10,000 for $3,500 and given someone a

13  commission of 50 percent for doing that for you?

14      A.   If I needed the money, I might have, but I

15  didn't.

16      Q.   Were you desperate for money here in this

17  instance?

18      A.   No.

19      Q.   It doesn't really make sense, does it?

20      A.   I don't understand.

21      Q.   You wouldn't sell a car that was worth

22  $10,000 for $500 and give the --

23      A.   I think that's a bad analogy.

24           First of all, in the art business, price is

25  in the eyes of the beholder as to what they're willing

77

1    to pay and not pay.  You can go on eBay and find pieces

2    of art at $3,500 that you think are only worth a

3    thousand and you can find pieces that are worth 2,000

4    that might be selling for 500.  The valuations are

5    based upon sales, price history, the artist, the

6    background, et cetera.  It isn't necessarily the

7    retail.  It isn't necessarily the wholesale.  But

8    that's the value.

9         Q.  You haven't kept any notes regarding your

10   discussions with either Mr. Grossman or Mr. Pearlman

11   with respect to the arrangements that were entered into

12   back in 1998 and that were continued through to 2001?

13        A.  No.

14        Q.  So nothing in writing?

15        A.  Not that I'm aware of.

16        Q.  And sir, you agree that you transacted well

17   over $20 million worth of business without documenting

18   that arrangement with Artistic?

19        A.  Yes.

20        Q.  I suggest to you, sir, that you never

21   discussed the idea that your companies would pay a

22   commission to Artistic Ideas and that the arrangement

23   was simply that the $3,500 being paid by the donors

24   would be split 50/50.

25             Isn't that what happened?

                                                        78

1      A.   Well, that's just semantics.

2      Q.   That's semantics?

3      A.   We didn't discuss it that way, no.   I

4  offered them the commission because that's what they

5  wanted.

6      Q.   That's what they wanted?

7      A.   That's what they wanted, and that was the

8  structure they wanted, and I agreed to it.   And when I

9  thought of the costs involved and what they were going

10 to spend and how they were going to have to go about

11 this, it was very reasonable.

12     Q.   And from your perspective, there was no

13 reason to pay a commission when you simply could have

14 split the proceeds 50/50.   From your perspective,

15 there's no reason for you to pay a commission to

16 Artistic Ideas when they need your art for your art

17 donation program and it had no impact on your bottom

18 line.   You got 50 percent, subject to some minor

19 discounts.   Isn't that fair?   There's no reason to pay

20 a commission.

21     A.   I'm not going to comment on that.

22     Q.   But this is how Allan and Mr. Pearlman --

23 Allan Grossman and Mr. Pearlman wanted to structure the

24 arrangement?

25     A.   Yes.

                                                        79

1      MR. DERKSEN:  Let me have a moment, Your Honor,

2  please.

3      THE COMMISSIONER:  Yes.

4  BY MR. DERKSEN:

5      Q.  Did Mr. Grossman and Mr. Pearlman say why

6  they wanted to structure the arrangement this way,

7  according to your explanation that you would pay them a

8  commission?

9      A.  They didn't tell me why.

10     Q.  Did it strike you as odd?

11     A.  Well, when you get involved with tax, you

12  know, consequences and donations, no, it didn't strike

13  me odd.  It could be anything.

14     MR. DERKSEN:  Thank you, Your Honor.  Mr. Sloan,

15  I have no further questions.

16     THE COMMISSIONER:  Thank you.  Mr. Marks, would

17  you like a few minutes?

18     MR. MARKS:  I could use five minutes.

19         (Recess taken.)

20

21              REDIRECT EXAMINATION

22  BY MR. MARKS:

23     Q.  Just a couple of questions, Mr. Sloan.

24         You were asked by Mr. Derksen about your

25  lack of willingness to be interviewed by the government

80

1    lawyers, and you said that you left it to Mr. Alpert to

2    respond.

3          A.   That's correct.

4          Q.   Do you know if Mr. Alpert sent a letter

5    indicating --

6          A.   Mr. Alpert, I think, did send a letter.

7          Q.   And did you see that letter?

8          A.   Yes, I did.

9          Q.   I'm going to show you now a copy of that

10   letter dated July 11, 2006.

11              I only have one copy of it, Your Honor.

12              Is that a letter that Mr. Alpert sent on

13   your behalf?

14         A.   Yes.

15         Q.   And this is a letter from Mr. Alpert to

16   Mr. Derksen; correct?

17         A.   Yes.

18         Q.   And did that letter accurately set out your

19   position?

20         A.   Yes.

21         MR. MARKS:   I'll have that marked as the next

22   exhibit, Your Honor.

23         THE COMMISSIONER:   It will be A3.

24              (Exhibit A3 was marked for identification.)

25

81

1          MR. MARKS:  And I'd like to show Mr. Sloan

2     Exhibit R8, please.

3          Q.  Mr. Sloan, a number of times in talking

4     about the orders for prints and shipping of prints, you

5     said that you paid advances to various galleries or

6     brokers.  And on this invoice, Exhibit R8, at the

7     bottom of the page, there's a reference to an amount

8     paid and an amount due.

9          A.  Yes.

10         Q.  What does that indicate?

11         A.  I paid them a $125,000 advance, and he was

12    only due $24,000 when he shipped.

13         Q.  Thank you.

14              I'd also like to show Mr. Sloan Exhibits R7

15    and R5.

16              I'm sorry.  That was my mistake.  It's R7

17    and R9.  I apologize.

18              So R7 is the shipping document that was

19    referred to that deals with the period January 1, '01,

20    to December 31, '02, and there's a document from

21    Russell A. Farrow?

22         A.  Yes.

23         Q.  And attached to that, there were two lists

24    of prints, one for CL Bragg, and one for -- one that

25    just says Bragg.  Right?

                                                          82

1          A.   Yes.

2          Q.   If you can turn to the one that relates to

3     Bragg -- that's Charles Bragg, you said; correct?

4          A.   Yes.

5          Q.   And that indicates that for this particular

6     shipping document, there were a total of 775 prints

7     involved?

8          A.   Yes.

9          Q.   And then if you could turn to Exhibit R9.

10    This was the July 26, 2001 invoice from Charles Bragg.

11              And what quantity of prints did that deal

12    with?

13         A.   5,000.

14         Q.   So what does that tell you, if anything,

15    about when the prints that were referred to in the --

16    in Exhibit R7 were purchased?

17         A.   When were they purchased?

18         Q.   Yes.

19         A.   They were purchased in 2000.

20         Q.   And the -- and you indicated that you were

21    continuously acquiring prints.

22         A.   Yeah.  From Charles Bragg and Charles Lynn

23    Bragg.  I continuously had them on payroll.

24         MR. MARKS:  Those are all my questions.  Thank

25    you.

83

1      THE COMMISSIONER:  Thank you.

2      Mr. Sloan, I have a few questions, a few points

3  I'd like to clarify with you if I may, please.

4      I understood you to say -- maybe I'll just ask

5  you to repeat the particulars of the arrangement you

6  had with Artistic Ideas for the payment of any amounts

7  to them relating to the artwork in question.

8      THE WITNESS:  We had an arrangement where they

9  were my agents and they were allowed to deduct

10  50 percent of any monies that came in for the package

11  of prints that they sold, less whatever deductions that

12  we agreed upon.

13      THE COMMISSIONER:  They were, you said, I

14  believe, paid a commission of 50 percent.

15      THE WITNESS:  Yes.

16      THE COMMISSIONER:  And now you said that there

17  were certain amounts deducted.

18      Was that deducted from their commission or --

19      THE WITNESS:  Well, actually, it was deducted

20  from both of us.  Some were referring to my liability,

21  and some were referring to a shared liability.

22      THE COMMISSIONER:  Can you give me an example of

23  both, please?

24      THE WITNESS:  The appraisals were my liability.

25  The legal bill was a shared liability.  The custom

84

1  charges were a shared liability. The minor wiring

2  charges were my liability. And there were some

3  incidental charges that were my liability, but

4  discounts were a shared liability.

5       THE COMMISSIONER: All discounts were shared

6  liabilities?

7       THE WITNESS: No, not all discounts. I think

8  there were some that were not my responsibility.

9       THE COMMISSIONER: So discounts generally -- if

10 they were approved --

11      THE WITNESS: If they were approved.

12      THE COMMISSIONER: But is it fair to say that

13 Artistic Ideas could discount the sale price of the

14 works if they absorbed the discount out of their

15 50 percent commission?

16      THE WITNESS: Yes.

17      THE COMMISSIONER: You've stated, then, you were

18 liable for the appraisal fees, for wiring charges, and

19 incidental amounts.

20      What type of amounts are in the category of

21 incidental amounts?

22      THE WITNESS: Some shipping charges, some custom

23 charges.

24      THE COMMISSIONER: Anything else you can think

25 of?

                                                    85

1        THE WITNESS:  Well, the discount we mentioned.

2   Legal.

3        THE COMMISSIONER:  You said that those were

4   shared liabilities.  I was --

5        THE WITNESS:  I can't think of anything else.

6        THE COMMISSIONER:  Anything else -- any other

7   items that were your liability alone besides appraisal,

8   wiring charge, and the shipping charges -- some

9   shipping charges and custom charges?

10        THE WITNESS:  Can I review that for a second?

11        THE COMMISSIONER:  That will be Exhibit A2 for

12   identification.

13        THE WITNESS:  Taxes were, I think, custom

14   charges.

15        THE COMMISSIONER:  Were your liability?

16        THE WITNESS:  We were shared liability on that.

17        THE COMMISSIONER:  Customs?

18        THE WITNESS:  Yeah.

19        And I shared some liability on their brokerage

20   charges which had to do with shipping.  That's really

21   it.

22        THE COMMISSIONER:  When you said earlier that

23   you had some incidental amounts that you were liable

24   for including some custom charges, was that an error

25   or --

86

1       THE WITNESS:  I'm sorry.  What did I say?

2       THE COMMISSIONER:  I was asking you for examples

3  of liabilities that were incurred by Silver Fine Arts

4  and the Coleman Fine Arts alone, not shared with

5  Artistic Ideas.  One of the categories of expenses that

6  you said were your liability alone were incidental

7  amounts.  You gave examples of those incidental amounts

8  of some shipping charges and custom charges.  Later on,

9  after looking at Exhibit A2, you said that custom

10 charges were shared.  I'm trying to clarify your

11 answer.

12      THE WITNESS:  Some custom charges were shared

13 and some were not.  It's strange the way I did that.

14 But for the most part, most custom charges were mine.

15 Sometimes there were some mistakes that the

16 administration made.

17      THE COMMISSIONER:  That is the administration of

18 whom?

19      THE WITNESS:  Paperwork.

20      THE COMMISSIONER:  Paperwork done by whom?

21      THE WITNESS:  Artistic.  Small incidental

22 things.

23      THE COMMISSIONER:  Most custom charges were

24 yours, and all shipping charges were yours?

25      THE WITNESS:  Yes.

87

1    THE COMMISSIONER:  Did you pay those shipping

2 charges directly, or were they paid by --

3    THE WITNESS:  I paid them directly.

4    THE COMMISSIONER:  You paid them directly.

5    And the customs charges?

6    THE WITNESS:  They paid them and then charged

7 back to me.

8    THE COMMISSIONER:  Would that be the same for

9 the legal fees?  They were paid by Artistic Ideas and

10 charged back?

11    THE WITNESS:  And then charged back to me.

12    THE COMMISSIONER:  What kind of legal fees would

13 those be?

14    THE WITNESS:  I think these were some legal fees

15 to -- what was the name of the law firm?

16    THE COMMISSIONER:  I'm sorry.  You're going to

17 have to --

18    THE WITNESS:  It was a law firm involved --

19 Graham.  I can't think of the name of the firm totally.

20    THE COMMISSIONER:  Was that in Canada or --

21    THE WITNESS:  In Canada.  Graham Turner is the

22 firm.

23    THE COMMISSIONER:  What were those fees for as

24 far as you can recall?

25    THE WITNESS:  I think they were for the legal

88

1  opinion.

2  THE COMMISSIONER: Legal opinion relating to

3  what?

4  THE WITNESS: Relating to the donation.

5  THE COMMISSIONER: To the donation -- art

6  donation arrangement?

7  THE WITNESS: Yes.

8  THE COMMISSIONER: And the brokerage charges,

9  were those amounts paid by Artistic Ideas and then

10  charged back to you in part?

11  THE WITNESS: Yes.

12  THE COMMISSIONER: And as well -- let's see.

13  Were there any other amounts charged back to you, can

14  you think?

15  THE WITNESS: I don't see anything else. Wire

16  charges. That's sort of insignificant.

17  THE COMMISSIONER: Wiring charges were charged

18  back to you?

19  THE WITNESS: Yes.

20  THE COMMISSIONER: Although you said that those

21  were your liability alone.

22  THE WITNESS: Yes, they were my liability alone.

23  THE COMMISSIONER: And the reference on

24  Exhibit A2 for identification, taxes, what were those

25  taxes?

89

1          THE WITNESS:  I think they refer to custom
2     charges.
3          THE COMMISSIONER:  Did you require any
4     documentation from Artistic Ideas with regard to the
5     sales discounts that were accepted?
6          THE WITNESS:  No.
7          THE COMMISSIONER:  You took Artistic Ideas' word
8     for the fact that certain items were discounted to
9     purchasers?
10          THE WITNESS:  Yes.
11          THE COMMISSIONER:  Did you receive copies of the
12     sale or purchase agreements signed on your behalf by
13     Artistic Ideas?
14          THE WITNESS:  No.
15          THE COMMISSIONER:  Have you ever seen them?
16          THE WITNESS:  I saw them today.  I hadn't seen
17     them, no.
18          THE COMMISSIONER:  You said that you felt that
19     this arrangement was satisfactory to you, that is, that
20     you simply received payment from Artistic Ideas for the
21     sale of the art -- well, you received these payments
22     without any documentation accompanying them because you
23     really had nothing to lose.  I think that's what your
24     answer was.
25          THE WITNESS:  Well, I really wasn't involved in

90

1   the administration or the aspects of the donation.  So

2   the only thing I needed was the adjustment we made at

3   year end.

4       THE COMMISSIONER:  You said that you were paid,

5   for the most part, in full prior to shipping the art?

6       THE WITNESS:  Yeah, yes.

7       THE COMMISSIONER:  And what did you mean by

8   "paid, for the most part, in full"?

9       THE WITNESS:  Well, sometimes because of the

10  discount or some money due there may have been some

11  small amount left over that would be paid, you know,

12  sometime in the three- or four-month period into the

13  next year.

14      THE COMMISSIONER:  So you were receiving

15  substantially all of the amount due to --

16      THE WITNESS:  I would say 98 percent.

17      THE COMMISSIONER:  And that was on an ongoing

18  basis, you would receive these amounts from Artistic

19  Ideas?

20      THE WITNESS:  Yes.

21      THE COMMISSIONER:  And your recollection, I

22  believe, with respect to price discounts was that there

23  weren't many discounts in the first year.

24      THE WITNESS:  No.  There weren't many.

25      THE COMMISSIONER:  On Exhibit A2 it shows sales

91

```
 1    discounts of apparently $325,000.

 2            THE WITNESS:  Uh-huh.

 3            THE COMMISSIONER:  And that would have been the

 4    share incurred by?

 5            THE WITNESS:  It's a shared number.

 6            THE COMMISSIONER:  So the total amount of the

 7    discounts would have been $650,000?

 8            THE WITNESS:  Yes.

 9            THE COMMISSIONER:  Do you recall the number of

10    discounts that that would have entailed?

11            THE WITNESS:  No.

12            THE COMMISSIONER:  What range of discounts was

13    acceptable to Coleman and Silver?

14            THE WITNESS:  Well, there wasn't any real range

15    of discount, to be honest with you.  It only happened

16    infrequently except maybe in the first year.  Somebody

17    who wanted a big purchase might have bought, you know,

18    a hundred units, so to speak, or 50 units, we might

19    give them 10 percent off or something like that.

20            THE COMMISSIONER:  And would you talk to someone

21    at Artistic Ideas each time a discount was proposed?

22            THE WITNESS:  Yes.  Allan Grossman would call

23    me.

24            THE COMMISSIONER:  Phone you.

25            THE WITNESS:  Yes.
```

92

```
 1          THE COMMISSIONER:  And that was the case

 2   throughout the years in question?

 3          THE WITNESS:  Yes.

 4          THE COMMISSIONER:  Throughout the entire period

 5   you did business with Artistic Ideas?

 6          THE WITNESS:  Yes.

 7          THE COMMISSIONER:  You don't recall the

 8   frequency of the calls in which you discussed

 9   discounts?

10          THE WITNESS:  They weren't significant in the

11   scope of things.

12          THE COMMISSIONER:  Weren't significant except

13   for the first year?

14          THE WITNESS:  Even that wasn't significant if

15   you think of the gross.

16          THE COMMISSIONER:  And if I show you page 2 and

17   page 3 of Exhibit A2, it shows in the first -- I'm

18   sorry.  Second page in the second-year discounts --

19   shows the figure to your companies 752,000.

20          So that would have been a discount in excess of

21   $1.5 million or discounts totaling in excess of

22   $1.5 million?

23          THE WITNESS:  I guess so.

24          THE COMMISSIONER:  And similarly on page 3,

25   subsequent year discounts, your portion would be
```

93

1   914,000-some dollars, therefore discounts in excess of

2   $1.8 million?

3        THE WITNESS:  This says less sales discount and

4   adjustments, so I don't think that number is just sales

5   discounts.  There's an adjustment.  Sometimes it had to

6   do with some other sales.  That sounds like more than I

7   would think for discounts.

8        THE COMMISSIONER:  What other adjustments would

9   there be, significant adjustments, to the sale price of

10   the art to be shared between your companies and

11   Artistic Ideas, then?

12        THE WITNESS:  I think advances.

13        THE COMMISSIONER:  Advances.

14        Well, if you look down at the page, it seems

15   that net payable is already taking into account amounts

16   already paid; is that right?  Less payments.  So that

17   seems to account for advances there, doesn't it?

18        THE WITNESS:  Yes, it does.

19        THE COMMISSIONER:  And you've given me a list of

20   all of the items that you say were shared expenses

21   between Artistic Ideas and --

22        THE WITNESS:  Oh, I know what that is.  Now I

23   recall what that is.  We had a fund that went into

24   legal expenses.  And they weren't just discounts.  It

25   was money being taken from me to go into a fund.

94

```
 1        THE COMMISSIONER:  What was that fund for?

 2        THE WITNESS:  That was for any legal expenses

 3   that would occur.

 4        THE COMMISSIONER:  And what nature of legal

 5   expenses did the parties envision might occur?

 6        THE WITNESS:  Sometime in the future if somebody

 7   sued them.

 8        THE COMMISSIONER:  To offset any potential legal

 9.  fees or legal challenges?

10        THE WITNESS:  Yes.

11        THE COMMISSIONER:  So that was included in that

12   amount?

13        THE WITNESS:  Yes.  In fact, the amount of those

14   adjustments were $50 per unit.

15        THE COMMISSIONER:  $50 per unit.

16        THE WITNESS:  Yes.

17        THE COMMISSIONER:  If I could direct your

18   attention to another line on the third page,

19   approximately two thirds of the way down the list,

20   amount withheld in trust for legal reserve, 23 times

21   50, a separate amount.

22        THE WITNESS:  Oh, you're right.  I didn't see

23   that.

24        THE COMMISSIONER:  Besides that type of

25   adjustment, can you think of any other adjustment that
```

95

1   could have been included in the line we were looking at

2   before in each of the sheets, that is, less sales

3   discounts/adjustments?

4          THE WITNESS:  No.

5          THE COMMISSIONER:  So is it likely that the

6   amounts shown on that line less sales discounts would

7   be for the sales discounts?

8          THE WITNESS:  Would have to be, right.

9          THE COMMISSIONER:  So you say despite there

10  being adjustments in these years, especially the latter

11  two years, over 1.5 million, over $1.8 million, that

12  all of those adjustments were done or all of the

13  details of adjustments were done over the phone with

14  Mr. Grossman?

15         THE WITNESS:  Yes.

16         THE COMMISSIONER:  And that they were done in a

17  series of phone calls that you described earlier as not

18  being frequent?

19         THE WITNESS:  Yes.

20         THE COMMISSIONER:  And you did not maintain any

21  paperwork or require any paperwork from Artistic Ideas

22  to support the amount of discounts that were being

23  charged against your entitlements?

24         THE WITNESS:  That's correct.

25         THE COMMISSIONER:  And can you explain how it is

96

1    that your recollection earlier today of the amount of

2    discounts that were given and shared between Artistic

3    Ideas and your companies was insignificant except for

4    the first year when, in fact, the paperwork that you've

5    identified as being year-end totals show significant

6    discounts?

7         THE WITNESS:  Just slipped my mind.  I didn't

8    remember.

9         THE COMMISSIONER:  Can you explain to me why

10   your companies would have agreed to contribute to a

11   legal fund of the type that you described?

12        THE WITNESS:  Well, it was just something that I

13   didn't think was important, but they thought it was

14   important, so I went along with it.

15        THE COMMISSIONER:  You agreed to -- at least

16   according to Exhibit A2 for identification, you agreed

17   to contribute $108,650 for year ending January 31,

18   2000, simply because Mr. Grossman and Mr. Pearlman

19   thought it was a good idea?

20        THE WITNESS:  Yes.

21        THE COMMISSIONER:  And did you have any other

22   discussions with them about the nature of the fund or

23   the terms in which that money would be held?

24        THE WITNESS:  Yes.  It was supposed to be held

25   in escrow, and if not spent, I would get it returned

97

1    over a three-year period.

2          THE COMMISSIONER:  Over a three-year period.

3          And what information did you receive subsequent

4    to January 31, 2001, with respect to that amount held

5    in trust?

6          THE WITNESS:  I was told it was all spent.

7          THE COMMISSIONER:  And did you receive any

8    documentation from Artistic Ideas or from Mr. --

9          THE WITNESS:  I did receive some documentation.

10          THE COMMISSIONER:  And what did that

11    documentation consist of?

12          THE WITNESS:  It consisted of checks that went

13    out for legal bills.

14          THE COMMISSIONER:  And can you -- you said that

15    you went along with this idea to create the trust fund,

16    this legal fund, but other than the fact that this was

17    asked of you, did you have any view as to why Coleman

18    and Silver Fine Arts would have any reason to

19    contribute to the fund?

20          THE WITNESS:  Well, the only reason I

21    contributed to the fund was because they were doing

22    such a good job that I felt there wasn't any point to

23    saying no.  They were selling more than I thought.

24          THE COMMISSIONER:  And you had, I take it, at

25    the outset of the arrangements with Artistic Ideas,

                                                          98

1   thought that that was an expense that should have been

2   borne by Artistic Ideas?

3        THE WITNESS:  Yes.

4        THE COMMISSIONER:  Can you tell me -- I'm going

5   to draw your attention again to page 3 of Exhibit A2

6   for identification.   There's an item charged to Coleman

7   and Silver, out-of-pocket expenses, $121,861.

8        Do you recall what those out-of-pocket expenses

9   would have been?

10        THE WITNESS:  I don't remember.

11        THE COMMISSIONER:  Do you recall receiving any

12   documentation with respect to out-of-pocket expenses?

13        THE WITNESS:  No.

14        THE COMMISSIONER:  You said that Artistic Ideas

15   paid for certain appraisals of the art; is that right?

16        THE WITNESS:  No.  They fronted all the

17   appraisal costs, but then charged it back to me.

18        THE COMMISSIONER:  Charged it back to you at the

19   end of the year?

20        THE WITNESS:  I think that's what that is.  I

21   think that's the appraisals.

22        THE COMMISSIONER:  The appraisal fees?

23        THE WITNESS:  Yeah.  They were very loose on

24   their accounting and what have you.

25        THE COMMISSIONER:  Less sales discounts -- I'm

99

1    sorry.  They were loose on their accounting?

2           THE WITNESS:  They were very loose.

3           THE COMMISSIONER:  Did that concern you?

4           THE WITNESS:  We both had an arrangement, like a

5    friendly arrangement, and I went along with it, but

6    sometimes Jeanine, who was managing, didn't put

7    everything down in writing.

8           THE COMMISSIONER:  And you're saying --

9           THE WITNESS:  I'm pretty sure that's what that

10   was because I don't see any appraisal fees on there.

11          THE COMMISSIONER:  And so what amount of

12   appraisal fees were paid?

13          THE WITNESS:  What amount was paid?  That was

14   the amount.

15          THE COMMISSIONER:  Where it says "less sales

16   discount adjustments"?

17          THE WITNESS:  No.  No.  This is not the page.

18          THE COMMISSIONER:  I'm sorry.  You may be

19   referring to page 3.  Oh, out-of-pocket expenses.

20          THE WITNESS:  Out-of-pocket expenses, $121,000.

21   I think that was the -- that was definitely -- and I

22   think included in the sales discount and adjustments

23   were the appraisals.

24          THE COMMISSIONER:  The appraisals were included

25   under a heading "less sales discounts and adjustments"?

100

1          THE WITNESS:  I think so.  And they would come

2      to 150, $200,000.

3          THE COMMISSIONER:  And otherwise, each of the

4      other items were broken down into particular

5      categories, lawyer, brokerage, wire charges?

6          THE WITNESS:  Uh-huh.

7          THE COMMISSIONER:  And you said there were

8      substantial amounts being paid to appraisers?

9          THE WITNESS:  Yeah.

10         THE COMMISSIONER:  And that -- did you receive

11     any copies of the --

12         THE WITNESS:  I did receive some copies.

13         THE COMMISSIONER:  Copies of what?

14         THE WITNESS:  Of invoices that they paid to Edie

15     Yeomans and Charles Rosoff.

16         THE COMMISSIONER:  And when did you receive

17     those?

18         THE WITNESS:  Roughly around the same time as

19     this.

20         THE COMMISSIONER:  Roughly around the same time

21     as A2?

22         THE WITNESS:  Yeah.

23         THE COMMISSIONER:  So the only information you

24     received from Artistic Ideas would have been appraisal

25     bills and these three sheets?

                                                      101

1    THE WITNESS:  Yeah, uh-huh.  They would

2  definitely average in the 200,000 range.

3    THE COMMISSIONER:  But you said that the

4  appraisal fees were ones that were to be borne by you

5  alone, by Silver and Coleman alone.

6    THE WITNESS:  Yes.  What printout did these come

7  from?

8    THE COMMISSIONER:  Do you recognize those

9  documents?

10    THE WITNESS:  I recognize them, but I think I

11  got some that were a little more detailed.

12    THE COMMISSIONER:  Well, I guess my concern is

13  that where -- if you look at the gross figure for

14  year 1 of sales, $4,326,000, 50 percent commission on

15  that would have been $2,163,000.

16    THE WITNESS:  Right.

17    THE COMMISSIONER:  The fees payable to Artistic

18  are shown as 1,849,953.  There's less sales discounts

19  adjustments, $325,000.

20    THE WITNESS:  That was obviously shared.

21    THE COMMISSIONER:  That was shared.

22    THE WITNESS:  I'm assuming because I'm looking

23  at -- the number looks like it would add up to that.

24    THE COMMISSIONER:  It would add up to it.  But

25  if you took out $200,000 of appraisal fees for which

102

1   your companies were liable alone, then the amounts

2   don't necessarily correspond to Artistic Ideas

3   receiving a 50 percent commission, do they?  Do you

4   follow me?

5          THE WITNESS:  I do follow you.

6          THE COMMISSIONER:  What would your answer be to

7   that?

8          THE WITNESS:  I don't have an answer to that.  I

9   wasn't the one making these sheets up.

10          THE COMMISSIONER:  And at the time, given the

11   amounts of money you were receiving and the money that

12   you were making --

13          THE WITNESS:  At the time, if there was a

14   question, I would call him, and we would discuss it.

15   And if there was a mistake, he would pay the

16   difference, even though it may not be on here, but for

17   the most part, we didn't have many mistakes.

18          THE COMMISSIONER:  Well, is it fair to say that

19   you didn't have many mistakes or you didn't necessarily

20   inquire in any great detail into the amounts shown on

21   these statements?

22          THE WITNESS:  I would inquire about expenses.  I

23   would inquire about the gross numbers because they were

24   what they were.

25          THE COMMISSIONER:  But you didn't keep track of

103

1   the amounts of discounts being given.  You relied on

2   Artistic Ideas to keep track of it?

3        THE WITNESS:  That's true.  I did not keep track

4   of that.

5        THE COMMISSIONER:  And is it fair to say that

6   because this venture was so lucrative, that you were

7   not particularly concerned about the accounting?

8        THE WITNESS:  To be honest with you, for the

9   most part, that's true.  It didn't matter a few dollars

10  one way or the other.

11       THE COMMISSIONER:  You said that you offered a

12  commission to Artistic Ideas or to Mr. Grossman and

13  Pearlman because that's what they wanted.

14       THE WITNESS:  Yes.

15       THE COMMISSIONER:  Whose idea was it to have a

16  commission arrangement?

17       THE WITNESS:  It was their idea.

18       THE COMMISSIONER:  It was their idea.

19       So rather than you offering that to them, they

20  requested that arrangement?

21       THE WITNESS:  Well, I agreed to it.

22       THE COMMISSIONER:  You agreed to it.

23       Was the rate of commission ever subject to

24  negotiation?

25       THE WITNESS:  No.  We never negotiated.

104

1       THE COMMISSIONER:  Whose idea, then, was it the

2   commission rate should be set up 50 percent of gross

3   sales?

4       THE WITNESS:  It was my idea, the 50 percent

5   number.

6       THE COMMISSIONER:  And in your initial

7   discussions with Mr. Grossman and Mr. Pearlman, did you

8   sit down and work out numbers, discuss back and forth

9   the potential number of sales, the potential amounts at

10   which the art could be sold?  That sort of thing?

11       THE WITNESS:  No.  It was more or less trial and

12   error from the get-go.

13       THE COMMISSIONER:  Those are all my questions.

14   Thank you, Mr. Sloan.  I'm going to offer counsel for

15   both parties the opportunity to ask any questions

16   arising out of the answers you've given to my

17   questions.

18       First, Mr. Marks?

19       MR. MARKS:  I wonder if I could just have a few

20   minutes to consult with Mr. Pearlman before doing that.

21       THE COMMISSIONER:  Yes.  Ten minutes.

22       (Recess taken.)

23   ///

24   ///

25   ///

105

```
                     FURTHER REDIRECT EXAMINATION
 1
 2    BY MR. MARKS:
 3         Q.  Mr. Sloan, I do have a few more questions
 4    about these three statements that are Exhibit A2.
 5              Do you have that in front of you?
 6         A.  A2?
 7         Q.  Yes.
 8              So Mr. Sloan, you said before, just -- that
 9    if -- I'm looking at the first statement for -- the one
10    dated January 31, 1999.  The first line is the gross
11    sales.
12         A.  Right.
13         Q.  So would that be all the units that were
14    sold and the price?
15         A.  Yes.
16         Q.  And that total, $4,326,000?
17         A.  Yes.
18         Q.  So you would expect, based on your deal with
19    Artistic, to get 50 percent of that, less whatever
20    adjustments were appropriate to be made.
21         A.  Yes.
22         Q.  So if I can do the math for you of
23    50 percent of $4,326,000 is 2,163,000.
24         A.  Right.
25         Q.  So you would be expecting to get $2,163,000
```

106

1    less the adjustments.

2         A.   Right.

3         Q.   And according to this, you received payments

4    of $2,096,000?

5         A.   Right.

6         Q.   That leaves a difference of $68,000,

7    approximately.

8         A.   Right.

9         Q.   So would you agree with me that the total

10   adjustments that were made to your 50 percent

11   entitlement of the gross sales was actually $68,000?

12        A.   That sounds more like it.

13        Q.   And do you know, where the adjustments

14   appear on the left side -- I'm going to suggest to

15   you -- I can't do that.

16             Do you know what those adjustments actually

17   represent?

18        A.   No.

19        Q.   But what you received was the 2,096,000.

20        A.   Yes.   It was a long time ago, and I'm sure I

21   was told exactly what it was when we went over it, but

22   I don't remember.

23        Q.   And the total amount of difference between

24   50 percent of the gross sales and what you received is

25   approximately $68,000.

                                                    107

1        A.   Right.

2        Q.   And if we turn to the next year, the year

3   2000, and we do the same process, you received -- there

4   were gross sales totaling $7,651,000.

5        A.   Right.

6        Q.   And so if we divide that by 2, your

7   50 percent before adjustment would have been

8   $3,825,000.

9        A.   Right.

10       Q.   And you actually received 3,727,000;

11  correct?

12       A.   Yes.

13       Q.   And so the total adjustment to the

14  50 percent share was approximately $98,000.

15       A.   Okay.

16       Q.   And if we go to the 2001 statement, the

17  gross sales were 12,135,000; is that correct?

18       A.   Yes.

19       Q.   And if we divide that by 2 to get your

20  50 percent share, then that would be 6,067,000

21  approximately?

22       A.   Right.

23       Q.   And in this case, in this year, you received

24  5 million -- you were entitled to 5,530,000.  You

25  actually, I guess, received a little bit more than your

108

1    entitlement, according to this.

2         A.   Okay.

3         Q.   You received 5,532,000 of payments.

4              Do you see that?

5         A.   Uh-huh.

6         Q.   And that's what you received?  Mr. Sloan, is

7    that what you received?

8         A.   Yes.

9         Q.   So I'm going to subtract to see the

10   difference, what -- the adjustments that were made to

11   your 50 percent share, I'm going to subtract the

12   figure -- the net payable figure from the 50 percent

13   amount.  And that would mean that there were, in that

14   case, adjustments to your 50 percent share of $537,000,

15   and that included an amount withheld for legal reserve

16   of 108,000.

17        A.   Okay.

18        Q.   So if we take that out, there were other

19   adjustments in the third year in question of

20   approximately $430,000.

21             Does that accord with your recollection?

22        A.   Yeah, that sounds more like it.

23        Q.   And I think you said before that you thought

24   that the larger discounts came in the later years.

25        A.   Yes.

109

1      MR. MARKS:  Those are all my questions.

2      THE COMMISSIONER:  Thank you.

3      Mr. Derksen?

4

5                    RECROSS-EXAMINATION

6   BY MR. DERKSEN:

7      Q.  Mr. Sloan, if you would keep your attention

8   focused on Exhibit A2, the first page, January 31,

9   1999 -- do you have that, sir?

10     A.  Uh-huh, yes.

11     Q.  And my learned friend was just taking you

12  through some of these numbers and leading you through

13  the calculations.  It shows gross sales in 1999, year

14  end January 31, 1999 -- so that would have been part of

15  1998 up until January 31 of '99 -- gross sales of

16  $4,326,000, and then over on the left side there's less

17  fees to Artistic of $1,849,953.

18         Do you know how that was calculated, sir?

19     A.  I'm not sure.

20     Q.  And would that also apply, then, for the

21  2000 year on the second page, where there's less fee to

22  Artistic, $3,084,001?  You're not sure how that was

23  calculated?

24     A.  The only question is the sales discount

25  adjustments and how that figured in.  And obviously, it

                                                      110

GRADILLAS COURT REPORTERS
(310) 859-6677

1    didn't figure into discounting the net amount to me.

2        Q.   What do you mean when you say "discounting

3    the net amount"?

4        A.   Well, if I was getting 50 percent of

5    4 million, to use a round number, and you're assuming

6    that this is doubled, it wouldn't come out right.

7        Q.   Can you explain for me how in the last year,

8    January 31, 2001, how the fee to Artistic of

9    $5,435,259, how that was calculated?

10       A.   I assume that there was -- there was

11   substantial sales discounts in that year.  I can think

12   of one particular party which I agreed to, but that's

13   the only answer I have for you.

14       Q.   Earlier today you said that you believed the

15   discounts were primarily in the first year.

16       A.   I said that?  I don't think I said that.

17       MR. DERKSEN:  No further questions, Your Honor.

18       THE COMMISSIONER:  Thank you, very much.   Thank

19   you, Mr. Sloan.

20       THE WITNESS:  Thank you.

21       THE COMMISSIONER:  That will end the commission

22   for evidence of Mr. Sloan.  The commission herein is

23   now concluded.

24            (Ending time 1:18 p.m.)

25

                                                    111

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14         I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____ DEC 1 4 2006 _____

21

22

23  _____

24  JEANINE CURCIONE
    CSR No. 10223, RPR

25

                                              112

**GRADILLAS COURT REPORTERS**
(310) 859-6677

**A**

ability 9:25 11:5 36:12
able 6:12 10:5 24:3 61:6
about 8:7 9:10 11:11,16
    12:16 13:7,12 15:25 22:24
    24:21 25:11,16,22 29:10
    33:15,23 34:12 35:3,6
    36:15,16 47:16 48:5,12
    50:5 51:12 57:12,21 58:7
    65:6 66:12 71:8,16,23 73:7
    79:10 80:24 82:4 83:15
    97:22 103:22,23 104:7
    106:4
Absolutely 48:3
absorbed 85:14
accept 21:9 42:1
acceptable 92:13
accepted 90:5
accommodate 5:2
accompanying 90:22
accord 66:11 68:16 109:21
according 80:7 97:16 107:3
    109:1
account 32:5,6 94:15,17
accountant 35:17,20 37:14
accountants 36:9
accountant's 37:5
accounting 14:18 27:13
    99:24 100:1 104:7
accurately 81:18
acquire 49:5 53:6 59:1 67:1
    68:25
acquired 46:25 48:25 55:3
    58:20 66:13 67:3 75:12
    76:16
acquiring 47:5 83:21
across 9:2
action 112:11
actually 16:17 17:14 18:24
    19:20 31:1 46:21 84:19
    107:11,16 108:10,25
add 102:23,24
additional 7:6 25:23 26:1
address 4:20 28:3
addressed 59:17 70:16
Adelaide 2:11
adjusting 30:20
adjustment 32:11 91:2 94:5
    95:25,25 108:7,13
adjustments 29:21,24,25
    30:10 94:4,8,9 95:14 96:10
    96:12,13 100:16,22,25
    102:19 106:20 107:1,10,13
    107:16 109:10,14,19
    110:25
administration 87:16,17
    91:1
admissibility 22:13,18 23:7
    23:15,22 25:17 26:20 27:5

admissible 26:7,16,16
admissibly 23:4
admitted 23:11 25:18 27:22
    56:19
admitting 39:7
advance 27:5 59:10 74:8
    82:11
advanced 58:25 59:4 69:2
    70:3,3 74:10
advances 82:5 94:12,13,17
advised 33:22
affairs 39:14
affirmed 4:12
African 64:3 66:21
after 7:1 10:22 13:14 16:20
    18:12 19:24 30:9 46:21
    47:6 49:1 58:21 69:18,22
    71:20 72:3 74:25 87:9
again 28:7 70:9 99:5
against 96:23
agents 11:4 84:9
ago 107:20
agree 26:18 49:6 78:16
    107:9
agreed 20:12 30:3 79:8
    84:12 97:10,15,16 104:21
    104:22 111:12
agreement 19:13 22:8 44:1
    46:23
agreements 69:12 90:12
Aladdin's 62:23 63:7 64:17
Allan 5:20 6:4,11 9:10 10:18
    10:20 14:7,9 15:1,1,8,16
    15:20 17:10 19:9,15,20
    20:15 21:5 29:6 35:16 45:2
    69:11 76:5 79:22,23 92:22
Allan's 14:12
allow 13:16 22:11
allowed 84:9
alone 24:5 86:7 87:4,6 89:21
    89:22 102:5,5 103:1
along 73:9 97:14 98:15
    100:5
Alpert 33:19,21 34:1 81:1,4
    81:6,12,15
already 29:14 94:15,16
Although 89:20
always 20:4 37:6 38:3 69:24
amount 12:1 20:2,23 30:10
    30:14,20 42:9 82:7,8 91:11
    91:15 92:6 95:12,13,20,21
    96:22 97:1 98:4 100:11,13
    100:14 107:23 109:13,15
    111:1,3
amounts 84:6,17 85:19,20
    85:21 86:23 87:7,7 89:9,13
    91:18 94:15 96:6 101:8
    103:1,11,20 104:1 105:9
analogy 77:23

Angeles 46:9
another 15:11 48:4,7,14
    55:24 57:3 58:8,9 59:16
    61:7 62:8,21 64:13 68:2
    70:14 95:18
answer 24:3 39:20 65:5
    87:11 90:24 103:6,8
    111:13
answers 24:15 25:1,14,15
    26:4 105:16
anything 6:24 8:19 11:11,19
    29:10 58:4 80:13 83:14
    85:24 86:5,6 89:15
apologize 57:11 82:17
apparently 92:1
appeal 23:23
appear 28:21 107:14
APPEARANCES 2:6
appears 39:12 54:3 55:25
    57:4 59:17,25 62:9 65:22
    65:25 66:15 68:3,4 70:15
Appellant 1:5 2:9 24:15,25
    25:2,24 31:5
Appellant's 25:9,21
APPLEBY 2:10
apply 110:20
appraisal 12:11,18 14:1,3
    16:11 54:8 71:19 72:21
    73:14,22,24 85:18 86:7
    99:17,22 100:10,12 101:24
    102:4,25
appraisals 12:14 17:3 72:13
    76:10 84:24 99:15,21
    100:23,24
appraise 41:23 73:10
appraised 12:22 17:24 64:6
    66:22 72:1 73:10
appraiser 12:12,13 16:11,12
    16:13,16,19 18:23 72:18
    72:25
appraisers 16:17 41:23
    101:8
appropriate 5:3 22:22
    106:20
approval 43:6
approve 18:25
approved 45:3 85:10,11
approximately 66:15 68:17
    95:19 107:7,25 108:14,21
    109:20
argue 22:5,10,21
argument 22:13 26:20
arising 105:16
around 8:12 10:9 12:14
    101:18,20
arranged 19:7 41:23,25
arrangement 19:8 36:19
    51:4 53:5 76:4 78:18,22
    79:24 80:6 84:5,8 89:6

90:19 100:4,5 104:16,20
arrangements 32:23 33:24
    75:25 78:11 98:25
arranging 14:22
arrive 12:5
art 8:8,13,15,18,20,22,23 9:8
    9:9,13,15,19,22,23 10:1,2
    10:6,10,25 11:6,9 12:5,6
    12:10,22 13:3,8,16,18
    14:23 15:3,4,21,22,24 16:5
    16:7 17:6,14,23 18:1,11,12
    18:14,15,18,21,22,25 20:4
    20:6,7,12 21:13,16 29:11
    29:16 31:13,14 32:1,3,22
    36:1,5,9,16 41:4,7 42:14
    42:19,24 44:12 45:17
    50:16 51:9,16 52:2 59:1,1
    75:25 77:24 78:2 79:16,16
    89:5 90:21 91:5 94:10
    99:15 105:10
artist 61:15 78:5
Artistic 1:4 14:11 16:12
    17:12 18:16,18 19:5 21:3
    21:20 27:12 32:4,9 33:23
    33:24 34:16 41:18,22,25
    42:4,14,24 46:14 51:4,6
    52:15 54:17 56:14 59:17
    60:5,19 61:1,19 62:1 63:17
    63:20,21 64:9,16 67:7,14
    68:9 76:5 77:4 78:18,22
    79:16 84:6 85:13 87:5,21
    88:9 89:9 90:4,7,13,20
    91:8 92:21 93:5 94:11,21
    96:21 97:2 98:8,25 99:2,14
    101:24 102:17 103:2 104:2
    104:12 106:19 110:17,22
    111:8
artists 70:3 72:25
Arts 10:15 15:13 34:5,7
    36:17,24 38:2,22 40:21
    42:13,13,18,18 44:23 45:9
    46:24 52:8 62:16 64:22
    66:1,6 67:18 68:6 70:6
    87:3,4 98:18
artwork 41:20,23 42:2,5
    84:7
ASG 7:20
asked 14:8 39:19 54:25
    80:24 98:17
asking 39:4 87:2
asks 56:20 67:17 70:5 74:1
aspects 91:1
assigns 45:21
Associates 62:17
association 37:12
assume 29:25 32:4 62:25
    64:23 65:7 66:14 68:18
    111:10
assumed 38:3

Proceedings  11/29/2006

assuming 102:22 111:5
assumption 38:25
attached 12:9 82:23
attempting 13:15
attention 95:18 99:5 110:7
attracted 43:3
August 35:6 36:25 70:15
   72:16 74:2
authenticity 25:18 26:9
   27:23,24 28:3,8,14 38:12
authority 20:20
authorize 15:16
authorized 15:8
available 37:20 61:2,3,8
Avenue 4:21
average 12:25 50:4,6,8
   72:14 102:2
aware 5:5 8:15,17 9:13
   21:12 34:15,19,21 78:15
A.M 2:1 4:2
A1 43:13,20,22,23 47:15
A2 3:13 31:7,8,10 86:11 87:9
   89:24 91:25 93:17 97:16
   99:5 101:21 106:4,6 110:8
A3 3:20 81:23,24

**B**

B 3:11
back 5:1,2,8 6:24 7:4 16:9
   19:2 22:14 26:25 35:1
   36:22 41:1 52:9 55:21
   59:14 60:18 74:5 75:22
   78:12 88:7,10,11 89:10,13
   89:18 99:17,18 105:8
background 8:17,22,23 36:1
   36:5 78:6
backup 11:8
bad 77:23
balance 69:9
bank 32:4
banking 6:7,15
BARISH 2:19
based 42:9 72:25 78:5
   106:18
basically 14:14 32:12
basis 69:3 76:14,14 91:18
bears 55:25
became 7:23,23 8:5 9:13
   16:19
become 34:17,21 41:19
before 2:3 24:4 29:2 40:24
   58:24 65:5 74:18 75:15,21
   75:22 96:2 105:20 106:8
   108:7 109:23
behalf 33:22 42:5 45:4 46:2
   46:14 69:12 81:13 90:12
beholder 77:25
being 8:13 9:14,16 13:5 16:8
   17:18 20:24 23:11 29:9

40:3 44:17 45:24 46:13,21
   51:5 53:3 58:15 61:1 64:16
   69:14 75:25 78:23 94:25
   96:10,18,22 97:5 101:8
   104:1
believe 22:7 39:18 40:6
   56:17 65:4 84:14 91:22
believed 76:21 77:3 111:14
benefits 9:17
besides 86:7 95:24
best 11:17 27:2,25
between 5:4 19:14 49:9
   50:15 72:13 94:10,21 97:2
   107:23
Beverly 1:14 2:3,21 4:1
big 92:17
bill 66:1 68:5 69:10 74:6
   84:25
billed 67:6
bills 98:13 101:25
blt 24:12 108:25
blank 44:8
book 37:20
books 73:14
borne 99:2 102:4
Bornstein 25:11
both 20:1 34:10,13 37:6
   84:20,23 100:4 105:15
bottom 46:5 56:4 59:25
   60:10 62:17 63:2 79:17
   82:7
bought 49:22,24 69:21,22
   75:3 77:9 92:17
Boulevard 2:20
Boutaille 47:17 58:8
Box 2:16
Bragg 61:14,17,18,21,21,25
   62:24,24 63:4,13,25 64:1,9
   64:14,18,20 65:23 66:5,18
   66:23,24,25 67:18 68:3,8
   68:17,19,22,24 69:2,3,19
   69:20 70:6,15,19,22,25,25
   71:2,24 72:3,11,20,23 73:6
   73:17,21 74:2 82:24,25
   83:3,3,10,22,23
break 32:17 62:4
brief 26:21
Brith 52:24
broken 101:4
broker 59:1
brokerage 30:3,5,6,7 86:19
   89:8 101:5
brokers 59:5 82:6
brought 43:14
bulk 49:22,24
bundle 20:12
bundles 13:9 15:3
business 6:6,14,16 8:18,22
   8:23 9:11,24 10:10,13,14

11:24 12:1 33:17 43:4
   48:22 75:10,11,16 77:24
   78:17 93:5
buy 41:10 53:6 59:3
B'nai 52:23
B-o-r-n-s-t-e-i-n 25:11
B-o-u-t-a-i-l-l-e 47:20
B-r-a-g-g 61:17

**C**

calculated 110:18,23 111:9
calculations 110:13
calendar 47:12
California 1:14 2:3,21 4:1,21
   6:7 23:24 37:16 46:10
   112:4,16
call 17:21 28:8 35:13,14
   72:25 92:22 103:14
called 6:19 8:24 10:24 14:11
   50:17
calls 8:14 93:8 96:17
came 8:4,11 11:13 19:9
   21:25 54:6 64:22 66:23
   74:25 84:10 109:24
Camelot 71:17,18
Camille 71:17
Canada 1:2 2:15 5:25 8:8,14
   8:15 9:14,22 11:5 17:7
   18:24 32:22 52:21 63:19
   76:9 88:20,21
Canadian 12:15 76:11
car 77:9,11,21
care 14:25 18:11,15 62:16
carried 9:14
carry 14:10
case 26:21 29:24 30:2 43:10
   46:20 72:7 76:18 77:2 93:1
   108:23 109:14
cases 59:9,9 73:12
categories 87:5 101:5
category 85:20
caused 39:19
cc 56:4,14
CEO 34:9
certain 20:2 22:17 25:10
   31:23 39:13 49:22 84:17
   90:8 99:15
certificate 37:16 112:1
Certified 112:15
certify 112:4,10
cetera 14:16 78:6
chair 5:6,7,15
challenged 23:22 76:13,17
challenges 95:9
change 5:15 7:1 10:22,23,24
   13:12,13 69:24
changed 7:3 12:7 13:10
charge 14:14 86:8
charged 29:9 88:6,10,11

89:10,13,17 96:23 99:6,17
   99:18
charges 30:7 85:1,2,3,18,22
   85:23 86:8,9,9,14,20,24
   87:8,8,10,12,14,23,24 88:2
   88:5 89:8,16,17 90:2 101:5
charitable 76:1
charities 16:1,5 18:15 42:1
   42:5,9,10
charity 13:24 41:9 52:25
   62:23 63:8 64:17
Charles 61:14,18,21,21,25
   62:24,24 64:1,8,17 65:23
   66:5,18,23,24,25 67:18
   68:3,8,17,22,24 69:2,2,19
   69:19 70:6,15,19,22,25,25
   71:2 72:20,23 73:6,9,17,21
   74:2 83:3,10,22,22 101:15
chartered 35:17,20
check 18:21,25
checked 52:19
checks 73:16 98:12
chief 34:9
Children's 62:23 63:7 64:17
choice 13:24 18:1
choose 13:16 41:9
circumstances 6:2 23:13
CL 63:13,25 82:24
clarify 84:3 87:10
CLARK 2:8
clean 65:18 67:23 70:13
   74:13
clear 27:22 70:24
clearly 27:25
client 32:15
close 30:22,23 71:20
Coleman 15:8,9 28:23,24
   34:5 36:17 42:13,18 44:23
   45:9 46:24 52:2,8 53:6
   66:1,6 67:18 87:4 92:13
   98:17 99:6 102:5
Coleman/silver 28:25
colleague 25:10
collectively 44:13 45:17
column 29:22
come 5:23 8:10 11:12 12:14
   18:24 19:20 26:25 38:12
   48:22 51:16 61:6 68:17
   101:1 102:6 111:6
comfortable 20:1
comment 79:21
comments 26:13 27:19
commercial 54:7,19
commission 1:1 11:18
   23:20 32:10 77:5,13 78:22
   79:4,13,15,20 80:8 84:14
   84:18 85:15 102:14 103:3
   104:12,16,23 105:2 111:21
   111:22

2

GRADILLAS COURT REPORTERS
(310) 859-6677

Proceedings   11/29/2006

**COMMISSIONER** 2:7 4:7,11 4:23 5:4,9,14 22:2 23:1,12 24:24 25:5 26:12 27:2,19 28:6,12,17 31:3,8 32:16 33:6 37:21,24 38:9 39:6,18 39:24 40:5 43:14,17,20 55:10,12,17,20 56:23 57:1 62:4 65:9,14,19 67:20,24 70:9 74:4,14 80:3,16 81:23 84:1,13,16,22 85:5,9,12,17 85:24 86:3,6,11,15,17,22 87:2,17,20,23 88:1,4,8,12 88:16,20,23 89:2,5,8,12,17 89:20,23 90:3,7,11,15,18 91:4,7,14,17,21,25 92:3,6 92:9,12,20,24 93:1,4,7,12 93:16,24 94:8,13,19 95:1,4 95:8,11,15,17,24 96:5,9,16 96:20,25 97:9,15,21 98:2,7 98:10,14,24 99:4,11,14,18 99:22,25 100:3,8,11,15,18 100:24 101:3,7,10,13,16 101:20,23 102:3,8,12,17 102:21,24 103:6,10,18,25 104:5,11,15,18,22 105:1,6 105:13,21 110:2 111:18,21
**common** 59:2
**communicate** 69:19 73:6
**companies** 6:16 19:14 34:10,13 37:7 42:13,17 54:16 63:18 76:4 78:21 93:19 94:10 97:3,10 103:1
**company** 6:10,19,20 7:5,16 7:19 8:24 9:3 14:8,9,11 15:4,9,11,14,17 17:10 19:15 36:18 37:3 40:20 45:9 52:8 66:6
**company's** 36:17 69:12
**complete** 112:8
**compliance** 25:25
**concern** 54:23 64:16 100:3 102:12
**concerned** 19:23 62:23 104:7
**concerning** 34:17,25
**concluded** 111:23
**conditions** 12:9
**conduct** 4:6 31:5
**conference** 4:5 13:4 35:13 35:14
**confirm** 43:18
**confirmation** 28:14 29:18 29:19
**confirming** 56:10,14
**confusion** 39:19
**connections** 9:24
**consequences** 80:12
**consequently** 55:7
**consider** 31:16 32:22

**considerable** 11:25
**considered** 32:25
**considering** 32:21
**consist** 98:11
**consisted** 98:12
**consistent** 69:3
**consult** 32:14 105:20
**contact** 60:7 73:4,5
**contemplates** 28:1 46:23
**contents** 39:7
**context** 29:4
**continued** 78:12
**continuously** 83:21,23
**contribute** 97:10,17 98:19
**contributed** 98:21
**control** 27:3
**conveys** 45:21
**copies** 27:17,18 28:9,10,22 75:4 90:11 101:11,12,13
**copy** 37:16 43:13,16 52:7 55:7,16,18 56:25 57:10 58:17 65:18,20 66:5 67:20 67:23 68:7 70:10,13,21 74:13 81:9,11
**core** 9:19
**corporation's** 24:15
**correct** 5:22 18:2 19:16 25:6 30:18 33:16 43:21 49:10 49:11 55:5 56:16 63:23 66:15 67:9 74:18 81:3,16 83:3 96:24 108:11,17 112:8
**corrected** 24:16 25:1 26:4
**correspond** 103:2
**costs** 79:9 99:17
**counsel** 2:6 27:6 31:5 33:6 39:19 105:14
**count** 20:5
**country** 9:2 23:20
**couple** 10:7 80:23
**course** 7:21 9:11 26:9 32:13 69:21,22
**court** 1:2 16:23 22:10,16 23:22 25:4,5 27:3 43:14 76:18
**Court's** 22:6 26:7
**covering** 31:22
**create** 12:20 14:9 98:15
**created** 12:6 14:11 67:13
**creating** 14:17
**credits** 76:2
**CROSS-EXAMINATION** 3:3 33:12
**cross-examine** 22:11,25 38:5
**Crown** 24:10 25:19,25 27:22 28:3 55:7 56:20 65:2 67:17 70:5 74:1
**Crown's** 23:3,5 24:11,17

25:13,14 64:24 76:8
**Crows's** 23:8
**CSR** 1:24
**cup** 10:21
**Curcione** 1:24 2:4 112:3
**currently** 60:12
**Curtis** 62:17
**custom** 62:9 84:25 85:22 86:9,13,24 87:8,9,12,14,23 90:1
**customs** 30:1,7 51:25 52:6 52:21 63:19 86:17 88:5
**C.S.R.** 2:4 112:3

**D**

**damage** 19:1
**damaged** 18:22 71:9
**date** 22:18 26:24 30:17 37:17 39:4,13,14,25 51:25 68:4
**dated** 44:1 54:19 55:25 57:4 59:18 65:23 67:17 70:5,15 74:2 81:10 106:10
**day** 112:12
**days** 12:25
**deal** 9:19,23 10:25 13:15 15:19 22:3,5,9 23:15 31:16 31:18 39:21 83:11 106:18
**dealers** 59:1,1,4 70:4
**dealing** 29:13
**deals** 82:19
**dealt** 23:18 72:22
**Dear** 71:4
**December** 44:1 46:1,24 82:20
**decide** 11:21 26:15 33:1
**decided** 23:9
**declined** 34:1
**deduct** 84:9
**deducted** 84:17,18,19
**deduction** 41:17
**deductions** 84:11
**definitely** 8:20 11:9 100:21 102:2
**deliver** 20:3
**delivered** 20:6
**DEPARTMENT** 2:15
**Depends** 51:22
**Derksen** 2:15 22:7,11,25 23:1,2 24:9 25:6 27:9,14 27:21 33:7,8,13 37:21,22 38:1,9,15,17 39:22 40:1,13 43:18,21 55:6,15,18,23 56:17,25 57:12,21 62:3,7,13 64:24 65:17,21 67:23 68:1 70:5,13 74:1,9,13,15 80:1 80:4,14,24 81:16 110:3,6 111:17
**describe** 62:12

**described** 58:12 96:17 97:11
**desirable** 23:14,19 24:2
**desperate** 77:16
**despite** 96:9
**detail** 103:20
**detailed** 63:13 64:13 73:15 102:11
**details** 96:13
**determination** 26:17 27:4
**Dick** 12:13
**difference** 103:16 107:6,23 109:10
**different** 9:18 39:15 49:18 49:19 76:17
**differently** 9:19
**difficulty** 24:5
**direct** 3:3 5:18 95:17
**direction** 112:7
**directly** 88:2,3,4
**director** 34:12,12 37:6 38:2 38:3,14,21 39:1,9
**discount** 20:16,21 29:24 43:11 85:13,14 86:1 91:10 92:15,21 93:20 94:3 100:16,22 110:24
**discounted** 90:8
**discounting** 111:1,2
**discounts** 20:19 79:19 85:4 85:5,7,9 90:5 91:22,23 92:1,7,10,12 93:9,18,21,25 94:1,5,7,24 96:6,7,22 97:2 97:6 99:25 100:25 102:18 104:1 109:24 111:11,15
**discounts/adjustments** 96:3
**discovery** 24:16 25:1,9 26:5
**discuss** 12:4 21:5 34:24 79:3 103:14 105:8
**discussed** 11:11 35:9 78:21 93:8
**discussion** 6:24 9:11 15:25 35:4
**discussions** 8:7 15:20 78:10 97:22 105:7
**dispute** 34:1
**disregard** 24:8
**divide** 108:6,19
**document** 15:4 19:21 37:15 38:5,6,8,12,13,19 39:2,4,7 39:12,23 40:3,5,7,11,14,15 40:17,23 43:25 44:4,7,10 44:21 45:4,6,9,11,14,24 51:23 52:3,23 54:3 55:7,24 56:3,6,8,9,18 57:3,6,9,13 57:17 58:13,18 59:14,16 59:19 62:8,11,14,20 63:10 63:12,16 64:13 65:1,5,8,11 68:2 82:18,20 83:6

3

GRADILLAS COURT REPORTERS
(310) 859-6677

Proceedings  11/29/2006

documentation 14:23 16:4
    73:13 90:4,22 98:8,9,11
    99:12
documenting 78:17
documents 15:7,12 21:2,23
    22:12,24 23:14 24:2,18
    25:3,15,17,21,22,24 26:1
    26:10 27:7,8,12,23 28:4,9
    28:10 29:2 52:12 62:9,22
    63:4 102:9
doing 9:3 10:25 31:20 77:13
    98:21 105:20
dollar 42:9
dollars 12:15,23 53:25 54:4
    54:5 76:11,23 94:1 104:9
donate 13:22,23
donated 16:1 41:8 49:4 76:1
donation 9:17 16:4 31:14
    41:4 42:10,14,20,24 46:22
    47:1,6,8,10 49:1 53:10
    54:24 58:21 64:21 67:2
    68:24 69:13 76:1 79:17
    89:4,5,6 91:1
donations 42:1 76:15 80:12
done 8:13 22:16 75:22 87:20
    96:12,13,16
donor 42:25 45:10
donors 41:20 42:6 43:7
    58:24 69:15 78:23
doubled 111:6
down 8:4 47:16,17 48:4,5,13
    56:4 57:20 58:7 59:24
    60:10 62:17 63:1 65:20
    67:21 70:10 94:14 95:19
    100:7 101:4 105:8 112:5
draw 99:5
Drive 2:2
due 74:7 82:8,12 91:10,15
duly 4:15
during 18:10 21:25 24:13,16
    25:9 32:13 35:13 69:21
Dyanson 8:25 10:10 74:17
    75:7,9,16,23
D-y-a-n-s-o-n 8:25

E

E 3:11
each 20:1 49:9,14 76:22
    92:21 96:2 101:3
earlier 57:21 58:9 63:10
    64:18 66:22 74:16 75:20
    75:21 86:22 96:17 97:1
    111:14
eBay 78:1
Edie 16:19,25 18:24 72:15
    72:18,21,22,24 73:4,7,9,20
    101:14
edition 50:17 68:13 75:5
editions 51:16 75:18

Edwin 37:10
effectively 45:10
effort 33:3
eight 73:16
either 9:17 22:21 78:10
ELLIOTT 2:19
embark 24:21
end 18:12 19:11 20:4,7
    21:16 23:17 27:12 28:23
    28:24,25 32:11 69:4,19
    91:3 99:19 110:14 111:21
ending 97:17 111:24
ends 14:5
enough 27:9 71:20 72:1
entailed 92:10
enter 38:10
entered 58:24 78:11
entire 93:4
entities 54:16
entitled 28:23,24,25 63:12
    108:24
entitlement 107:11 109:1
entitlements 96:23
envision 95:5
equate 30:16
error 86:24 105:12
escrow 97:25
especially 96:10
ESQ 2:11,15,19
essentially 51:1 54:4
establish 27:15,24
et 14:16 47:17 48:5,6 58:8
    78:6
eve 25:22
even 27:4 77:2 93:14 103:16
event 5:9 23:21 24:6 40:11
    112:11
events 34:25 35:3
eventually 9:1 14:8 55:19
ever 20:15 21:5,9 32:22 65:5
    73:6 77:9,11 90:15 104:23
every 5:1 18:8
everything 100:7
evidence 1:1 4:9 22:11,14
    22:17 23:10,20,24 24:7,21
    25:3,9 26:5,14,16,24 27:1
    27:25 28:2,5 35:9 38:7
    39:15 40:2 55:3 77:4
    111:22
exact 41:16
exactly 10:23 49:13 52:19
    107:21
examination 3:3,6,8 5:18
    13:4 25:1 31:5 80:21 106:1
examined 4:16
example 46:22 47:9 52:21
    53:9 66:20 69:12 84:22
examples 48:18 87:2,7
except 26:7 92:16 93:12

97:3
excess 93:20,21 94:1
exclude 24:7
excuse 22:22 31:3 57:10
execute 45:3
executive 34:9
exhibit 28:2 31:10 38:10
    40:6 43:13,13,22,23 47:15
    55:8,9,14,14,22 56:20,24 65:2
    65:3,14,16 67:19,22 70:7
    70:12 74:12 81:22,24 82:2
    82:6 83:9,16 86:11 87:9
    89:24 91:25 93:17 97:16
    99:5 106:4 110:8
exhibits 28:13,19 82:14
existence 64:22
expect 106:18
expecting 106:25
expeditious 22:18
expense 99:1
expenses 14:6,17,19 29:9
    31:22,23 87:5 94:20,24
    95:2,5 99:7,8,12 100:19,20
    103:22
expensive 33:2
explain 96:25 97:9 111:7
explanation 49:21 80:7
express 6:21
expressed 11:3 26:11
extension 57:24
extent 31:23
extra 75:1
extremely 73:15
eyes 77:25
E-d-i-e 17:1
e-t 47:20 48:6

F

fact 21:6 38:14 46:8 90:8
    95:13 97:4 98:16
fair 12:3 27:9 36:2,3 42:12
    42:17,21,22 43:4 46:1
    48:19 49:8 66:17 68:19
    76:11,22 79:19 85:12
    103:18 104:5
fairness 39:3,11,16
far 19:22 88:24
Farrow 62:18 82:21
favorable 26:6,6
fax 18:8
February 37:17 59:18
federal 23:22
fee 29:23 30:3 32:9,12
    110:21 111:8
fees 11:12 85:18 88:9,12,14
    88:23 95:9 99:22 100:10
    100:12 102:4,17,25 110:17
felt 13:15 19:10 20:1 90:18
    98:22

Femme 48:5,6,13 57:20
Fenwood 4:21
few 14:5 22:24 80:17 84:2,2
    104:9 105:19 106:3
figure 71:19 93:19 102:13
    109:12,12 111:1
figured 110:25
filed 39:13
filled 44:8
find 11:5 12:1 41:19 42:1
    78:1,3
fine 4:7 5:11 10:14 15:13
    34:5,7 36:17,24 38:2,22
    40:21 42:13,13,18,18
    44:23 45:9 46:24 52:2,8
    62:16 64:22 66:1,6 67:18
    68:6 70:6 87:3,4 98:18
finish 72:3
finished 71:20
Fink 16:18,25
firm 35:22 88:15,18,19,22
first 4:15 10:17 16:18 17:16
    19:24 20:17 26:2 29:20,21
    34:21 36:17 37:17 44:6,10
    51:24 59:25 62:15 63:24
    64:4,21 77:24 91:23 92:16
    93:13,17 97:4 105:18
    106:9,10 110:8 111:15
five 80:18
focused 110:8
follow 103:4,5
following 7:3 24:24 53:7
    69:24
follows 4:16
force 14:17,18 32:23
form 30:25 43:11
forth 105:8
forward 22:21
found 12:12
Foundation 52:24
four 62:15 71:16
fourth 64:12,15 72:11
four-month 91:12
Francophone 47:18
frequency 93:8
frequent 50:13,14 96:18
fresh 67:13
Friday 25:22
friend 6:11 21:24 24:18,20
    26:19 27:15,24 28:2 38:4
    39:16 56:19 110:11
friendly 7:23 100:5
friends 8:5
friend's 37:19 39:11
from 8:14 15:3 19:4,4 21:3
    21:10,19 25:3 27:1,12
    31:25 32:6 37:16,19 48:22
    49:1,5 51:16 53:6 54:11
    59:25 60:7 65:23 66:23

4

GRADILLAS COURT REPORTERS
(310) 859-6677

67:18 68:3,8,17 70:6,14,15
70:19,21 71:17,25 74:2
76:9 79:12,14 81:15 82:20
83:10,22 84:18,20 90:4,20
91:18 94:25 96:21 98:8,8
101:24 102:7 105:12
109:12
front 43:25 106:5
fronted 99:16
full 4:18 20:10 23:7 69:25
91:5,8
fund 94:23,25 95:1 97:11,22
98:15,16,19,21
funds 7:6,9 31:25 32:3,6
further 3:6 27:1 48:4 80:15
106:1 111:17 112:10
future 26:25 95:6
F-a-r-r-o-w 62:19
F-e-m-m-e 48:6,13
F-i-n-k 16:25

**G**
galleries 9:2,8,9 10:10 36:1
36:5 74:17,20 75:16,23
82:5
gallery 9:1 63:12 64:13 75:1
75:12
gather 17:23
gave 21:6 25:9,13 26:22
67:5 87:7
general 49:21
generality 50:3
generally 51:13,14 59:8
76:15 85:9
generate 41:13
generated 41:17
getting 8:14,19 31:24 111:4
get-go 105:12
give 11:18 49:20 51:15
77:22 84:22 92:19
given 4:5 17:25 24:1,4,15
25:1 39:20 77:12 94:19
97:2 103:10 104:1 105:16
giving 5:10 27:12
Glenn 62:17
go 16:9 22:20 41:19 50:9
58:23 63:7 78:1 79:10
94:25 108:16
going 13:8,16,20,22 15:22
16:10 18:18 20:8 27:6,15
31:3 33:8 37:15 38:1 39:20
41:6 51:23 73:11 79:9,10
79:21 81:9 88:16 99:4
105:14 107:14 109:9,11
Goldberg 58:4,5
good 4:4 26:23 31:16,18,21
31:24 97:19 98:22
goods 53:20,23
government 76:13 80:25

government's 76:10
Graham 88:19,21
graphic 72:8
graphics 68:12
great 9:23 103:20
gross 29:12 93:15 102:13
103:23 105:2 106:10
107:11,24 108:4,17 110:13
110:15
grosses 31:20
Grossman 5:21 6:9,14,21
7:8,12,25 15:1 19:20 34:16
35:1,3,16,25 36:20 41:4
45:2,3 46:2 69:11 76:5
78:10 79:23 80:5 92:22
96:14 97:18 104:12 105:7
Grossman's 6:4
group 41:7,10 60:21 61:3,5
61:9 71:17 72:15
groups 60:20,25 61:12
guess 19:9 73:18 93:23
102:12 108:25
Guitare 47:17 48:13,14
57:20 58:8
G-u-i-t-a-r-e 47:19 48:14

**H**
H 2:19 3:11
hand 19:14,15 62:11,16
67:20 112:12
handed 65:20
handled 14:15,16
handling 22:19
hands 22:15,20 33:17 42:5
69:24
handwritten 59:24
happen 13:20 20:15
happened 10:24 32:1 78:25
92:15
happens 26:24
having 4:15 40:14 65:1
Hawaii 9:2
headed 43:25 51:24 53:13
64:13
heading 100:25
hear 4:9 22:10,17
heard 26:15 38:9
hearing 28:15
held 13:5 97:23,24 98:4
help 6:12
her 1:7 2:14 14:16 60:7 73:2
73:13,14,19
hereto 44:14 45:18
high 31:22 50:2 72:1
Hills 1:14 2:3,21 4:1,21
him 5:3 6:5,25 7:4,13 22:24
38:14 39:5 62:11 67:5
71:13 73:12,23 103:14
history 78:5

hold 55:1
Hole 64:3 66:21
hollow 25:24
honest 20:5 92:15 104:8
honestly 76:21
Honor 4:4,25 21:22 23:2
25:7 26:18,22 27:10,22
28:20 32:15 33:5,10 55:9
55:15 56:21,25 64:24
65:17 67:19,23 70:8,13
74:3,13 80:1,14 81:11,22
111:17
hook 58:23
Hopefully 5:7
Horwath 35:23
Human 52:23
hundred 10:7 92:18

**I**
idea 11:23 37:5 41:14 64:18
78:21 97:19 98:15 104:15
104:17,18 105:1,4
ideas 1:4 14:12 17:12 18:16
18:18 32:4 33:24,24 34:16
41:18,22 42:14,24 46:14
51:4,6 52:15 54:17 56:14
59:17 60:5,20 63:20 64:10
67:8 68:9 76:5 77:5 78:22
79:16 84:6 85:13 87:5 88:9
88:9 90:4,7,13,20 91:19
92:21 93:5 94:11,21 96:21
97:3 98:8,25 99:2,14
101:24 103:2 104:2,12
identification 3:12 21:23
28:13,13,19 31:6,8,10
39:23 40:8,10 55:14 56:24
65:16 67:22 70:12 74:12
81:24 86:12 89:24 97:16
99:6
identified 23:14 39:25 40:9
40:11 55:6,12 56:18 64:25
97:5
identify 24:2 28:10 38:6
65:7
images 41:7 72:8 75:18
impact 79:17
important 97:13,14
INC 1:4
incidental 85:3,19,21 86:23
87:6,7,21
included 66:20 73:1,2 95:11
96:1 100:22,24 109:15
including 9:2 86:24
income 30:11
inconsistent 24:17 25:15
incorporated 36:19,25 37:4
incorporation 40:20
incurred 87:3 92:4
INDEX 3:1

indicate 29:10 82:10
indicated 83:20
indicates 57:23 83:5
indicating 40:8 81:5
individual 43:7
individuals 5:24
industry 50:16,17
information 25:12 44:8
54:10,12,15 73:21,25 98:3
101:23
infrequently 92:16
initial 13:8 105:6
inquire 103:20,22,23
insignificant 89:16 97:3
insofar 42:14,19
instance 77:17
instances 20:18
intend 40:1
intends 38:10
interest 6:21 7:1,3 10:20,21
45:22
interested 7:7 8:18 10:25
11:1 112:10
International 48:23 49:6
53:13 54:22 56:1 57:5
interrupt 31:4
interviewed 33:23 80:25
introduce 40:2
introduced 6:11 38:6
introduction 28:4
inventories 17:18
inventory 9:23 10:2,12,15
32:22 46:19 67:11 75:7,9
investment 6:5,7,15 41:12
investor 13:18 41:9
invite 39:20
invited 6:24
invoice 51:25 52:6,22 54:7
54:19 65:23 66:4,5 67:17
68:3,8 70:5 82:6 83:10
invoices 52:8 55:1 101:14
invoicing 66:25 67:4 68:22
involved 7:14 8:19 13:14
14:22 16:3 17:6 20:2 34:17
41:5 42:8 43:6,9 45:11
52:11 63:3 69:8 75:24 79:9
80:11 83:7 88:18 90:25
involvement 33:15,23
IRVING 2:11
Irwin 71:4
issue 23:3,9 26:2,9 27:5
28:3
issued 42:10 66:5
issues 25:16,20 26:8
item 99:6
items 86:7 90:8 94:20 101:4

**J**
January 18:13 28:23,24 29:1

82:19 97:17 98:4 106:10
110:8,14,15 111:8
Jeanine 1:24 2:3 14:12 18:8
100:6 112:3
JENNA 2:8
job 1:25 31:21 98:22
John 71:18
judge 24:5
July 35:6 68:5,22 70:6 81:10
83:10
just 10:7 27:21 29:13 33:3,8
39:16 40:3 41:1,16 43:18
43:23 48:18 56:9 59:7,10
61:12 62:12 65:17 69:10
70:24 73:24 76:15 79:1
80:23 82:25 84:4 94:4,24
97:7,12 105:19 106:8
110:11
JUSTICE 2:15

### K

KAHAN 2:19
KAJAN 2:19 5:7 16:21 31:1
keep 16:8 103:25 104:2,3
110:7
keeping 17:17
kept 10:15 69:23 78:9
kind 51:24 88:12
King 2:16
knew 8:17,21 17:23 29:16
36:15,15 41:17 73:8,18
know 5:10,20,23 7:22 9:25
11:23 12:2 16:15 17:22
21:24 23:10 29:14,15 32:1
37:9 41:16 44:15,17 45:12
49:18 57:14 58:2 61:11,13
71:13,16,21 72:6 73:19
74:10 80:12 81:4 91:11
92:17 94:22 107:13,16
110:18
knowledge 47:2,3,5
known 35:23 48:22

### L

L 2:8 62:17
la 48:13,13 57:20
label 31:7
lack 39:10 80:25
large 72:12
larger 109:24
last 30:19 44:21 46:6,71:4
111:7
late 51:21
later 11:12,13 12:8 13:10
22:18 26:23 28:14 36:25
39:25 40:9 87:8 109:24
latter 96:10
launch 26:19
law 88:15,18

lawyer 30:3 101:5
lawyers 81:1
lead 24:20
leading 25:3 110:12
League 52:23
learn 36:13,14
learned 24:18,20 27:15,23
28:2 56:19 110:11
least 12:23 97:15
leave 25:4,5 26:7
leaves 107:6
led 26:5
left 10:12 52:1 62:15 68:5
74:22,25 81:1 91:11
107:14 110:16
legal 14:18 84:25 86:2 88:9
88:12,14,25 89:2 94:24
95:2,4,8,9,20 97:11 98:13
98:16 109:15
Leslie 16:18,25
less 12:3 30:5,6,14 84:11
94:3,16 96:2,6 99:25
100:15,25 102:18 105:11
106:19 107:1 110:16,21
let 5:10 16:9 17:21 27:6
71:21 73:19 80:1
letter 70:14,18,21 71:25
74:1 81:4,6,7,10,12,15,18
letterhead 56:1 57:5 59:17
let's 5:14 62:4 89:12
level 72:1
liabilities 85:6 86:4 87:3
liability 84:20,21,24,25 85:1
85:2,3,4 86:7,15,16,19
87:6 89:21,22
liable 85:18 86:23 103:1
like 5:5 8:19 13:17 27:20
32:16 43:12 44:7 65:7
80:17 82:1,14 84:3 92:19
94:6 100:4 102:23 107:12
109:22
likely 96:5
limited 36:18,24 38:22 40:21
44:23 50:17 52:2 53:13
56:2 62:19 66:1 68:13
75:18
line 29:20 30:19 46:6 79:18
95:18 96:1,6 106:10
list 18:8 25:21,23 26:1 51:22
94:19 95:19
listed 25:21 63:24
listened 73:3
listing 47:16
lists 82:23
litigation 34:17
little 9:18 10:20 24:12 73:5
102:11 108:25
LLP 2:10
locally 12:12

logical 4:8
London 10:14
long 107:20
longer 61:1
look 37:18 38:18 44:21·45:6
46:7 51:22 53:12 57:3
62:10,20 65:24 70:17
73:14 94:14 102:13
looked 40:14 57:18 63:11
66:21
looking 7:6 44:7 46:23 87:9
96:1 102:22 106:9
looks 102:23
loose 99:23 100:1,2
Los 46:9
lose 20:3 90:23
Loss 30:3
lot 10:15 58:25 73:17
low 50:1
lower 46:5
lucrative 104:6
Lynn 56:11 61:21,25 62:24
64:1,9 65:23 66:5,18,24,25
67:18 69:2,20 70:25 83:22
I-a 48:13
L-e-s-l-i-e 16:25
L.A 8:4 12:12

### M

Madam 4:11 28:18 55:21
made 21:12 23:21 39:11
46:6,7 51:1,2 76:16 87:16
91:2 106:20 107:10 109:10
maintain 96:20
MAJESTY 1:7 2:14
major 59:10
make 23:7 24:22 26:10,17
27:4,19 32:23 61:12 71:19
77:19
makes 26:23
making 103:9,12
Malcolm 4:20
manager 14:14 33:18 60:5
managing 14:17 100:6
many 10:5 17:22 20:18
22:16 29:11 31:13 48:18
69:20 75:14,20 91:23,24
103:17,19
Maple 2:2
March 52:1 53:4,9 54:20,23
55:25 56:13 57:4
Marilyn 58:4,5
mark 5:21 9:10 10:18 14:8,9
15:20 19:15 20:15 21:5
35:19 39:22 76:5
marked 28:12,18,19 31:1,10
40:7,10 43:19 55:8,13,14
55:19,21 56:24 65:16
67:19,22 70:7,12 74:12

81:21,24
market 13:15 42:25 76:12
76:22
marketed 61:1
marketing 17:6
Marks 2:11 4:4,9,24,25 5:12
5:19 16:22 21:22 22:3 25:4
26:13,18 27:10,18 28:6,7
28:16,20 31:2,11 32:14,18
32:20 33:4,8 37:19,23 38:4
38:16 39:3,10 43:16,17
55:10,11 56:22 57:10,11
62:11 65:4,13 80:16,18,22
81:21 82:1 83:24 105:18
105:19 106:2 110:1
Mark's 10:19 17:10
Masters 48:22 49:1,6 53:13
53:19,24 54:9,21 56:1,11
57:5 58:5
math 106:22
MATHER 2:19
matter 23:8,18 24:14 33:16
38:7 104:9
may 24:12 26:6 32:12 39:13
39:15 58:19 60:11 62:3
65:23 67:1,4,17 69:8,22
84:3 91:10 100:18 103:16
maybe 22:4 31:15 35:14
48:5 57:15 84:4 92:16
mean 8:3 9:15 14:2 46:17
50:19 69:7 75:18 76:17
91:7 109:13 111:2
means 22:18
meeting 6:8
mentioned 21:15 27:11 86:1
met 5:25 6:3
Metelits 37:10,13
mid 5:25
might 6:12 19:11 20:17
43:10 60:16 61:4,6 69:9
70:1 77:14 78:4 92:17,18
95:5
Miller 56:11
million 9:3,6 10:4 78:17
93:21,22 94:2 96:11,11
108:24 111:5
mind 11:21 43:18 97:7
mine 6:11 19:11 87:14
minor 79:18 85:1
Minotaure 48:5
minus 30:21
minutes 62:5 80:17,18
105:20,21
missed 16:8
mistake 82:16 103:15
mistakes 87:15 103:17,19
misunderstood 57:15
MMI 53:13
moment 31:2 32:14 45:6

Proceedings  11/29/2006

62:3 80:1
money 6:10,16,18 7:4 12:1
   19:9 58:25 59:4 69:3 70:4
   77:14,16 91:10 94:25
   97:23 103:11,11
monies 69:24 84:10
more 4:8 10:21 22:4 23:7,14
   24:1 34:23 36:15 49:14,15
   49:17 62:9 69:22 94:6
   98:23 102:11 105:11 106:3
   107:12 108:25 109:22
morning 4:4 33:14 35:15
   36:4 74:16
most 20:9 26:13 50:13,14
   87:14,14,23 91:5,8 103:17
   104:9
motion 24:7
moves 65:2
much 5:12 9:5 10:2 11:24
   17:23 20:17 21:16,17
   29:16 33:2,2,6 111:18
multiple 75:4,4
Museum 48:22 49:1,5 53:13
   53:19,24 54:9,21 56:1,11
   57:4 58:5
M-e-t-e-l-i-t-s 37:10
M-i-n-o-t-a-u-r-e 48:6
M5H 2:12
M5X 2:17

_____ N _____
name 4:18 7:19 12:12 15:12
   16:15 37:9 44:23 52:22
   60:2 61:14 63:2 88:15,19
named 16:11 112:6
names 16:21,23 21:12
nature 95:4 97:22
necessarily 24:25 69:5,6
   78:6,7 103:2,19
necessitate 23:23
need 5:10 9:25 21:1 26:25
   45:7 46:7 69:20 71:16
   79:16
needed 8:20 12:19 17:23
   29:17 42:25,25 77:14 91:2
needs 5:1
negotiated 104:25
negotiation 104:24
net 30:10,19 94:15 109:12
   111:1,3
never 19:21 24:16 43:9
   58:17 72:22 78:20 104:25
new 9:1 53:3,4 72:15
next 64:12 65:22 81:21
   91:13 108:2
nice 6:23
nine 73:16
nominee 24:15 25:2,9
None 51:7

North 2:2
note 28:18 59:24 60:10,16
noted 12:13
notes 21:3,6,9 78:9
nothing 8:16 20:3 78:14
   90:23
notice 2:4 25:25 53:23 56:4
   57:19 73:15 74:5
noticed 8:12
notified 18:5
notwithstanding 46:8
November 1:13 2:2 4:2
number 8:13 19:9 29:14
   31:15 36:6 61:8 66:12
   68:15,16 69:20 74:17,23
   75:1 82:3 92:5,9 94:4
   102:23 105:5,9 111:5
numbers 10:7 41:16 103:23
   105:8 110:12

_____ O _____
object 28:4 37:23
objecting 39:10
objection 21:24 22:5,10,13
   23:15 55:11 56:22 65:13
objections 56:19
obligation 13:25 14:3,4,4
obligations 14:7 42:14,19
observation 24:22 26:10
obtain 23:24 61:24
obvious 26:2
obviously 24:10 40:19 71:9
   102:20 110:25
occasion 34:24 35:2
occasionally 73:25
occasions 60:25
occupation 4:19,22
occur 95:3,5
occurred 13:13
odd 36:8 80:10,13
odds 14:5
off 75:8 92:19
offer 41:7 61:10 105:14
offered 79:4 104:11
offering 104:19
office 6:5 14:14 33:15,22
   60:6
officer 14:13,13 34:10 38:22
   39:1
offices 11:6
office's 34:2
offset 95:8
often 5:2
oh 29:12 66:24 94:22 95:22
   100:19
okay 21:1 65:14 108:15
   109:2,17
old 51:9,11 75:7,9
once 16:7 17:5 18:18 36:14

70:9
one 9:1,3 16:14 19:14 22:4
   25:18,20 28:22,24 43:15
   52:7 57:20 58:8 61:6 64:8
   73:16,18,18 81:11 82:24
   82:24,24 83:2 87:5 103:9
   104:10 106:9 111:12
ones 102:4
ongoing 91:17
only 22:24 28:19 31:6 39:13
   43:10,14 59:2 61:7 71:5
   73:15 74:7 78:2 81:11
   82:12 91:2 92:15 98:20
   101:23 110:24 111:13
Ontario 2:12,17
open 38:15
operate 11:17
operating 42:15
operation 42:19
opinion 89:1,2
opportunity 9:21 38:18
   105:15·
order 12:19 20:20 42:23
   67:5 71:21 72:2,4,5
ordered 68:6
orders 18:9 60:12 82:4
organization 14:19
original 27:16 28:1 37:20
   38:7 40:2,23 71:21 72:4,4
Originally 6:4,23 10:19
originals 27:25
Ornstein 35:23
other 13:20 14:5 16:15
   17:21 19:15 20:2 22:6 28:7
   38:7 49:23 76:14 86:6
   89:13 94:6,8 95:25 97:21
   98:16 101:4 104:10 109:18
otherwise 22:23 39:2 101:3
out 8:25 9:14 11:19,20 14:5
   14:10 16:11 41:19 44:13
   45:17 61:4,9 81:18 85:14
   98:13 102:25 105:8,16
   109:18 111:6
outset 98:25
outside 23:20
out-of-pocket 7,8,12
   100:19,20
over 7:11 9:3,5 17:15 18:24
   27:3 47:14 48:12 50:9
   51:25 52:1,22 53:12 62:15
   63:1,19 64:12 68:4,5 78:17
   91:11 96:11,11,13 98:1,2
   107:21 110:16
overhead 11:6 12:2
overturned 23:23
owing 21:17
own 16:14 27:4 31:23 32:23
   69:13
owned 46:15,18

owner 44:12 45:17 75:3
ownership 36:5

_____ P _____
package 69:23 84:10
page 37:17,19 44:11,21
   45:19 47:16 48:12 51:24
   53:12 62:15,16 63:1,11,14
   63:25 64:12,13,15,18
   65:25 82:7 93:16,17,18,24
   94:14 95:18 99:5 100:17
   100:19 110:8,21
pages 31:9 51:24 62:15
paid 20:9,24 32:2,9 49:12,13
   49:25 50:1,2 68:20 69:9
   70:1 74:7 78:23 82:5,8,11
   84:14 88:2,3,4,6,9 89:9
   91:4,8,11 94:16 99:15
   100:12,13 101:8,14
paper 28:22
paperwork 14:15,18 87:19
   87:20 96:21,21 97:4
paragraph 45:18,20 46:5
   71:15 72:11
PARIS 2:7
part 20:9 40:12 43:3 47:24
   48:9 61:25 67:2 69:23
   87:14 89:10 91:5,8 103:17
   104:9 110:14
particular 6:17 7:5 18:6,23
   19:18 44:18 53:20 60:25
   61:2 83:5 101:4 111:12
particularly 104:7
particulars 84:5
parties 23:10,23 95:5
   105:15
partner 8:24 10:15
partners 35:22
party 26:6 111:12
pass 37:15 41:1 51:23 55:15
   55:20,24 56:25 59:14,16
   60:18 62:8 65:17,22 67:23
   70:10,13,14 74:13
passed 62:14
passing 43:23 68:2
past 34:23 35:6
Paul 3:4 4:10,14,20 56:4
   59:18 63:2 68:6 70:16 71:4
   74:2
pay 12:3 14:2 17:2 77:4 78:1
   78:1,21 79:13,15,19 80:7
   88:1 103:15
payable 30:19 94:15 102:17
   109:12
paying 42:8 44:9 50:4,6
   57:25 58:4,11 66:17
payment 20:7 21:7 84:6
   90:20
payments 19:3 30:13,14,16

Proceedings  11/29/2006

90:21 94:16 107:3 109:3
payroll 83:23
Pearlman 5:21 7:14,22
  25:13 34:16 35:1,2,19 36:1
  36:20 41:4 76:5 78:10
  79:22,23 80:5 97:18
  104:13 105:7,20
Pearlman's 21:25
people 8:14 11:7 13:16
  14:16 18:20
per 54:4,5 58:1 68:20 76:11
  95:14,15
percent 11:18,22 12:3 19:4
  19:10 29:23 32:9 77:5,13
  79:18 84:10,14 85:15
  91:16 92:19 102:14 103:3
  105:2,4 106:19,23 107:10
  107:24 108:7,14,20 109:11
  109:12,14 111:4
perfect 19:1
perhaps 23:16 27:14 39:22
period 7:1,11,13 10:22
  39:15,17 82:19 91:12 93:4
  98:1,2
permission 22:7
PERRY 2:15
personal 75:2
persons 76:16
perspective 79:12,14
pertained 47:1
phone 92:24 96:13,17
Picasso 47:21 48:4,7,14
  57:21 58:1,9
Picassos 48:21 58:15
pick 19:9
picked 71:4
piece 13:1,3,18 49:14 76:23
pieces 10:6 12:7,8,22 13:9
  13:21 15:3 17:18 18:1,6
  29:11 31:13 41:8 49:22,23
  49:24 51:12 71:5,6,9,16,22
  72:12 78:1,3
place 35:13 112:6
play 38:12
playing 73:7
please 4:18 37:18 41:2
  43:24 47:14 55:19,20
  59:15 60:18 62:3,10 63:11
  65:20,24 67:19 70:7,17
  74:3 80:2 82:2 84:3,23
point 8:6 9:3 21:22 23:12,25
  28:14 38:11,11 40:7,9
  98:22
points 84:2
portion 93:25
position 23:3,9 24:11 64:25
  65:9 81:19
positive 7:20
possibility 24:1

possible 22:3,9 23:9 31:4
  38:2,21,23 46:25 48:25
  49:3 58:20 72:10
Possibly 48:24 59:23
potential 41:12,13,19 60:21
  95:8 105:9,9
practical 23:8 26:14
practice 59:2
preamble 44:10
precluded 25:3
preference 24:23 26:11
premises 46:9
preparation 52:11
prepared 22:20 23:6 33:22
  52:14,15 58:23 77:4
president 34:4
pretrial 25:19
pretty 30:22 100:9
previous 7:5
price 11:12,16 12:4,6,21
  19:4 20:11,16,21 29:11
  30:1 31:24 50:4,6,8,9,13
  50:14 53:24 59:3 77:24
  78:5 85:13 91:22 94:9
  106:14
prices 49:18,21
primarily 111:15
print 12:25 47:17 48:7,14
  49:9 50:17 54:5,16 57:21
  57:21 58:1,7 61:6 63:24
  64:4 66:18,21 76:11
printed 51:7
printing 50:20,25 71:20 72:4
  72:5,7
printout 102:6
prints 42:20,25 43:1 44:13
  44:17 45:10,17,22,24 46:3
  46:8,11,13,14,18,19,20,25
  47:5,16,24 48:5,18 49:1,5
  50:5,18,19 51:3,5,7 53:1,3
  53:6 54:13,16,23 55:4
  57:20 58:12,21,23 59:8
  60:20,21 61:2,5,8,19,24
  62:22,23 63:5,19 64:9,16
  64:17,20 66:8,12,18 67:7
  67:10,13 68:8,13,24,25
  69:13 70:1 72:8 74:23 75:1
  75:2,4,10,17,22 76:12,16
  76:22 77:3,6 82:4,4,24
  83:6,11,15,21 84:11
prior 91:5
pristine 18:23
probably 13:2 50:14
problem 5:1 12:24 19:22,24
  24:19
procedures 27:4
proceed 7:8 22:23 23:8
  26:11 27:6,14
proceeding 24:4 26:14

34:18
proceedings 1:12 2:1 23:16
  112:5,9
proceeds 79:14
process 24:22 73:8 108:3
produce 8:20 10:1
produced 63:18
producing 75:18
product 11:7 36:13,13
production 27:7 28:1
profession 35:17,20
program 9:15 14:10 16:7
  17:5,14 31:14 41:4,5,13
  42:15,20,24 72:9 79:17
programs 8:13,16 9:14
promissory 21:3,6,9
pronunciation 47:19
proposal 11:2 13:8
propose 21:22 22:23 26:22
  28:8 37:24 39:24
proposed 92:21
proposes 24:18 55:8
proposing 39:25
Protosource 6:19
provide 11:9 12:17 14:1
  16:10 24:11,14 54:12,15
  73:13
provided 16:14 25:12 63:17
  63:21
provides 26:4
providing 24:20 63:3
published 51:17 75:14
publishing 75:17,17
pull 50:18
pulled 51:5 60:11
pulling 50:17,19
purchase 18:3 19:4 20:11
  41:8 43:7 44:1 67:5 69:11
  73:11,12 90:12 92:17
purchased 15:2 46:19,21,21
  54:25 83:16,17,19
purchaser 15:5 41:13 44:8
  44:18 45:10,21 60:21
purchasers 11:5 15:2 17:25
  21:4,6,10,13 32:1,3 41:7
  41:19 48:2,10,16 51:6 53:5
  58:24 64:10 69:17 90:9
purchaser's 16:4 52:22
purchasing 21:13
purportedly 69:14
purpose 6:8 41:8
purposes 36:19 39:23 54:17
  63:4,18,22 65:1 72:8 73:22
  73:24 76:1
pursuant 2:4
put 25:25 27:16 33:17 40:4,6
  40:7 100:6
p.m 111:24
P.S 60:11

<table>
<tr><td>Q</td></tr>
</table>
quantities 18:7
quantity 57:23 59:8 66:8
  68:11 83:11
QUEEN 1:7 2:14
question 22:12,17 31:12
  39:11,19 42:16 84:7 93:2
  103:14 109:19 110:24
questions 22:24 24:3 25:10
  27:7 33:4 39:17 65:6 80:15
  80:23 83:24 84:2 105:13
  105:15,17 106:3 110:1
  111:17
quite 36:6 71:18

<table>
<tr><td>R</td></tr>
</table>
raise 6:18 7:6,9
raised 6:16 7:4 10:17
raising 6:10
ran 25:8
range 74:21 92:12,14 102:2
rate 104:23 105:2
rather 22:9 104:19
reaction 12:21
Read 60:1,4
ready 4:10
real 24:19 45:13 92:14
realize 26:10 76:9
really 16:2 23:4 25:16 26:8
  35:4 59:3 75:9 77:19 86:20
  90:23,25
reason 12:17 13:13 19:18
  23:5 37:3 79:13,15,19
  98:18,20
reasonable 11:22 79:11
reasons 26:22
recall 13:7,12 22:1 24:12
  44:9 67:15,16 88:24 92:9
  93:7 94:23 99:8,11
receipts 42:10
receive 18:21 19:3 21:19
  27:12 90:11 91:18 98:3,7,9
  101:10,12,16
received 18:9,19 20:7 25:23
  28:11 30:17 31:25 58:17
  59:22 70:19,21 74:8 90:20
  90:21 101:24 107:3,19,24
  108:3,10,23,25 109:3,6,7
receiving 53:1 91:14 99:11
  103:3,11
recently 34:23
Recess 5:16 32:19 62:6
  80:19 105:22
recognize 40:15,16 44:4,24
  45:1 47:21 52:3,7 53:16
  56:3,6 57:6 58:15 59:19
  60:2 61:14 62:21 64:8
  65:10,12 66:4 68:7 70:18
  102:8,10

8

recognized 57:16
recollection 34:24 35:3,10
 35:11 58:11 66:12 68:16
 91:21 97:1 109:21
reconciliation 29:5
record 21:3 27:21 40:12
 43:20 70:24
RECROSS 3:8
RECROSS-EXAMINATION
 110:5
redirect 3:6,6 39:21 80:21
 106:1
reduce 20:16,23
reduced 112:7
reductions 30:1,2
refer 60:16 90:1
reference 46:6,7 72:17 82:7
 89:23
references 62:18
referred 15:11 48:21 58:8
 82:19 83:15
referring 13:3 47:9 71:24
 84:20,21 100:19
refers 62:16 68:11
reflect 54:3 76:11
reflected 54:7 66:8
reflecting 53:24
refused 33:15
regard 90:4
regarding 6:5 15:20 50:19
 78:9
registrar 2:8 4:11,18 28:18
 31:6 55:21 65:20 67:21
 70:11
regular 69:3
relate 39:15,16
relates 83:2
relating 16:4 84:7 89:2,4
relationship 8:6
relied 104:1
relying 73:21,23
remember 7:19 34:22 40:25
 49:13 58:3,19 64:23 97:8
 99:10 107:22
repeat 42:16 84:5
replace 19:2 71:11,13
replacement 71:5
replacing 71:12
REPORTED 1:23
reporter 16:23 112:16
REPORTER'S 112:1
reports 25:12
represent 39:13 107:17
represented 10:6
reprinted 71:10
reprinting 71:12
request 34:2
requested 104:20
require 20:20 90:3 96:21

required 17:19
reserve 22:12,17 26:23
 95:20 109:15
resolved 23:4,5 27:5
respect 21:20 28:8 59:7
 68:8 76:15 78:11 91:22
 98:4 99:12
respective 59:9
respects 24:10
respond 26:19 81:2
Respondent 1:8
response 10:18,19,20 11:14
 25:10
responsibility 16:2 17:2,4,9
 85:8
resume 22:14
resumption 23:16
retail 9:8,9 78:7
retired 4:22
return 41:12
returned 97:25
returning 23:24
review 86:10
right 18:4 24:14 29:19 30:12
 30:15 45:22 47:7 51:2,25
 52:22 59:3 63:9 64:7 65:25
 68:4 82:25 94:16 95:22
 96:8 99:15 102:16 106:12
 106:24 107:2,5,8 108:1,5,9
 108:22 111:6
Rights 52:23
ROBINS 2:10
role 73:7
room 13:4
Rosoff 73:9 101:15
roughly 12:25 101:18,20
round 10:7 31:15 111:5
RPR 1:24 2:4 112:3
rule 26:3 27:25
rules 24:10,13,19 25:25 26:8
ruling 23:21 24:9
running 14:19
Ruskin 12:13
Russell 62:18 82:21
R-u-s-s-e-l-l 62:18
R10 3:19 74:3,4,12
R5 3:14 55:9,13,14,19 82:15
R6 3:15 56:20,23,24
R7 3:16 65:3,14,16 82:14,16
 82:18 83:16
R8 3:17 67:19,20,22 82:2,6
R9 3:18 70:7,9,12 82:17 83:9

————————————
     S
————————————
S 3:11
Sachman 44:20
sale 14:23 46:24 51:6 75:1
 85:13 90:12,21 94:9
sales 14:17,18,19 17:5,16

29:12,24 30:1 32:23 43:6
 73:17 78:5 90:5 91:25 94:3
 94:4,6 96:2,6,7 99:25
 100:15,22,25 102:14,18
 105:3,9 106:11 107:11,24
 108:4,17 110:13,15,24
 111:11
same 30:25 64:18 75:4,5
 88:8 101:18,20 108:3
 112:8
sample 73:9
satisfactory 90:19
savings 41:12
saw 9:20,21 39:8 90:16
saying 24:25 39:8 98:23
 100:8
says 30:5,14,19 45:16 56:11
 72:3 82:25 94:3 100:15
scan 47:16
schedule 44:13,15 45:18
scope 93:11
sculpture 75:11
seated 4:6
second 5:14 28:24 37:3 46:6
 48:12 53:12 63:1 86:10
 93:18 110:21
secondly 26:3
second-to 46:6
second-year 93:18
secretarial 11:8
see 7:4 18:22 28:9 31:20
 44:2 52:19 53:14 54:1 63:2
 63:24 64:3 66:2,9 81:7
 89:12,15 95:22 100:10
 109:4,9
seeking 6:18
seems 23:13 94:14,17
seen 15:11 21:2 22:16 29:2
 40:23 44:7 65:5 90:15,16
select 60:21
sell 9:22,25 11:7,10 20:12
 31:13 36:9,12,14 45:10
 74:20 75:8 77:21
selling 8:8 15:4 31:21 32:21
 46:2 54:16 60:20 75:10,11
 78:4 98:23
sells 45:19,20
semantics 79:1,2
send 17:23 19:2,10 29:6
 60:11 69:4 72:15 81:6
sending 56:10,15
sense 23:19 26:23 77:19
sent 30:8 52:16,20 73:8 81:4
 81:12
separate 10:5 95:21
September 24:13 25:23 35:7
 36:22
series 96:17
serving 26:1

set 17:17,20 44:13 45:17
 62:21 81:18 105:2
setting 4:5 32:23
settled 19:11
seven 73:16
several 57:19
shape 18:23
share 92:4 108:14,20 109:11
 109:14
shared 29:9 84:21,25 85:1,4
 85:5 86:4,16,19 87:4,10,12
 92:5 94:10,20 97:2 102:20
 102:21
shareholder 34:4
sheets 28:22 96:2 101:25
 103:9
ship 18:14 20:8 55:2
shipment 53:10 54:17 56:10
 56:15 63:4,22
shipments 18:21
shipped 18:12,15 53:3,7,19
 55:1 62:22 64:16 67:2,6,7
 69:25 82:12
shipping 14:4 18:11 52:20
 53:23 57:17 62:9,22 63:18
 82:4,18 83:6 85:22 86:8,9
 86:20 87:8,24 88:1 91:5
short 32:16
shorthand 112:6,15
show 6:25 21:23 28:8 81:9
 82:1,14 93:16 97:5
showing 28:21 38:13 39:1,4
shown 96:6 102:18 103:20
shows 30:9,13,13 39:2
 91:25 93:17,19 110:13
side 52:1,1,23 62:16 65:25
 68:5 107:14 110:16
sign 15:3,8,16
signature 44:22,24 45:1
signed 15:7 60:13 69:11
 90:12
significant 17:13 93:10,12
 93:14 94:9 97:5
silver 15:12,13 34:7 36:24
 38:2,22 40:21 42:13,18
 62:16 64:22 68:6 70:6 87:3
 92:13 98:18 99:7 102:5
similar 25:7 63:10 75:24
similarly 58:7 93:24
simply 39:7 78:23 79:13
 90:20 97:18
Since 45:11
sir 31:3 36:8 37:9 38:19 41:3
 44:2,17 46:20 51:23 52:3
 55:24 56:3 57:13 58:11
 59:16,19 60:16,19 62:20
 63:14 65:15 66:2 67:1 68:2
 68:25 69:11 70:14,17 72:7
 72:20 74:16 76:8 77:2

9

GRADILLAS COURT REPORTERS
(310) 859-6677

32945626333337333

78:16,20 110:9,18
sit 105:8
situation 25:7 69:18
slipped 97:7
Sloan 3:4 4:10,14,20,25 5:5
5:6,13,20 21:23 22:22
25:13 27:1,11 28:21 31:12
32:21 33:14 34:15 35:15
38:1 40:14 42:12 43:23
44:22 45:20 47:15 56:4
59:18 62:8,14 63:2 64:25
65:4,10,22 68:6 70:9,16,24
74:2 80:14,23 82:1,3,14
84:2 105:14 106:3,8 109:6
110:7 111:19,22
Sloan's 23:24 39:14
small 87:21 91:11
social 7:24,25 8:2
software 6:20 36:15
sold 9:16 10:14 11:19 12:10
12:25 13:1,8,9 16:8 17:14
17:18,22 18:6 21:17 29:11
44:18 45:24 46:13 47:24
47:24 48:2,9,15,19 50:5
61:4,9 69:14 70:2 74:17
75:25 77:9,11 84:11
105:10 106:14
sole 34:4
solicit 6:5
some 7:4 8:6,14 9:16,17
20:18 21:3,6,23 25:14 30:2
32:13 35:12 36:5 43:11
46:2,20 48:18 49:5,20
58:20 59:9,9 61:18 62:9
65:6 72:12 73:12,24 74:17
75:21 76:14 79:18 84:20
84:21 85:2,8,22,22 86:8,19
86:23,24 87:8,12,13,15
88:14 91:10,10 94:6 98:9
101:12 102:11 110:12
somebody 92:16 95:6
someone 37:9 77:12 92:20
something 16:9 21:19 39:8
47:23 48:9,15 59:21 61:10
63:17 73:1 92:19 97:12
sometime 91:12 95:6
sometimes 50:10 73:16
87:15 91:9 94:5 100:6
somewhat 25:24
somewhere 8:11,12 12:14
49:9 50:14
son 61:21
sorry 57:15 69:6 82:16 87:1
88:16 93:18 100:1,18
sort 50:3 89:16 105:10
sounds 94:6 107:12 109:22
source 42:20 43:1 61:18
73:16,21
sources 54:13 73:17,17

speak 33:15 34:2 35:2 92:18
specific 11:2 19:8 21:12
25:14 45:23 51:15 59:7
specifically 51:5
spell 16:21,23 47:19
spend 11:25 79:10
spent 97:25 98:6
split 76:6 78:24 79:14
spoke 35:8 57:21
spot 73:18
spots 33:9
stand 5:1,5,10 60:12
stands 24:14
started 8:25 11:16
starts 44:11 45:19
state 4:18 26:3 37:16 39:14
40:19 112:4,16
stated 85:17
statement 29:20 39:12 69:4
106:9 108:16
statements 21:25 28:22
29:7,8 30:24 103:21 106:4
States 15:23
steps 25:19
still 7:6 10:10 71:16 74:7
stop 5:14
stops 40:3
stored 46:9,11
strange 87:13
Street 2:11,16
stretch 5:2
strike 36:8 80:10,12
structure 11:17 12:20 14:15
79:8,23 80:6
structured 9:18 15:19
subject 26:12 28:13 40:8
79:18 104:23
submissions 23:7
subsequent 16:20 30:25
93:25 98:3
subsequently 16:19 26:15
substantial 14:20 101:8
111:11
substantially 49:14 91:15
substitutions 61:11
subtract 109:9,11
sub1 26:3
successful 24:6
Sue 60:13
sued 95:7
sufficiently 55:13 56:18
64:25
suggest 38:10 78:20 107:14
suggested 39:8
suggesting 22:8 38:13
39:16 51:8
Suite 2:3,12,16,20
summer 35:6
supply 59:11

support 96:22
suppose 25:17
supposed 19:20 97:24
sure 29:12 30:4 57:18 62:13
65:7 66:14 75:19 100:9
107:20 110:19,22
Susan 59:25 60:4
sweeping 39:12
switch 33:9
sworn 4:12,15
system 17:17,20,21
S-a-c-h-m-a-n 44:20
S-u-e 60:13

**T**

T 3:11
tab 43:12,21,24 44:7,22
46:23 47:14
take 18:11 22:9 23:20 26:24
30:25 34:15 35:12 36:18
37:17,19 42:8 46:7,22 62:4
62:10,20 65:24 70:16
98:24 109:18
taken 2:1 5:16 32:12,19
35:12 62:6 80:19 94:25
105:22 112:5
taking 19:10 94:15 110:11
talk 45:6 92:20
talking 11:16 51:12 82:3
tally 21:16 27:13
TAUB 2:10
tax 1:2 9:17 41:12 80:11
taxes 29:25 30:1 86:13
89:24,25
tea 10:21
tell 10:23 29:7 51:14 57:12
74:11 80:9 83:14 99:4
ten 12:7,22 13:21 58:7 62:4
75:21 105:21
tender 24:18
tendered 56:20 65:1,3 67:19
70:7
tenders 74:1
tenth 47:17
term 50:16,23,24
terms 97:23
terrible 47:18
testified 4:16
testify 4:10
testimony 5:11 21:15 22:1
thank 4:23,25 5:12 9:7 23:2
27:10 28:20 32:18 33:6,10
43:17 55:17,22 57:1 65:14
65:19 67:24 74:14 80:14
80:16 82:13 83:24 84:1
105:14 110:2 111:18,18,20
their 10:18,19,21 13:24 14:8
16:2,14 17:10 19:15 27:24
29:23 31:21,22 32:4,12

41:7 84:18 85:14 86:19
99:24 100:1 104:17,18
thing 91:2 105:10
things 49:19 65:6 87:22
93:11
think 4:7 7:20 8:11 9:20
13:14 17:1 22:21 23:19
24:1,5 26:12,13,22 27:2,3
27:6 30:5 36:15 38:4,14
39:6 40:3 54:8 58:2,2,3
65:12 73:23 74:5,21 77:23
78:2 81:6 85:7,24 86:5,13
88:14,19,25 89:14 90:1,23
93:15 94:4,7,12 95:25
97:13 99:20,21 100:21,22
101:1 102:10 109:23
111:11,16
third 25:17 28:25 57:20
63:13,25 71:15 95:18
109:19
thirds 95:19
though 76:21 77:2 103:16
thought 31:21,24 57:16,17
73:1 77:6,11 79:9 97:13,19
98:23 99:1 109:23
thousand 10:8 12:14,23
53:24 54:4,4 76:10,22 78:3
thousand-plus 13:1
three 28:22 31:9,12 48:21
57:23 91:12 101:25 106:4
three-year 98:1,2
through 7:21 25:19 31:14
45:24 51:6 61:24 62:1
63:19 67:14 68:9 78:12
110:12,12
throughout 93:2,4
thrown 61:12
time 6:6,14,18 7:2,7,11 10:3
10:9,22 11:3,12,23 12:15
19:4,4 20:6 22:10 23:6
39:15,17 44:6 51:8 60:6,7
60:8 68:3 69:14 70:2 92:21
101:18,20 103:10,13
107:20 111:24 112:6
times 5:3 22:16 82:3 95:20
title 15:21,22 45:22
titles 59:7,9,12 60:23 67:1
68:16,19 75:13,14
today 23:4,6,10 26:11 71:5
90:16 97:1 111:14
told 8:15,16 9:10,20 11:14
29:8 35:15 36:4 50:4 55:2
57:16 74:16,22 98:6
107:21
top 63:12 68:4
topic 10:17
Toronto 2:12,17 5:25 8:5
22:14 23:16,18
total 83:6 92:6 106:16 107:9

10

GRADILLAS COURT REPORTERS
(310) 859-6677

107:23 108:13
totaling 93:21 108:4
totally 88:19
totals 97:5
track 16:8 17:17 103:25
  104:2,3
transacted 47:24 51:3 52:9
  61:19 64:9,21 68:9 75:25
  78:16
transacting 54:22
transaction 7:9 48:10,16
transactions 61:25 67:14
transcript 1:12 2:1 112:8
transferred 15:21,23
transfers 45:21
transit 46:10
transpired 34:25
trial 22:14 23:17 24:13 25:23
  105:11
true 76:11 104:3,9 112:8
trust 20:2 95:20 98:5,15
try 40:1,9
trying 87:10
turn 16:11 43:12,24 47:14
  63:11 83:2,9 108:2
turned 14:5
Turner 25:8 88:21
two 5:23 16:17 22:3,4 25:16
  25:20 26:8 30:24 51:24
  82:23 95:19 96:11
two-year 7:13
type 12:10,20 14:19 25:11
  25:12 54:15 85:20 95:24
  97:11
typewriting 112:7
Typically 18:12

___ U ___

uh-huh 57:22 92:2 101:6
  102:1 109:5 110:10
ultimate 26:23
ultimately 26:16 27:3
unable 71:6
unaware 42:11
under 6:2 14:16 17:14 38:25
  44:22 45:9 100:25 112:7
understand 5:4,20 17:13
  19:13 23:12 33:21 36:25
  40:17 47:9,15 52:25 53:18
  56:8 60:4 63:25 64:15
  72:17,23 73:20 76:8,12
  77:20
understanding 6:13 18:17
  41:3,6,11,15 45:8,13,23
  50:23,24 54:6 57:8,13
  59:11 60:15 61:22 68:23
  71:7,23
understood 35:16,19,25
  41:18,22,25 42:4,23 60:19

84:4
underway 16:7 17:5,17
unique 13:17
unit 53:24 54:4 58:1 68:20
  95:14,15
United 15:23
units 17:22 60:11 69:20
  92:18,18 106:13
unless 18:25
unpack 18:21
until 19:11 20:4 23:17 33:14
  55:1 58:21 69:25 110:15
unusual 13:17
upper 62:15
use 38:4 43:16 54:22 71:20
  80:18 111:5
used 16:12,13 52:20
using 7:16 36:9
usual 25:19
U.S 12:16

___ V ___

valuations 78:4
value 12:10,18,19,23 42:9
  64:6 66:22 73:10 76:12,22
  78:8
values 72:21
variety 29:25
various 9:17 16:5 18:1 29:8
  29:21 58:25 60:23 65:6
  70:4 82:5
vendor 44:12 45:16,19,20
  46:9 52:2
venture 6:17 7:14 43:4
  104:6
Verte 47:17 58:8
very 5:12 7:23,24 8:2,15
  25:14 27:21 28:17 30:23
  31:18,21,22,24 33:6 38:16
  40:13 41:1 65:13 73:5
  79:11 99:23 100:2 111:18
view 23:5 24:17 25:13,14
  76:8,10 98:17
virtue 17:22 29:16
volume 11:24 17:13 43:20
  43:24
V-e-r-t-e 47:20

___ W ___

waiting 23:17
wall 13:1,4,18
want 16:21 71:21
wanted 12:20 13:19 20:15
  20:23 41:10 73:11 75:3
  79:5,6,7,8,23 80:6 92:17
  104:13
wants 38:4
warehouse 11:8 18:20
wasn't 10:21 18:22 19:8,17

19:24 33:3 38:14 45:11
  50:8 69:5 75:9 90:25 92:14
  93:14 98:22 103:9
Watering 64:3 66:21
way 11:17 22:9,15,21 23:10
  26:14 32:24 33:2 51:14
  53:5 59:2 60:19 79:3 80:6
  87:13 95:19 104:10
ways 22:3
Wednesday 1:13 2:2 4:2
well 6:15 8:1,4,24 9:16,24
  11:23 12:19,24 15:17,22
  16:17 17:20 18:8,20 19:8
  20:1 27:21 28:17 29:5,16
  30:21 32:13 33:17 35:16
  36:12 38:16,24 40:5,13,19
  41:1 46:16 49:22 51:16
  52:6 56:9 61:4 65:13 69:8
  71:25 73:8 75:2,14 78:16
  79:1 80:11 84:19 86:1
  89:12 90:21,25 91:9 92:14
  94:14 97:12 98:20 102:12
  103:18 104:21 111:4
went 6:4 7:4 8:4 32:3,4
  94:23 97:14 98:12,15
  100:5 107:21
were 6:2,6,18 7:5,16,25 8:13
  8:15 9:8,9,16,17,18 10:9
  10:25 11:25 12:9 13:16,22
  14:5,7,22 16:3,10 17:6,18
  17:22,25 18:5 19:22 20:8
  21:12,13 23:22 24:14
  25:12 26:1 30:7 31:20,22
  31:22,25 32:2,7,21 34:4,9
  34:12,19 35:22 36:8 41:5,6
  43:6 44:17 45:24 46:11,13
  46:14,18,19,21 49:4,18
  50:4 51:3,3,4,5,7,17 52:11
  52:15,16 54:16,25 57:12
  57:25 58:23 60:25 61:1,1
  61:11,12,19 62:22 63:7
  64:9,16 66:17 67:2,13 68:9
  68:23 69:14,25 71:5,6,9,10
  71:19 72:1,5,7,20 74:22
  75:2,10,14,22 76:16,17
  77:3,4,6,16 78:11,12 79:9
  79:10 80:24 82:23 83:6,15
  83:16,17,19,20 84:9,9,13
  84:17,20,21,24 85:1,2,2,3
  85:4,5,8,8,10,11,17 86:3,7
  86:13,15,16,23 87:3,6,6,10
  87:12,13,14,15,23,24 88:2
  88:9,14,23,25 89:9,13,17
  89:21,22,24 90:5,8 91:4,14
  94:20 95:14 96:1,12,13,16
  96:22 97:2 98:21,23 99:23
  100:1,2,12,23,24 101:4,7
  102:4,4,11 103:1,11,12,23
  103:24 104:6 106:13,20

107:10 108:4,17,24 109:10
  109:13,18 111:15 112:5
weren't 8:17 20:18 25:21
  42:8 61:3 67:10 73:11
  91:23,24 93:10,12 94:24
West 2:11,16
We'll 31:2,4
we're 4:9 23:6 24:21 25:7
  46:23
we've 15:11 21:2
while 5:10 22:22
wholesale 78:7
wife 14:12
willing 11:18,25 77:25
willingness 80:25
Wilshire 2:20
wire 30:7 89:15 101:5
wired 32:7
wires 30:8
wiring 85:1,18 86:8 89:17
wish 40:9
wishes 22:12
withheld 95:20 109:15
witness 2:18 3:3 4:12,20
  23:15 24:2 27:8,16 28:9
  38:3,5,13 39:3,6,20 40:4
  55:6,12 56:17 65:12,19
  74:5 84:8,15,19,24 85:7,11
  85:16,22 86:1,5,10,13,16
  86:18 87:1,12,19,21,25
  88:3,6,11,14,18,21,25 89:4
  89:7,11,15,19,22 90:1,6,10
  90:14,16,25 91:6,9,16,20
  91:24 92:2,5,8,11,14,22,25
  93:3,6,10,14,23 94:3,12,18
  94:22 95:2,6,10,13,16,22
  96:4,8,15,19,24 97:7,12,20
  97:24 98:6,9,12,20 99:3,10
  99:13,16,20,23 100:2,4,9
  100:13,17,20 101:1,6,9,12
  101:14,18,22 102:1,6,10
  102:16,20,22 103:5,8,13
  103:22 104:3,8,14,17,21
  104:25 105:4,11 111:20
  112:12
witnesses 28:7
witness's 55:18
wonder 4:4 37:20 105:19
Woodland 4:21
word 54:22 90:7
work 7:11 11:19,20 33:2
  42:24 49:20 105:8
worked 7:13 41:5 49:21 53:5
working 72:12,20,24
works 85:14
worth 10:4 33:3 77:3,6,12
  77:21 78:2,3,17
wouldn't 12:2 18:25 77:21
  111:6

Proceedings  11/29/2006

write 71:3
writes 71:15 72:11
writing 19:16,17,19 21:19
  56:13 71:1 78:14 100:7

___
**X**
___
x 3:11 61:8

___
**Y**
___
Yeah 10:14 11:4 30:22 42:22
  50:12 59:6,13 63:15 65:12
  66:16 83:22 86:18 91:6
  99:23 101:9,22 102:1
  109:22
year 7:3,5 9:4 16:18 17:16
  18:10,12 19:12,24 20:4,7
  20:17 21:15 27:12 28:23
  28:24,25 32:11,13 34:24
  46:22 47:1,6,8,10,12 49:1
  49:4 53:4,4,7,10 54:24
  58:21 64:21,22 67:2 68:24
  69:13,19,22,23,24 74:20
  91:3,13,23 92:16 93:13,25
  97:4,17 99:19 102:14
  108:2,2,23 109:19 110:13
  110:21 111:7,11,15
years 16:20 17:15 30:25
  31:12 36:6 74:17 75:14,20
  75:21 93:2 96:10,11
  109:24
year-end 21:25 29:5 97:5
Yeomans 16:19 17:1 18:24
  72:18,21,22,24 73:4,7,9,20
  101:15
York 9:1
Y-e-o-m-a-n-s 17:1

___
**$**
___
$1,849,953 110:17
$1.5 93:21,22
$1.8 94:2 96:11
$10,000 77:12,22
$108,650 97:17
$11,000 76:25 77:3
$121,000 100:20
$121,861 99:7
$125,000 82:11
$128 30:21
$2,095,963 30:10
$2,096,000 107:4
$2,163,000 102:15 106:25
$2,200 72:14
$20 49:9,14 57:23 58:4,12
  78:17
$200,000 69:8 101:2 102:25
$24,000 82:12
$3,084,001 110:22
$3,500 12:7,22 20:12 76:6
  77:6,12 78:2,23

$3,825,000 108:8
$325,000 92:1 102:19
$4,326,000 102:14 106:16
  106:23 110:16
$40 50:1 66:17 68:20
$430,000 109:20
$5 10:4
$5,435,259 111:9
$50 9:3 95:14,15
$500 77:22
$537,000 109:14
$6,300 64:6 66:22
$60 50:9 57:24
$650,000 92:7
$68,000 107:6,11,25
$7,500 74:7
$7,651,000 108:4
$80 50:2
$98,000 108:14

___
**0**
___
01 67:4 68:23 82:19
02 82:20
061129JCU 1:25

___
**1**
___
1 25:23 43:20,24 45:18,19
  45:20 46:5 71:17 82:19
  102:14
1K6 2:17
1T1 2:12
1,800 72:13
1,849,953 102:18
1.5 96:11
1:18 111:24
10 13:9 49:9 61:6 92:19
10223 1:24 2:4 112:3
106 3:7
108,000 109:16
11 9:1 12:7 13:10 15:3 20:13
  41:8 48:12 61:5 71:5 76:25
  81:10
11,000 77:7
110 3:9
12,135,000 108:17
120 2:11
130 2:16
14 70:15 74:2
15 37:17
150 101:2
150,000 69:9
17 59:18
185 2:3
19 60:11
1980s 51:17 75:22
1990s 51:19
1997 51:21
1998 10:9 35:1 44:1 46:2,24
  47:1,9 53:6,10 54:23,25

55:4 74:18 78:12 110:15
1999 28:23 35:1 47:1 52:1
  53:4,7,9 54:20 55:25 56:13
  57:4 59:18 106:10 110:9
  110:13,14

___
**2**
___
2 43:12,21,24 44:7 46:23
  71:18 93:16 108:6,19
2,000 78:3
2,096,000 107:19
2,163,000 106:23
2:15 25:22
20 48:5
200,000 74:6 102:2
2000 28:25 31:13 35:1 37:1
  64:21 67:2,3 68:24 69:13
  83:19 97:18 108:3 110:21
2001 29:1 35:2 65:24 67:1
  67:18 68:5 69:1 70:6,16
  74:2 78:12 83:10 98:4
  108:16 111:8
2003-1855(GST)G 1:6
2005 37:17
2006 1:13 2:2 4:2 81:10
  112:13
207,000 74:6
23 95:20
23rd 71:18
24 65:23 67:17
26 68:5 70:6 83:10
2600 2:12
29 1:13 2:2 4:2 44:1 46:1,24

___
**3**
___
3 63:11 93:17,24 99:5
  100:19
3,000 13:2
3,500 13:10
3,727,000 108:10
3,738 66:8
31 3:13 28:23,24 29:1 82:20
  97:17 98:4 106:10 110:8
  110:14,15 111:8
33 3:4
3400 2:16
345 2:2
36 2:16

___
**4**
___
4 52:1 53:4,9 54:20 55:25
  56:13 57:4 111:5
40 49:15 50:15

___
**5**
___
5 3:4 47:14 108:24
5,000 68:11,15 83:13
5,530,000 108:24
5,532,000 109:3

50 9:6,7 11:18,22 12:3 19:4
  19:10 29:23 32:9 77:5,13
  79:18 84:10,14 85:15
  92:18 95:21 102:14 103:3
  105:2,4 106:19,23 107:10
  107:24 108:7,14,20 109:11
  109:12,14 111:4
50,000 31:15 50:5 69:10
50/50 76:6 78:24 79:14
500 78:4
55 3:14
56 3:15

___
**6**
___
6 61:7
6,067,000 108:20
60 49:17 50:15
6041 4:21
65 3:16
650 12:16
67 3:17

___
**7**
___
70 3:18
74 3:19
752,000 93:19
775 83:6

___
**8**
___
80 3:7 50:11
805 2:20
81 3:20

___
**9**
___
9:35 2:1 4:2
90s 6:1
90212 2:21
914,000-some 94:1
95 10:15 74:21
96 74:21
97 8:12
9777 2:20
98 8:12,12 26:3 31:13 36:22
  91:16
99 31:13 54:23 110:15

M

**THIS IS EXHIBIT "M"**
**referred to in the affidavit of**
**Laura Alescio**
This 30th day of September, 2011

**Commissioner for Taking Affidavits**

*Artistic Ideas Inc. v. H.M.Q.*
Court File No. 2003-1855(GST)G

# Exhibits

## Paul Sloan's Evidence

A2

Coleman - Year End Jan 31, 1999

| | | |
|---|---|---|
| Gross Sales | 1236 x 3,500.00 | 4,326,000.00 |
| | | |
| Less Paid to Affiliate | 1,849,963.00 | |
| Less Sales Discount/Adjustments | 305,981.00 | |
| Less taxes | 25,647.00 | |
| Less Sales Price reductions as discussed on certain investors | 25,451.00 | |
| Less Lawyer | 2,738.00 | |
| Less Brokerage | 197.00 | |
| Less Wire Charges | 70.00 | |
| | 2,230,037.00 | |
| | | |
| Net Income | | 2,095,963.00 |
| | | |
| Less Payments | 2,096,091.00 | |
| | | |
| Net payable | | -128.00 |

Coleman - Year End Jan 31, 2000

| | | |
|---|---|---|
| Gross Sales | | |
| | 2185 @ 3,500.00 | 7,651,000.00 |
| Less Fee to Artists | | |
| Less Sales Discount/Adjustments | 3,084,601.00 | |
| Less sales taxes (50%) | 752,821.00 | |
| Less one-half early discount | 45,360.00 | |
| Less Lawyer | 16,000.00 | |
| Less Brokerage | 15,033.00 | |
| Less interest in C.O.S. | 5,700.00 | |
| | 5,000.00 | |
| | 3,923,915.00 | |
| Net Income | | 3,727,085.00 |
| Less Payments | 3,727,000.00 | |
| Net payable | | 85.00 |

| Colnman/Silver - Year End Jan 31, 2001 | | |
|---|---|---|
| Gross Sales | 1164 @ 3,500.00 | 4,074,000.00 |
| | 607 @ 3,600.00 | 2,185,200.00 |
| | 1567 @ 3,750.00 | 5,876,250.00 |
| | | 12,135,450.00 |
| Less Fee to Artelic | | |
| Less Sales Discount/Adjustments | 5,435,299.00 | |
| Less Out of Pocket Expenses | 914,137.00 | |
| Less tax on February sales | 121,861.00 | |
| Less early discounts February (50%) | 24,153.00 | |
| | 1,225.00 | |
| Net Income | | 5,638,815.00 |
| Amount withheld in Trust for legal reserve | (2173 x 50.00) | 108,650.00 |
| Net payable | | 5,530,165.00 |
| Less Payments | 5,532,961.00 | -2,796.00 |

R5

02/26/1999 17:50   410670 ***

| ◆ Revenue Canada Customs and Excise | CANADA CUSTOMS INVOICE | PAGE | OF |
|---|---|---|---|

1. Vendor (Name and Address)

Coleman Fine Art Ltd.
6041 Fenwood Avenue
Woodland Hills, CA  91367

3. Date of Direct Shipment to Canada

March 4, 1999

4. Other References (Include Purchaser's Order No.)

2. Consignee (Name and Address)

Artistic Ideas Inc.
Attn:  Sharon Helferty
595 Bay Street, Suite 300
Toronto, ON  M5G 2C2

Tel: 416-598-2868 ext. 328

5. Purchaser's Name and Address (if other than Consignee)

League for Human Rights, B'nai Brith Foundation
c/o Red Cap Express Attn:  Jim Strathdee
110 Milner Avenue, Units 4 & 5
Scarborough, Toronto, ON  Tel: 299-4747

6. Country of Transhipment

U.S.A.

7. Country of Origin of Goods

U.S.A.

8. Transportation: Give Mode and Place of Direct Shipment to Canada

8. Conditions of Sale and Terms of Payment
(i.e. Sale, Consignment Shipment, Leased Goods etc.)

Donation

10. Currency of Settlement

Canadian Dollars

| 11. No. of Pkgs | 12. Specification of Commodities (Kind of Packages, Marks and Numbers, General Description and Characteristics i.e. Grade, Quality) | 13. Quantity (State Unit) | 14. Unit Price | Selling Price |
|---|---|---|---|---|
| | Cartons | | | |
| | Consult Waybills for Numbers and Contents | | Value for Canadian Customs Purposes ONly | |
| | Artwork — See Invoices | | Canadian $1,799,000.00 | |
| | Tax Exempt — Excise Tax Act Sch. 7, Part 10, Para. 4 | | FOR CHARITY | |

| 18. If any of fields 1 to 17 are not used as per attached commercial invoice, check this box. | | | | X | 16. | Total Weight | | Invoice Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Net | | |
| | | | | | | Gross | | |

17. Exporter's Name and Address (if other than Vendor)

Same as above

18. Originator (Name and Address)

Same as above

21. Departmental Ruling (if applicable)

22. If fields 23 to 25 are not applicable, check this box.

| 23. If included in field 17 indicate amount: | 24. If not included in field 17 indicate amounts: | 25. Check if applicable: |
|---|---|---|
| (i) Transportation charges, expenses and insurances from the place of direct shipment to Canada $ | (iv) Transportation charges, expenses and insurance to the place of direct shipment to Canada $ | (ix) Royalty payments or subsequent proceeds are paid or payable by the purchaser ☐ |
| (ii) Costs for construction, erection and assembly incurred after importation into Canada $ | (v) Amounts for commissions other than buying commissions $ | (x) The purchaser has supplied goods or services for use in the production of these goods ☐ |
| (iii) Export packing $ | (vi) Export packing $ | |

▲ RUSSELL A. PARROW LIMITED

CORPORATE: 347 HURON CHURCH RD. WINDSOR, ONTARIO
P.O. BOX 368, WINDSOR, ONTARIO, N9A 6L9
PHONE (519) 252-4615  FAX (519) 258-0256

VANCOUVER • EDMONTON • CALGARY • WINNIPEG • TORONTO • MONTREAL

31010013 - 03/98

# MMI



International Headquarters

Museum Masters International, Ltd.

26 East 64th Street, New York, NY 10021, U.S.A. Tel. 212.759.0777 Fax 212.753.0179

## COMMERCIAL INVOICE

4-Mar-99

League for Human Rights/B'nai Brith Foundation
c/o Red Cap Express
Attn: Jim Strathdee
110 Milner Avenue, Units 4 & 5
Scarborough, Toronto, ON

| Qty. | Description | Unit Price | Extension |
|------|-------------|-----------|-----------|
| 142 | 35-2 Nature morte a la guitare | $1,000.00 | $142,000.00 |
| 152 | 18-C Minotaur et femme | $1,000.00 | $152,000.00 |
| 138 | 32-1 Femme a la guitare | $1,000.00 | $138,000.00 |
| 158 | 27-2 Le peintre et son modele | $1,000.00 | $158,000.00 |
| 167 | 18-D Une poupe decoupee | $1,000.00 | $167,000.00 |
| 206 | 7-D Cavalier en armure | $1,000.00 | $206,000.00 |
| 36 | 10-A Nature morte a la fenetre | $1,000.00 | $36,000.00 |
| 198 | 24-7 Tete | $1,000.00 | $198,000.00 |
| 76 | 36-9 Guitare, verre et bouteille | $1,000.00 | $76,000.00 |
| 58 | J-129 Femme dans L'atelier | $1,000.00 | $58,000.00 |
| 190 | J-133 Nue allonge et tete d'homme de profil | $1,000.00 | $190,000.00 |
| 278 | J-268 Nature morte a la palette et a la tete de taureau | $1,000.00 | $278,000.00 |
| 1,799 | Total | | $1,799,000.00 |

Lynn Miller, Director of Administration

R6

# MMI

**Museum Masters International, Ltd.**
26 East 64th Street, New York, NY 10021
Tel: 212/759-0777 • Fax: 212/753-0179
e-mail: MMILynnM@aol.com

TO:      SHARON HELFERTY
         ARTISTIC IDEAS INC.

FROM:    LYNN MILLER

DATE:    MARCH 4, 1999

Dear Sharon:

Please find attached all of the paperwork for the shipment going out today. It has been reviewed and approved by Lorne Bly.

The shipment is going via Trans Border Air Cargo, on a truck that leaves New York tonight at 8:00 and arrives in Toronto tomorrow morning at 10:00 a.m.

Please call me if you have any questions.

Best regards,

Lynn Miller
Director of Administration

Cc: Paul Sloan

R7

Silver Fine Arts
c/o Glen Alpert Associates
8899 Beverly Blvd. Ste 918
Los Angeles, California 90048

Aladdin Childrens Charity
C/O Artistic Ideas Inc
595 Bay Street, Ste 300
Toronto, ON. M5G 2C2
Attn: Janine  416-598-2868 x268

ALADDIN CHILDRENS CHARITY
2017B Danforth Avenue
Toronto, ON.  M4C 1J7
B.N. 891113292

Country of Transhipment
U.S.A.

Country of Origin of Goods
U.S.A

CALIFORNIA

DONATION

For customs clearance by Russell A. Farrow Limited

CARTONS
Consult waybills for numbers
And contents
SEE INVOICES

VALUE FOR CDN
CUSTOMS ONLY

ARTWORK

TAX EXEMPT – EXCISE TAX ACT
SCHEDULE – 7, PART – 10,
PARAGRAPH – 4

FOR CHARITY

19. Exporter's Name and Address (if other than Vendor)

SAME AS ABOVE

20.

SAME AS ABOVE

RUSSELL A. FARROW LIMITED

CORPORATE: 747 HURON CHURCH RD. WINDSOR, ONTARIO
P.O. BOX 333, WINDSOR, ONTARIO N9A 6L6
PHONE (519) 252-4415   FAX (519) 252-0339



## RUSSELL A. FARROW LIMITED

A FARROW COMPANY   CUSTOMS · LOGISTICS · SYSTEMS SOLUTIONS · GLOBAL SERVICE

PROTECTED WHEN COMPLETED

CORPORATE OFFICE: 737-747 Huron Church Road, P.O. Box 333, Windsor, Ontario N9A 6L6  Telephone: (519) 252-4415 Fax: (519) 252-0882

### North American Free Trade Agreement
### CERTIFICATE OF ORIGIN

Please Print or Type                                    (Instructions on Reverse)

| 1. EXPORTER'S NAME AND ADDRESS | 2. BLANKET PERIOD |
|---|---|

**1. EXPORTER'S NAME AND ADDRESS**

Silver Fine Arts
c/o Glen Alpert Associates
8899 Beverly Blvd Ste. 918
Los Angeles, California 90048

ERI/Tax Identification Number: 95-481-5723

**2. BLANKET PERIOD**

FROM | DD 01 | MM 01 | YY 01 | TO | DD 31 | MM 12 | YY 02

**3. PRODUCER'S NAME AND ADDRESS**

AVAILABLE UPON REQUEST

ERI/Tax Identification Number:

**4. IMPORTER'S NAME AND ADDRESS**

ALADDIN CHILDRENS CHARITY
2017B Danforth Avenue
Toronto, ON., M4C 1J7
B.N. 891113292

| 5. DESCRIPTION OF GOOD(S) | 6. H.S. TARIFF CLASSIFICATION NUMBER | 7. PREFERENCE CRITERION | 8. PRODUCER | 9. NET COST | 10. COUNTRY OF ORIGIN |
|---|---|---|---|---|---|
| POSTERS VARIOUS – titled as per Commercial invoices as per date | 4911.91 | C | No | No | U.S. |

TAX EXEMPT – EXCISE TAX ACT
SCHEDULE – 7,  PART – 10,
PARAGRAPH – 4

11. I certify that:

the information on this document is true and accurate and I assume the responsibility for proving such representations.  I understand that I am liable for any false statements or material omissions made on or in connection with document;

I agree to maintain, and present upon request, documentation necessary to support this Certificate, and to inform, in writing, all persons to whom the Certificate was given of any changes that would affect the accuracy or validity of this Certificate;

the goods originated in the territory of one or more of the Parties, and comply with the origin requirements specified for those goods in the North American Free Trade Agreement, and unless specifically exempted in Article 411 or Annex 401, there has been no further production or any other operation outside the territories of the Parties; and,

this Certificate consists of _____ page(s), including all attachments.

| AUTHORIZED SIGNATURE: | COMPANY: SILVER FINE ARTS. |
|---|---|
| NAME: (print or type) PAUL SLOAN | TITLE: CHIEF EXECUTIVE OFFICER |
| DATE: /MM/YY) | | | | | | | | | | TELEPHONE: 818·348·1563 | FAX: 818·883·7770 |

02001 · 01/99

## Gallery(Detailed)  Bragg

## Charity  Aladdin Children's Charity

### 2017B Danforth Ave Toronto ON M4C1J7

| PrintName | Appraised Value In US$: | Qty | Total Value of Prints In US$: |
|---|---|---|---|
| And He Saw that it was good (manbaby) | $1,500.00 | 25 | $37,500.00 |
| And He Saw that it was good(food chain) | $1,500.00 | 21 | $31,500.00 |
| Anesthestia 1848 | $1,500.00 | 34 | $51,000.00 |
| Antique Ambulance | $1,400.00 | 32 | $44,800.00 |
| By Appointment | $1,600.00 | 29 | $46,400.00 |
| Cyrano de Bergerac | $1,200.00 | 37 | $44,400.00 |
| Day Traders | $1,200.00 | 21 | $25,200.00 |
| Divorce Court | $1,200.00 | 21 | $25,200.00 |
| Don Juan | $1,400.00 | 24 | $33,600.00 |
| Don Quixote(on horse) | $1,300.00 | 32 | $41,600.00 |
| Don Quixote(portrait) | $1,200.00 | 28 | $33,600.00 |
| Erik | $1,200.00 | 21 | $25,200.00 |
| In The Beginning there were mistakes | $1,600.00 | 21 | $33,600.00 |
| Justice Department, Retroactive Division | $1,500.00 | 21 | $31,500.00 |
| Marc Chagall | $1,200.00 | 24 | $28,800.00 |
| Open House | $1,300.00 | 23 | $29,900.00 |
| Pandora's Box | $1,600.00 | 26 | $41,600.00 |
| Psychiatrist | $1,500.00 | 29 | $43,500.00 |
| The Defense Rests | $1,400.00 | 23 | $32,200.00 |
| The Fifth Day | $1,400.00 | 35 | $49,000.00 |
| The Jury | $1,400.00 | 28 | $39,200.00 |
| The Klondike Bar and Grill | $1,400.00 | 28 | $39,200.00 |
| The Perfect Couple(golfers) | $1,300.00 | 32 | $41,600.00 |
| The Perfect Couple(music lovers) | $1,200.00 | 30 | $36,000.00 |
| The Sixth Day | $1,400.00 | 34 | $47,600.00 |
| The Trophy | $1,200.00 | 31 | $37,200.00 |
| Untitled(statue of David) | $1,800.00 | 26 | $46,800.00 |
| Viking | $1,200.00 | 39 | $46,800.00 |
| | | 775 | $1,064,500.00 |

THIS INFORMATION IS FURNISHED UNDER THE PROVISIONS OF AN INCOME TAX TREATY WITH A FOREIGN GOVERNMENT. ITS USE AND DISCLOSURE MUST BE STRICTLY LIMITED.

Gallery(Detailed)  BraggCL

## Charity  Aladdin Children's Charity

### 2017B Danforth Ave Toronto ON M4C1J7

| PrintName | Appraised Value In US$: | Qty | Total Value of Prints In US$: |
|---|---|---|---|
| African Watering Hole | $6,300.00 | 39 | $245,700.00 |
| Animal Magnetism | $4,800.00 | 2 | $9,600.00 |
| Athena | $4,000.00 | 7 | $28,000.00 |
| Beauty and the Reef | $4,500.00 | 26 | $117,000.00 |
| City Limits | $4,800.00 | 4 | $19,200.00 |
| Cosmic Dance | $2,800.00 | 15 | $42,000.00 |
| Cultured Cat | $2,600.00 | 36 | $93,600.00 |
| Day Dreamer(Sleeper II) | $2,500.00 | 18 | $45,000.00 |
| Desert Eve | $4,000.00 | 6 | $24,000.00 |
| First Light | $2,800.00 | 29 | $81,200.00 |
| Jungle Story | $4,800.00 | 31 | $148,800.00 |
| Kitten in the Window | $2,500.00 | 3 | $7,500.00 |
| Last Oasis | $4,800.00 | 5 | $24,000.00 |
| Legend of Aurora | $5,600.00 | 22 | $123,200.00 |
| Mare and Colt | $1,000.00 | 13 | $13,000.00 |
| Morning (1st edition) | $2,500.00 | 15 | $37,500.00 |
| Mystical Fantasy | $3,600.00 | 29 | $104,400.00 |
| Night Vision | $4,000.00 | 5 | $20,000.00 |
| Rainbow Reef | $5,800.00 | 34 | $197,200.00 |
| Rescue the Reef | $4,800.00 | 26 | $124,800.00 |
| Sleeper II | $2,500.00 | 25 | $62,500.00 |
| Song of the Sea | $5,000.00 | 16 | $80,000.00 |
| Swan Song | $3,000.00 | 28 | $84,000.00 |
| The Emperor Takes a Leak | $1,500.00 | 28 | $42,000.00 |
| White Stallion | $3,000.00 | 14 | $42,000.00 |
| | | 476 | $1,816,200.00 |

R8

**CHARLES LYNN BRAGG**
Raging Art Unlimited
4147 Moore Street
Los Angeles, CA  90066
(310) 305-8891

# INVOICE

INVOICE 200111
DATE    05/24/01

Shipped to:

Artistic Ideas Inc.
595 Bay Street #300
Toronto, Ontario  M5G 2C2
Canada

Bill to:

Coleman Fine Arts, Limited
6041 Fenwood Avenue
Woodland Hills, CA  91367

| Item No. | Description | Unit Price | Qty. | Amount |
|---|---|---|---|---|
| 1 | Fine Art Prints, Item Nos. 1 - 25 as listed in Schedule A of "Agreement between Charles Lynn Bragg and Silver Fine Arts", dated 09/21/2000, and last updated 05/24/2001 | 40.00 | 3738 | 149,520.00 |
| | TOTAL | | | 149,520.00 |



Amount Paid  $125,000.00
Amount Due   $ 24,520.00

R9

# CHARLES BRAGG
## ASYLUM STUDIO

BILL TO: SILVER FINE ARTS

| QUANTITY | DESCRIPTION | TITLE | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| ORDERED BY: PAUL SLOAN | | CUSTOMER ORDER NO. | TERMS | DATE 7-26-01 |
| SHIP VIA | SHIP MEMO □ PREPAID □ C.O.D. | SPECIAL INSTRUCTIONS | | SHIP DATE |
| 5,000 | GRAPHICS | ASSORTED TITLES | $40 | $200,000 |

| | |
|---|---|
| SUBTOTAL | 200,000 |
| SALES TAX | -0- |
| SHIPPING | -0- |
| TOTAL | 200,000 |

R10

THIS FAX IS FOR PAUL SLOAN;                                                    1
IT'S FROM CHARLES BRAGG;

AUGUST 14, 2001

Dear Paul,
Erwin picked up the last of the replacement pieces today.
There were only eleven pieces which we were unable to do.

The total pieces delivered is 5,200 pieces according to my
records. I may be a few off. (like minus the 11 pieces.)

I still need to know about the four pieces from this group
(CAMILLE, CAMELOT 1 and CAMELOT 2 and JOHN XXIII) that
didn't quite make the appraisal figure. You said they were close
enough to use after we finished printing the original order.
Let me know what you what me to do on these pieces..

I'm working on some large pieces that should get appraisals of
between $1,800 and $2,200. That should get our average up on
the new group.
I will send them to Edy towards the end of this August.

Of course I'll check with you on the timing.

All my very best,

Charles

2

So here is the summary of this order;

5,200  original graphics

−11  pieces not replaced

_____

5,189  total  x $40.00  =  $207,560

advance  $200,000

balance.......$7,560



A3

07/11/2006  14:31    13107889532              ALPERT AND ASSOC                PAGE  01

# ALPERT AND ASSOCIATES
## BUSINESS MANAGEMENT

8899 Beverly Boulevard, Suite 918
Los Angeles, California 90048
310-788-8695  Fax: 310-788-9532

VIA FACSIMILE: 416-973-0810

July 11, 2006

Mr. Perry Derksen, Council
Tax Law Services Section
Department of Justice
Canada

Re:     Artistic Ideas, Inc. vs H.M.Q.
        Court File #2003-1855 (GST) G

Dear Mr. Derksen,

Thank you for your letter dated July 7th which confirmed our telephone conversation of
July 6, 2006. Your letter did not, however, accurately reflect our entire conversation.

In the conversation, when you explained your views of this case, I advised you that you
were incorrect in your understanding of the agreement in question and that your facts
were also incorrect. I explained to you that if Mr. Sloan appears or speaks with you he
would confirm the position of Artistic Ideas since that position is, in fact, what the
agreement was. I also explained that, since Mr. Sloan is not your witness, he would not
speak directly to you. Mr. Sloan has tried to stay out of this but, since your call, he may
supply an affidavit to the council for Artistic (or choose to come to court), under penalty
of perjury, stating the facts above which are not in favor of the Department of Justice.

If there is anything further, please let me know.

Sincerely,

Glen Alpert

N

**THIS IS EXHIBIT "N"**
referred to in the affidavit of
**Laura Alescio**
This _30th_ day of September, 2011

_____

**Commissioner for Taking Affidavits**

**Tab 59 of the Respondent's 2nd Supplementary List of Documents
filed November 8, 2006**



**ROGallery**
*Image Makers, Inc.*

The Source For Select

47-15 36ᵗʰ Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

## INVOICE
Date: 10/28/00

**Sold To:**

COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

**Ship To:**

COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367

| Order: 00-1111 | Terms: | Upon Presentation | Shipped Via: | SEKO-USF WORLDWIDE | |
|---|---|---|---|---|---|
| **Artist** | **Quantity** | **Description** | **Cost\*** | **Amount** |
| Assorted | 7635 | See attached detailed list | $40.00 | $305,400.00 |
| | | *pd. $285,000* | | |
| | | *due: $22,440.00* | | |
| Shipping Preparation | 1 | By others (Crossroads) Shrink wrap 4 skids, contain with Cardboard all around, and prepare for Shipping to Canada by SEKO – USF WORLDWIDE | $200.00 | $200.00 |
| Packing Charge | 184 | Materials, labor, counting, packing, Computer scanning, labeling, Invoicing for customs | $10.00 | $1,840.00 |

*\*Prices Subject to Change Without Notice.*

| | |
|---|---|
| **Sub Total:** | $307,440.00 |
| **PAID ON ACCOUNT:** | -$185,000.00 |
| **Sales Tax :** | Ship To Cana |
| **Total Invoice:** | $122,440.00 |

Comments:

**Tab 62 of the Respondent's 2nd Supplementary List of Documents
filed November 8, 2006**



The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

## INVOICE
Date: 1/23/2001(2/5)

**Sold To:**
COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

**Ship To:**
COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367

| Order01c131 | Terms: | Upon Presentation | Shipped Via: | | No Am Van Lines |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Picasso(estate) | 6963 | Various editions (see attached) | | $60.00 | $417,780.00 |
| Ensrud, Wayne | 305 | Assorted titles (see attached) | | $60.00 | $18,300.00 |
| Saff, Donald | 368 | Assorted titles | | $40.00 | $14,720.00 |
| Packing Charge | 295 | Materials, labor, counting, packing, Computer scanning, labeling, Invoicing for customs | | $10.00 | $2,950.00 |
| Shipping Preparation | 1 | By Others (crossroads) Shrink wrap 4 skids, contain with Cardboard all around, apply edges, And prepare for shipping to Canada. | | $200.00 | $200.00 |
| | 1 | Breakdown 4 skids, sort packages per Charity, box, shrink wrap 4 skids, contain With cardboard all around, apply edges, And prepare custom invoices for Canada. | | $2000.00 | $2000.00 |

*Prices Subject to Change Without Notice.

Comments:

| | |
|---|---|
| Sub Total: | $455,950.00 |
| Packing, Handling, Shipping & Insurance: | Customer |
| Sales Tax : | Ship to CA |
| Total Invoice: | $455,950.00 |

| Artist | Title | Quantity | Unit Price | Extension |
|--------|-------|----------|------------|-----------|
| Picasso | 7-A Chevalier en armure | 300 | $60.00 | $18,000.00 |
| Picasso | J-175 Arlequin moustachu a la gui | 297 | $60.00 | $17,820.00 |
| Picasso | 27-8 Femme dans un fauteuil | 246 | $60.00 | $14,760.00 |
| Picasso | 25-6 Femme assise dans un faut | 300 | $60.00 | $18,000.00 |
| Picasso | 51-D Etude de mains et colombe | 300 | $60.00 | $18,000.00 |
| Picasso | J-274 Nature morte sur gueridon | 300 | $60.00 | $18,000.00 |
| Picasso | 35-7  Portrait d'un homme debout | 300 | $60.00 | $18,000.00 |
| Picasso | J-170 Femme assise dans un faut | 300 | $60.00 | $18,000.00 |
| Picasso | 24-8 Tete de morte, lampe cruches | 300 | $60.00 | $18,000.00 |
| Picasso | 26-1 Femme couchee | 300 | $60.00 | $18,000.00 |
| Picasso | 35-9  Visage de femme de face | 300 | $60.00 | $18,000.00 |
| Picasso | J-209 Femme debout | 300 | $60.00 | $18,000.00 |
| Picasso | 36-5 Femme au chapeau gris | 300 | $60.00 | $18,000.00 |
| Picasso | J-205 Le bouquet | 300 | $60.00 | $18,000.00 |
| Picasso | 35-3 Nature morte au verre | 300 | $60.00 | $18,000.00 |
| Picasso | 27-3  Pigeons | 300 | $60.00 | $18,000.00 |
| Picasso | 29-1 Port of Marie Terese Walter | 300 | $60.00 | $18,000.00 |
| Picasso | J-220 Enfant dejeunant | 150 | $60.00 | $9,000.00 |
| Picasso | J-115  Olga Picasso | 300 | $60.00 | $18,000.00 |
| Picasso | 27-6  Quatre nus au harem | 300 | $60.00 | $18,000.00 |
| Picasso | 23-4  Tete | 300 | $60.00 | $18,000.00 |
| Picasso | 5 buste de petite fille | 300 | $60.00 | $18,000.00 |
| Picasso | 25-1  Tete | 270 | $60.00 | $16,200.00 |
| Picasso | 24-3  Jeux de pages | 300 | $60.00 | $18,000.00 |
| Ensrud | Nude | 169 | $60.00 | $10,140.00 |
| Ensrud | Venice | 136 | $60.00 | $8,160.00 |
| Saff | Fish (color small) | 26 | $40.00 | $1,040.00 |
| Saff | Boot (b&w small) | 24 | $40.00 | $960.00 |
| Saff | Comb (b&w small) | 28 | $40.00 | $1,120.00 |
| Saff | Parrot/Toothbrush (b&w small) | 29 | $40.00 | $1,160.00 |
| Saff | Bug/chair (b&w small) | 34 | $40.00 | $1,360.00 |
| Saff | Man (color small) | 40 | $40.00 | $1,600.00 |
| Saff | Screw-X (b&w small) | 40 | $40.00 | $1,600.00 |
| Saff | Elephant (b&w small) | 39 | $40.00 | $1,560.00 |
| Saff | Screw-X (color - large)) | 36 | $40.00 | $1,440.00 |
| Saff | Comb (color - large) | 29 | $40.00 | $1,160.00 |
| Saff | Zebra (color - large) | 26 | $40.00 | $1,040.00 |
| Saff | Gazelle (color -large | 17 | $40.00 | $680.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
|  |  |  |  | $0.00 |
| TOTAL PIECES |  | 7,636 | TOTAL $ | $450,800.00 |



**Tab 63 of the Respondent's 2nd Supplementary List of Documents
filed November 8, 2006**



The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

## INVOICE

Date: 1/23/2001

**Sold To:**
COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

**Ship To:**
COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367

| Order01c131 | Terms: Upon Presentation | | Shipped Via: | No Am Van Lines |
|---|---|---|---|---|
| **Artist** | **Quantity** | **Description** | **Cost\*** | **Amount** |
| Picasso | 6693 | Various editions (see attached) | $60.00 | $401,580.00 |
| Various artists | 673 | Assorted titles (see attached) | $40.00 | $26,920.00 |
| Packing Charge | 284 | Materials, labor, counting, packing, Computer scanning, labeling, Invoicing for customs | $10.00 | $2,840.00 |
| Shipping Preparation | 1 | By Others (crossroads) Shrink wrap 4 skids, contain with Cardboard all around, apply edges, And prepare for shipping to Canada. | $200.00 | $200.00 |

THIS INFORMATION IS FURNISHED UNDER THE PROVISIONS OF AN INCOME TAX TREATY WITH A FOREIGN GOVERNMENT. ITS USE OR DISCLOSURE MUST BE GOVERNED BY THE PROVISIONS OF THAT TREATY.

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice.* | **Sub Total:** | $431,540.00 |
| Packing, Handling, Shipping & Insurance: | | Customer |
| **Comments:** | **Sales Tax :** | Ship to CA |
| | **Total Invoice:** | $431,540.00 |

| Artist | Title | Quantity | Unit Price | Extension |
|---|---|---|---|---|
| Picasso | 7-A | 300 | $60.00 | $18,000.00 |
| Picasso | J-175 | 297 | $60.00 | $17,820.00 |
| Picasso | 27-8 | 246 | $60.00 | $14,760.00 |
| Picasso | 25-6 | 300 | $60.00 | $18,000.00 |
| Picasso | 51-D | 300 | $60.00 | $18,000.00 |
| Picasso | J-274 | 300 | $60.00 | $18,000.00 |
| Picasso | 35-7 | 300 | $60.00 | $18,000.00 |
| Picasso | J-170 | 300 | $60.00 | $18,000.00 |
| Picasso | 24-8 | 300 | $60.00 | $18,000.00 |
| Picasso | 26-1 | 300 | $60.00 | $18,000.00 |
| Picasso | 35-9 | 300 | $60.00 | $18,000.00 |
| Picasso | J-209 | 300 | $60.00 | $18,000.00 |
| Picasso | 36-5 | 300 | $60.00 | $18,000.00 |
| Picasso | J-205 | 300 | $60.00 | $18,000.00 |
| Picasso | 35-3 | 300 | $60.00 | $18,000.00 |
| Picasso | 27-3 | 300 | $60.00 | $18,000.00 |
| Picasso | 29-1 | 300 | $60.00 | $18,000.00 |
| Picasso | J-220 | 150 | $60.00 | $9,000.00 |
| Picasso | J-115 | 300 | $60.00 | $18,000.00 |
| Picasso | 27-6 | 300 | $60.00 | $18,000.00 |
| Picasso | 23-4 | 300 | $60.00 | $18,000.00 |
| Picasso | 5 | 300 | $60.00 | $18,000.00 |
| | | | | |
| Picasso | 24-3 | 300 | $60.00 | $18,000.00 |
| Ensrud | Nude | 169 | $40.00 | $6,760.00 |
| Ensrud | Venice | 136 | $40.00 | $5,440.00 |
| Saff | Fish (color small) | 26 | $40.00 | $1,040.00 |
| Saff | Boot (b&w small) | 24 | $40.00 | $960.00 |
| Saff | Comb (b&w small) | 28 | $40.00 | $1,120.00 |
| Saff | Parrot/Toothbrush (b&w small) | 29 | $40.00 | $1,160.00 |
| Saff | Bug/chair (b&w small) | 34 | $40.00 | $1,360.00 |
| Saff | Man (color small) | 40 | $40.00 | $1,600.00 |
| Saff | Screw-X (b&w small) | 40 | $40.00 | $1,600.00 |
| Saff | Elelphant (b&w small) | 39 | $40.00 | $1,560.00 |
| Saff | Screw-X (color - large)) | 36 | $40.00 | $1,440.00 |
| Saff | Comb (color - large) | 29 | $40.00 | $1,160.00 |
| Saff | Zebra (color - large) | 26 | $40.00 | $1,040.00 |
| Saff | Gazelle (color -large | 17 | $40.00 | $680.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| **TOTAL PIECES** | | 7366 | TOTAL: $ | $428,500.00 |



**Tab 64 of the Respondent's 2nd Supplementary List of Documents
filed November 8, 2006**



**The Source For Select Artworks**

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

### INVOICE
Date: 1/23/2001

**Sold To:**
COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

**Ship To:**
COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367

| Order01c131 | Terms: | Upon Presentation | | Shipped Via: | | No Am Van Lines |
|---|---|---|---|---|---|---|
| Artist | Quantity | Description | | | Cost* | Amount |
| Picasso | 6693 | Various editions (see attached) | | | $60.00 | $401,580.00 |
| Various artists | 673 | Assorted titles (see attached) | | | $40.00 | $26,920.00 |
| Packing Charge | 284 | Materials, labor, counting, packing, Computer scanning, labeling, Invoicing for customs | | | $10.00 | $2,840.00 |
| Shipping Preparation | 1 | By Others (crossroads) Shrink wrap 4 skids, contain with Cardboard all around, apply edges, And prepare for shipping to Canada. | | | $200.00 | $200.00 |

*Prices Subject to Change Without Notice.*

| | | |
|---|---|---|
| | Sub Total: | $431,540.00 |
| | Packing, Handling, Shipping & Insurance: | Customer |
| | Sales Tax : | Ship to CA |
| | Total Invoice: | $431,540.00 |

Comments:

| Artist | Title | Quantity | Unit Price | Extension |
|--------|-------|----------|-----------|-----------|
| Picasso | 7-A | 300 | $60.00 | $18,000.00 |
| Picasso | J-175 | 297 | $60.00 | $17,820.00 |
| Picasso | 27-8 | 246 | $60.00 | $14,760.00 |
| Picasso | 25-6 | 300 | $60.00 | $18,000.00 |
| Picasso | 51-D | 300 | $60.00 | $18,000.00 |
| Picasso | J-274 | 300 | $60.00 | $18,000.00 |
| Picasso | 35-7 | 300 | $60.00 | $18,000.00 |
| Picasso | J-170 | 300 | $60.00 | $18,000.00 |
| Picasso | 24-8 | 300 | $60.00 | $18,000.00 |
| Picasso | 26-1 | 300 | $60.00 | $18,000.00 |
| Picasso | 35-9 | 300 | $60.00 | $18,000.00 |
| Picasso | J-209 | 300 | $60.00 | $18,000.00 |
| Picasso | 36-5 | 300 | $60.00 | $18,000.00 |
| Picasso | J-205 | 300 | $60.00 | $18,000.00 |
| Picasso | 35-3 | 300 | $60.00 | $18,000.00 |
| Picasso | 27-3 | 300 | $60.00 | $18,000.00 |
| Picasso | 29-1 | 300 | $60.00 | $18,000.00 |
| Picasso | J-220 | 150 | $60.00 | $9,000.00 |
| Picasso | J-115 | 300 | $60.00 | $18,000.00 |
| Picasso | 27-6 | 300 | $60.00 | $18,000.00 |
| Picasso | 23-4 | 300 | $60.00 | $18,000.00 |
| Picasso | 5 | 300 | $60.00 | $18,000.00 |
| | | | | |
| Picasso | 24-3 | 300 | $60.00 | $18,000.00 |
| Ensrud | Nude | 169 | $40.00 | $6,760.00 |
| Ensrud | Venice | 136 | $40.00 | $5,440.00 |
| Saff | Fish (color small) | 26 | $40.00 | $1,040.00 |
| Saff | Boot (b&w small) | 24 | $40.00 | $960.00 |
| Saff | Comb (b&w small) | 28 | $40.00 | $1,120.00 |
| Saff | Parrot/Toothbrush (b&w small) | 29 | $40.00 | $1,160.00 |
| Saff | Bug/chair (b&w small) | 34 | $40.00 | $1,360.00 |
| Saff | Man (color small) | 40 | $40.00 | $1,600.00 |
| Saff | Screw-X (b&w small) | 40 | $40.00 | $1,600.00 |
| Saff | Elephant (b&w small) | 39 | $40.00 | $1,580.00 |
| Saff | Screw-X (color - large) | 36 | $40.00 | $1,440.00 |
| Saff | Comb (color - large) | 29 | $40.00 | $1,160.00 |
| Saff | Zebra (color - large) | 26 | $40.00 | $1,040.00 |
| Saff | Gazelle (color - large) | 17 | $40.00 | $680.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| TOTAL PIECES | | 7366 | TOTAL $ | $428,500.00 |

**Tab 77 of the Respondent's 2nd Supplementary List of Documents
filed November 8, 2006**

 

47-15 36th Street •Long Island City, NY 11101

Date:        2/6/01

To:        COLEMAN FINE ARTS
           Paul SLOAN
           Phone:   818-348-1553
           Fax:     818-883-7770

From:      RO GALLERY IMAGE MAKERS, INC.
           Robert Rogal
           Phone:              718-937-0901
           Fax:                718-937-1206
           E-Mail:             art@rogallery.com
           Web Site:           www.rogallery.com

Pages (Including Cover Page):   5 6

Subject:    SHIPMENT TO CANADA

DEAR PAUL,

ATTACHED IS THE BILL OF LADING FROM NORTH
AMERICAN ALONG WITH DESCRIPTIVE INVENTORY
ATTACHEMENTS WITH 12 SEPARATE BAR CODES.

SHIPMENT SHOULD ARRIVE IN ONE WEEK.

GAIL ROGAL



02/06/2001   00:41   7109371206

**orthAmerican**  NORTH AMERICAN VAN LINES
Logistics
P.O. BOX 988
FORT WAYNE, INDIANA 46801-0988

**ROGALLERY**
AREA CODE FOR SHIP&ILL
BILL OF LADING / FREIGHT BILL
LCC-MC 107012

**CONTRACT NUMBER**

PAGE   02

| TARIFF/SECTION | BOOKER CODE/ ASSIST CODE | TOTAL ESTIMATED CHARGES FOR SHIPMENT | VEHICLE NO. | AGREED SERV. DATES -OR PERIOD OF TIME | ACTUAL PICKUP DATE |
|---|---|---|---|---|---|
| H00301 | | | | PUD 02/04/01-02/07/01 | |
| 004 | 2642/2640 | | | DEL 02/14/01-02/15/01 | |

S H I P F R O M — RO GALLERY IMAGE MAK 47-15 36TH STREET
LONG ISLAND         NY   11101

S H I P T O — ARTISTIC IDEAS   175 BAY STREET, STE. 300
TORONTO   ON   T2171   JANINE LORDMANN   416 599 2011 EXT 250

CHARGES STATED HEREIN ARE ESTIMATES ONLY. ACTUAL CHARGES ARE BASED UPON THE APPLICABLE TARIFF.

B I L L T O — SILVER FINE ART   8041 PENWOOD AVE
WOODLAND HL CA 91367   PAUL SLOAN

**SPECIAL INSTRUCTIONS**   PC CNT   4
LIFTGATE AT ORIG/DEST
ADDL INSURANCE OF  $15000 SKIDDED
CANADA PROPERLY RUSSELL A FARRO/DOCUMENTS AT ORI
1-4"x8TPS" (30"x48"x68") MUST CALL PRIO
TO PICKUP/CUSTOMS REFDS SEPARATE BAR CODES ON BF
RATE INVENTORIES PER IMPORTER (PIECE) PIECE WILL
LABELED BY IMPORTER/CUSTOMS FARRO/CASSIE
5-622-9307
CSR IS HANK MCFADDEN, PHP 800-451-7743 12

| | | WEIGHT | ORIGINAL | REWEIGH |
|---|---|---|---|---|
| | GROSS | | | |
| | TARE | | | |
| | NET | | 3366 | |

Shipper Signature

| DATE | PTS ID/INITIALS | LOCATION | TIME |
|---|---|---|---|
| | | | |

ORIG: Arrive _____ Depart _____ Van Crew (A)_____ Initials
DEST: Arrive _____ Depart _____ Van Crew (d)_____ Initials
ORIG. NAME _____ PHONE # _____ DATE
DEST. NAME _____ PHONE # _____ DATE

**VALUATION STATEMENT**

TOTAL PIECE COUNT PER ATTACHED
DESCRIPTIVE INVENTORY IS: _____   ASSIGNED 2192   HC706989

NAVL CANADA   2015   03-07-01   CONTRACT NO.

**DELIVERY ACKNOWLEDGMENT**

TORONTO   ON

PAYMENT RECEIVED

AMOUNT

| CONSIGNEE PRINTED NAME | ACTUAL DELIVERY DATE |
|---|---|

| NET WEIGHT | MILES | RATE | CHARGES. | CODE |
|---|---|---|---|---|
| 7146 | 0474 | | | |
| OTHER ACCESSORIALS-LIST TYPE/ QTY. | | | | |
| LIFTGATE | LV. | | | 0301 |
| ADDITIONAL INS | 3366 | 7.00 | 310.00 | MONTH |

**TOTAL CHARGES**

02/06/2001  00:41   7189371206                    ROGALLERY                        PAGE  03

# LOGISTICS

### BAR CODE DESCRIPTIVE INVENTORY
(Do not use RBD Form 14 for HVP Shipments)

**northAmerican.**
Logistics
...sion of North American Van Lines, Inc.

FIRST HAULER

SHIPPER'S NAME: *RO Gallery*

ORIGIN LOADING ADDRESS: *Toronto LIC NY*
CITY *Toronto*   STATE *ON*

DESTINATION

| DESCRIPTIVE SYMBOLS | | EXCEPTION SYMBOLS | | | | LOCATION SYMBOLS | |
|---|---|---|---|---|---|---|---|
| CP - Packed by Carrier | DBS - Disassembled By Shipper | BE - Bent | D - Dented | M - Marred | SO - Soiled | 1. Arm | 4. Left   9. Side |
| | | BR - Broken | F - Faded | R - Rubbed | Y - Torn | 2. Bottom | 6. Leg   10. Top |
| PBS - Packed By Shipper | MCU - Mechanical Condition Unknown | BU - Burned | G - Gouged | RU - Rusted | W - Badly Worn | 3. Corner | 7. Rear   11. Veneer |
| CD - Carrier Dis-assembled | CU - Condition and Condition Unknown | CH - Chipped | L - Loose | SQ - Scratched | Z - Cracked | 4. Front | 6. Right   12. Edge |
| | | | | | | | 13. Corner |

NOTE: The omission of these symbols indicates good condition for normal wear.

FREIGHT CLASSIFICATION:   A) LOOSE OR CARTONED ITEMS UNDER 80 LBS.   B) ITEMS BODDED SECURED
C) ITEMS ON WHEELS   D) ITEMS NOT ON WHEELS OVER 80 LBS.

| ITEM NO. | INVENTORY TRACKING NUMBERS | CLASS. | ITEM DESCRIPTION AND CONDITION AT ORIGIN | EXCEPTIONS (IF ANY) AT DESTINATION |
|---|---|---|---|---|
| 1 | 02830017-8 | | *Skid #1 PBS CU* | |
| | | | *ALLADDIN CHILDRENS* | |
| | 02800016-8 | | *Skid #1* | |
| | | | *AZAMRA INST.* | |
| | 02800015-8 | | *Skid #1* | |
| | | | *Boys & Girls Club* | |

*"WE HAVE CHECKED ALL THE ITEMS LISTED AND NUMBERED ON THIS PAGE INCLUSIVE AND ACKNOWLEDGE THAT THIS IS A TRUE AND COMPLETE LIST OF THE ITEMS TENDERED AND OF THE STATE OF THE ITEMS RECEIVED."*

**IMPORTANT NOTICE**                          BEFORE SIGNING - CHECK SHIPMENT, COUNT ITEMS AND DESCRIBE LOSS OR DAMAGE IN SPACE ON THE RIGHT ABOVE

| | CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) | DATE | | CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) | DATE |
|---|---|---|---|---|---|
| AT ORIGIN | (Signature) | | AT DESTI-NATION | (Signature) | |
| | SHIPPER OR AUTHORIZED AGENT | DATE | | SHIPPER OR AUTHORIZED AGENT | |
| | (Signature) | | | (Signature) | |

02/06/2081  00:41   7189371206                    MJSALLERY                          PAGE  04

## LOGISTICS
### AML
### BAR CODE DESCRIPTIVE INVENTORY
(Do not use RSO Form 14 for HVP Shipments)

**northAmerican.**
Logistics
Division of North American Van Lines, Inc.

| PAGE NO. | NO. OF PAGES |
| --- | --- |

HAULER: *Magic Fleet*

LABEL — VON ___ THRU ___

CODE # ___

CARRIER'S REFERENCE NO.

SHIPPER'S NAME: *RO Gallery*

GBL NO. ___ 1060

VON LOADING ADDRESS: ___ CITY *LIC* STATE *NY*

GOVT. SERVICE ORDER NO.

DESTINATION: *Toronto  ONT*

TRAILER NUMBER

**DESCRIPTIVE SYMBOLS**
CP - Packed By Carrier    DBS - Disassembled By Shipper
PS - Packed By Shipper    MCU - Mechanical Condition
CD - Carrier Dis-assembled    CU - Contents and Condition Unknown

**EXCEPTION SYMBOLS**
BE - Bent    D - Dented    M - Marred    SO - Soiled
BR - Broken    F - Faded    R - Rubbed    T - Torn
BU - Burned    G - Gouged    RU - Rusted    W - Badly Worn
CH - Chipped    L - Loose    SC - Scratched    Z - Cracked
NOTE: The omission of these symbols indicate good condition for normal wear.

**LOCATION SYMBOLS**
1. Arm    5. Left    9. Side
2. Bottom    6. Leg    10. Top
3. Corner    7. Rear    11. Veneer
4. Front    8. Right    12. Edge
13. Center

WEIGHT CLASSIFICATIONS: A) LOOSE OR CARTONED ITEMS UNDER 80 LBS.    B) ITEMS SKIDDED SECURED
C) ITEMS ON WHEELS    D) ITEMS NOT ON WHEELS OVER 80 LBS.

| W | INVENTORY TRACKING NUMBERS | CLASS. | ITEM DESCRIPTION AND CONDITION AT ORIGIN | EXCEPTIONS (IF ANY) AT DESTINATION |
| --- | --- | --- | --- | --- |
| | 025630914-B | | *Skid #2  PDS* | |
| | | | *Don Mills    CU* | |
| | 025630912-B | | *Skid #2* | |
| | | | *Friends of Honduras* | |
| | 025630911-B | | *Skid # 2* | |
| | | | *Hastings* | |
| | | | | |
| | | | | |

WE HAVE CHECKED ALL THE ITEMS LISTED AND NUMBERED ON THIS PAGE INCLUSIVE AND ACKNOWLEDGE THAT THIS IS A TRUE AND COMPLETE LIST OF THE ITEMS TENDERED AND OF THE STATE OF THE ITEMS RECEIVED.

**IMPORTANT NOTICE**

BEFORE SIGNING - CHECK SHIPMENT, COUNT ITEMS, AND DESCRIBE LOSS OR DAMAGE IN SPACE ON THE RIGHT ABOVE.

| CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) | DATE | AT DESTI-NATION | CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) | DATE |
| --- | --- | --- | --- | --- |
| (Signature) | | | (Signature) | |
| SHIPPER OR AUTHORIZED AGENT | DATE | | SHIPPER OR AUTHORIZED AGENT | DATE |
| (Signature) | | | (Signature) | |

FINAL — SEND TO NAVL, FT. WAYNE, INDIANA AFTER FINAL DELIVERY

02/06/2001  00:41  7189371206                    MUSALLERY                    PAGE  05

**northAmerican.**
Logistics
sion of North American Van Lines, Inc.

## LOGISTICS
### BAR CODE DESCRIPTIVE INVENTORY
(Do not use R30 Form 14 for HVP Shipments)

SHIPPER'S NAME: Magic Tree / RO Gallery

FREIGHT LOADING ADDRESS: CITY L.I.C. STATE N.Y.

DESTINATION: Toronto ON

**DESCRIPTIVE SYMBOLS**

| | | | **EXCEPTION SYMBOLS** | | | | **LOCATION SYMBOLS** | |
|---|---|---|---|---|---|---|---|---|
| CP - Packed By Carrier | PBS - Represented By Shipper | BE - Bent BR - Broken | D - Dented F - Faded | M - Marred R - Rubbed | SO - Soiled T - Torn | 1. Arm 2. Bottom | 5. Left 6. Leg | 9. Side 10. Top |
| PBS - Packed By Shipper | MCU - Mechanical Condition Unknown | BU - Burned CH - Chipped | G - Gouged L - Loose | RU - Rusted SC - Scratched | W - Body Worn Z - Cracked | 3. Corner 4. Front | 7. Rear 8. Right | 11. Veneer 12. Edge |
| CD - Carrier Disassembled | CU - Contents and Condition Unknown | | | | | | 13. Center | |

NOTE: The omission of these symbols indicates good condition for normal wear.

FREIGHT CLASSIFICATIONS:  A) LOOSE OR CARTONED ITEMS UNDER 80 LBS.  B) ITEMS SKIDDED SECURED
C) ITEMS ON WHEELS  D) ITEMS NOT ON WHEELS OVER 80 LBS.

| INVENTORY TRACKING NUMBERS | CLASS. | ITEM DESCRIPTION AND CONDITION AT ORIGIN | EXCEPTIONS (IF ANY) AT DESTINATION |
|---|---|---|---|
| 00680011-8 | | Skid #3 PBS LoveCry CU | |
| 00680010-6 | | Skid #3 ME ASSN. | |
| 00680009-8 | | Skid #3 NAT'L CHILD | |

"WE HAVE CHECKED ALL THE ITEMS LISTED AND NUMBERED ON THIS PAGE INCLUSIVE AND ACKNOWLEDGE THAT THIS IS A TRUE AND COMPLETE LIST OF THE ITEMS TENDERED AND OF THE STATE OF THE ITEMS RECEIVED."

**IMPORTANT NOTICE** BEFORE SIGNING - CHECK SHIPMENT, COUNT ITEMS AND DESCRIBE LOSS OR DAMAGE IN SPACE ON THE RIGHT ABOVE.

| CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) (Signature) | DATE | | CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) (Signature) | DATE |
|---|---|---|---|---|
| SHIPPER OR AUTHORIZED AGENT (Signature) | DATE | AT DESTINATION | SHIPPER OR AUTHORIZED AGENT (Signature) | DATE |

RIGINAL — SEND TO NAVL, FT. WAYNE, INDIANA AFTER FINAL DELIVERY

02/06/2001  00:41  7189371206                    RDGALLERY                              PAGE:  06

## LOGISTICS
### BAR CODE DESCRIPTIVE INVENTORY
(Do not use ASD Form 14 for HVP Shipments)

**northAmerican.**
Logistics
Division of North American Van Lines, Inc.

| | |
|---|---|
| HAULER | PAGE NO. / NO. OF PAGES |
| SHIPPER'S NAME  *Magic Fleet* | OWNER'S REFERENCE NO. |
| MAIN LOADING ADDRESS  *RD Gallery*  CITY *LIC* STATE *NY* | CONTRACT OR GBL NO.  *7060* |
| DESTINATION  *Toronto*  *ON* | GOV'T SERVICE ORDER NO. |
| | TRAILER NUMBER |

**DESCRIPTIVE SYMBOLS**
CP - Packed by Carrier   DBS - Disassembled by Shipper
PBS - Packed by Shipper   MCU - Mechanical Condition Unknown
CD - Carrier Disassembled   CU - Contents and Condition Unknown

**EXCEPTION SYMBOLS**
BE - Bent   D - Dented   M - Marred   SO - Soiled
BR - Broken   F - Faded   R - Rubbed   T - Torn
BU - Burned   G - Gouged   RU - Rusted   W - Body Worn
CH - Chipped   L - Loose   SC - Scratched   Z - Crushed

NOTE: The omission of these symbols indicates good condition for normal wear.

WEIGHT CLASSIFICATIONS:   A) LOOSE OR CARTONED ITEMS UNDER 90 LBS.   B) ITEMS SKIDDED SECURED
C) ITEMS ON WHEELS   D) ITEMS NOT ON WHEELS OVER 90 LBS.

**LOCATION SYMBOLS**
1. Arm   5. Left   9. Side
2. Bottom   6. Leg   10. Top
3. Corner   7. Rear   11. Veneer
4. Front   8. Right   12. Edge
13. Center

| INVENTORY TRACKING NUMBERS | CLASS. | ITEM DESCRIPTION AND CONDITION AT ORIGIN | EXCEPTIONS (IF ANY) AT DESTINATION |
|---|---|---|---|
| ‖‖‖‖‖‖ 026630007-8 | | *Skid #4* | |
| | | *Serpent River* | |
| ‖‖‖‖‖‖ 026630006-8 | | *Skid #4* | |
| | | *Univiris* | |
| ‖‖‖‖‖‖ 026630008-8 | | *Skid #4* | |
| | | *Yeshiva Gedola* | |

"WE HAVE CHECKED ALL THE ITEMS LISTED AND NUMBERED ON THIS PAGE INCLUSIVE AND ACKNOWLEDGE THAT THIS IS A TRUE AND COMPLETE LIST OF THE ITEMS TENDERED AND OF THE STATE OF THE ITEMS RECEIVED."

**IMPORTANT NOTICE** ➤
BEFORE SIGNING - CHECK SHIPMENT, COUNT ITEMS AND DESCRIBE LOSS OR DAMAGE IN SPACE ON THE RIGHT ABOVE.

| CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) | DATE | | CONTRACTOR, CARRIER OR AUTHORIZED AGENT (DRIVER) | DATE |
|---|---|---|---|---|
| (Signature) | | AT | (Signature) | |
| SHIPPER OR AUTHORIZED AGENT | DATE | DESTI- | SHIPPER OR AUTHORIZED AGENT | DATE |
| (Signature) | | NATION | (Signature) | |

ORIGINAL — SEND TO NAVL, FT. WAYNE, INDIANA AFTER FINAL DELIVERY

**Tab 78 of the Respondent's 2nd Supplementary List of Documents
filed November 8, 2006**



The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
Date: 02/17/01

Sold To:

COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

Ship To:

COLEMAN FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367

| Order: 01c3911 | Terms: | Upon Presentation | Shipped Via: | Customer Fed Ex Int'l. | |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Knigin, M. | 30 | Thunder Shower I | | $40.00 | $1,200.00 |
| | 15 | Brave Venture | | $40.00 | $600.00 |
| | 35 | Advance Notice | | $40.00 | $1,400.00 |
| | 36 | Loyal to Me | | $40.00 | $1,440.00 |
| | 35 | Royal Applause | | $40.00 | $1,400.00 |
| | 165 | Boldest Native | | $40.00 | $6,600.00 |
| | 98 | Woman Playing a Poppin | | $40.00 | $3,920.00 |
| Laventhal, Hank | 4 | Floating Strawberg | | $40.00 | $160.00 |
| | 6 | Floating Plum | | $40.00 | $240.00 |
| | 9 | Floating Raspberry | | $40.00 | $360.00 |
| Kramer, M. | 35 | Lovers V | | $40.00 | $1,400.00 |
| Sevy | 75 | Extended Life Line II | | $40.00 | $3,000.00 |
| Yaskill | 37 | Roosters | | $40.00 | $1,480.00 |

$70

THIS INFORMATION IS FURNISHED TO CREDITORS PROVISION OR AN INCOME TAX TREATY WITH A FOREIGN GOVERNMENT. ITS USE AND DISCLOSURE MUST BE GOVERNED BY THE PROVISIONS OF SUCH TREATY.

*Prices Subject to Change Without Notice.

Comments:

| | | |
|---|---|---|
| Sub Total: | $23,200.00 |
| Packing, Handling: | $200.00 |
| Sales Tax: | Ship to CANA |
| Total Invoice: | $23,400.00 |

**Tab 79 of the Respondent's 2nd Supplementary List of Documents**
**filed November 8, 2006**





47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**The Source For Select Artworks**

**INVOICE**
Date: 02/17/01

Sold To:                                                Ship To:   makeup's

**COLEMAN FINE ARTS**                    **COLEMAN FINE ARTS**
Paul SLOAN                                        Paul SLOAN
6041 Fenwood Avenue                        6041 Fenwood Avenue
Woodland Hills, CA 91367                 Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

| Order:01c3911 | Terms: | Upon Presentation | Shipped Via: | Customer Fed Ex Int'l. | |
|---|---|---|---|---|---|
| Artist | Quantity | Description | | Cost* | Amount |
| Knigin, M. | 30 | Thunder Shower I | | $40.00 | $1,200.00 |
| | 15 | Brave Venture | | $40.00 | $600.00 |
| | 35 | Advance Notice | | $40.00 | $1,400.00 |
| | 36 | Loyal to Me | | $40.00 | $1,440.00 |
| | 35 | Royal Applause | | $40.00 | $1,400.00 |
| | 165 | Boldest Native | | $40.00 | $6,600.00 |
| | 98 | Woman Playing a Poppin | | $40.00 | $3,920.00 |
| Laventhal, Hank | 4 | Floating Strawberry | | $40.00 | $160.00 |
| | 6 | Floating Plum | | $40.00 | $240.00 |
| | 9 | Floating Raspberry | | $40.00 | $360.00 |
| Kramer, M. | 35 | Lovers V | | $40.00 | $1,400.00 |
| Yaskill | 37 | Roosters | | $40.00 | $1,480.00 |

| | | |
|---|---|---|
| *Prices Subject to Change Without Notice. | Sub Total: | $20,200.00 |
| | Packing, Handling: | $200.00 |
| Comments: | Sales Tax: | Ship to CANA |
| | Total Invoice: | $20,400.00 |

**Tab 98 of the Respondent's 2nd Supplementary List of Documents**
**filed November 8, 2006**



The Source For Select Artworks

47-15 36th Street
Long Island City, New York 11101
Tel: 718 937-0901 • 212 732-6887
Fax: 718 937-1206
e-mail: art@rogallery.com
web address: www.rogallery.com

**INVOICE**
**Date:**

**Sold To:**
SILVER FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367
Tel: 818-348-1553/Fax: 818-883-7770

**Ship To:**
SILVER FINE ARTS
Paul SLOAN
6041 Fenwood Avenue
Woodland Hills, CA 91367

| Order #: | Terms: | | Shipped Via: | CUSTOMER FED.EX | |
|---|---|---|---|---|---|
| Artist | Quantity | | Description | Cost* | Amount |
| Picasso (estate) | 6 | | 36-9, Guitare verre et bouteille  481/500 | $60.00 | $360.00 |
| | | | 22-E, Les Cyclamens  11/1500 ✓ | | |
| | | | 34-1, Sylvette de profil gauche  3/500  ✓ | | |
| | | | 19-B Minotaure  AP 2  ✓ | | |
| | | | 29-10, Deux Pigeons   7/500 ✓ | | |
| | | | 25-6, Femme assise dan une | | |
| | | | Fauteuil tresse   AP 27  ? | | |
| | | | ok   Buste D' Homme 1971 | | |

*Prices Subject to Change Without Notice.

| | |
|---|---|
| Sub Total: | $360.00 |
| Packing, Handling: | 25.00 |
| Sales Tax : | Ship to CANA |
| Total Invoice: | $385.00 |

**Comments:**

O

**THIS IS EXHIBIT "O"**
**referred to in the affidavit of**
**Laura Alescio**
This 30ᵗʰ day of September, 2011

_____

**Commissioner for Taking Affidavits**

**I+I**

| Department of Justice<br>Canada | Ministère de la Justice<br>Canada | | |
|---|---|---|---|
| Ontario Regional Office<br>Tax Law Services Section<br>The Exchange Tower<br>130 King St. West<br>Suite 3400, Box 36<br>Toronto, Ontario<br>M5X 1K6 | Bureau régional de l'Ontario<br>la tour Exchange<br>130 rue King ouest<br>Pièce 3400, CP 36<br>Toronto (Ontario)<br>M5X 1K6 | *Tel:*<br>*Fax:*<br>*Email:* | (416) 954-4306<br>(416) 973-0810 |

*Our File:*
*Notre dossier:* 3-504992

*Your File:*
*Votre dossier:*

August 19, 2010

## VIA PROCESS SERVER

Teplitsky Colson
Barristers and Solicitors
70 Bond Street, Suite 200
Toronto, Ontario
M5B 1X3

**Attention: Martin Teplitsky**

Dear Sir:

**Re:**   SACKMAN, Jeffrey v. H.M.Q.          **Court File No.:  2002-4824(IT)G**

We enclose a Request to Admit pursuant to Section 130 of the *Tax Court of Canada Rules (General Procedure)*.  Please note that if you fail to respond within 15 days you shall be deemed, for the purposes of this appeal only, to admit the truth of the facts or the authenticity of the documents mentioned in the Request to Admit.

This Request to Admit concerns evidence given orally by Paul Sloan, principal of Coleman Fine Arts ("Coleman") and Silver Fine Arts ("Silver"), before a commissioner in the matter of *Artistic Ideas Inc. v. H.M.Q.* Court File No. 2003-1855(GST)G.

Mr. Sloan is a citizen of the United States and refused to travel to Canada to give evidence at the request of Artistic Ideas Inc. ("Artistic"). The Tax Court of Canada issued a commission authorizing the taking of evidence in Beverley Hills, California.  Mr. Sloan's evidence detailed the origin and operation of the art donation program at the heart of Mr. Sackman's appeal.  The art donation program was operated by Artistic, Coleman and Silver.  Mr. Sloan is the only individual able to give evidence on behalf of Coleman and Silver.

It is our hope that by obtaining the Appellant's admission of these facts the Respondent will be able to avoid a costly and time consuming commission obtained pursuant to section 112 of the *Tax Court of Canada Rules (General Procedure)*.

Yours truly,

Jenna Clark
Counsel
Tax Law Services Division
Encl.

Canadä

2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

### JEFFREY SACKMAN

Appellant,

and

### HER MAJESTY THE QUEEN

Respondent.

### REQUEST TO ADMIT

YOU ARE REQUESTED TO ADMIT, for the purposes of this proceeding only, the truth of the following facts:

1. Coleman Fine Arts, Ltd. ("Coleman") was incorporated under the laws of California on September 4, 1998.

2. Silver Fine Arts, Inc. ("Silver") was incorporated under the laws of California on August 8, 2000.

3. In 1998, 1999, 2000 and 2001, Paul Sloan ("Sloan") was the president, director, chief executive officer and sole shareholder of Coleman.

4. In 2000 and 2001, Sloan was the sole shareholder of Silver.

5. In 1998 through 2001, Sloan acted on behalf of Coleman in the acquisition of prints for sale to Canadian purchasers.

6. In 2000 and 2001, Sloan acted on behalf of Silver in the acquisition of prints for sale to Canadian purchasers.

7. Sloan was a partner in a company called Dyanson that operated up to 11 retail art galleries throughout the United States ("Dyanson Galleries").

–2–

8. When Dyanson Galleries was sold in 1995 to London Fine Arts, Sloan retained roughly 200,000 pieces of art from the inventory of the various galleries.

9. Sloan noticed, in around 1997 or 1998, that there were a number of art programs in Canada.

10. Sloan received calls from people in Canada for art in or around 1997 and 1998.

11. Sloan could produce all the art needed for an art donation program.

12. Sloan entered into an agreement with Mark Pearlman ("Pearlman") and Allan Grossman ("Grossman") to set up an art donation program in Canada.

13. Coleman was incorporated in 1998 for the purpose of the art donation program arrangement with Pearlman and Grossman.

14. Silver Fine Arts was incorporated in 2000 for the purpose of the art donation program arrangement with Pearlman and Grossman on the advice of Sloan's accountant, Edwin Metelits.

15. The inventory retained from Dyanson Galleries was a major source of the prints provided by Coleman, and later Silver, for sale to Canadian purchasers.

16. Sloan sold this inventory to Canadian purchasers with the assistance of Artistic Ideas Inc. ("Artistic"), a corporation set up by Pearlman and Grossman.

17. Pearlman and Grossman, through Artistic, were tasked with finding purchasers for the art.

18. Pearlman and Grossman would offer a group of art images to their purchasers for the purpose of a purchase a group of 11 pieces to be donated to a charity, and it was up to the investor to choose what group he wanted to buy.

−3−

19. Sloan, Pearlman and Grossman agreed that Sloan, through Coleman, and later Silver, would give Artistic a 50 percent commission on any artwork that they sold.

20. Pearlman and Grossman set the price for the art, originally $3,500 for 10 pieces of art, and later $3,500 for 11 pieces of art.

21. Sloan was required to arrange for appraisals for the artwork.

22. The appraisals had to come in somewhere at around $1,000.

23. The appraisal had to come in at around $1,000 because Pearlman and Grossman needed that value to create the type of structure they wanted.

24. Sloan originally hired Dick Ruskin to appraise the artwork.

25. Pearlman and Grossman ultimately hired Leslie Fink and Edith Yeomans to provide appraisals.

26. Sloan paid for the appraisals provided by Leslie Fink and Edith Yeomans.

27. Artistic was responsible for tracking how much the artwork was sold for and to whom it was sold.

28. Sloan was required to pay for shipment of the artwork.

29. Sloan shipped art directly to Artistic who would then ensure delivery of the art to various charities.

30. Artistic prepared Year End Reconciliations of gross sales which it provided to Sloan.

31. The Year End Reconciliations indicated how much in gross sales was generated during a particular year.

32. At its year end of January 31, 1999, Coleman realized gross sales of $4,326,000 representing sales of 1,236 groups of artwork sold at $3,500 each.

– 4 –

33. At its year end of January 31, 2000, Coleman realized gross sales of $7,651,000 representing sales of 2,186 groups of artwork sold at $3,500 each.

34. At its year end of January 31, 2001, Coleman and Silver together realized gross sales of $12,135,450 representing sales of 1,164 groups of prints sold for $3,500, 607 groups of prints sold for $3,600 and 1,567 groups of prints sold for $3,750.

35. In order for Artistic's art donation program to work within a donor market, Sloan was required to source prints.

36. Sloan authorized Grossman to sign documents with purchasers on behalf of Coleman and Silver.

37. The Appellant purchased artwork in 1998, 1999 and 2000 from Coleman and/or Silver, through the agent Artistic.

38. Artistic arranged for both the sale and donation of prints by the Appellant.

39. Coleman and Silver paid between $40 and $80 U.S. for each print that it sold to Canadian purchasers.

40. Coleman and Silver acquired prints to be sold to Canadian purchasers from Museum Masters International, Ltd. ("Museum Masters").

41. Museum Masters shipped the prints to Artistic for Sloan in 1999.

42. Coleman and Silver acquired prints to be sold to Canadian purchasers from Ro Gallery.

43. Coleman and Silver acquired prints to be sold to Canadian purchasers from Charles Lynn Bragg.

44. Coleman acquired prints to be sold to Canadian purchasers from Charles Bragg.

45. Charles Bragg is the father of Charles Lynn Bragg.

46. Coleman and Silver paid $40 a print for Charles Lynn Bragg prints.

–5–

47. Silver paid $40 a print for Charles Bragg prints.

48. Charles Bragg provided Edith Yeomans with some of the information that she relied upon when preparing appraisals of Charles Bragg works.

49. Artistic would substitute prints in groups if a particular print was sold out.

–6–

YOU ARE REQUESTED TO ADMIT, for the purposes of this proceeding only, the authenticity of the following documents:

1. the transcript of Commission Evidence of Paul Sloan taken November 29, 2006 in Beverly Hills, California in the matter of Artistic Ideas Inc. and Her Majesty the Queen;

2. exhibits to the Commission Evidence of Paul Sloan taken November 29, 2006:

A2        Year End Reconcilliation Statements for Year End January 31, 1999, 2000 and 2001

R5        March 4, 1999 Copy of Canada Customs Invoice listing Coleman Fine Arts as vendor and League for Human Rights and B'nai Brith Foundation as purchasers c/o Red Cap Express

R6        March 4, 1999 Copy of Commercial Invoice issued by Museum Masters International Ltd. to League for Human Rights/B'nai Brith Foundation c/o Red Cap Express with highlights and handwritten notes

R7        Copy of shipping documents listing Silver Fine Arts as vendor and Aladdin Children's Charity as purchaser with attachments

R8        May 24, 2001 Copy of invoice from Charles Lynn Bragg to Coleman Fine Arts Ltd. re 3738 Fine Art Prints with highlights

R9        July 26, 2001 Copy of invoice from Charles Bragg to Silver Fine Arts re 5000 assorted title graphics with highlights

– 7 –

R10           August 14, 2001 Copy of facsimile from Charles Bragg to Paul Sloan re replacement prints and appraisal figures with highlights and handwritten notes

A3           July 11, 2006 Copy of letter from Glen Alpert, Paul Sloan's business manager, to Perry Derksen, counsel for the respondent re Sloan's position with respect to the agreement with Artistic Ideas as well as his role in the litigation

Attached to this request is a copy of the transcript of Paul Sloan's evidence given at the hearing of commission evidence in the appeal of Artistic Ideas Inc. v. H.M.Q. Court File No. 2003-1855(GST)G, dated November 29, 2006 together with Exhibits referenced therein.

YOU MUST RESPOND TO THIS REQUEST by serving a response to request to admit in Form 131 WITHIN FIFTEEN DAYS after this request is served on you. If you fail to do so, you will be deemed to admit, for the purposes of this proceeding only, the truth of the facts and the authenticity of the documents set out above.

DATED at the City of Toronto, Ontario, this August 19, 2010.

John H. Sims, Q.C.
Deputy Attorney General of Canada
Solicitor for the Respondent

Per:    Jenna Clark / Martin Beaudry
        Erin Strashin
Department of Justice
Ontario Regional Office
The Exchange Tower
130 King Street West
Suite 3400, Box 36
Toronto, Ontario, M5X 1K6

Tel:    (416) 954-4306
Fax:   (416) 973-0810
Counsel for the Respondent

−8−

TO:     Martin Teplitsky, Q.C.
        Teplitsky Colson
        Barristers & Solicitors

        70 Bond Street, Ste. 200
        Toronto, Ontario
        M5B 1X3
        Counsel for the Appellant

P

**THIS IS EXHIBIT "P"**
referred to in the affidavit of
**Laura Alescio**
This _30ᵗʰ_ day of September, 2011

_____
**Commissioner for Taking Affidavits**

23-Aug-2010  02:36pm  From-Teplitsky Colson LLP          +4163659936       T-539  P.001/004  F-843



# TEPLITSKY, COLSON LLP

### B A R R I S T E R S

Suite 200, 70 Bond Street
Toronto, Ontario
M5B 1X3
Telephone: (416) 365-9320
Facsimile: (416) 365-7702

# FAX COVER SHEET

DATE:                  August 23, 2010

No. of Pgs.            4

TO:                    **JENNA L. CLARK**
FIRM:                  Department of Justice Canada – Ontario Regional Office
                       Tax Law Services Division
FAX NO.:               (416) 973-0810

FROM:                  **MATTHEW SOKOLSKY**
FIRM:                  Teplitsky, Colson LLP

FILE NO:               19287

COMMENTS/SPECIAL INSTRUCTIONS:

IN CASE OF TRANSMISSION PROBLEMS, PLEASE CALL (416) 365-9320.

*The information and documents contained in this facsimile transmission are confidential and protected by solicitor-client and/or solicitor work product and/or litigation privilege. Such information and documents are intended only for disclosure to and the use of the corporate or natural person named above and the privileges and confidentiality are not waived by virtue of having been sent by facsimile. If the person actually receiving this facsimile transmission, or any other reader, is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, transmission, distribution or copying, in any manner or form whatsoever, is strictly prohibited. Failure to comply with the foregoing prohibition may result in the breach of certain laws and/or the infringement of legal and equitable rights which may attract liability. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address by regular mail. Thank you in advance for your cooperation.*

23-Aug-2010  02:36pm   From-Teplitsky Colson LLP          +4163659936          T-539   P.002/004   F-843



**TEPLITSKY, COLSON LLP**
B A R R I S T E R S

Suite 200, 70 Bond Street
Toronto, Ontario
M5B 1X3
Telephone: (416) 365-9320
Facsimile: (416) 365-7702

MATTHEW SOKOLSKY
Direct Line: (416) 865-5347

August 23, 2010

**Via Facsimile (416) 973-0810**

Jenna Clark
Department of Justice Canada
Ontario Regional Office
Tax Law Services Division
The Exchange Tower
130 King Street West
Suite 3400, Box 36
Toronto, ON  M5X 1K6

Dear Ms. Clark:

Re:   Sackman, Jeffrey ats. H.M.Q.
      Court File No. 2002-4824(IT)G
      Our File No. 19287

We acknowledge receipt of your correspondence dated August 19, 2010.  Enclosed
please find our Response to Request to Admit, served upon you pursuant to the *Rules*.

Yours truly,

TEPLITSKY, COLSON LLP

Matthew Sokolsky
MS/s.

Encl.

23-Aug-2010  02:36pm   From-Teplitsky Colson LLP         +4163658936         T-539   P.003/004   F-843

Court File No. 2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

JEFFREY SACKMAN

Appellant,

and

HER MAJESTY THE QUEEN

Respondent.

### RESPONSE TO REQUEST TO ADMIT

In response to your Request to Admit dated August 19th, 2010, the Appellant:

1. Has no knowledge and refuses to admit any of the allegations set out at paragraphs 1 – 49.

2. Has no knowledge and refuses to admit the authenticity of documents referred to in the Request to Admit.

Date: August 23, 2010

**TEPLITSKY, COLSON LLP**
Barristers
70 Bond Street, Suite 200
Toronto, ON M5B 1X3

Martin Teplitsky, Q.C. (10647K)
Tel.: (416) 365-9320
Fax: (416) 365-7702

Lawyers for the Appellant

TO:   **DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower
130 King Street West
Suite 3400, Box 36
Toronto, ON M5X 1K6

Jenna Clark
Tel.: (416) 954-4306
Fax: (416) 973-0810

Lawyers for the Respondent

23-Aug-2010 02:36pm  From-Teplitsky Colson LLP          +4163659936          T-539  P.004/004  F-843

Court File No.: 2002-4824(IT)G

TAX COURT OF CANADA

JEFFREY SACKMAN

Appellant

and

HER MAJESTY THE QUEEN

Respondent

RESPONSE TO REQUEST TO ADMIT

TEPLITSKY, COLSON LLP
Barristers
70 Bond Street, Suite 200
Toronto, ON M5B 1X3

Martin Teplitsky, Q.C.
Tel.: (416) 365-9320
Fax: (416) 365-7702

Lawyers for the Appellant

Q

**THIS IS EXHIBIT "Q"**
**referred to in the affidavit of**
**Laura Alescio**
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**



| **Department of Justice** | **Ministère de la Justice** | | |
|---|---|---|---|
| **Canada** | **Canada** | | |

| Department of Justice | Section des Services du droit fiscal | *Tel:* | (613) 957-4814 |
| Tax Law Services | Édifice Banque du Canada, Tour Est | *Fax:* | (013) 941-2293 |
| Bank of Canada Building | 234, rue Wellington | *Email:* | Martin.Beaudry@justice.gc.ca |
| East Tower, 9th Floor | Ottawa, Ontario | | |
| Room 909 | K1A 0H8 | *Our File:* | |
| Ottawa, Ontario | | *Notre dossier:* | **3-504992** |
| K1A 0H8 | | | |
| | | *Your File:* | |
| | | *Votre dossier:* | |

August 25, 2010

**VIA PRIORITY POST**

Paul Sloan
6041 Fenwood Avenue
Woodland Hills, CA
91367-3117

Dear Sir:

**Re:   SACKMAN, Jeffrey v. H.M.Q.**
       **Court File No.:  2002-4824(IT)G**

We are writing with respect to the above noted appeal currently before the Tax Court of Canada. This appeal involves donation of artwork acquired from you in 1998, 1999 and 2000. We would like to discuss this appeal with you at your earliest convenience. In particular we believe that your evidence is critical to this appeal and we would like to discuss your attendance in Toronto, Ontario, to give evidence at the hearing of this matter.

We look forward to your reply. You may contact the undersigned by telephone or if you prefer, by email to arrange a telephone discussion.

Yours truly,

Martin Beaudry
Counsel
Tax Law Services

c.c.    CRA

Canada

R

**THIS IS EXHIBIT "R"**
referred to in the affidavit of
**Laura Alescio**
This ___30th___ day of September, 2011

_____
**Commissioner for Taking Affidavits**



**Department of Justice**
**Canada**

Department of Justice
Tax Law Services
Bank of Canada Building
East Tower, 9th Floor
Room 909
Ottawa, Ontario
K1A 0H8

**Ministère de la Justice**
**Canada**

Section des Services du droit fiscal
Édifice Banque du Canada, Tour Est
234, rue Wellington
Ottawa, Ontario
K1A 0H8

*Tel:* (613) 957-4814
*Fax:* (613) 941-2293
*Email:* Martin.Beaudry@justice.gc.ca

*Our File:*
*Notre dossier:* 3-504992

*Your File:*
*Votre dossier:*

September 13, 2010

**VIA PRIORITY POST**

Paul Sloan
6041 Fenwood Avenue
Woodland Hills, CA
91367-3117

Dear Sir:

Re:   **SACKMAN, Jeffrey v. H.M.Q.**
      **Court File No.:  2002-4824(IT)G**

Further to our telephone conversation held on September 8, 2010, we wish to confirm that you will not travel to Toronto, Ontario, to attend at trial as a witness. As such, the only other way to obtain your testimony at trial will be for us to move before the Tax Court of Canada for an Order for the taking of commission evidence in California.

We understand that you already testified in a similar commission held in California by the Tax Court of Canada in November 2006 in the matter of Artistic Ideas Inc. v. Her Majesty The Queen, 2003-1855(GST)G. We are enclosing with this letter a copy of the transcript of the proceedings for your reference. The evidence we are seeking from you in the present appeal is very similar to the evidence you gave during that commission in 2006.

Yours truly,

*Martin Beaudry*

Martin Beaudry
Counsel
Tax Law Services

Encl.

c.c.   CRA

Canada

S

**THIS IS EXHIBIT "S"**
**referred to in the affidavit of**
**Laura Alescio**
This _30th_ day of September, 2011

_____

**Commissioner for Taking Affidavits**

**Department of Justice**
**Canada**

Department of Justice
Tax Law Services
Bank of Canada Building
East Tower, 9th Floor
Room 909
Ottawa, Ontario
K1A 0H8

**Ministère de la Justice**
**Canada**

Section des Services du droit fiscal
Édifice Banque du Canada, Tour Est
234, rue Wellington
Ottawa, Ontario
K1A 0H8

| | |
|---|---|
| *Tel:* | (613) 957-4814 |
| *Fax:* | (613) 941-2293 |
| *Email:* | Martin.Beaudry@justice.gc.ca |

*Our File:*
*Notre dossier:* 3-504992

*Your File:*
*Votre dossier:*

February 25, 2011

**VIA FACSIMILE & PRIORITY POST**

Teplitsky Colson
Barristers and Solicitors
70 Bond Street, Suite 200
Toronto, Ontario
M5B 1X3

**Attention: Martin Teplitsky**

Dear Sir:

Re:    **SACKMAN, Jeffrey v. H.M.Q.**
       **Court File No.: 2002-4824(IT)G**

Further to our letter dated January 12, 2011 and Mr. Sokolsky's email of January 14, 2011, we are enclosing for your review and consent a draft Order and a draft Notice of Motion along with the draft Affidavit of Laura Alescio. For simplification purpose, we did not enclose exhibits D and E to Ms. Alescio's affidavit as we trust they are in your possession. As indicated in our January 12, 2011 correspondence, we believe that both the appellant and the respondent will be served by the taking of Mr. Sloan's evidence in this appeal. As such, you will notice that the enclosed Notice of Motion and Affidavit contain noncontentious facts which should enable your client to agree to the relief sought.

Please advise us of your position at your earliest convenience.

Yours truly,

Martin Beaudry
Counsel
Tax Law Services

Encl.

c.c.    CRA

Canadā

2002-4824(IT)G

TAX COURT OF CANADA

BETWEEN:

JEFFREY SACKMAN

Appellant,

and

HER MAJESTY THE QUEEN,

Respondent.

(the Honourable Justice        )                    (Day and date order made)
(Court seal)

ORDER

UPON reading the Respondent's notice of motion seeking an Order granting leave to examine Paul Sloan in California, USA, before the hearing, on oath or affirmation for the purpose of having his testimony to be tendered as evidence at the hearing of the appeal;

AND UPON hearing the submissions of counsel for both parties;

AND the Respondent having requested the issuance of a commission and letter of request with respect to the witness referred to above;

THE COURT DIRECTS AS FOLLOWS:

1.  The evidence of the witness Paul Sloan shall be taken on oath or affirmation in California, USA, before the hearing, at a time and place to be determined.

2.  The Registrar shall prepare and issue a commission naming _____ of the Tax Court of Canada as commissioner to take the evidence of the witness for use in the hearing.

3.  The Registrar shall prepare and issue a letter of request addressed to the judicial authorities of the State of California, USA, requesting they initiate the process necessary to compel the witness to attend and be examined before the commissioner.

THE COURT FURTHER ORDERS THAT :

4.  All issues relating to costs with respect to this motion shall be left to the discretion of the trial judge.

5.  All expenses incurred by the Commissioner with respect to the commission evidence of Paul Sloan shall be reimbursed by the Respondent.

6.  Reasonable travel expenses incurred by the Appellant with respect to the commission evidence of Paul Sloan with the exception of professional fees shall be reimbursed by the Respondent.

7.  The reimbursement of travel expenses incurred by the Appellant shall be limited to economy class travel for two people, hotel costs up to $200 per night per room, and meals and incidentals at the rates prescribed by the Treasury Board Secretariat for government travelers.

8.  With respect to paragraphs 6, 7 and 8 of this Order, the ultimate reimbursement of costs shall be left to the discretion of the trial judge.

Signed in the city of Ottawa, Ontario, this _____

_____

DRAFT

2002-4824(IT)G

TAX COURT OF CANADA

BETWEEN:

JEFFREY SACKMAN

Appellant

- and -

HER MAJESTY THE QUEEN

Respondent

## NOTICE OF MOTION

TAKE NOTICE THAT the Respondent will make a motion to the Court on      , 2011 at 9:30 a.m. or as soon thereafter as counsel may be heard at the Tax Court of Canada, Federal Judicial Centre, 180 Queen Street West, 6th Floor, Toronto, Ontario.

THE MOTION IS FOR a Direction

    a)   pursuant to Rule 119 of the *Tax Court of Canada Rules (General Procedure)* granting leave to examine Mr. Paul Sloan, in California, USA, before the hearing of this appeal, on oath or affirmation, for the purpose of having his testimony available to be tendered as evidence at the hearing of the appeal;

    and

    b)   pursuant to Rules 112, 119 and 121, providing for

-2-

    i)       the issuance of a commission authorizing the taking of

                 evidence before a named commissioner;

    ii)     the appointment of the trial judge as the named

                 commissioner; and

    iii)    the issuance of a letter of request directed to the judicial

                 authorities of the State of California, USA for the issuance

                 of such process as is necessary to compel Paul Sloan to

                 attend and be examined before the commissioner.

**THE GROUNDS FOR THE MOTION ARE:**

1. The Respondent wishes to call Paul Sloan, a resident of California, as a witness at trial as Mr. Sloan can give evidence about material facts in dispute.

2. The Respondent will be prejudiced if Mr. Sloan's evidence is not made available to the trial judge.

3. Mr. Sloan does not want to travel to Canada for the purpose of testifying at trial.

4. There is no apparent prejudice to the Appellant.

5. This application is made *bona fide* and not for any improper purpose.

6. The Respondent relies on sections 112, 119, 121, and 122 of the *Tax Court Rules (General Procedure)*.

-3-

**THE FOLLOWING DOCUMENTARY OR OTHER EVIDENCE** may be used at the hearing of the motion:

1.  The affidavit of Laura Alescio, sworn      , 2011.

2.  The pleadings.

3.  Such further and other material as counsel may advise and this Honourable Court permit.

**THE ESTIMATED DURATION** of this hearing will be approximately one hour.

DATED at the City of Ottawa, Ontario, this    day of      , 2011.

_____
Myles J. Kirvan
Deputy Attorney General of Canada

Per:   Jenna Clark
       Martin Beaudry
       Erin Strashin
       Counsel for the Respondent

       Department of Justice
       Tax Law Services Section
       Bank of Canada Building
       East Tower, 9th Floor
       234 Wellington Street
       Ottawa, Ontario
       K1A 0H8

       Telephone:   (613) 957-4814
       Facsimile:   (613) 941-2293

-4-

TO:   Tax Court of Canada
      200 Kent Street
      4th Floor
      Ottawa, Ontario
      K1A 0M1


AND TO:  Martin Teplitsky
      Matthew Sokolsky
      Teplitsky Colson
      Barristers and Solicitors
      70 Bond Street, Suite 200
      Toronto, Ontario
      M5B 1X3

DRAFT

2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

**JEFFREY SACKMAN**

Appellant

- and -

**HER MAJESTY THE QUEEN**

Respondent

## AFFIDAVIT

I, Laura Alescio, of the City of Toronto, in the Province of Ontario, MAKE OATH AND SAY AS FOLLOWS:

1.      I am employed as a paralegal, in the Tax Law Services Section of the Department of Justice in Toronto, Ontario. I have been assigned to this file since 2002, and as such have personal knowledge of the matters hereinafter deposed to, save and except what is stated to be on information and belief, and where so stated, I verily believe them to be true.

2.      This appeal concerns the Minister of National Revenue's (the "Minister") reassessment of the Appellant's 2000 taxation year, wherein the Minister disallowed a tax credit claimed by the Appellant in respect of donated art prints.

-2-

3.   The issue in this appeal the fair market value of 447 prints the Appellant donated in the 1999 and 2000 taxation year to various charities.

4.   The Further Amended Reply to the Amended Notice of Appeal states that Artistic Ideas Inc. ("Artistic") promoted an art donation program which was marketed to taxpayers, including the Appellant, as a tax avoidance arrangement.

5.   During his examination for discovery, the Appellant admitted that he appointed Artistic as his agent for the purposes of acquiring prints and for the purposes of donating them to charities in return for charitable donation receipts.  Attached to this my Affidavit and marked as Exhibit "A" is a true copy of an excerpt from the transcript of the Examination for Discovery of Jeffrey Sackman conducted on December 11, 2006 wherein he makes such admission.

6.   The Appellant also admitted during examination for discovery that Artistic purchased the artwork on his behalf from two American companies known as Coleman Fine Arts ("Coleman") and Silver Fine Arts ("Silver").  Attached to this my Affidavit and marked as Exhibit "B" is a true copy of an excerpt from the transcript of the Examination for Discovery of Jeffrey Sackman conducted on December 11, 2006 wherein he makes such admission.

7.   Coleman sold art to the Appellant, through Artistic, in 1998, 1999 and until February 28, 2000.

8.   Silver sold art to the Appellant, through Artistic, in the latter part of 2000.

9.   Both Coleman and Silver were owned by Paul Sloan, a resident of the United States.

-3-

10.     In the GST tax appeal 2003-1855(GST)G *Artistic Ideas Inc.* v. *Her Majesty the Queen*, a commission was held in Beverly Hills, California on November 29, 2006, at the request of Artistic Ideas Inc. for the purpose of obtaining the evidence of Paul Sloan. Attached to this my Affidavit and marked as Exhibit "C" is a true copy of the Motion Record filed by counsel for Artistic Ideas Inc. which includes a Notice of Motion dated September 1, 2006 and an affidavit sworn by Paul Sloan dated August 31, 2006.

11.     This commission was held in the context of a GST appeal and I have reviewed the transcript and I note that the evidence the respondent is seeking in the current appeal from Mr. Sloan is very similar to the evidence that he gave during the commission in 2006.  In order to avoid incurring the cost of another commission for the purpose of securing the evidence of Paul Sloan, the respondent served on the appellant a Request to Admit dated August 19, 2010 pursuant to Section 130 of the *Tax Court of Canada Rules (General Procedure)*. Attached to this my Affidavit and marked as Exhibit "D" is a true copy of the Request to Admit together with the transcript evidence of Paul Sloan and covering letter both dated August 19, 2010.

12.     By letter dated August 23, 2010, counsel for the appellant advised counsel for the respondent that he would refuse to admit any of the facts and documents stated in the Request to Admit. Attached to this my Affidavit and marked as Exhibit "E" is a true copy of the letter dated August 23, 2010 sent by counsel for the appellant advising of his refusals.

-4-

13.   By letter dated August 25, 2010, counsel for the respondent wrote to Mr. Sloan in order to make initial contact and to discuss Mr. Sloan's voluntarily attendance as a witness for the respondent at the hearing. Attached to this my Affidavit and marked as Exhibit "F" is a true copy of the letter dated August 25, 2010 sent by counsel for the respondent to Mr. Sloan.

14.   I am advised by Martin Beaudry and verily believe, that on September 8, 2010, he spoke with Mr. Sloan via telephone conversation. During the conversation, Mr. Sloan informed that he will not voluntarily attend at trial in Canada. Mr. Sloan indicated that he is 75 years old and does not want to travel to Canada.

15.   By letter dated August 13, 2010, counsel for the respondent wrote to Mr. Sloan confirming his refusal to attend at trial in Canada and enclosing a copy of the transcript of the proceedings of the commission held in the GST appeal in 2006 for Mr. Sloan's reference. Attached to this my Affidavit and marked as Exhibit "G" is a true copy of the letter dated September 13, 2010 sent by counsel for the respondent to Mr. Sloan.

16.   Upon my review of all of the documents attached to my Affidavit I verily believe that Mr. Sloan possesses information relevant and material to the issue to be tried as Mr. Sloan's evidence will detail the origin and operation of the art donation program at the heart of Mr. Sackman's appeal.  Mr. Sloan is the only individual able to give evidence on behalf of Coleman and Silver.

17.   Upon my review of all of the documents attached to my Affidavit I verily believe that the issue in this appeal is one that the Court ought to try.

-5-

18.   I make this affidavit *bona fide* and in support of an application by the Attorney General of Canada in the Tax Court of Canada for an Order to obtain evidence from Paul Sloan in California, USA through commission evidence.

SWORN BEFORE me at the City of        )
Toronto, in the Province of Ontario, this  )
day of February, 2011.                )
                                      )
                                      )
                                      )        Laura Alescio
                                      )        _____
                                      )
_____        )
A Commissioner for Oaths in and        )
for the Province of Ontario

Proposed Exhibit A

MHFR

MH Feltman Verbatim Reporting

39:

Jeffrey Sackman

    1             A. Do I have a practice?  I sign an awful

    2   lot of things in my professional life.  I don't know that

    3   it matters if it's dated a day before and I sign it on the

    4   next day.

    5   134.         Q. What was your understanding as to the

    6   purpose of entering into this agency agreement at Tab 70?

    7             A. It's self-explanatory.

    8           MR. TEPLITSKY:  The agreement speaks for

    9   itself.

   10   135.       BY MR. DERKSEN:  Q. I'm not asking what

   11   the agreement says, I'm asking what Mr. Sackman's

   12   understanding is as to why he was entering into the

   13   agreement.

   14            A. To agree with what's written.  I mean,

   15   I don't understand that question.

   16   136.        Q. So you understood that you were

   17   appointing Artistic Ideas as your agent for the purposes of

   18   acquiring prints.

   19            A. That's what it says.

   20   137.        Q. And you understood you were appointing

   21   Artistic Ideas as your agent for the purposes of carrying

   22   out donations of those prints to charities in return for

   23   charitable donation receipts.

   24            A. Correct.

   25   138.        Q. Is there any issue about the

Proposed Exhibit B

MHF

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1          MR. DERKSEN:  If I said Artistic Ideas, I

2    apologize.

3                    MR. TEPLITSKY:  And that's 1998, but, yes,

4    it is his signature, even though I don't consider it

5    relevant, and his signature appears at Tabs 67, 68, and 69.

6    148.               BY MR. DERKSEN:  Q.  So you agree that

7    each of these documents at Tabs 66, 67, 68, and 69 are

8    copies of the purchase agreements that you entered into

9    with respect to your purchases of the art.

10                   MR. TEPLITSKY:  Yes.

11   149.               BY MR. DERKSEN:  Q.  In the first three

12   instances, I take it, you understood you were purchasing

13   art from Coleman Fine Arts, and then in the latter

14   agreement in November of 2000, you understood you were

15   purchasing art from Silver Fine Arts.

16                   A.  It appears, yes.

17   150.               Q.  Do you know why there was a change

18   between Coleman and Silver?

19                   A.  No.

20   151.               Q.  Did you have any understanding of who

21   Coleman Fine Arts Ltd. was?

22                   A.  No.

23   152.               Q.  Were you ever told who the principals

24   of Coleman Fine Arts were?

25                   A.  No.

Proposed Exhibit C

2003-1855(GST)G

## TAX COURT OF CANADA

BETWEEN:

### ARTISTIC IDEAS INC.

Appellant

and

### HER MAJESTY THE QUEEN

Respondent

## MOTION RECORD

**ROBINS, APPLEBY & TAUB LLP**
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

2

TO:   **PERRY DERKSEN**
      Department of Justice
      Ontario Regional Office
      The Exchange Tower
      130 King Street West
      Suite 3400, Box 36
      Toronto, ON  M5X 1K6

      Tel: (416) 952-1504
      Fax: (416) 973-0810

      Counsel for the Respondent

3

**INDEX**

| TAB | DOCUMENT |
|-----|----------|
| 1 | Notice of Motion |
| 2 | Affidavit of Paul Sloan |

Court No. 2003-1855(GST)G

## TAX COURT OF CANADA
*In the Excise Tax Act, R.S.C. 1985, c. E-15, as amended*

BETWEEN:

### ARTISTIC IDEAS INC.

Appellant

- and -

### HER MAJESTY THE QUEEN

Respondent

### NOTICE OF MOTION

**TAKE NOTICE THAT** the Appellant will make a motion to the Court on Tuesday, September 5, 2006, at 9:30 a.m., or as soon after that time as the motion may be heard at 180 Queen Street West, Suite 200, Toronto, Ontario.

**THE MOTION IS FOR:**

(a)   An Order granting the Appellant leave to file the Affidavit of Mr. Paul Sloan, sworn August 28, 2006, with cross-examination and re-examination to be conducted by telephone or video conference; or

(b)   An Order permitting the evidence of Mr. Paul Sloan to be taken by video or telephone conference; or

(c)   An Order to allow for the evidence of Mr. Paul Sloan to be taken by commission in California; or

(d)   Such further or other Order as this Court deems just.

2

**THE GROUNDS FOR THIS MOTION ARE:**

(a)     The Appellant wishes to call Mr. Paul Sloan, a resident of California, as a witness at trial;

(b)     On August 28, 2006, Mr. Sloan swore an Affidavit concerning his companies' dealings with the Appellant;

(c)     Mr. Sloan is 70 years-old, and has recently become concerned about flying in light of increased terrorism concerns;

(d)     As the date for attendance in Toronto approached, Mr. Sloan decided that he did not want to travel to Toronto;

(e)     Mr. Sloan's advisor informed the Appellant's counsel on August 29, 2006, of his decision not to fly to Toronto.

(f)     Although Mr. Sloan is not prepared to fly to Toronto, he is willing to testify via either phone or video conference, or in person in California;

(g)     The Appellant is willing to pay the costs of either the video conference or commissioning the evidence as may be ordered;

(h)     Mr. Sloan is a material witness. The Appellant will be unduly prejudiced if not granted leave to obtain his evidence;

(i)     Sections 143(1)(a), 4(1) and (2), 9, 119-122 of the *Tax Court of Canada Rules (General Procedure).*

3

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

      (a)     Affidavit of Paul Sloan, sworn August 31, 2006;

      (b)     Such other evidence as this Honourable Court may permit.

Date: Friday, September 1, 2006

                               **ROBINS, APPLEBY & TAUB LLP**
                               Barristers & Solicitors
                               120 Adelaide Street West
                               Suite 2600
                               Toronto, ON  M5H 1T1

                               **Irving Marks** LSUC#19979H
                               Tel: 416.360.3329
                               **Shawn Pulver**  LSUC#51129L
                               Tel: 416.360.3803
                               Fax: 416.868.0306

                               Solicitors for the Appellant

TO:    **PERRY DERKSEN**
        Department of Justice
        Ontario Regional Office
        The Exchange Tower
        130 King Street West
        Suite 3400, Box 36
        Toronto, ON  M5X 1K6

        Tel: (416) 952-1504
        Fax: (416) 973-0810

        Counsel for the Respondent

r:\files\0600073\im\pleadings\notice of motion.doc

2003-1855(GST)G

TAX COURT OF CANADA

B E T W E E N :

ARTISTIC IDEAS INC.

Appellant

- and -

HER MAJESTY THE QUEEN

Respondent

---

NOTICE OF MOTION

---

Robins, Appleby & Taub LLP
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

08/31/2006  10:47    13107889532           ALPERT AND ASSOC                    PAGE  02

2003-1855(GST)G

## TAX COURT OF CANADA

BETWEEN:

### ARTISTIC IDEAS INC.

Appellant

and

### HER MAJESTY THE QUEEN

Respondent

## AFFIDAVIT OF PAUL SLOAN

I, **PAUL SLOAN**, of the City of Woodland Hills, in the State of California, MAKE

OATH AND SAY AS FOLLOWS:

1.     I am the President and sole shareholder of Coleman Fine Arts Ltd. and Silver Fine Arts Ltd.,
which are incorporated pursuant to and do business under the laws of California, and as such have
knowledge of the facts to which I depose.

2.     Over the past several weeks, I, together with my advisors, Mr. Glen Alpert and Elliot Kajan
have had discussions with the lawyers for Artistic Ideas Inc. ("Artistic"), in preparation for my
attendance as a witness at Artistic's income tax appeal, commencing on September 5, 2006, in
Toronto, Ontario, Canada.

3.     On August 28, 2006, I swore an Affidavit concerning my companies' dealings with Artistic.

4.     I am 70 years old, and recently have become scared about flying in light of increased terrorism
concerns. I am of Jewish descent and the increase of anti Semitism throughout the Middle East and
United States has me concerned for my safety as well as Jews worldwide.  As the date for attendance

2

in Toronto approached, I decided under concerns from my family and friends that I could not travel until the threats of terrorism dissipate.

5.     Mr. Alpert informed Mr. Marks, counsel for Artistic, on August 29, 2006, of my decision and my fears of travel at this time.  Although I will not travel, I am willing to testify via either phone or videoconference, or in person in California.

SWORN before me at the City of                    )
                  , In the State of                    )
California,                                             )
This        day of, 2006                          )
                                                        )
A Commissioner, Notary, etc.                )        Paul Sloan

r:\files\060073\im\pleadings\affidavit of p. sloan #2.doc

## JURAT

State of California

County of _San Diego_

Subscribed and sworn to (or affirmed) before me on

this _31st_ day of _August_ , 20 _06_ ,

by _Paul Sloan_

personally known to me or proved to me on the basis of satisfactory
evidence to be the person(s) who appeared before me.

BERRIE A. SYREK
Commission # 1559804
Notary Public - California
San Diego County
My Comm. Expires Mar 15, 2009

(seal)                     Signature _Berrie A. Syrek_

2003-1855(GST)G

TAX COURT OF CANADA

BETWEEN:

ARTISTIC IDEAS INC.

Appellant

- and -

HER MAJESTY THE QUEEN

Respondent

---

## MOTION RECORD

---

Robins, Appleby & Taub LLP
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

Proposed Exhibit F

**Department of Justice**
**Canada**

Department of Justice
Tax Law Services
Bank of Canada Building
East Tower, 9th Floor
Room 909
Ottawa, Ontario
K1A 0H8

**Ministère de la Justice**
**Canada**

Section des Services du droit fiscal
Édifice Banque du Canada, Tour Est
234, rue Wellington
Ottawa, Ontario
K1A 0H8

Tel: (613) 957-4814
Fax: (013) 941-2293
Email: Martin.Beaudry@justice.gc.ca

Our File:
Notre dossier: **3-504992**

Your File:
Votre dossier:

August 25, 2010

**VIA PRIORITY POST**

Paul Sloan
6041 Fenwood Avenue
Woodland Hills, CA
91367-3117

Dear Sir:

Re:   **SACKMAN, Jeffrey v. H.M.Q.**
      **Court File No.:  2002-4824(IT)G**

We are writing with respect to the above noted appeal currently before the Tax Court of Canada. This appeal involves donation of artwork acquired from you in 1998, 1999 and 2000. We would like to discuss this appeal with you at your earliest convenience. In particular we believe that your evidence is critical to this appeal and we would like to discuss your attendance in Toronto, Ontario, to give evidence at the hearing of this matter.

We look forward to your reply. You may contact the undersigned by telephone or if you prefer, by email to arrange a telephone discussion.

Yours truly,

*Martin Beaudry*

Martin Beaudry
Counsel
Tax Law Services

c.c.   CRA

**Canada**

Proposed Exhibit G

**Department of Justice**    **Ministère de la Justice**
Canada                 Canada

Department of Justice     Section des Services du droit fiscal
Tax Law Services          Édifice Banque du Canada, Tour Est
Bank of Canada Building    234, rue Wellington
East Tower, 9th Floor       Ottawa, Ontario
Room 909                K1A 0H8
Ottawa, Ontario
K1A 0H8

*Tel:*   (613) 957-4814
*Fax:*   (613) 941-2293
*Email:*   Martin.Beaudry@justice.gc.ca

*Our File:*
*Notre dossier:*   3-504992

*Your File:*
*Votre dossier:*

September 13, 2010

**VIA PRIORITY POST**

Paul Sloan
6041 Fenwood Avenue
Woodland Hills, CA
91367-3117

Dear Sir:

**Re:**     **SACKMAN, Jeffrey v. H.M.Q.**
        **Court File No.: 2002-4824(IT)G**

Further to our telephone conversation held on September 8, 2010, we wish to confirm
that you will not travel to Toronto, Ontario, to attend at trial as a witness. As such, the
only other way to obtain your testimony at trial will be for us to move before the Tax
Court of Canada for an Order for the taking of commission evidence in California.

We understand that you already testified in a similar commission held in California by
the Tax Court of Canada in November 2006 in the matter of Artistic Ideas Inc. v. Her
Majesty The Queen, 2003-1855(GST)G. We are enclosing with this letter a copy of the
transcript of the proceedings for your reference. The evidence we are seeking from you
in the present appeal is very similar to the evidence you gave during that commission in
2006.

Yours truly,

*Martin Beaudry*

Martin Beaudry
Counsel
Tax Law Services

Encl.

c.c.    CRA

**Canada**

T

**THIS IS EXHIBIT "T"**
**referred to in the affidavit of**
**Laura Alescio**
This _30ᵗʰ_ day of September, 2011

_____

**Commissioner for Taking Affidavits**



 **TEPLITSKY, COLSON** LLP

B A R R I S T E R S

Suite 200, 70 Bond Street
Toronto, Ontario
M5B 1X3
Telephone: (416) 365-9320
Facsimile: (416) 365-7702

# FAX COVER SHEET

DATE:                 March 1, 2011

No. of Pgs.           3

TO:                   **MARTIN BEAUDRY**
FIRM:                 Department of Justice Canada
FAX NO.:              (613) 941-2293

FROM:                 **MARTIN TEPLITSKY, Q.C.**
FIRM:                 Teplitsky, Colson LLP

FILE NO:              19287

COMMENTS/SPECIAL INSTRUCTIONS:

IN CASE OF TRANSMISSION PROBLEMS, PLEASE CALL (416) 365-9320.

*The information and documents contained in this facsimile transmission are confidential and protected by solicitor-client and/or solicitor work product and/or litigation privilege. Such information and documents are intended only for disclosure to and the use of the corporate or natural person named above and the privileges and confidentiality are not waived by virtue of having been sent by facsimile. If the person actually receiving this facsimile transmission, or any other reader, is not the named recipient or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, transmission, distribution or copying, in any manner or form whatsoever, is strictly prohibited. Failure to comply with the foregoing prohibition may result in the breach of certain laws and/or the infringement of legal and equitable rights which may attract liability. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address by regular mail. Thank you in advance for your cooperation.*



## TEPLITSKY, COLSON LLP
### BARRISTERS

Suite 200, 70 Bond Street
Toronto, Ontario
M5B 1X3
Telephone: (416) 365-9320
Facsimile: (416) 365-7702

MARTIN TEPLITSKY Q.C.,LSM, LL.D
Direct line: (416) 865-5300
email: mteplitsky@teplitskycolson.com

March 1, 2011

**Via Fax**

Mr. Martin Beaudry
Department of Justice Canada
Tax Law Services
Bank of Canada Building
East Tower, 9th Floor
Room 909
Ottawa, ON  K1A 0H8

Dear Mr. Beaudry:

Re:   Sackman, Joffrey ats. H.M.Q. Court File No. 2002-4824(IT)G
      Our File No. 19287

      Further to your letter of February 25, 2011, we have given serious consideration
to your request. However, for the following reasons we cannot consent to your motion:

      (i)    Mr. Sloan's evidence is not material. The CRA knows how much Mr.
            Sackman paid for the art. Based on prior authorities that is the least
            amount that he will receive as a tax credit. Based upon the Crown's
            position that there is a "tax donation market" the price paid by Mr.
            Sackman is the price in that market;

      (ii)   To the extent that Mr. Sloan was involved with Artistic Ideas Inc.
            ("Artistic") we already went through an extensive exercise to have a
            representative of Artistic produced for discovery. The Crown should have
            brought this motion at that time with respect to Mr. Sloan. The Crown's
            request will delay matters. My client is anxious, as he has been throughout
            these proceedings to have the matter finally resolved;

      (iii)  The Crown has already examined Artistic. A representative of Artistic will
            be compellable to attend trial as a witness in Ontario. Artistic can give
            evidence about the "tax scheme". Mr. Sloan is redundant.

01-Mar-2011  02:53pm   From-Teplitsky Colson LLP          +4163659936        T-673  P.003/003  F-040

2

If you intend to proceed with your motion, please contact us to arrange a mutually convenient time for the hearing of the motion.

Yours truly,

MARTIN TEPLITSKY, Q.C.

1

## PART I – OVERVIEW

> *The problem with the claim here, whereby property is acquired for $5 to*
> *$50, sold to the appellant for $3,000 and claimed to have a fair market*
> *value two days later of $10,000 is that it is devoid of common sense and*
> *out of touch with ordinary commercial reality.*

Former Chief Justice Bowman in *Klotz v. R.*

1.  This appeal is to determine the fair market value of prints donated by the appellant to various charities in the 1999 and 2000 taxation years. During these years, the appellant participated in a buy low/donate high art donation program marketed by Artistic Ideas Inc. ("Artistic"). Artistic sourced the prints from Coleman Fine Arts ("Coleman") and Silver Fine Arts ("Silver"), both owned by Paul Sloan, a resident of California.

2.  Mr. Sloan's evidence is material to the respondent's case. It is necessary for the respondent to establish the source and the cost of the prints donated in the Artistic program, as well as the nature of the donation program itself. The only way the respondent can obtain Mr. Sloan's evidence is to secure a direction for the taking of evidence by commission held in California. All of the respondent's attempts to secure Mr. Sloan's evidence by other means have been unsuccessful.

## PART II – SUMMARY OF FACTS

3.  The Artistic program, operated by Mark Pearlman and Alan Grossman, was marketed to potential donors as a tax avoidance arrangement.[1] Donors were told they would benefit from their participation by receiving a large discount on their taxes. Promotional

---

[1] Further Amended Reply to the Amended Notice of Appeal (the "Reply"), subpara. 11 (a).

2

documents advertised that for an investment of $3,500, donors would receive a donation receipt in the amount of $10,000, a 39.29% return on their investment.[2]

4. The appellant participated in the Artistic Program in each of the 1998, 1999 and 2000 taxation years.[3] The appellant purchased groups of prints from Artistic, as agent of Coleman and Silver.[4] Mr. Sloan, through Coleman and Silver, paid Artistic a fee equivalent to 50% of his gross income from the sale of the artwork.[5]

*Respondent has Made Every Attempt to Obtain Admissions of Relevant Facts*

5. The respondent pleads a number of facts concerning the acquisition cost of the art and Mr. Sloan's involvement with the program.[6] Over the long history of Mr. Sackman's appeal, the respondent has made numerous attempts to secure this information in an expeditious manner. These attempts to obtain information have been unsuccessful.

6. Beginning in 2004, the respondent wrote the appellant asking for the cost of artwork and Mr. Sloan's role in the program. The appellant declined the Crown's request for assistance in obtaining this information.[7]

7. In 2006 and 2007, during examination for discovery, the respondent asked the appellant to provide information concerning the cost of artwork and the origins of the donation program. The respondent was again not able to obtain this information.[8]

---

[2] "Artistic Expressions '99' document, at Tab 2-A of the Respondent's Motion Record (the "Record").
[3] Reply, subpara. 11. (j).
[4] Examination for Discovery Transcript of Jeffrey Sackman (the "Transcript"), page 39, at Tab 2-C of the Record.
[5] *Artistic Ideas v Canada (MNR)*, 2008 TCC 452, [2008] TCJ no 413 at paras 24 and 102 (QL), at Tab 2-B of the Record.
[6] Reply, para. 11.
[7] Letter to Teplitsky, Colson dated September 7, 2004, at Tab 2-I of the Record; and Letter to Department of Justice, dated September 8, 2004, at Tab 2-J of the Record.
[8] Transcript, pages 157 to 162, at Tab 2-G of the Record.

3

8.  The information the respondent was seeking was very similar to that provided by Mr. Sloan during a commission held in 2006 in another tax appeal (the "Artistic appeal"). In an effort to avoid the cost of another commission, the respondent served on the appellant a Request to Admit pursuant to section 130 of the *Tax Court of Canada Rules (General Procedure)* (the "Rules").[9] The admissions sought included many findings of fact made in the Artistic appeal, including:

a)  Mr. Sloan entered into an agreement with Mark Pearlman and Allan Grossman to set up an art donation program in Canada;

b)  Mr. Sloan, Pearlman and Grossman agreed that Mr. Sloan, through Coleman, and later Silver, would give Artistic a 50 percent commission on any artwork that they sold; and

c)  Mr. Sloan paid for the appraisals provided by Leslie Fink and Edith Yeomans.

9.  By letter dated August 23, 2010, the appellant advised the respondent that he had no knowledge of and refused to admit any of the facts or documents included in the Request to Admit.[10]

***Respondent Attempts to Secure Mr. Sloan's Agreement to Attend Hearing***

10. Counsel for the respondent wrote to Mr. Sloan to make initial contact and to discuss Mr. Sloan's voluntary attendance as a witness for the respondent at the hearing.[11]

---

[9] Request to Admit, dated August 19, 2010, at Tab 2-O of the Record.
[10] Letter to Department of Justice, dated August 23, 2010, at Tab 2-P of the Record.
[11] Letter to Paul Sloan, dated August 25, 2010, at Tab 2-Q of the Record.

4

11. During a telephone conversation with counsel for the respondent, Mr. Sloan indicated he would not voluntarily attend at trial in Canada.[12]

12. Counsel for the respondent wrote to Mr. Sloan confirming his refusal to attend at trial in Canada and enclosing a copy of the transcript from the commission held in the Artistic appeal in 2006 for his reference.[13]

13. The respondent wrote to the appellant to inquire as to whether he would consent to a motion seeking the evidence of Mr. Sloan in California by way of commission.[14]  The appellant refused to consent,[15] thus necessitating this motion.

*Mr. Sloan's evidence necessary to refute appellant's documents*

14. The appellant provided the respondent with documents he says he will rely on as part of an expert report.  Among these documents are receipts from Ro Gallery in New York that he intends to rely on as evidence of the so-called retail market for the prints.[16]

15. The respondent has listed documents that challenge this so-called retail market and establish that Ro Gallery supplied prints to Mr. Sloan, for use in the Artistic program, at prices far below the so-called retail sales that the appellant intends to tender.[17]

---

[12] Affidavit of Laura Alescio sworn September 30, 2011, paragraph 19, at Tab 2 of the Record.
[13] Letter to Paul Sloan dated September 13, 2010, at Tab 2-R of the Record.
[14] Letter to Teplitsky Colson dated February 25, 2011, at Tab 2-S of the Record.
[15] Letter to the Department of Justice, dated March 1, 2011, at Tab 2-T of the Record.
[16] Invoices from Ro Gallery, at Tab 2-F of the Record; and pages 197-214 of the Transcript, at Tab 2-E of the Record.
[17] Invoices and Documents Listed in the Respondent's 2nd Supplementary List of Documents, at Tab 2-N of the Record.

5

**PART III – ISSUE**

16. The issue in this motion is whether this Court should allow the Crown's motion and issue a direction for a commission to be held in California for the taking of Paul Sloan's evidence before trial.

**PART IV – ARGUMENT**

17. The procedure for obtaining a commission is set out in sections 112 and 119 through 122 of the *Rules*. This is an appropriate case for the Court to issue a commission authorizing the taking of Mr. Sloan's evidence and a letter of request to the United States District Court for the Central District of California pursuant to sections 112 and 119 of the *Rules*.

*Direction for a Commission*

18. Before a commission will be issued, the court must be satisfied that: a) the application is *bona fide*; b) the issue is one which the court ought to try; c) the witness to be examined can give evidence material to the issue; and d) there is some good reason why the witness cannot be examined within the jurisdiction.[18]

*a) The application is made bona fide*

19. Mr. Sloan's evidence is sought for purposes of this appeal.  There is no evidence that it is sought for some other or improper purpose.

20. There is evidence before this Court that the respondent has made every effort to obtain evidence concerning the creation of the donation market through acquisition of prints

---

[18] *Crestbrook Forest Industries Ltd v Canada*, [1993] FCR 251 at p 13, footnote 13 (FCA), [1993] FCJ No. 361, Respondent's Book of Authorities ("R's BOA"), Tab 4. See also *Glaxosmithkline v Canada*, 2005 TCC 621, [2005] TCJ no 445 (QL) at para. 12, R's BOA, Tab 5.

6

later sold to donors, and that these efforts have been thwarted, leaving the respondent no option but to seek a commission.

21. The fact that the Crown conducted a third-party discovery of Artistic should have no bearing on whether this Court should grant the taking of Mr. Sloan's evidence by way of commission. The third-party discovery of Artistic was limited, by Court Order, to details concerning the size and volume of the donation market.[19] Further, much if not all of any testimony given by representatives of Artistic at trial with respect to how Coleman and Silver conducted its business in the Artistic Program would constitute hearsay. The testimony of Paul Sloan is essential and is sought in good faith.

*b) The Issue is One the Court Ought to Try*

22. The appellant is entitled to appeal the Minister of National Revenue's determination, and the respondent is entitled to respond to such an appeal.  In an earlier motion where this appellant refused the respondent access to material evidence, the Federal Court of Appeal held that the respondent is entitled to "put its best foot forward in this litigation".[20]

*c) Paul Sloan's Evidence is Material to the Issue*

23. For evidence to be "material" it must be directed at a matter in issue.[21]  Mr. Sloan's evidence is directed to a matter at issue in this appeal, namely the relevant market to be referenced by the Court when determining the fair market value of the artwork donated by the appellant.

---

[19] *Sackman v Canada*, 2008 FCA 177 at para 12, 2008 DTC 6407 [*Sackman*], at Tab 2-H of the Record.
[20] *Ibid* at para 19.
[21] David M. Paciocco, *The Law of Evidence*, 5th ed (Toronto: Irwin Law, 2008) at p. 27 – 29, R's BOA, Tab 18.

7

24. The Artistic Program is one of many art flip schemes that operated during the mid to late 1990's and early 2000's.[22] This Court and the Federal Court of Appeal agree that the fair market value of artwork donated as part of these schemes is equal to the price paid by the taxpayer to acquire the artwork.[23]

25. The circumstances leading to the donation are material to appeals from determinations of fair market value of artwork. This Court, in other decisions, has considered the origins of art donation programs, as well as the cost of the artwork to the promoters when reaching a determination of fair market value.[24]

26. The respondent's theory of the case is that there was no identifiable market for the prints before Coleman, Silver and Artistic created a market through the donation program. Mr. Sloan is able to give evidence concerning the origins of the donation program and the absence of any discernible market for the artwork before it was packaged as part of the Artistic program. His testimony is also necessary to authenticate documents necessary to challenge the appellant's anticipated expert evidence.

**d) Witness Cannot Be Examined in the Jurisdiction**

27. Paul Sloan lives in the United States of America and as such, the respondent can not compel him to attend at trial.[25]  Accordingly, the respondent has no alternative but to seek leave to conduct a commission in the United States of America in order to obtain evidence from Mr. Sloan.

---

[22] *Sackman, supra* note 20 at para 6, R's BOA, Tab 6. See also: *Nguyen v Canada*, 2008 TCC 401, 2008 DTC 4390 [*Nguyen*], R's BOA, Tab 11 and *Russell v Canada*, 2009 TCC 548, 2009 DTC 1371 [*Russell*], R's BOA, Tab 14.
[23] *Klotz v Canada*, 2004 TCC 147 aff'd 2005 FCA 158, leave to appeal to SCC refused, [2005] SCCA no 286 (QL) [*Klotz*], R's BOA, Tab 7. See also : *Nash v Canada*, 2005 FCA 386, leave to appeal to SCC refused, [2006] SCCA no 20 (QL), R's BOA, Tab 10 and *Nguyen, supra* note 23, R's BOA, Tab 11; *Russell, supra* note 23, R's BOA, Tab 14.
[24] *Nguyen, supra* note 23 at paras 11, 12, 14, 15 and 24, R's BOA, Tab 11; *Russell, supra* note 23 at paras 7, 8, 10, 11, 12 and 13, R's BOA, Tab 14; *Klotz, ibid* at paras 11, 12, 13, 14 15, 40(a)(vii) and 56, R's BOA, Tab 7.
[25] *Lido Industrial Products Ltd v Teledyne Industries*, [1979] 1 FCR 310, [1978] FCJ no 132 at paras 12 & 13, R's BOA, Tab 8.

8

*Appellant's Affidavit*

28. Mark Pearlman swore an affidavit in support of the appellant in this motion.  Mr. Pearlman's affidavit does not contain any statement that establishes or even implies that the appellant would suffer any prejudice if the respondent were able to adduce the evidence of Mr. Sloan.  Moreover, paragraphs 4, 6 and 7 of Mr. Pearlman's affidavit contain opinion and simply reiterate the appellant's arguments.  These paragraphs are not statements of fact and are improperly included in an affidavit.[26]  Accordingly, the respondent asks that this Court disregard these improper statements of opinion and argument.

29. Beyond including contents of the March 11, 2011 letter already reproduced in the Respondent's Motion Record, the only statement in Mr. Pearlman's affidavit relevant to this motion is his belief that he will be able to give evidence with respect to the origin and operation of the art donation program.[27]  While Mr. Pearlman will be able to give evidence with respect to Artistic's role in the donation program as Coleman and Silver's agent, he cannot give first-hand evidence with respect to Coleman and Silver's role in the program, how Mr. Sloan acquired the artwork or how much Mr. Sloan paid to acquire artwork.

30. Mr. Sloan is the best source of evidence with respect to the cost of the artwork to the Artistic program.  Mr. Sloan is able to attest that his companies, Coleman and Silver, purchased the donated artwork from Ro Gallery, the very gallery that the appellant's potential expert witnesses claim provided them with evidence of so-called retail sales.

---

[26] *4145356 Canada Limited v The Queen*, 2010 TCC 613 at para 11, 2011 DTC 1041, R's BOA, Tab 2. See also: *Ray v HMQ*, 2003 FCA 317 at paras 12 &13, 2003 DTC 5596, R's BOA, Tab 12.
[27] Affidavit of Mark Pearlman, sworn October 6, 2011, paragraph 10.

9

31. The appellant, acting in concert with Artistic, has attempted to prevent the respondent, and by extension this Court, from having access to information material to this appeal. The appellant and Artistic refused to provide information concerning the operation of the art donation program to the respondent both before, and during, the discovery process. The appellant has still not identified any other means available to the respondent for securing evidence concerning the acquisition of artwork and the cost of the artwork to Mr. Sloan.

*Requirements of s. 112 of the Rules*

32. The respondent has investigated the procedures required to obtain a subpoena compelling Mr. Sloan's attendance at a commission.[28] The respondent submits that Mr. Sloan ought to be paid attendance fees in accordance with those paid all witnesses before the Tax Court of Canada.  These amounts exceed the amounts required to be paid to United States witnesses.[29]

33. The respondent asks that this commission be scheduled as soon as is practicable.  The respondent anticipates that no more than one day will be required for the examination and cross-examination of this witness.  The parties will require one travel day before and after the commission.  If this Honourable Court grants the direction sought, the respondent requests that a case management conference be held in order to discuss scheduling and other practical matters.  The respondent submits that this would also be an appropriate time for the parties and the Court to discuss scheduling the hearing of this appeal.

---

[28] Kenneth C. MacDonald, *Cross-Border Litigation: Interjurisdictional Practice and Procedure,* (Aurora: Canada Law Book, 2009) at p. 189 to 191, R's BOA, Tab 17. See also: *California Code of Civil Procedure*, § 2029.100 – 2029.900 (2004), R's BOA, Tab 15.
[29] *United States Code*, Title 28, §. 1821, R's BOA, Tab 16.

10

34. The respondent will pay the travel expenses of the commissioner. This expense, as well as the expenses incurred by the parties to attend the commission, will be disbursements for costs purposes, potentially recoverable in accordance with the award of costs made by this Court.  The respondent asks that the travel costs of the parties to attend the examination be restricted to no more than $3,000.

***Leave of the Court pursuant to Section 119 of the Rules***

35. Section 119 of the *Rules* provides that a party may, with leave of the Court, examine a person on oath or affirmation before the hearing for the purpose of having the person's testimony available to be tendered as evidence at the hearing.  Section 119 sets out criteria that the Court shall take into account when exercising its discretion to direct such an examination.  The respondent relies on, in particular, paragraph 119(2)(c) which deals with the possibility that the person, here Mr. Sloan, will be beyond the jurisdiction of the Court at the time of the hearing.

***Conclusion***

36. The respondent will be prejudiced if she is not permitted to adduce the evidence of a witness in possession of evidence material to her theory of the case.  It would be open to the appellant to argue that an adverse inference ought to be drawn if the respondent did not call a witness, even a witness outside of the Tax Court of Canada's jurisdiction.[30]

37. The respondent has pursued every avenue open to her to establish the relevant facts to which only Mr. Sloan can attest.  The appellant has taken full advantage of his prerogative to refuse to admit relevant facts, including findings made by this Court, and

---

[30] *Morely v Canada,* 2004 TCC 280 (TCC), affirmed 2006 FCA 171 (FCA) at para. 65 and footnote 68, R's BOA, Tab 9

11

as a result the respondent has no alternative but to seek the evidence of Mr. Sloan through commission.

38. The denial of access to highly material information diminishes any court's ability to do justice.[31]  The appellant's repeated attempts to control access to evidence impact this Court's ability to make a fair and reasoned determination in this appeal.  Without the direction of this Court for a commission, the evidence of Paul Sloan will not be available as Mr. Sloan has made it clear he will not voluntarily attend hearing in Canada.

39. In the event that the Justice of this Court appointed to hear the commission will not be the hearing judge, the respondent asks that the commission be videotaped pursuant to section 122 of the Rules.

**PART V – ORDER SOUGHT**

40. The respondent requests that her motion for the issuing of a commission for the purpose of taking Paul Sloan's evidence in California prior to trial pursuant to sections 112, 119, 120, 121 and 122 of the *Tax Court of Canada Rules (General Procedure)* be granted with costs awarded forthwith.

ALL OF WHICH IS RESPECTFULLY SUBMITTED.

---

[31] *France (Republic) v De Havilland Aircraft of Canada Ltd. and Byron-Exarcos* (1991), 3 OR (3d) 705 (Ont CA) at para 40, [1991] OJ no 1038 (QL), R's BOA, Tab 13.